**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ADVANCED TECHNOLOGY SYSTEMS INTEGRATORS CORP.<br><br>and<br><br>INTERNATIONAL FIDELITY INSURANCE COMPANY<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | ) | Case No. 03-1953C<br>(Senior Judge Margolis) |

**PLAINTIFF ADVANCED TECHNOLOGY SYSTEMS INTEGRATORS CORP.'S MOTION FOR PARTIAL SUMMARY JUDGMENT WITH EMBEDDED LEGAL ANALYSIS**

COMES NOW Plaintiff Advanced Technology Systems Integrators Corp. ("ATSIC"), by and through its undersigned counsel, makes its Motion for Partial Summary Judgment, and states as follows:

**OUTLINE**


INTRODUCTION ........ 3

I. LEGAL ISSUES ........ 3

II. STYLE MATTERS ........ 4

STATEMENT OF BASIC FACTS ........ 5

STATEMENT OF ANCILLARY FACTS, LAW, AND ANALYSIS ........ 16

I. STANDARD FOR SUMMARY JUDGMENT ........ 16

II. THE CONTRACT WAS TERMINATED FOR CONVENIENCE ........ 16

A. Introduction. .......... 16

B. USPS waived its right to terminate for failure to complete the Project timely. .......... 18

1. *By repeatedly failing to terminate ATSIC for failure of timely completion, USPS waived its right to terminate for cause for such reason.* .......... 18

2. *USPS confirmed the waiver of its right to terminate for cause in Contract Modification No. 11.* .......... 21

C. The Postal Service terminated ATSIC prematurely. .......... 21

1. *Failure of the Postal Service plans and orders made completion impossible.* .......... 22

2. *The Postal Service terminated the Contract before the termination for completion deadline under Contract Modification No. 11.* .......... 22

(a). Calculation of delay days is required. .......... 23

(ß). Concurrent delay by the Government excuses the contractor. .......... 25

2a. *The Contracting Officer failed to include delays caused by USPS and its agents in the determination of the Contract completion date.* .......... 26

2a(i). The *Postal Service failed to pay requisitions timely and violated of Contract Disputes Act of 1978 § 605(c)(5).* .......... 26

2a(ii). *Postal Service failure to discharge its non-payment-related responsibilities.* .......... 32

2b. *The Contracting Officer failed to include weather delays and any other delays not caused by ATSIC in the determination of a revised Contract completion date.* .......... 34

3. *USPS violated the contractual requirement of a 10-day cure period.* .......... 36

4. *USPS terminated ATSIC prematurely under the September10, 2002, date specified in the second Show Cause letter.* ........................... 38

5. *USPS terminated ATSIC prematurely under Modification No. M02 of Contract No. 123125-00-B-3153 of the AMC Project.* ............... 38

D. By USPS's Actions and interactions, it breached the covenant of good faith and fair dealing. ........................................................................... 39

E. A supplier must be the cause of a failure to perform in order to be terminated for cause. ........................................................................... 42

F. The Project was adequately manned .................................................................. 42

G. The Postal Service failed to comply with termination notice requirements. ....... 43

H. The Postal Service Notice of Termination violated USPS Purchasing Manual notice requirements. .................................................................... 43

III. ATSIC IS ENTITLED TO ATTORNEY'S FEES ........................................................ 44

IV. DEFENDANT'S SOLE METHOD OF ENFORCEMENT OF THE AMC PROJECT PAYMENT IS BY SETOFF. ......................................................................... 46

## INTRODUCTION

I. LEGAL ISSUES

This Motion for Partial Summary Judgment seeks summary judgment with regard to three issues. First, for each of the several reasons set forth below, the termination of ATSIC by the United States Postal Service ("USPS") prior to completion of the subject contract should be deemed to be for convenience, not for cause as the Government contends. If the Court agrees with ATSIC that the legal consequence of the Government's actions was a termination of the contract for convenience, the Government would be precluded from asserting that ATSIC owes excess

reprocurement costs to the Government.[1]

Second, if the Court rules that the termination was for convenience, then the Court may also rule that the Government was not substantially justified in terminating ATSIC for cause and issuing its decision that ATSIC owed excess reprocurement costs. If the termination for cause was not substantially justified, then ATSIC is entitled to attorney's fees from the Government.

Third, the parties entered into a Settlement Agreement prior to termination of the subject project (the "P&DC Project") regarding resolution of a claim on a different Postal Service project (the "AMC Project"). The Settlement Agreement provides for a payment of a specified sum to the Postal Service, but explicitly specifies that payment shall be made from funds actually received by ATSIC thereafter from the Government on the P&DC Project. The Government contends that, notwithstanding the explicit payment method set forth in the Settlement Agreement, ATSIC must pay the Government the amount stated in the Settlement Agreement, and further contends that the amount should be added to the excess reprocurement costs for the P&DC Project.

## II. STYLE MATTERS

The Defendant may be known as the "United States," the "Government," the "Postal Service," or "USPS." Plaintiff Advanced Technology Systems Integrators Corp. shall be known as "ATSIC." Plaintiff International Fidelity Insurance Company may be known as "International Fidelity."[2]

---

[1] If ATSIC has no liability for excess procurement costs, neither does its surety, International Fidelity Insurance Company ("IFIC"), as the surety's liability is co-extensive with its principal's liability.

[2]The Contract incorporates USPS Facilities Department Contract Requirements, reference to which are denoted in this Motion as F.D. §___. References to the sections of the United States Postal Service Purchasing Manual shall be denoted as "Purch. Man.§____." Each Contract

References to individuals shall generally be by last name. References to depositions shall be denoted by the last name of the witness, followed by the page and lines of the transcript, such as "Warren dep. at ___:___." The transcripts of the depositions are all contained in a joint appendix prepared, by agreement, by the Government, which is to be filed at the time of filing the parties' cross motions for summary judgment.

The documents referenced in this Motion are of two types. First, there are documents that were identified as exhibits at one of the depositions, which were sequentially numbered throughout the depositions and are denominated "Dep. Ex. ___." These documents are found in Plaintiff's Appendix of Deposition Exhibits, which is filed separately from this Motion.

Second, there are additional documents identified in ATSIC's Motion for Partial Summary Judgment, which are denominated "Mot. Ex. ___." These documents are found in Plaintiff's Appendix of Exhibits Attached to the Motion, which is filed separately from this Motion.

The parties have stipulated that, for purposes of the cross summary judgment motions, the additional documents are deemed to be authenticated without the need for verification by affidavit or deposition, unless timely objection to the authenticity of a document is raised by an opposing party.

**<u>STATEMENT OF BASIC FACTS</u>**

1. The claims of ATSIC, as set forth with more specificity below, arise out of its performance under Contract No. 123125-00-B-3154 - Project H54096 (the "Contract"), which

---

modification may be known as "Mod. ___." Federal Acquisition Regulations may be known as "FAR §____."

project was also known as the Miami P&DC Security & Access Control (the "Project" or the "P&DC Project"), issued by the USPS to ATSIC. Mot. Ex. 1 (the Contract). The surety for ATSIC was International Fidelity. Dep. Ex. 3, 5. The Project included the acquisition and installation of both interior and exterior security components on a USPS facility.

2. The initial contract amount was $1,308,990.00. The Contract provided a performance time of 230 days. The Contract contains a time is of the essence clause and a liquidated damages clause.

3. On October 3, 2000, the USPS issued its Formal Notice to Proceed for the Project as of January 15, 2001. Mot. Ex. 2 (Formal Notice to Proceed). The Notice specified a Contract duration of 230 days and a completion date of September 2, 2001.

4. During the period that ATSIC performed work under the Contract, USPS required and/or directed changed, extra, or additional work, requiring modification to the initial Contract. ATSIC submitted proposed change orders for processing of the USPS-directed modifications to the Contract in which ATSIC requested both (i) an equitable adjustment of the compensation for the extra work required by USPS to be performed under the Contract and (ii) equitable time extensions to perform that work. USPS failed to process properly the proposed change orders and requests for the USPS-directed modifications. As set forth below, despite USPS or SEC directing or ordering the changes, USPS failed to act on some change orders for more than ten (10) months. Dep. Ex. 57.

5. The original Project Manager for both the P&DC Project and another USPS project for which ATSIC was awarded a Contract (the "AMC Project"), was the architect, José E. Blanco, but he was indicted, and ultimately imprisoned, for fraud relating to other Government contracts. The Project Engineer, Stuhl Engineering Contractors, Inc. ("SEC"), with its principal, Joseph Stuhl,

was thereupon elevated to the position of Project Manager, despite SEC's lack of sufficient experience as a Project Manager.

5.1. ATSIC, which had already been working with SEC as the Project Engineer on both the P&DC and the AMC Projects, protested both orally and in writing SEC's elevation to a position for which it was not suited or prepared. Vento dep. 32:11-33:7, 159:9-160:5, and Dep. Ex. 5. Subsequent events proved that ATSIC's concerns were well-founded, as Joseph Stuhl:

(i) made obstructive, parochial decisions in violation of the Contract specifications, Vento dep. 86:24-90:22 (Stuhl refused to allow the use of an approved equipment vendor specified in the accepted bid, attempted to require use of the only vendor with which he was familiar, and finally agreed on a third vendor and required reduction of the contract price) ;

(ii) repeatedly made decisions that retarded the progress of the Project, Vento dep. 157:8-159:5 (Stuhl's fickle decision-making and errors and miscalculations regarding conduit); Warren dep. 44:25-46:16 (Stuhl would write reports that were different than the statements he made on-site); Dep. Ex. 54, 59;

(iii) failed to make timely decisions necessary to prosecute the work on the Project, including withholding change order approval for changes required by Stuhl for more than ten months after submittal, Vento dep. 157:8-159:5 (Stuhl withheld decisions necessary to the critical path of the Project), 163:20-164:14 (ATSIC had waited for approval for some change orders for over ten months), 164:21-165:19 (four change orders were never approved, so the changes required by Stuhl could never be completed); Dep. Ex. 54, 58;

(iv) repeatedly and consistently reduced and delayed approval of ATSIC's payment requisitions, often after orally approving them on-site, Vento dep. 135:3-136:22 (the Post Office did

not put requisitions on their list to be paid until four to six weeks after receipt) ; Warren dep. 32:23-34:15 (reduced pay requisitions by 75% from the amounts approved by Stuhl), 39:9-23 (withholding of 75%), 114:16-115:10 (withholding of 75% of pay requisitions), 127:7-21(Stuhl approved portions of the work and then later said that it was not done, in order to cur pay requisitions), 131:24-132:16 (re 75% retainage); Zamora dep. 72:12-73:10 (USPS cut the last pay requisition from $93,759 to $63,000 without specifying what was being cut), 83:11-84:9 (payments cut 75%); Dep Ex. 20, 25, 40 (protesting 75% retainage), 54 (protesting SEC's arbitrary and contradictory reduction of pay requisitions based on how Mr. Stuhl "feels" on any given day, rather than on the approved progress on the Project), 59;

(v) overlooked Postal Service irregularities, Vento dep. 139:5-21 (USPS refused to pay for the repair for a gate that was installed by ATSIC and then later hit by a USPS truck);

(vi) submitted false reports, Warren dep. 40:20-41:16 (Stuhl says something at a meeting and writes a report saying something completely different), 45:25-47:5 (discrepancies between on-site discussions and Stuhl's written letters and reports that were "not accurate in many cases"), 108:22-110:7 (items documented "partially incorrectly"); Zamora dep. 60:24-61:9(discrepancies between what Stuhl said was complete and what was actually complete) , 77:1-78:22 (SEC dunning ATSIC for a Contract reduction despite previous approval by SEC); Dep. Ex. 36, 37, and

(vii) repeatedly and consistently agreed to one method of Project implementation on-site, only to return to his office in Orlando and issue later reports requiring a different method of implementation than he had previously approved. Vento dep. 34:12-35:18 (Stuhl would approve work on-site, refuse to sign off on-site, and send a letter saying the work was not done), 79:11-22 (Stuhl refused to give a change order for work already done requiring digging underneath concrete),

160:8-161:20 (change orders prosecuted as required by Stuhl, but not paid), 164:21-165:19 (four change orders were never approved); Warren dep. 128:20-130:7 ["the pay ap (sic: app)would be changed or the report would be different that the walk-through said"]; Dep. Ex. 23, 56, 58, 59.

5.2. In addition to elevating SEC and Mr. Stuhl to a position for which they were unsuitable, the Contracting Officer, first Ronald Grzymala and later Jerry Goddard, collaborated with Mr. Stuhl in the items described in Paragraphs 5.1 and maliciously and unprofessionally interfered in the prosecution of the work. Warren dep. 101:19-103:18 [Jerry Goddard was unprofessional and malicious. "He just wasn't proceeding in a matter (sic: manner) of a business fair relationship. It was more setting the stage for the kill or for the claim."]. They wrote formal letters with incorrect or incomplete information that formed the basis for legal consequences. See Dep. Ex. 5, 19, Warren dep. 121:25-124:6 (using SEC letters to rebut Goddard's allegations in the second Show Cause letter). They promised to expedite payments, but, instead, cut them and then did not approve the reduced payment for more than two months, which was untimely by more than one month under the Contract. Warren dep. 119:13-120:23, 134:6-135:5 (Goddard failed to pay 100% of material costs, as agreed); Zamora dep. 78:23-80:3 (USPS failure to approve Modifications stopped all work to which SEC and ATSIC had previously agreed), 80:7-81:1 (Stuhl duns ATSIC for failure to complete modification work that USPS has not approved, and ATSIC responds to Contracting Officer); Dep. Ex. 17, 20, 26, 37, 38.

6. September 2, 2001, the initial completion date under the Contract, passed without USPS terminating the Contract. USPS did not seek an extension agreement with ATSIC; accordingly, the failure to terminate by USPS constituted a waiver of the completion date under the Contract.

7. When a contractual due date has passed and the contract has not been terminated for default within 30 days, then an inference is created that the Postal Service's right to terminate for default has been waived. Purch. Man. §6.9.3b4(a). By its failure to terminate ATSIC for default when USPS arguably had the right to do so, the USPS waived its right to enforce the time of performance clause and the liquidated damages clause contained in the Contract. ATSIC relied on this waiver and continued performing under the Contract.

8. On January 4, 2002, one hundred twenty four (124) days after the specified Contract completion date, the USPS gave ATSIC its first Show Cause letter, which warned ATSIC of possible termination of the Contract for failure to timely complete the project. Mot. Ex. 3. ATSIC continued to perform work required under the Contract, and USPS did not terminate ATSIC at that time, resulting in a renewal of the waiver of the right to terminate for default. Purch. Man. §6.9.3. b4(a).

9. On March 12, 2002, USPS, by and through its Contracting Officer, executed Contract Modification No. Eight (8), which increased the contract price to $1,351,961.14, but did not grant an extension of time to complete the project. The stated completion date remained September 10, 2001. Mot. Ex. 4 [Contract Modification No. Eight (8)]. By executing Contract Modification No. Eight (8), the Contracting Officer (i) explicitly acknowledged that ATSIC's work on the Project was approximately six months beyond the required (but waived) completion date for the Project, and (ii) confirmed his intention to waive the time of performance clause and liquidated damages clause in the Contract. ATSIC relied on this waiver, and continued to perform work under the Contract, resulting in a renewal of the waiver of the right to terminate for default. Purch. Man. §6.9.3. b4(a).

10. On May 1, 2002, two hundred thirty-three (233) days after the revised Contract

completion date, USPS gave ATSIC its second Show Cause letter, which warned ATSIC of possible termination of the Contract for failure to timely complete the Project. This letter explicitly recited a revised contract completion date of September 10, 2002. Dep. Ex. 5. Once again, USPS did not terminate ATSIC at that time. By again failing to terminate ATSIC for default when USPS arguably had the right to do so, USPS again (for the third time) waived its right to enforce the time of performance clause and the liquidated damages clause in the contract. ATSIC again relied on the USPS waiving its right to terminate ATSIC for default and continued performing under the Contract, again resulting in a renewal of the waiver of the right to terminate for default. Purch. Man. §6.9.3. b4(a).

11. During the course of the Project, ATSIC submitted approximately twelve (12) change orders or contract modifications to USPS, of which the first nine sought equitable adjustments in the time of performance or the cost of the work. An ongoing dispute developed between ATSIC, on the one hand, and the USPS and its Project Engineer, on the other hand, regarding these issues. See Paragraph 5.1(iii), above. ATSIC made payment requests, all or a portion of which were in dispute or not acted upon by the Contracting Officer within a reasonable time. See Par. 5(iv) and (vii), above. In each case the disputed sum was less than $100,000.00. Such disputed requests constituted claims, and USPS's failure to issue a timely decision violated Section 605(c)(5) of the Contract Disputes Act of 1978.

12. ATSIC and USPS purported to compromise and settle their prior disputes by execution of Contract Modification No. 11, which, although previously executed by ATSIC, was not executed by Goddard for USPS until June 20, 2002. This Modification purported to establish a new contract completion date of July 15, 2002, thereby extending the original contract completion

date by 308 calendar days.[3] Vento dep. 104:24-107:15; Dep. Ex. 31A.[4] Contract Modification No. 11 further provided that "[i]f ATC has not completed the project by 7/15/02, Liquidated Damages of $100/day will be reinstated beginning on 7/15/02 and continuing until building acceptance." Contact Modification No. 11 was executed under duress of non-payment. Vento dep. 107:16-109:14 (although agreed on May 29, 2002, which would barely provide ATSIC the time necessary to complete the Project with USPS cooperation, Goddard did not sign it until June 20, when half of the seven week period had elapsed; ATSIC had no choice but to sign in order to get money into the Project); 113:20-114:6 (cut pay requisition from $110,000 to $63,000).

13. On July 15, 2002, which was 25 days after execution of Contract Modification No. 11, USPS gave ATSIC its third Show Cause letter, which warned ATSIC of possible termination of the Contract for failure to complete the Project by July 15, 2002. Dep. Ex. 9; Vento dep. 109:22-111:3. ATSIC responded in two letters explaining the extent of required extensions due to weather delays and due to the USPS failure to meet contract payment requirements. Vento dep. 111:4-13;

---

[3] Modification No. 11 recites that the Contract is extended by 293 calendar days for a revised completion date of 6/30/02. Correct calculation would yield July 3, 2002. The discrepancy is partially explained by the interlineation of the completion date to 7/15/02. Dep. Ex. 31A.

[4] Two versions of Modification No. 11 were identified. The one marked Exhibit 31 showed a contract completion date of 6/30/02, with liquidated damages to start on 7/15/02 (interlineated) if the project is not completed by 6/12/02. Dep. Ex. 31. The one marked Exhibit 31A showed a contract completion date of 7/15/02 (interlineated), with liquidated damages to start on 7/16/02 (interlineated) if the project is not completed by 7/15/02 (interlineated). Dep. Ex. 31A. Although ATSIC believes that Exhibit 31A is the actual document used by the parties, at least in part because the document was not signed by USPS Contracting Officer Jerry Goddard until June 20, 2002 (eight days after the date for liquidated damages to commence as set forth in Exhibit 31), which view may well be corroborated by Jerry Goddard when his deposition is taken, none of the arguments presented by ATSIC in this Motion turns on the question of which is the correct document.

Warren dep. 148:25-150:4; Dep. Ex. 21, 33.

14. Simultaneously with the issuance of its third Show Cause letter, on July 15, 2002, USPS issued a letter directing ATSIC "to immediately cease all work at the job-site until further notice." Dep. Ex. 32; Vento dep. 111:14-112:9, 127:1-128-7.

15. The USPS Contracting Officer, Jerry Goddard, issued his Termination for Default on August 16, 2002. Dep. Ex. 12. The termination was based on (i) failure to complete the Contract by July 15, 2002, (ii) unsatisfactory progress, and (iii) failure to man the project adequately. The termination letter stated that the "explanation offered by ATC, Inc. was not an acceptable cause for delay."

16. On June 20, 2002, the USPS Contracting Officer issued Modification No. M02 on Contract No. 123125-00-B-3153 (the AMC Project) in which the parties agreed (i) that ATSIC would be terminated for convenience from the AMC Project contract and (ii) "TOTAL AMMOUNT (sic: AMOUNT) TO BE WITHHELD FROM [P&DC] PROJECT contract no. 123125-00-B-3154 ($52,137.10) With extension of 271 calendar days for revised completion date of 12/19/02." Dep. Ex. 53; Vento dep. 155:17-21.

17. On February 8, 2002, USPS had issued directions to ATSIC not to continue on specified portions of the Project work due to matters, such as air conditioning issues and the need for design plans to be issued by the Postal Service, that needed to be resolved before ATSIC's work in those areas could be concluded. These were not the responsibility of ATSIC. Vento dep. 55:1-57:16, 116:8-117:11, 161:21-162:9, and Dep. Ex. 56. USPS never rescinded or revised these directions, thus making completion of the Project <u>impossible</u>. Vento dep. 129:10-130:3, 130:15-132:6. A significant portion of the work remaining unfinished between February 8, 2002, and the

date when ATSIC was terminated was directly related to the control room work that ATSIC was required by USPS not to complete. Vento dep. 116:18-117:11; Zamora dep. 32:6-22; Dep. Ex. 34 ("Microsoft Project" printout).

18. By June 20, 2002, USPS had paid ATSIC approximately $1,078,719.20 (per testimony) or $1,069,563.10 (per Dep. Ex. 54) or $1,089,686.25 (per Dep. Ex. 40) under the Contract, excluding retainage as provided for by the Contract. Thus, by no later than June 20, 2002, more than 82 percent of the Contract value had been earned and paid to ATSIC under the Contract. Moreover, additional work in the amount of approximately $116,392.81 had been completed by May 20, 2002, and requisitioned by ATSIC, but not yet paid. Thus, the total of the work completed by that date, all of which had been approved by the Project Manager, SEC, was approximately $1,195,112.01, which constituted over 91% of the original Contract amount. See Vento dep. 132:17-133:3.

19. After the Contracting Officer issued the Termination for Default on August 16, 2002, Dep. Ex. 12, USPS made a demand for damages relating to its costs of completion of the Contract in the amount of $900,939.30. Despite over 91% completion of the Contract at the time of the default termination, USPS claimed that it cost more than 65% of the initial Contract amount to complete the work.

20. At the time the Contracting Officer issued the final decision to terminate the Contract, Contract funds in the amount of $269,671.61 remained, which was more than enough to complete the remaining Contract work.

21. Joseph Stuhl of SEC consistently manifested his intention to terminate the Contract prematurely and divert Project funds to friends and favored parties. Vento dep. 85:24-86:14, 96:4-

97:3, 147:4-148:1. As just two examples:

21.1. Mr. Stuhl made no secret that he wanted Tri-State Life Safety & Electric System, Inc. ("Tri-State"), the company that was ultimately retained to complete the Project, to be retained for that purpose. Vento dep. 99:11-101:20, Warren dep. 77:4-22, and Dep. Ex. 18. When Mr. Stuhl became completely intractable, and he and Mr. Goddard refused to approve payment requests and change orders, some of which were more than ten months old, ATSIC contacted Tri-State to ask Tri-State to consider completing the P&DC Project for ATSIC. Tri-State was interested in doing so for approximately $215,000.00, which was less than the amount remaining and unpaid under the Contract. Dep. Ex. 20 (showing $269,672.21 remaining unpaid). After a site visit by Tri-State followed by finalizing discussions, Tri-State suddenly stopped communicating with ATSIC, and Stuhl agreed to a resolution of the outstanding issues in return for a short extension of the completion date, which was reduced to 3 1/2 weeks by Goddard's late signing of the Modification. See Par. 12, above. At the end of the 3 ½ weeks, without Stuhl lifting the restrictions against completing some portions of the work, ATSIC was terminated. Tri-State was then retained by the Postal Service to complete the Project at a substantially higher contract price than the amount it had discussed with ATSIC. Vento dep. 101:21-104:23, 149:2-14; Warren dep. 78:15-24; Dep. Ex. 18.

21.2. After terminating ATSIC, but expecting to charge it excess reprocurement costs, Mr. Stuhl actively and candidly diverted funds, meanwhile expending unnecessary funds, by diverting work to his "good buddy," Joseph Erickson. Three emails between Messrs. Stuhl and Erickson clearly illustrate the diversion. Mot. Ex. 5, 6, and 7. In Exhibit 5, Mr. Stuhl writes, "I think there is some extra money left in the contract," and, then, tongue in cheek, "Thanks for making this easy on me, we both know that you had a chance to take advantage of the dumb engineer." In

Exhibit 7, Mr. Erickson, writing to Mr. Stuhl about the "gate situation," which was still not resolved more than 21 months after ATSIC ceased working, and speaking of the Postal Service management, says candidly (because he was only addressing his "good buddy") that "they deserve what they get and (sic) unless and until sane management comes to the District."

## STATEMENT OF ANCILLARY FACTS, LAW, AND ANALYSIS

### I. STANDARD FOR SUMMARY JUDGMENT

> A grant of summary judgment is appropriate "where the record shows 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"

*Info. Sys. & Networks Corp. v. United States,* 437 F.3d 1173, 1176 (Fed. Cir. 2006), *citing Argent v. United States*, 124 F.3d 1277, 1280 (Fed. Cir. 1997), *quoting Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 799 (Fed. Cir. 1993).

### II. THE CONTRACT WAS TERMINATED FOR CONVENIENCE

#### A. Introduction.

The relevant portion of Section H.6, Termination for Default, of the USPS Facilities Department Contract Requirements, which the USPS Contracting Officer referenced in his first Show Cause letter (Mot. Ex. 3), provides as follows:

> **H.6 Termination for Default**
> **(Clause B-13) (January 1997)**
>
> a.
>
> (1) The Postal Service may, subject to Paragraphs c and d below, by written notice of default to the supplier, terminate this contract in whole or in part if the supplier fails to:
>
> (a) Complete the requirements of this contract within the time specified in the contract or any extension;
>
> (b) Make progress, so as to endanger performance of this contract (but see paragraph d below); or

(c) Perform any of the other provisions of this contract (but see subparagraph a.2 following).

(2) The Postal Service's right to terminate this contract under a.1(b) and (c) above may be exercised if the supplier does not cure the failure within ten days (or more is authorized in writing by the contracting officer) after receipt of the notice from the contracting officer specifying the failure.

. . .

c. . . . the supplier is not liable for any excess costs if the failure to perform the contract arises from causes beyond the control and without the fault or negligence of the supplier.

. . .

g. If, after termination, it is determined that the supplier was not in default, or that the delay was excusable, the rights and obligations of the parties will be the same as if the termination had been issued for convenience.

Pursuant to Section H.6g, if the supplier (ATSIC) is not found to be in default, as defined under the terms of the applicable contract and applicable law, then the termination will essentially be deemed to be for convenience. Due to each and all of the following factors, each of which is sufficient for the Court to determine that the supplier is not at fault under the Contract and the law, termination of ATSIC in this matter should be deemed to be for convenience:

(i). USPS waived termination for cause as a remedy by course of dealing.

(ii). USPS waived termination for cause in Modification 11.

(iii). The Contracting Officer ordered ATSIC to stop work on the Project prior to the date and time permitted under Modification 11.

(iv). The Contracting Officer was required to, but failed to, include delays caused by USPS and its agents in the determination of the Contract completion date.

(v). The Contracting Officer was required to, but failed to, include weather delays and any other delays not caused by ATSIC in the determination of the Contract completion date.

(vi). USPS violated the contractual requirement of a 10-day cure period.

(vii). USPS failed to reinstate any right to terminate for fault.

(viii). USPS breached the covenant of good faith and fair dealing.

(ix). A supplier must be the cause of a failure to perform in order to be terminated for cause.

(x). The postal Service failed to comply with termination notice requirements.

> Because of the drastic nature and effect of terminations for default, they are disfavored.
>
> A termination for default is a "drastic sanction" which can have a severe negative impact on a contractor's eligibility for other contracts. *Lisbon Contractors v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987). n14
>
> n14 See generally, John Cibinic, Jr. and Ralph Nash, Administration of Government Contracts, 3d ed., at 902 (since a default termination not infrequently leads to the contractor's financial ruin, the Court of Claims has branded default termination a species of forfeiture). *De Vito v. United States*, 188 Ct. Cl. 979, 413 F.2d 1147 (1969).

*International Resource Recovery, Inc. v. United States*, 64 Fed. Cl. 150, 163 (2005).

B. <u>USPS waived its right to terminate for failure to complete the Project timely.</u>

1. *By repeatedly failing to terminate ATSIC for failure of timely completion, USPS waived its right to terminate for cause for such reason.*

USPS consistently and repeatedly ignored completion dates without seeking contract extensions. See Paragraphs 6, 8, 9, and 10, above. Pursuant to *DeVito v. U.S.*, 413 F.2d 1147 (Ct. Cl. 1969), any one of these missed "due dates" was sufficient to create inference that the deadline is waived. *Bernardi Brothers v. United States*, 47 Fed. Cl. 708 (2000) (The Postal Service waived its deadline, thereby making time not of the essence, by allowing the [contractor] to continue its efforts under the contract after the deadline established by agreement). Numerous such dates were ignored in this case, which resulted in the waiver of any deadline and created a course of dealing.

> Waiver operates to deprive the government of its right to terminate for default when the government fails to terminate a contractor within a reasonable time after the circumstances that form the basis for termination arise, and the contractor relies to its detriment on the forbearance by continuing with performance. *De Vito v. United States*, 413 F.2d 1147, 188 Ct. Cl. 979, 991 (1969) (discussing government's inability to terminate a contractor for failure to deliver by due date because it waited too long to do so). Stated differently, "waiver or election is binding, not because of consideration, but on principles of fair dealing or estoppel." John Cibinic, Jr. & Ralph Nash, Jr., Administration of Government Contracts 963 (3d ed. 1995).

*Aptus Company v. United States*, 61 Fed. Cl. 638, 650 n.19 (2004).

ATSIC continually relied on the Postal Service forbearance to forge ahead with the portion of the Project that it was permitted to prosecute.[5] ATSIC thereby incurred increased, exaggerated overhead during the excessively long Postal Service delays.

Although it is possible to create a new completion date after a contracting officer creates a waiver by delay in issuing a notice of termination for default, any attempt to do so in Modification No. 11 (Dep. Ex. 31) in the instant case was unavailing for several reasons, as set forth below. Also as set forth further in subsections below, the Postal Service failed to comply with the Purchasing Manual Requirements, as follows:

> 6.9.3 **Termination for Default**
> . . .
> 6.9.3.b *Fixed-Price Contracts*
> . . .
> 4. *Initiating Termination -- Failure to Make Timely Delivery*
> . . .
> (c) If a contracting officer's delay in issuing a notice of termination for default results in a waiver of that right, a new delivery date must be

---

[5]ATSIC was directed not to proceed on certain items and areas (such as the control room, in which SEC had to issue new air conditioning plans prior to ATSIC proceeding), none of which was the responsibility of ATSIC. See Paragraph 17, above. Further, SEC required a number of modifications and change orders, but then the Contracting Officer failed or refused to sign them for 10 months or more. See Paragraph 5.1(iii), above, and Dep. Ex. 57.

> established by bilateral or unilateral modification of the contract. The new delivery date must be reasonable considering all the circumstances of the contract performance. When the new date is established, the right to terminate for default is reinstated.

The new delivery date was not established, notwithstanding Modification No. 11, because (i) the proposed new date in Modification No. 11 was not reasonable considering all the circumstances of contract performance (see Section IIC2, below), and (ii) Modification No. 11 was executed under duress. Vento dep. 107:16-109:14 and 113:20-114:6.

The execution of Contract Modification No. 11, Dep. Ex. 31A, which will be discussed further in Section IIC2, below, is unavailing to remedy USPS's notice failure, because Contract Modification No. 11 explicitly reinstated or created the remedy for a time of completion default of a liquidated damages provision, which had been previously waived, but it did not reinstate the right to terminate ATSIC for default for failure of timely completion. Dep. Ex. 31A.

Alternatively, the Postal Service also failed to comply with the requirements of Part 49 of the Federal Acquisition Regulations. As stated in Paragraphs 6, 8, 9, and 10, *supra*, USPS had taken action that "might be construed as a waiver of the Contract delivery or performance date." FAR §49.402-3(c). In order to set a new date for the Contractor to complete performance, USPS was required to send a notice to the Contractor, which notice must have reserved "the Government's rights under the Default clause." *Id.* The Postal Service failed to give ATSIC notice of a new completion date that reserved the Postal Service's rights under the Default clause. Therefore, under FAR, the Postal Service had no right to enforce a time of completion default clause and had no right to terminate ATSIC for default for failure to meet a time of performance deadline.

The Postal Service never established a new, reasonable, delivery date, as required by Section

6.9.3b4(c) of the Purchasing Manual. The Postal Service also failed to follow the FAR §49.402-3(c) procedures after action that might have been construed as a waiver. Therefore, USPS was barred from terminating ATSIC for default.

2. *USPS confirmed the waiver of its right to terminate for cause in Contract Modification No. 11.*

USPS had previously waived the original contract completion date. See Section IIB1, above. By entering into Contract Modification No. 11, Dep. Ex. 31A, the parties agreed, *inter alia*, to an exclusive remedy for failure of completion. By virtue of the negotiated solution culminating in Contract Modification No. 11, USPS reinstated its right to liquidated damages beginning on July 15, 2002, as its exclusive remedy for failure of completion. Dep. Ex. 31A ("If ATC has not completed the project by 7/15/02, Liquidated Damages of $100/day will be reinstated beginning on 7/15/02 and continuing until building acceptance."); Vento dep. 150:25-151:24. USPS did nothing to reinstate the waived contract provision permitting the USPS to enforce the time of performance clause by terminating ATSIC for default. The choice of termination for default due to failure of timely completion was both passively waived by USPS inactivity (See Section IIB1) and then affirmatively superseded by USPS's execution of Contract Modification No. 11.

C. <u>The Postal Service terminated ATSIC prematurely.</u>

ATSIC could have completed the Project timely, if the Postal Service had cooperated, had released funds for completed work, and had granted a reasonable extension for weather delays. ATSIC's on-site Project Manager, José Zamora, was asked that question at deposition:

> Q. Was it your understanding at this time that if Advanced Technology, in cooperation with the government, had had sufficient funds and if the rain had not intervened that the project would have been able to be completed according to this schedule that's set forth here?

A. At that time they should have been able to have been (sic) completed.

Q. According to the schedule?

A. Yeah.

Zamora dep. 97:23-98:7; Dep. Ex. 17.

1. *Failure of the Postal Service plans and orders made completion impossible.*

USPS's explicit written instructions not to complete the control room, issued approximately six months prior to ATSIC's termination, with the result that many other items and components could not be completed or installed, were never rescinded. See Paragraph 17, *supra*, and Dep. Ex. 56. Even after Modification No. 11 was executed, which granted a specific contract extension, USPS failed to rescind or countermand the instructions not to proceed on these items critical to substantial completion of the Contract.

Without rescission of these instructions, as well as decisions regarding critical path issues, it was not possible for ATSIC to complete the work. Dep. Ex. 54, items 3, 5, and 6; Vento dep. 156:22-159:5. These orders remained in effect, even through the dates that ATSIC was ordered to stop work and that ATSIC was terminated. Thus, USPS made it impossible to complete the Contract. Taking into account these facts and circumstances, as required under Section 6.9.3b4(c) of the Purchasing Manual, the new completion date was not reasonable and the Contracting Officer was required to extend the contract completion date a reasonable period after the restrictions were rescinded.

2. *The Postal Service terminated the Contract before the termination for completion deadline under Contract Modification No. 11.*

Simultaneously with the issuance of its third Show Cause letter, on July 15, 2002, USPS

issued a second letter directing ATSIC "to immediately cease all work at the job-site until further notice." Dep. Ex. 32. Even if the USPS did have the right to terminate ATSIC for failure to complete the work by July 15, 2002, ATSIC could not be in default until July 16, 2005, Vento dep. 149:16-150:24 and Dep. Ex. 31A, supplemented by authorized, required delay days. The letter from the USPS requiring ATSIC to cease in ATSIC's attempt to complete the work was issued prior to the expiration of the contracted completion deadline. ATSIC cannot be at fault for failing to complete the work by the deadline, when the USPS ordered ATSIC to stop work prior to the deadline.

Suspension of the work by the Contracting Officer requires an extension of the Contract. F.D.§C.2a. Unless the termination is construed as a termination for convenience, USPS's order for ATSIC to stop work prior to the deadline, (i) made it impossible for ATSIC to have the full, contracted time to complete the job before that deadline, (ii) violated the requirement of a 10-day cure period after notice of a specified failure, and (iii) constituted a clear and direct breach by USPS of the Contract Modification No. 11 deadline executed less than a month earlier. Furthermore, because the suspension of work occurred prior to the deadline, and was never lifted, ATSIC still, to this day, has never received the required Contract extension. Therefore, any termination of ATSIC for failing to meet the completion date cannot be for cause.

(a). Calculation of delay days is required. In order to find termination for default based on failure of timely completion, the Government must show "that it was reasonable for the [Postal Service] to conclude that [ATSIC] would be unable to complete the project by the proper completion date." *See Danzig v. AEC Corporation,* 224 F.3d 1333, 1336 (Fed. Cir. 2000). Because the completion date of July 15, 2002, set forth in Modification No. 11 was subject to

weather delays and payment delays, and because, most importantly, the Postal Service never rescinded its orders for ATSIC not to proceed on certain items due under the Contract, the written plans of which were completely under the control of the Postal Service, the Postal Service was never in a position to be able to determine whether the contractor would be able to complete the project by a particular completion date. In fact, until the forgoing issues were resolved, it was impossible for the Postal Service to determine a proper, final completion date. ATSIC had consistently, for many months, indicated that the Project could be completed in two months. By promulgation of the Microsoft Project report, Dep. Ex. 17, ATSIC indicated that the project could actually be completed in less than six weeks with the Government's cooperation on the forgoing issues. That cooperation was never forthcoming, so it was never possible for the Government to specify a "proper completion date."

> ("[A] court's review of default justification does not turn on the contracting officer's subjective beliefs, but rather requires an objective inquiry.") It requires the court to consider whether the contracting officer's decision to terminate for failure to make progress was reasonable given the events that occurred before the termination decision was made. *Id*. at 1017.

*Empire Energy Management Systems, Inc. v. Roche*, 362 F.3d 1343, 1357-58 (Fed. Cir. 2004), *citing McDonnell Douglas Corp. v. United States*, 323 F.3d 1006, 1017 (Fed. Cir. 2003).

A reasonable analysis requires the Postal Service to compare the number of days required to complete the Project with the number of days of excusable delay. *Empire Energy*, *supra*, 362 F.3d at 1358. Even without regard to the Postal Service's failure to rescind its order not to proceed on certain items, the Postal Service dismissed ATSIC's explanation for excusable delay and failed to present any analysis of the permitted excusable delay versus the time necessary to complete the Project.

Even if the Contracting Officer is permitted to determine whether it is reasonable to expect the supplier to complete the project in the time remaining, when making that determination he is required to extend the completion date to take into account delays caused by weather, the Postal Services's own delays and failures, and, in this odd case, the fact that the Postal Service still had not authorized that work be done (or provided the plans for the air conditioning so that the supplier's work could be done) in the control room. Based on the undisputed facts that (i) the extension was negotiated in May of 2002 and gave ATSIC through July 15, 2002, and (ii) ATSIC's own Project Close-Out Schedule (prepared at the USPS Contracting Officer's request, Warren dep. 63:17-64:24) showed that the remaining work would take approximately five weeks once ATSIC was freed to do the work, Dep. Ex. 17 and Warren dep. 68:21-70:6, it is impossible for the Contracting Officer to have reasonably concluded that the work could not be done timely. Thus, he had no legal or contractual basis to terminate the contract prematurely, even if only by one day, and the improper termination must be deemed for convenience.

(ß). Concurrent delay by the Government excuses the contractor. When seeking extensions of a contract completion date due to contract changes and excusable delay, the contractor must establish by a preponderance of the evidence the existence of an excusable cause of delay and the extent to which the completion of the contract work as a whole is delayed. *Morganti National Inc. v. United States*, 49 Fed Cl. 110, 132 (2001). However, if the court determines that the Government contributed to the delay, "the fact that the contractor may also have caused concurrent delay is not fatal to the contractor's claim for additional time due to excusable delay." *Id*. "If a period of delay can be attributed simultaneously to the Government and the Contractor, there are said to be concurrent delays, and the result is an excusable but not a

compensable delay." *Id., citing Weaver-Bailey Contractors, Inc. v. United States*, 19 Cl. Ct. 474, 476 (1990).

Even if the Court were to determine that ATSIC bore any fault for the failure of timely completion, the numerous material, substantial mistakes and failures of the Postal Service and its agents detailed above (this Section and Paragraph 5.1) requires the Court to determine that the delays were concurrent. Such a determination requires the Court to conclude that the Postal Service was required to provide ATSIC additional time to complete the Project, and its failure to do so requires that the termination be deemed for convenience, rather than for default.

2a. *The Contracting Officer failed to include delays caused by USPS and its agents in the determination of the Contract completion date.*

On July 15, 2002, which was 25 days after execution of Contract Modification No. 11, USPS gave ATSIC its third Show Cause letter, which warned ATSIC of possible termination of the Contract for failure to complete the project by July 15, 2002. USPS violated the terms of the Contract by each of the following:

2a(i). *The Postal Service failed to pay requisitions timely and violated the Contract Disputes Act of 1978 § 605(c)(5).*

The Contract incorporated the standard payment regulation controlling progress payments, as follows:

> F.4 **Prompt Payment for Construction Contracts (Clause FB-272) (May 1994)**
>
> Notwithstanding any other payment terms in this contract, the Postal Service will make invoice payments and contract financing payments under the terms and conditions specified in this clause. Payment shall be considered as being made on the day the check is dated or an electronic funds transfer is made. All days referred to in this clause are calendar days, unless otherwise specified.

a. Invoice payments.

1. For purposes of this clause, there are several types of invoice payments which may occur under this contract as follows:

(a) Progress payments, if provided for elsewhere in this contract, based on Contracting Officer approval of the estimated amount and value of the work or services performed, including payments for reaching milestones in any project:

(1) The due date for making payments shall be 14 days after receipt of the payment request by the designated billing office, except as may be modified in accordance with paragraph FB 272-2 (herein).

(2) The due date for payments retained by the Contracting Officer in accordance with clause FB-272-1, Progress Payments under Fixed-Price Construction Contracts, shall be 30 days after approval for release to the Contractor by the Contracting Officer.

. . .

3. An interest penalty shall be paid automatically by the designated payment office, without request from the Contractor, if payment is not made by the due date and the following conditions are met, if applicable:

(a) A proper invoice was received by the designated billing office;

(b) A receiving report or other Postal Service documentation authorizing payment was processed and there was no disagreement over quantity, quality, Contractor compliance with any contract term or condition, or requested progress payment amount; and

(c) In the case of a final invoice for any balance of funds due the Contractor for work or serviced performed, and the amount was not subject to further contract settlement actions between the Postal Service and the Contractor.

4. . . .

(a) For the sole purpose of computing an interest penalty that night be due the Contractor for payments described in subdivision

> a.1.(b) on this clause, Postal Service acceptance or approval shall be deemed to have occurred constructively on the seventh day after the Contractor has completed the work or services in accordance with the terms and conditions of the contract. . . .

USPS issued the final Show Cause letter without extending the completion date based on USPS's failure to pay the proper claims and requisitions of ATSIC. ATSIC had outstanding its May 20, 2002, requisition for $116,392.81, which had not been paid after 56 days, despite the contractual requirement to pay requisitions in 30 days. F.D. § F.4a1(a)(2).

USPS agreed to pay materials at 100% of schedule of values, per Modification No. M10, Dep. Ex. 30, but failed to do so. See Dep. Ex. 20, 26.

> Although it is well settled that the mere financial incapacity of a contractor to perform is not a cause beyond its control and without its fault or negligence, it is equally well established that financial incapacity can be excusable when it was precipitated by causes beyond the control and without the fault or negligence of the contractor. This is *a fortiori* true when the precipitating causes are acts or omissions of the Government, the other contracting party. As a result, and as illustrated by the cited cases, closer issues are presented herein than would at first blush appear. [Footnotes omitted.]

*National Eastern Corporation v. United States*, 201 Ct.Cl. 776, 477 F.2d 1347, 1356 (Ct.Cl. 1973).

> [W]hen the financial incapacity of the contractor to perform is caused by the acts or omissions of the government, the default is excused and the contract is deemed to have been terminated for the convenience of the government.

*TGC Contracting Corporation v. United States*, 736 F.2d 1512, 1515 (Fed. Cir. 1984). The Court in *TGC* cites numerous cases in which the government's failure timely to accept work and pay the contractor as required under the contract, causing financial stress to the contractor, or failing to pay the actual value of the services received, forms a basis for an excusable default by the contractor. *TGC* at 1515.

> A contractor's failure to perform may be excused and a termination for default converted to a termination for the convenience of the Government if the contractor can establish that the

> Government materially breached the Contract. *Alliant Techsystems, Inc., v. United States*, 178 F.3d 1260, 1276 (Fed. Cir. 1999); *Malone v. United States*, 849 F.3d 1441, 1445 (Fed. Cir. 1988).

*Morganti*, *supra*, at 140. For all the reasons described in Paragraph 5, above, the Postal Service's conduct in administering the Contract amounted to a material breach, and the failure of the postal Service to pay (including the unreasonable and unconscionable withholding of 75% retainage) created the financial incapacity of ATSIC. Accordingly, any failure to perform on the part of ATSIC should be excused, and the termination for default should be converted to one for the convenience of the Government. *See Morganti, supra*. Just as in the *Morganti* case, the contract was materially breached by the Government entity by: (1) making late progress payments; (2) making baseless retainages and excessive withholdings; and (3) failing to negotiate and make payments of change orders and modifications directed by the Postal Service or its project manager. *See Morganti*, *supra*, at 140.

Although failure to pay progress payments alone may not be considered a material breach of the contract per se, a "prolonged failure to pay large amounts" should constitute a material breach. *Morganti*, *supra* at 141, *quoting Northern Helix Company v. United States*, 197 Ct. Cl. 118, 125, 455 F.2d 546, 550 (1972).

Unlike in *Morganti*, not only did ATSIC not acquiesce to the Postal Service's late payments, ATSIC consistently requested the outstanding funds and the approval of the change orders and modifications so that additional funds could be paid into the Project. Furthermore, ATSIC consistently informed and reminded both the Project Manager and the Contracting Officer that the failure to provide these funds was a material difficulty in completing the Project. See, e.g., Dep. Ex. 58. *See "D.W. Sandau Dredging*, 1995 Eng. BCA LEXIS 27, 96-1 B.C.A. (CCH) P28,064, at

140,161 (holding that 'contractor complaints that late or no payments are affecting performance' is a significant factor in determining materiality; *Jones Plumbing & Heat, Inc*., 1985 VA BCA LEXIS 65, 86-1 B.C.A. (CCH) P18,659, at 93,858 (finding breach was not material where contractor did not assert payment or any urgency)." *Morganti*, *supra,* at 142.

The Postal Service failed to negotiate in good faith. After ATSIC waited as much as ten or more months for USPS to approve Modifications, in some cases for work already performed at the Project Manager's insistence and direction, and during which ATSIC was directed not to proceed with some of the work, but continued to incur overhead, the Contracting Officer refused to sign a modification to move forward unless ATSIC (i) relinquished its rights to payment for proposed Modifications 3, 4, 5, and interest due on the Government's delay in payment, and (ii) accept a reduction from $93,759.10 to $63,009.49 in Pay Application No, 17, the work for which had already been approved by SEC. Dep. Ex. 20; Zamora dep. 72:12-73:10; Dep. Ex. 31A (Modification 11).

Furthermore, the parties agreed to the terms of Modification 11 in May of 2002. However, it was not signed until June 20, 2002, resulting in only 35 more days until the new completion date. Meanwhile, because the Contracting Officer signed Modification 11 without simultaneously removing the work restrictions (such as control room work), completion was impossible. Good faith required the Postal Service to remove the roadblocks that it created, but the Postal Service refused to do so.

In addition to the withheld funds, 31 U.S.C. §3902 (a) and Facilities Department Regulation F.4a3 requires payment of interest on late payments. The Postal Service missed numerous payment dates, as set forth in Paragraph 5.1(iv), above. Accordingly, interest was due and payable to ATSIC by the Postal Service, which became a significant amount that ATSIC would have received to

mitigate its excessive expenses due to the long Postal Service delays.

Although the contractor's financial difficulties are not generally a legitimate excuse for failure to make progress, the financial difficulties become a legitimate excuse when the Government is the cause of the financial difficulties. *National Eastern Corporation, supra; TGC Contracting Corporation, supra*. The Government's failure to approve modifications and change orders, that it required, for as long as ten months extended the contract intolerably and drove up overhead relentlessly and significantly. If USPS had approved the modifications and change orders timely, countermanded the previously written instructions that ATSIC not complete work on the control room, and timely provided the plans that were the Postal Service's responsibility, the Project would have been concluded timely, Zamora dep. 97:23-98:7 and Dep. Ex. 17, and within the contract price.

The failures of the USPS to process and pay timely the proper claims of ATSIC for work performed pursuant to the Contract, as modified by direction of the USPS, constituted a violation of §605(c)(5) of the Contract Disputes Act of 1978, and further constituted (i) a default by USPS prior to the extension period under the terms of the Contract, F.D. §F.4, (ii) a breach of the Contract by the USPS during the extension period, and (iii) a breach of the Contract by the USPS for failing to adjust the performance date, F.D. §C.2a(2). Numerous examples are referenced in Paragraph 5.1(iv), above. These delays and refusals occurred repeatedly. When payments were finally made, USPS failed to pay interest on the late payments, as required under F.D. §F.4a3. Not only was the failure to pay a breach and default of the Contract, the USPS failure to pay ATSIC constituted a significant substantive basis for the failure of completion of the work under the Contract within the extension period.

2a(ii). *Postal Service failure to discharge its non-payment-related responsibilities*.

Prior to execution of Contract Modification No. 11, on various occasions during the course of ATSIC's work on the Project, delay in performance was caused by the USPS, by and through its authorized representatives, including, by way of example but not of limitation, the Project Architect and SEC, the Project Engineer. On January 18, 2002, six months prior to the Government's "stop work" order, ATSIC met with the Project Engineer, and then wrote the Project Engineer, with a copy to the Contract Officer, explaining critical path decisions that the Government had to make before ATSIC could complete the last portion of the Project. Dep. Ex. 23 (re cable, air conditioning, and bulletproof glass decisions). The Government's delay in making such decisions was a principal reason for months of delay. At all relevant times, ATSIC attempted to work with the representatives of the USPS to make sure the Contract was properly and fully completed. Warren dep. 139:10-141:17; Dep. Ex. 28 (offering joint payment alternative rejected by USPS). However, the plans prepared by the Project Architect or Project Engineer contained numerous defects and deficiencies. *See, e.g.*, Dep. Ex. 56. Moreover, the Project Engineer, who provided professional services during the construction phase, routinely failed to perform his duties properly. See Paragraph 5.1, above.

Because the delays in completing the work under the Contract were caused, in whole or part, by the USPS, during the relevant time, any resulting delays were not chargeable to ATSIC and were excused. Not only did ATSIC offer alternatives, but International Fidelity, the surety, also asked Jerry Goddard, the Contracting Officer, to contact it if "there was a request for the Surety to get financially involved in the P&DC project." Dep. Ex. 3, Sexton dep. 24:17-25:22. The Contracting Officer made no such request.

ATSIC's performance of the work on the Project was substantially delayed by:

a. the failure of USPS or its agent, the Project Engineer, to provide adequate, complete, and non-deficient plans and specifications,

b. over-inspection and active interference in the Project by USPS's Project Engineer,

c. poor and untimely communication and contract administration by the Project Engineer and the Contracting Officer,

d. changes and constructive changes in the work of the Project directed by USPS or its Agent,

e. the failure of the Project Engineer to respond or to timely respond to ATSIC's requests for information,

f. the failure of USPS or its agent, the Project Engineer, to respond or timely respond to ATSIC's submittals, including technical data and shop drawings,

g. the failure of USPS or its agent, the Project Engineer, to respond or timely respond to ATSIC's request for change orders or contract modifications,

h. the failure of USPS or its agent, the Project Engineer, to respond to and process ATSIC's payment applications,

i. the failure of USPS to make payment or to make payment timely to ATSIC in violation of USPS Facilities Department Contract Requirement Section F.4a3.

All acts of the Contracting Officer in administering the Contract that suspended, delayed, or interrupted ATSIC's work under the Contract required the Contracting Officer to extend the delivery or performance dates accordingly. F.D. §C.2a. Even after the execution of Modification 11, which arguably extended the completion date, the Contracting Officer failed to extend the performance date despite (i) suspending work on the Contract, (ii) failing to resolve continuing

design deficiencies that completely suspended work on the computer operations room, delaying specific work on the Contract, and (iii) delaying completion by failing to pay ATSIC needed funds in conformity with the Contract terms for work previously completed.

2b. *The Contracting Officer failed to include weather delays and any other delays not caused by ATSIC in the determination of a revised Contract completion date.*

As required by the Excusable Delays provision of the Contract, F.D. §C.3, and consistent both with FAR §§49.402-3(e)(1) and the course of dealing between the parties, the July15, 2002, Show Cause letter offered ATSIC the opportunity to show facts indicating that ATSIC's delay in completing the project arose out of causes beyond ATSIC's control and without fault or negligence by ATSIC. On July 19, 2002, ATSIC provided a letter to USPS showing (i) that its work had been delayed because of nearly continuous rain during June and early July, 2002, and (ii) because of USPS's failure to timely process payment applications. Warren dep. 89:13-90:13, 95:24-96:5 and Dep. Ex. 21 (showing delays of 37 days for rain and 24 days for late payment). The letter included, *inter alia*, National Weather Service records showing rain on 37 of the previous 48 days, Zamora dep. 55:14-23; Dep. Ex. 21, and delays due to the Government's failure to pay outstanding invoices. This uncontroverted information required the Contract Officer (i) to extend the delivery schedule accordingly, and (ii) to recognize that, in the event of termination, "the supplier will not be in default." F.D. §C.3a.

On August 16, 2002, USPS issued its Termination for Default, effective July 31, 2002. From July 15, 2005 to July 31, 2005, it was impossible for ATSIC to complete the work, because ATSIC remained under the USPS order to "cease all work."

In issuing its Termination for Default, USPS again violated the Contract and, alternatively,

the Federal Acquisition Regulations by failing to consider the USPS's premature termination of ATSIC's work and failing to properly consider critical factors in determining whether to terminate the Contract for default, as follows:

a. The Contracting Officer failed to properly consider the fact that ATSIC was entitled to an equitable extension of the time of performance because of excessive rain, which delayed its work. F.D. §C.3a; FAR §49.402-3(f)(1). Significant and persistent rain, which effectively halted the trenching and the gate and closed circuit television installation and testing of the electronic security components to be installed by ATSIC under the Contract, rendered timely completion impossible. Warren dep. 146:16-147:7, 148:25-150:4; Zamora dep. 26:24-27:14, 73:15-74:11; Dep. Ex. 33, 42 (detailing persistent rain in June 2002), 43. Some of the rain was heavy (several inches in a day), Dep. Ex. 21, which could effectively halt trenching work for an additional day. Furthermore, some work had to be completed before other work could be done, so ATSIC was equitably entitled to an extension of 35 days due to the weather delays. Zamora dep. 70:24-7:6; Dep. Ex. 17 (schedule printout).

b. The Contracting Officer failed to properly consider the fact that ATSIC was delayed by the USPS's delays in making payment in violation of the payment provisions under the Contract. F.D. §C.4a; FAR §49.402-3(f)(1). During the extension period, USPS continued to delay processing of the payment requisitions and modifications for additional work (Warren dep. 119:13-120:23 and Dep. Ex. 20, 26, 30), leaving ATSIC without adequate funds to purchase equipment and making timely completion of the Project impossible. See Paragraph 5.1(iv), above.

c. The time to completion provided to USPS by ATSIC was 35 calendar days once the Postal Service paid the outstanding pay requisitions and rescinded the order preventing ATSIC from

performing work in the control room. Dep. Ex. 17. In violation of the requirement of good faith, and, alternatively, in violation of FAR §49.402-3(f)(4), the Contracting Officer failed to properly consider the cost and the period of time required to obtain completion of the Contract by other means as compared to completion of the work by ATSIC.

Failure of the Government to provide a necessary precursor (such as change order approval, approval to work on the control room, and payments due under the Contract) to contractor's work is a sufficient basis for the contractor to recover from the Government for wrongful termination. *Litchfield Manufacturing Corporation*, 167 Ct.Cl. 604, 338 F.2d 94 (1964) (Government's delinquency in providing Government-furnished material constitutes a breach of contract by the Government). *A fortiori*, if, despite these impediments and lack of governmental cooperation, the contractor perseveres until terminated by the Government, the termination cannot be for default.

> We think the contractor must have available at the time of the contract award reasonable financial resources <u>in the light of business custom and practice</u> either on hand or through its customary lines of credit, to finance the expected cost of production. (emphasis added)

*Id.* 338 F.2d at 98. The Government's interminable delay (more than ten months) in providing approvals of change orders and modifications, coupled with the failure to approve work on the control room, and exacerbated by the Government's refusal to pay requisitions for work approved on-site, does not constitute "reasonable custom and practice." Accordingly, the Court must find that any failure of resources, to the extent that this was a factor in the termination, was due to the Government, and not attributable to ATSIC.

3. *USPS violated the contractual requirement of a 10-day cure period.*

F.D. §H.6a expressly predicates the Postal Service's right to terminate a supplier for default

on the prior requirement that the supplier not cure a failure within ten days . . ."after receipt of the notice from the Contracting Officer specifying the failure." The Contracting Officer expressly acknowledged the requirement of a cure period in the first Show Cause letter. Mot. Ex. 3.

The Postal Service never provided a cure notice that specified the items to be cured. ATSIC repeatedly stated that, if the Postal Service would fulfill its responsibilities providing payments due to ATSIC and rescind its prior instructions not to complete the control room, then, with proper consideration for weather delays, the Project could and would be completed timely. Zamora dep. 97:23-98:7, Dep. Ex. 17.

The "notice letter," issued on July 15, 2002, warned ATSIC of possible termination of the Contract for "failure to complete project per revised contract completion date." Dep. Ex. 9. However, the Contracting Officer terminated ATSIC for three reasons.

This termination is based on but not limited to the following:

- Contract is delinquent; Contract completion date is July 15, 2002.
- The progress on the project is not satisfactory.
- The project is not adequately manned.

Dep. Ex. 12 (Termination letter).

Thus, the Contract was terminated for reasons beyond the notice, without the opportunity to cure. As a matter of public policy, permitting extraneous reasons to be included in the basis of termination, whether or not correct or accurate, creates incentive for contracting officers to withhold reasons in their notices so that the contractor has no reason or ability to counter, explain, resolve, or otherwise cure the alleged failure. This behavior undermines the contractual responsibility to cure and the numerous reasons, for the benefit if both the Government and the contractor, to permit curing.

The "notice letter," issued on July 15, 2002, warned ATSIC of possible termination of the Contract for failure to complete the project by the completion date of July 15, 2002. Dep. Ex. 9. Accordingly, the notice failed to meet the requirements of F.D. §H.6a, as the notice failed to provide any time to cure.

The Postal Service Contracting Officer compounded the problem by promulgating a companion letter, issued the same date, requiring ATSIC to cease work on the Project immediately. Dep. Ex. 32. Therefore, even if the notice letter had provided for at least ten days to cure, the Postal Service's "stop work" letter would have made the cure period a nullity. Again, because of the Postal Service's failure to provide time to cure, which is a condition precedent to the right to terminate for default, the termination must be deemed to be for convenience pursuant to F.D. §H.6g.

4. *USPS terminated ATSIC prematurely under the September10, 2002, date specified in the second Show Cause letter.*

On May 1, 2002, the USPS Contacting Officer issued the second Show Cause letter to ATSIC explicitly revising the Contract completion date to September 10, 2002. Dep. Ex. 5; Warren dep. 121:7-24 (ATSIC relied on revised date). This letter reestablished the completion date that the Postal Service had previously waived by failure to adhere to the prior deadline. Accordingly, the Postal Service's "stop work" letter on July 15, 2002, and subsequent termination letter were several months premature. Thus, the termination cannot be for default for failure to meet the completion deadline and must be deemed for convenience.

5. *USPS terminated ATSIC prematurely under the December 19, 2002, date specified in Modification No. M02 of Contract No. 123125-00-B-3153 of the AMC Project.*

On June 20, 2002, the USPS Contracting Officer issued Modification No. M02 on Contract

No. 123125-00-B-3153 (the AMC Project) in which, in consideration for ATSIC's agreement to be terminated for convenience from the AMC Project contract and pay USPS $52,137.10 from ATSIC's P&DC Project receipts, the Postal Service agreed in writing to a revised completion date of December 19, 2002, on the P&DC Contract. Dep. Ex. 53; Vento dep. 155:17-21. Although, the Modification was to the AMC Project, the revised completion date is part of the sentence applying the $52,137.10 to the P&DC Contract (known in that Modification as the GMF Project). The revised completion date cannot apply to the AMC Contract, because that Contract was terminated per the description in Block 7 reading "Settlement of Termination Issues." Thus, in light of the December 19, 2002, completion date, the Postal Service's "stop work" letter on July 15, 2002, and subsequent termination letter were several months premature.

D. <u>By USPS's actions and inactions, it breached the covenant of good faith and fair dealing.</u>

> Every contract includes the implied covenant of good faith and fair dealing. *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005); see also Restatement (Second) of Contracts 205 (1981). Two closely related aspects of the covenant of good faith and fair dealing are "the duties to cooperate and not hinder the contractor's performance." *C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1542 (Fed. Cir. 1993); *Centex Corp.*, 395 F.3d at 1304 (stating that the covenant of good faith and fair dealing "imposes obligations . . . that include the duty not to interfere with the other party's performance"); *see Olympus Corp. v. United States*, 98 F.3d 1314, 1318 (Fed. Cir. 1996) ("Interference by the government with a contractor's access to the work site may constitute a breach of the government's duty to cooperate . . . ."). A breach of these duties is actually a breach of the covenant of good faith and fair dealing. *See Malone v. United States*, 849 F.2d 1441, 1445 (Fed. Cir. 1988).
>
> The duty not to hinder performance requires a party "not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex Corp.*, 395 F.3d at 1304. The contracting party is prohibited from "doing anything to prevent performance . . . by the [contractor] or that will hinder or delay him in its performance." *Lewis-Nicholson, Inc. v. United States*, 550 F.2d 26, 32, 213 Ct. Cl. 192 (Ct. Cl. 1977). "Not only must the Government refrain from hindering the contractor's performance, it must do whatever is necessary to enable the contractor to perform." *Id.* . . .

> The Government breaches these duties when it acts unreasonably under the circumstances-specifically, if it unreasonably delays the contractor or unreasonably fails to cooperate. *See C. Sanchez & Son*, 6 F.3d at 1542 ("The government must avoid actions that unreasonably cause delay . . . ."); *Commerce Int'l Co. v. United States*, 338 F.2d 81, 86, 167 Ct. Cl. 529 (Ct. Cl. 1964) (holding that what actions cause "breach of [the] obligation of reasonable cooperation" depend upon "particular contract, its context, and its surrounding circumstances"). Bad faith on the part of the Government is not required for a breach of these duties, *Abcon Assocs. v. United States*, 49 Fed. Cl. 678, 688 (2001), only "willful[] or negligent[] interference with the contractor in the performance of his contract[.]" *Peter Kiewit Sons' Co. v. United States*, 151 F. Supp. 726, 731, 138 Ct. Cl. 668 (Ct. Cl. 1957). *See generally Tecom, Inc. v. United States*, 66 Fed. Cl. 736 (2005).
>
> The case law is instructive. In *Malone v. United States*, 849 F.2d 1441, 1442 (Fed. Cir. 1988), a contractor built a model home for the military "as a means of establishing workmanship standards before [the contractor] commenced work on other houses." The Government's contracting officer viewed the model home unfavorably, but was evasive in his answers to the contractor, causing the contractor to complete extensive work not up to the Government's standards. Upon these facts the United States Court of Appeals for the Federal Circuit found a breach of the duty to cooperate on the part of the Government. In *Lewis-Nicholson*, 550 F.2d 26, 213 Ct. Cl. 192, the United States Court of Claims found that the Government breached its duty not to hinder the contractor's performance when it was unreasonably slow in doing necessary survey and staking work on a piece of land. The Government's failure to do this work in a timely manner hindered the contractor's performance and rendered the Government liable for any damages caused by the delays that the contractor suffered.

*Orlosky Inc. v. United States*, 68 Fed. Cl. 296, 311-12 (2005).

The Postal Service's (i) failure to approve change orders and modifications for more than ten months, (ii) failure to rectify over many months its orders to ATSIC not to proceed with certain portions of the work due to failure of the Postal Service to provide design plans, which was completely within its hands (SEC was an engineering firm), (iii) disingenuousness by Stuhl telling ATSIC on-site that work was acceptable and then writing reports to Goddard that it was not, and (iv) failure to pay approved requisitions timely and to approve requisitions for work actually completed, all of which unfairly and unreasonably lengthened the period required for completion of the Project, is exactly the kind of interference, unreasonable slowness, and evasiveness decried in the *Malone*

and *Lewis-Nicholson* cases. Thus, the facts of this case demand a determination of a breach of the covenant of good faith and fair dealing.

The Postal Service's situation is worsened immeasurably by the obvious intent by its agent, Stuhl, (i) to undermine the Contract by having it terminated so that it could be transferred to Tri-State, and (ii) to divert funds to his "good buddy" Joe Erickson. See Paragraphs 21.1 and 21.2, above.

Furthermore, USPS first issued its second Show Cause letter with a September 10, 2002, completion date, followed by its Modification No. 02 on the AMC Contract specifying a PD&C Contract completion date of December 19, 2002. Then it asserted a July 15, 2002, completion date on June 20, 2002, which it knew from the construction schedule was inadequate to complete the five weeks of work remaining. Dep. Ex. 17 This short period to a new completion date evidences neither good faith or fair dealing.

As a direct and proximate result of the breach of the covenant of good faith and fair dealing, ATSIC suffered damage in that ATSIC's performance of the Contract was hindered and ultimately made impossible by the United States' lack of cooperation and obstruction, ATSIC's performance of the Contract was delayed and ultimately made impossible due to the actions or inactions of the USPS, and, ultimately, the Contract was wrongfully terminated by the USPS. The termination benefitted SEC, the advisor to the Contracting Officer, by more than $100,000.00 in additional billings. Warren dep. 151:8-152:9, 162:14-164:5.

For all the foregoing reasons, USPS acted with conscious indifference to the rights, obligations, and interests of the Plaintiffs; with improper motive; and in a manner of unfair dealing. Such actions of USPS constitute a breach of the covenant of good faith and fair dealing with regard

to the Contract and the bonds issued by International Fidelity for the Contract. Accordingly, the termination for default of ATSIC under the Contract was improper, not in the best interest of USPS, and should be converted to a termination for convenience.

E. A supplier must be the cause of a failure to perform in order to be terminated for cause.

The "supplier is not liable for any excess costs if the failure to perform the contract arises from causes beyond the control without the fault or negligence of the supplier." F.D. §H.6c; Purch. Man. §6.9.3a2. USPS's unrescinded orders not to proceed on portions of the Project, the severe inclement weather, USPS's failure to make timely payments, and USPS's premature notice requiring ATSIC to cease the work, each of which was a sufficient cause of ATSIC's failure to have completed the Project by the date ATSIC was terminated, were all beyond the control and without the fault or negligence of ATSIC. Accordingly, termination for fault for failure of timely completion is improper and unwarranted and should be reversed.

F. The Project was adequately manned.

The USPS cited inadequate staffing of the Project as a basis for termination. Dep. Ex. 12. All the record evidence shows that the Project was adequately manned when there was work to do. Warren dep. 115:11-116:7 (staffed according to conditions), 116:8-118:18 (can't do much of the work in the rain); Zamora 38:22-39:1 ["there was (sic) always personnel to find the work that needed to be done"]. Even SEC acknowledged on June 10, 2002, that "my inspection revealed that some progress has been made by ATC and it appears they are increasing their effort at this facility." Dep. Ex. 19.

G. The Postal Service failed to comply with termination notice requirements.

Among other things, Section 6.9.3b7(6) of the Purchasing Manual requires that, in a termination for default, the Postal Service "[i]nform the supplier that the termination is subject to Clause B-9, *Claims and Disputes*." The Postal Service Notice of Termination neither contained the specified language nor contains a copy of Clause B-9 (F.D § H.3 of the Contact). Dep. Ex. 12. Accordingly, the Notice of Termination was substantially and fatally defective and cannot serve as the basis for a termination for default.

H. The Postal Service Notice of Termination violated USPS Purchasing Manual notice requirements.

Section 6.9.3b7(a) of the Purchasing Manual requires that, if a contracting officer is going to issue a notice of termination for default, he must do so "immediately" upon determining that termination is proper. Once again, the Postal Service, through the Contracting Officer, failed to act timely. The Show Cause letter was issued July 15, 2002, before the completion date had elapsed. Dep. Ex. 9. Nonetheless, ATSIC responded with its reasonable basis for the delay (including weather issues and the USPS financing issues) by July 19, 2002. Dep. Ex. 21. Goddard obviously determined that a termination for default was in order in July, because he issued the termination "effective July 31, 2002." However, he delayed issuing the Notice of Termination until August 16, 2002. Dep. Ex. 12. This delay cannot be construed as "immediately,"as required by the Postal Service. Accordingly, the Notice of Termination cannot serve as the basis for a termination for default.

## III. ATSIC IS ENTITLED TO ATTORNEY'S FEES

ATSIC is entitled to attorneys fees pursuant to the Equal Access to Justice Act, 5 USCA §504 ("EAJA"), and 28 USCA §2412. Section 504(a)(1) of the EAJA provides as follows:

> **(a)(1)** An agency that conducts an adversary adjudication shall award, to a prevailing party other that the United States, fees and other expenses incurred by that party in connection with that proceeding, unless the adjudicative officer of the agency finds that the position of the agency was substantially justified or that specific circumstances make an award unjust. Whether or not the position of the agency was substantially justified shall be determined on the basis of the administrative record, as a whole, which is made in the adversary adjudication for which fees and other expenses are sought.

The USPS did not award attorneys fees to ATSIC, and ATSIC is seeking review. Section 504 further provides that "If a court reviews the underlying decision of the adversary adjudication, an award for fees and other expenses may be made only pursuant to Section 2412(d)(3) of Title 28, United States Code." 5 U.S.C. § 504(c)(1).

> The EAJA only permits assessment of fees against the Government to a prevailing party in a civil action. *See* 28 U.S.C. § 2412(b) & (d). In this context, the words "civil action" include proceedings for judicial review of agency action and appeals of decisions made by "a contracting officer rendered pursuant to a disputes clause in a contract with the Government or pursuant to the **Contract Disputes Act** of 1978." 28 U.S.C. § 2412(d)(1)(A) & (d)(2)(E).

*Maritime Management, Inc. v. United States*, 242 F.3d 1326, 1336 (11th Cir. 2001).

The burden of proving that an attorney fee award should not be made under the Equal Access to Justice Act rests with the governmental agency. *See Enerhall, Inc. v. N.L.R.B.*, 710 F.2d 748 (11th Cir. 1983). A governmental position that is not substantially justified entitles the private party to recover attorney's fees and expenses. The Government's failure to follow contractual or regulatory requirements provides a basis for finding that the Government's administrative position was not substantially justified. *Smith v. National Transportation Safety Board*, 992 F.2d 849 (8th Cir. 1993).

The "merits reasoning" used by a court is relevant to the resolution of whether the Government was substantially justified; in some cases the standard of review on the merits is so close to the reasonableness standard applicable to determining substantial justification that the losing agency is unlikely to be able to show that its position was substantially justified. *F. J. Vollmer Co., Inc. v. Magaw*, 102 F.3d 591, 322 U.S. App. DC 193 (C.A.D.C. 1996).

Unless the agency meets its burden of demonstrating substantial justification of its position, denial of attorneys fees and expenses is an abuse of discretion modifiable on appeal. *Derrickson Co., Inc. v. N.L.R.B.*, 774 F.2d 229 (8th Cir. 1985). When the Government compels an individual to resort to the courts in order to attack arbitrary governmental conduct, the Government's position is not substantially justified and an award of attorney's fees is in order. *Glick v. U.S. Civil Service Commission* 567 F. Supp. 1483 (N.D. Ill. 1983), *affirmed* 799 F.2d 753 (7th Cir. 1986).

For the numerous reasons set forth in the prior section of the Motion, the Government was not substantially justified in taking the position that the termination of ATSIC was for fault. The Government, by and through its agents, substantially hindered ATSIC's performance on the Project, prematurely terminated ATSIC from the Project, waived the right to terminate ATSIC for fault, did not permit ATSIC to cure under the contractual requirements, failed to take into account delays due to weather and the Government's failure to pay as required under the Contract, and failed to deal in good faith. Each and all of these was sufficient, by itself, to preclude termination for fault. Notwithstanding these obvious failures by the Government, the Government nevertheless terminated ATSIC for fault. This position of the Government could not have been, and was not, substantially justified. Therefore, the Court should order entitlement to attorney's fees to ATSIC in an amount to be determined.

## IV. DEFENDANT'S SOLE METHOD OF ENFORCEMENT OF THE AMC PROJECT PAYMENT IS BY SETOFF.

The parties executed as of June 19, 2002, an Agreement of Settlement Between the Parties ("Settlement Agreement") settling a dispute regarding another contract between the parties designated Contract #123125-00-3153 (on the "AMC Project"). Dep. Ex. 29. Under the terms of the Settlement Agreement, Postal Service was to receive the sum of $52,137.10 solely on the condition that it "be withheld from Contract No.123125-00-B-3154 [the P&DC Project]." Dep. Ex. 29 at Par. C. This requirement is corroborated by Mod. 2 of the AMC Project, which provides that $52,137.10 was to be withheld from . . . contract no. 123125-00-B-3154." Dep. Ex. 29, 53; Vento dep. 153:20-154:8, 155:2-9; Warren dep. 141:20-143:7.

Under the excess reprocurement costs asserted by the USPS, no additional funds will be paid to ATSIC under Contract No. 123125-00-B-3154 (the P&DC Contract, which is the one at issue in this case). Therefore, no pool of funds exists from which the $52,137.10 may be withheld.

The Settlement Agreement explicitly provides and binds the USPS that it is "intended to constitute full and final . . . disposition of all matters arising under the Contract No. 123125-00-B-3153, [and] shall constitute a full release and complete accord and satisfaction as to any and all claims, demands or causes of action, actual or constructive, legal, equitable, or contractual, either party has against the other which arise under [Contract No. 123125-00-B-3153]" and "shall constitute a full release." Dep. Ex. 29 at Par. D. Accordingly, USPS is not entitled to a reduction in the Contract amount credited against the alleged excess reprocurement costs, nor any other credit or setoff, for the $52,137.10 from the Contract No. 123125-00-B-3153. USPS may only be paid from the amount awarded to ATSIC by the Court if the Court determines that ATSIC's termination

was for convenience.

**WHEREFORE**, ATSIC respectfully requests that this honorable Court (i) grant judgment in favor of Plaintiffs on their appeal of the termination for fault, order that the determination to terminate ATSIC for fault was improper, declare that USPS wrongfully terminated the Contract for fault, declare USPS liable to ATSIC for the costs of completed, but unaccepted, work at the time of termination, declare that neither ATSIC nor International Fidelity is liable for excess costs of reprocurement or completion of the Contract, declare that neither ATSIC nor International Fidelity is liable for liquidated damages, if any; (ii) determine that the $52,137.10 due the Government because of the Settlement Agreement on the AMC Project may only be paid, if at all, as a setoff from funds to be paid by the Government to ATSIC under the P&DC Contract; (iii) award Plaintiffs attorneys fees and costs associated with this action as provided by law, and (iv) award such other and further relief as is just and proper

Respectfully submitted on this 28th day of April, 2006.

E. SCOTT GOLDEN & ASSOCIATES
Attorneys for Plaintiff Advanced
Technology Systems Integrators Corp.
644 S.E. Fourth Avenue
Fort Lauderdale, FL 33301
Tel.: (954) 764-6766 ext. 2
Fax: (954) 764-6789
Email: esglaw@bellsouth.net

s/E. Scott Golden
E. Scott Golden

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by electronic transmission to the following persons as of this 28th day of April, 2006.

Michael J. Dierberg, Esquire
U.S. Department of Justice, Civil Division
Commercial Litigation Branch
1100 L. Street NW, Room 12116
Washington, D.C. 20530

Helen H. Albee, Esquire
HENRICHSEN SIEGEL, P.L.L.C.
1648 Osceola St.
Jacksonville, FL 32204

s/E. Scott Golden
E. Scott Golden

HP2C:\Mydocs\3082-1\SUMM.JUDG.MOT.fnl.wpd(rev.April 28, 2006)