**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

ADVANCED TECHNOLOGY SYSTEMS INTEGRATORS CORP.

and

INTERNATIONAL FIDELITY INSURANCE COMPANY

Plaintiffs,

v.

THE UNITED STATES OF AMERICA,

Defendant.

Case No. 03-1953C
(Senior Judge Margolis)

**PLAINTIFF ADVANCED TECHNOLOGY SYSTEMS INTEGRATORS CORP.'S STATEMENT OF UNCONTROVERTED FACT**

COMES NOW Plaintiff Advanced Technology Systems Integrators Corp. ("ATSIC"), by and through its undersigned counsel, files its Statement of Uncontroverted Fact, and states as follows:

1. The claims of ATSIC arise out of its performance under Contract No. 123125-00-B-3154 - Project H54096 (the "Contract"), which project was also known as the Miami P&DC Security & Access Control (the "Project" or the "P&DC Project"), issued by the United States Postal Service ("USPS") to ATSIC. Mot. Ex. 1.[1] The Project included the acquisition and installation of

[1]References to USPS Facilities Department Contract Requirements shall be identified as F.D. §___. References to Exhibits to the Motion shall be "Mot. Ex.___." References to depositions shall be denoted by the last name of the witness and the page and lines, such as "Warren dep. at ___:___." The deposition exhibits, which were numbered sequentially throughout the depositions, shall be denoted as 'Dep. Ex. ___." Each Contract modification may be known as "Mod. ___." Federal Acquisition Regulations may be known as "FAR §____."

both interior and exterior security components on a USPS facility.

2. The surety for ATSIC was International Fidelity Insurance Company. Dep. Ex. 3, 5.

3. The initial contract amount was $1,308,990.00. The Contract provided a performance time of 230 days. The Contract contains a time is of the essence clause and a liquidated damages clause. Mot. Ex. 1.

4. On October 3, 2000, the USPS issued its Formal Notice to Proceed for the Project as of January 15, 2001. The Notice specified a Contract duration of 230 days and a completion date of September 2, 2001. Mot. Ex. 2.

5. During the period that ATSIC performed work under the Contract, USPS required and/or directed changed, extra, or additional work, requiring modification to the initial Contract. Mot. Ex. 4; Dep. Ex. 20, 31A, 37.

6. ATSIC submitted proposed change orders for processing of the USPS-directed modifications to the Contract in which ATSIC requested both (i) an equitable adjustment of the compensation for the extra work required by USPS to be performed under the Contract and (ii) equitable time extensions to perform that work. Mot. Ex. 4; Dep. Ex. 20, 31A, 37.

7. USPS failed to process properly some of the proposed change orders and requests for the USPS-directed modifications. USPS failed to act on some change orders for more than ten (10) months. Dep. Ex. 57.

8. The Project Engineer, Stuhl Engineering Contractors, Inc. ("SEC"), with its principal, Joseph Stuhl, was installed as the Project Manager when the prior Project Manager was dismissed. ATSIC, which had already been working with SEC on both the P&DC and the AMC Projects,

protested both orally and in writing SEC's elevation to that position. Vento dep. 32:11-33:7, 159:9-160:5; Dep. Ex. 5.

9. Joseph Stuhl:

(i) made obstructive, parochial decisions in violation of the Contract specifications, Vento dep. 85:24-90:22;

(ii) repeatedly made decisions that retarded the progress of the Project, Vento dep. 157:8-159:5; Warren dep. 44:25-46:16; Dep. Ex. 54, 59;

(iii) failed to make timely decisions necessary to prosecute the work of the Project, including withholding change order approval for changes required by Stuhl for more than ten months after submittal, Vento dep. 157:8-159:5, 163:20-164:14, 164:21-165:19; Dep. Ex. 54, 58;

(iv) repeatedly and consistently reduced and delayed ATSIC's payment requisitions, often after orally approving them on-site, Vento dep. 135:3-136:22; Warren dep. 32:23-34:15, 39:9-23, 114:16-115:10 (withholding of 75% of pay requisitions), 127:7-21, 131:24-132:16 (re 75% retainage); Zamora dep. 72:12-73:10, 83:11-84:9; Dep Ex. 20, 25, 40 (protesting 75% retainage), 54 (protesting SEC's arbitrary and contradictory reduction of pay requisitions based on how Mr. Stuhl "feels" on any given day, rather than on the approved progress on the Project), 59;

(v) overlooked Postal Service irregularities, Vento dep. 138:5-21;

(vi) submitted false reports, Warren dep. 40:20-41:16, 45:25-47:5, 108:22-110:7; Zamora dep. 60:24-61:9, 77:1-78:22 (SEC dunning ATSIC for a Contract reduction despite previous approval by SEC); Dep. Ex. 36, 37; and

(vii) repeatedly and consistently agreed to one method of Project implementation

on-site, only to return to his office in Orlando and issue later reports requiring a different method of implementation than he had previously approved. Vento dep. 33:12-34:18, 78:11-22, 160:8-20, 164:21-165:19; Warren dep. 128:20-130:7; Dep. Ex. 23, 56, 58, 59.

10. The Contracting Officers, first Ronald Grzymala and later Jerry Goddard, collaborated with Mr. Stuhl in the items described in Paragraph 9 and maliciously and unprofessionally interfered in the prosecution of the work. Warren dep. 101:19-103:18. They wrote formal letters with incorrect or incomplete information that formed the basis for legal consequences. See Dep. Ex. 5, 19, Warren dep. 121:25-124:6 (using SEC letters to rebut Goddard's allegations in the second Show Cause letter). They promised to expedite payments, but, instead, cut them and then did not approve the reduced payment for more than two months, which was untimely by more than one month under the Contract. Warren dep. 119:13-120:23, 134:6-135:5; Zamora dep. 78:23-80:3 (USPS failure to approve Modifications stopped all work agreed with SEC), 80:7-81:1 (Stuhl duns ATSIC for failure to complete modification work that USPS hasn't approved, and ATSIC responds to Contracting Officer); Dep. Ex. 17, 20, 26, 37, 38.

11. September 2, 2001, the initial completion date under the Contract, passed without USPS terminating the Contract. Mot. Ex. 3. USPS did not seek an extension agreement with ATSIC.

12. ATSIC continued performing under the Contract after September 2, 2001.

13. On January 4, 2002, one hundred twenty four (124) days after the specified Contract completion date, the USPS gave ATSIC its first Show Cause letter, which warned ATSIC of possible termination of the Contract for failure to timely complete the project. Mot. Ex. 3. USPS

did not terminate ATSIC at that time. Dep. Ex. 12.

14. On March 12, 2002, USPS, by and through its Contracting Officer, executed Contract Modification No. Eight (8), which increased the contract price to $1,351,961.14, but did not grant an extension of time to complete the project. The stated completion date remained September 10, 2001. Mot. Ex. 4. By executing Contract Modification No. Eight (8), the Contracting Officer (i) explicitly acknowledged that ATSIC's work on the Project was approximately six months beyond the required (but abandoned) completion date for the Project, and (ii) confirmed his intention to waive the time of performance clause and liquidated damages clause in the Contract.

15. On May 1, 2002, two hundred thirty-three (233) days after the revised Contract completion date, USPS gave ATSIC its second Show Cause letter, which warned ATSIC of possible termination of the Contract for failure to timely complete the Project. This letter explicitly recited a revised contract completion date of September 10, 2002. Dep. Ex. 5. USPS did not terminate ATSIC at that time. Dep. Ex. 12.

16. During the course of the Project, ATSIC issued and proposed approximately twelve (12) change orders or contract modifications to USPS, seeking equitable adjustments in the time of performance or the cost of the work. Mot. Ex. 4; Dep. Ex. 20, 31A, 37. An ongoing dispute developed between ATSIC, on the one hand, and the USPS and its Project Engineer, on the other hand, regarding these issues. Dep Ex. 31A, 37. ATSIC made payment requests, each of less than $100,000.00, all or a portion of which were in dispute or not acted upon by the Contracting Officer within a reasonable time. Dep. Ex. 31A, 28, 59. USPS's failure to issue a timely decision violated Section 605(c)(5) of the Contract Disputes Act of 1978.

17. On June 20, 2002, ATSIC and USPS purported to compromise and settle their prior disputes by execution of Contract Modification No. 11, which stated a new contract completion date of July 15, 2002, further stating that it extended the original contract completion date by 293 calendar days.[2] Vento dep. 104:24-107:15; Dep. Ex. 31A. Contract Modification No. 11 further provided that "[i]f ATC has not completed the project by 7/15/02, Liquidated Damages of $100/day will be reinstated beginning on 7/15/02 and continuing until building acceptance."

18. Contact Modification No. 11 was executed under duress of non-payment. Vento dep. 107:16-109:14; 113:20-114:6.

19. On July 15, 2002, which was 25 days after execution of Contract Modification No. 11, USPS gave ATSIC its third Show Cause letter, which warned ATSIC of possible termination of the Contract for failure to complete the Project by July 15, 2002. Vento dep. 109:22-111:3; Dep. Ex. 9.

20. ATSIC responded in two letters explaining the extent of required extensions due to weather delays and due to the USPS failure to meet contract payment requirements. Vento dep. 111:4-13; Warren dep. 148:25-150:4; Dep. Ex. 21, 33.

21. Simultaneously with the issuance of its third Show Cause letter, on July 15, 2002, USPS issued a letter directing ATSIC "to immediately cease all work at the job-site until further notice." Vento dep. 111:14-112:9, 127:1-128-7; Dep. Ex. 32.

22. The USPS Contracting Officer, Jerry Goddard, issued his Termination for Default

---

[2] Modification No. 11 recites that the Contract is extended by 293 calendar days for a revised completion date of 6/30/02. Correct calculation would yield July 3, 2002. The interlineated completion date of 7/15/02 affected this calculation. Dep. Ex. 31A.

on August 16, 2002. Dep. Ex. 12. The termination was based on (i) failure to complete the Contract by July 15, 2002 (ii) unsatisfactory progress, and (iii) failure to man the project adequately. The termination letter stated that the "explanation offered by ATC, Inc. was not an acceptable cause for delay."

23. The termination letter cited two reasons for termination that were not included in the third Show Cause letter.

24. On June 20, 2002, the USPS Contracting Officer issued Modification No. M02 on Contract No. 123125-00-B-3153 (the AMC Project) in which, in consideration for ATSIC's agreement to be terminated from the AMC Project contract and pay USPS $52,137.10 from ATSIC's P&DC Project receipts, the Postal Service agreed in writing to a revised completion date on the P&DC Contract of December 19, 2002. Dep. Ex. 53; Vento dep. 155:17-21.

25. On February 8, 2002, USPS had issued directions to ATSIC not to continue on specified portions of the Project work due to matters, such as air conditioning issues and design plans that were the responsibility of the Postal Service, that needed to be resolved before ATSIC's work in those areas could be concluded. These were not the responsibility of ATSIC. Vento dep. 56:1-57:16, 116:8-117:11, 161:21-162:9; Dep. Ex. 56. USPS never rescinded or revised these directions, thus making completion of the Project impossible. Vento dep. 129:10-130:3, 130:15-132:6. A significant portion of the work remaining unfinished between February 8, 2002, and the date when ATSIC was terminated was directly related to the control room work that ATSIC was required by USPS not to complete. Vento dep. 116:18-117:11; Zamora dep. 32:6-22; Dep. Ex. 34 ("Microsoft Project" printout).

26. By June 20, 2002, USPS had paid ATSIC approximately $1,078,719.20 under the Contract, excluding retainage as provided for by the Contract. Thus, by no later than June 20, 2002, more than 82 percent of the Contract value had been earned and paid to ATSIC under the Contract. Dep. Ex. 40. Moreover, additional work in the amount of approximately $116,392.81 had been completed by May 20, 2002, and requisitioned by ATSIC, but not yet paid. Dep. Ex. 21. Thus, the total of the work completed by that date, all of which had been approved by the Project Manager, SEC, was $1,195,112.01, which constituted over 91% of the original Contract amount. See Vento dep. 132:17-133:3.

27. At the time the Contracting Officer issued the final decision to terminate the Contract, Contract funds in the amount of $269,671.61 remained unpaid. Dep. Ex. 20.

28. Joseph Stuhl of SEC consistently manifested his intention to terminate the Contract prematurely and divert Project funds to friends and favored parties. Vento dep. 85:24-86:14, 96:4-97:3, 147:4-148:1. Mr. Stuhl made no secret that he wanted Tri-State Life Safety & Electric System, Inc. ("Tri-State"), the company that was ultimately retained to complete the Project, to be retained for that purpose. Vento dep. 99:11-101:20; Warren dep. 77:4-22; Dep. Ex. 18. In May of 2002, ATSIC contacted Tri-State to ask Tri-State to consider completing the P&DC Project for ATSIC. Warren dep. 77:4-22, Dep. Ex. 18. Tri-State indicated interest in doing so for approximately $215,000.00, which was less than the amount remaining and unpaid under the Contract. Dep. Ex. 20 (showing $269,672.21 remaining unpaid). After a site visit by Tri-State followed by finalizing discussions, Tri-State suddenly stopped communicating with ATSIC, and, within days, Stuhl and the Contracting Officer entered into an agreement with ATSIC, intending thereby to resolve the

outstanding issues in return for a short extension of the completion date. Dep. Ex. 31A (Modification No. 11). However, the Contracting Officer delayed signing Modification No. 11 until June 20, 2002, leaving less than 3-1/2 weeks for ATSIC to complete the Project. Less than one month later, without Stuhl lifting the restrictions against completing some portions of the work, ATSIC was removed from the Project and, shortly thereafter, terminated. Dep. Ex. 12, 32. Tri-State was then retained by the Government at a substantially higher contract price to complete the Project. Vento dep. 101:21-104:23, 149:2-14; Warren dep. 78:15-24; Dep. Ex. 18.

29. After terminating ATSIC, but expecting to charge it excess reprocurement costs, Mr. Stuhl actively and candidly diverted funds, meanwhile expending unnecessary funds, by diverting work to a person who he describes in his communications as his "good buddy," Joseph Erickson. Three emails between Messrs. Stuhl and Erickson clearly illustrate the diversion. Mot. Ex. 5, 6, 7. In Exhibit 5, Mr. Stuhl writes, "I think there is some extra money left in the contract," and, then, tongue in cheek, "Thanks for making this easy on me, we both know that you had a chance to take advantage of the dumb engineer." In Exhibit 7, Mr. Erickson, writing to Mr. Stuhl about the "gate situation," which was still not resolved more than 21 months after ATSIC was ordered to cease working, and speaking of the Postal Service management, says candidly (because he was only addressing his "good buddy") that "they deserve what they get and (sic) unless and until sane management comes to the District."

30. The relevant portion of Section H.6, Termination for Default, of the USPS Facilities Department Contract Requirements, which the USPS Contracting Officer referenced in his first Show Cause letter (see Exhibit 3 to this Motion), provides as follows:

**H.6 Termination for Default**
**(Clause B-13) (January 1997)**

a.

(1) The Postal Service may, subject to Paragraphs c and d below, by written notice of default to the supplier, terminate this contract in whole or in part if the supplier fails to:

(a) Complete the requirements of this contract within the tie specified in the contract or any extension;
(b) Make progress, so as to endanger performance of this contract (but see paragraph d below); or
(c) Perform any of the other provisions of this contract(but see subparagraph a.2 following).

(2) The postal Service's right to terminate this contract under a.1(b) and (c) above may be exercised if the supplier does not cure the failure within ten days (or more is authorized in writing by the contracting officer) after receipt of the notice from the contracting officer specifying the failure.

. . .

c. . . . the supplier is not liable for any excess costs if the failure to perform the contract arises from causes beyond the control and without the fault or negligence of the supplier.

. . .

g. If, after termination, it is determined that the supplier was not in default, or that the delay was excusable, the rights and obligations of the parties will be the same as if the termination had been issued for convenience.

31. USPS waived termination for cause as a remedy by course of dealing. ATSIC continually relied on the Postal Service forbearance to forge ahead with the portion of the Project that it was permitted to prosecute; thereby incurring increased, exaggerated overhead during the excessively long Postal Service delays.

32. The Postal Service failed to comply with the requirements of Part 49 of the Federal Acquisition Regulations ("FAR"), in that USPS had taken action that "might be construed as a waiver of the Contract delivery or performance date." FAR §49.402-3(c).

33. In order to set a new date for the Contractor to complete performance, USPS was

required to send a notice to the Contractor, which notice must have reserved "the Government's rights under the Default clause." FAR §49.402-3(c).

34. The Postal Service failed to give ATSIC notice of a new completion date that reserved the Postal Service's rights under the Default clause. Contract Modification No. 11 reinstated a liquidated damages provision of the Contract that had been previously waived, but did not reinstate the right to terminate the Contractor for default for failure of timely completion. Dep. Ex. 31A.

35. Because of its failure to follow the FAR §49.402-3(c) procedures after action that might have been construed as a waiver, the USPS was barred from terminating ATSIC for default.

36. By entering into Contract Modification No. 11, Dep. Ex. 31A, the parties agreed, *inter alia*, to a new failure of completion remedy. By virtue of the negotiated solution culminating in Contract Modification No. 11, USPS reinstated its right to liquidated damages beginning on July 15, 2002, as its exclusive remedy for failure of completion. Vento dep. 150:25-151:24; Dep. Ex. 31A. Contract Modification No. 11 did not reinstate the waived contract provision permitting the USPS to enforce the time of performance clause by terminating ATSIC for default. The choice of termination for default due to failure of timely completion was both passively waived by USPS inactivity (Facts 32-34) and then affirmatively superseded by USPS's execution of Contract Modification No. 11. Dep. Ex. 31A.

37. ATSIC would have been able to complete the Project timely within the final Project schedule if ATSIC had received the funds that were required to be paid to it under outstanding pay requisitions and if the rain had not intervened. Zamora dep. 97:23-98:7; Dep. Ex. 17.

38. USPS's explicit written instructions not to complete the control room, issued approximately six months prior to ATSIC's termination, with the result that many other items and components could not be completed or installed, were never rescinded, even after Modification No. 11 was executed. Vento dep. 129:10-130:31, 130:15-132:6; Zamora dep. 32:6-22; Dep. Ex. 34, 56 (Item #3).

39. Suspension of the work by the Contracting Officer requires an extension of the Contract. F.D.§C.2a.

40. Because the completion date of July 15, 2002, set forth in Modification No. 11 was subject to weather delays and payment delays, and because, most importantly, the Postal Service never rescinded its orders for ATSIC not to proceed on certain items due under the Contract, <u>the written plans for which were completely under the control of the Postal Service</u>, the Postal Service was never in a position to be able to determine whether the contractor would be able to complete the project by a proper completion date.

41. ATSIC had consistently, for many months, indicated that the Project could be completed in two months. Dep. Ex 17. By promulgation of the Microsoft Project report, Dep. Ex. 17, ATSIC confirmed that the project could actually be completed in less than six weeks with the Government's cooperation.

42. Even without regard to the Postal Service's failure to rescind its order not to proceed on certain items, the Postal Service dismissed ATSIC's explanation for excusable delay and failed to present any analysis of the permitted excusable delay versus the time necessary to complete the Project. Dep. Ex. 12.

43. Based on the undisputed facts that (i) the extension was negotiated in May of 2002 and gave ATSIC through July 15, 2002, and (ii) ATSIC's own Project Close-Out Schedule (prepared at the USPS Contracting Officer's request, Warren dep. 63:17-64:24) showed that the remaining work would take approximately five weeks once ATSIC was freed to do the work, Dep. Ex. 17 and Warren dep. 68:21-70:6, it is impossible for the Contracting Officer to have reasonably concluded that the work could not be done timely.

44. USPS issued the third and final Show Cause letter without extending the completion date based on USPS's failure to pay the proper claims and requisitions of ATSIC. ATSIC had outstanding its May 20, 2002, requisition for $116,392.81, which had not been paid after 56 days, despite the contractual requirement to pay requisitions in 30 days. Vento dep. 132:17-133:3; F.D. § F.4a1(a)(2).

45. USPS agreed to pay materials at 100% of schedule of values, per Modification No. M10, Dep. Ex. 30, but failed to do so. See Dep. Ex. 20, 26.

46. The Contracting Officer failed to properly consider the fact that ATSIC was delayed by the USPS's delays in making payment in violation of the payment provisions under the Contract. F.D. §C.4a; FAR §49.402-3(f)(1). During the extension period, the USPS continued to delay processing of the payment requisitions and modifications for additional work, leaving the Project without adequate funds to purchase equipment and making timely completion of the Project impossible. Dep. Ex. 21.

47. Given that the time to completion provided to USPS by ATSIC was 35 calendar days once the Postal Service paid the outstanding pay requisitions and rescinded the order preventing

ATSIC from performing work in the control room, Dep. Ex. 17, the Contracting Officer failed to properly consider the cost and the period of time required to obtain completion of the Contract by other means as compared to completion of the work by ATSIC. FAR §49.402-3(f)(4).

48. The plans prepared by the Project Architect or Project Engineer contained numerous defects and deficiencies. Dep. Ex. 56.

49. On January 18, 2002, six months prior to the Government's "stop work" order, ATSIC met with the Project Engineer, and then wrote the Project Engineer, with a copy to the Contract Officer, explaining critical path decisions that the Government had to make before ATSIC could complete the last portion of the Project. Dep. Ex. 23 (re cable, air conditioning, and bulletproof glass decisions). The Government's delay in making such decisions was a principal reason for months of delay.

50. At all relevant times, ATSIC attempted to work with the representatives of the USPS to make sure the Contract was properly and fully completed. Warren dep. 139:10-141:17; Dep. Ex. 28 (offering joint payment alternative rejected by USPS).

51. On July 19, 2002, ATSIC provided a letter, in response to the July 15, 2002, Show Cause letter, to USPS showing (i) that its critical path work had been delayed because of nearly continuous rain during June and early July, 2002, and (ii) because of USPS's failure to timely process payment applications. Warren dep. 89:13-90:13, 95:24-96:5; Dep. Ex. 21 (showing delays of 37 days for rain and 24 days for late payment). The letter included, *inter alia*, National Weather Service records showing rain on 37 of the previous 48 days, Zamora dep. 55:14-23; Dep. Ex. 21, and delays due to the Government's failure to pay outstanding invoices. This uncontroverted information

requires the Contract Officer (i) to extend the delivery schedule accordingly, and (ii) to recognize that, in the event of termination, "the supplier will not be in default." F.D. §C3a.

52. The Contracting Officer failed to properly consider the fact that ATSIC was entitled to an equitable extension of the time of performance because of excessive rain, which delayed its work. F.D. §C3a; FAR §49.402-3(f)(1). Significant and persistent rain, which effectively halted the trenching and the gate and closed circuit television installation and testing of the electronic security components to be installed by ATSIC under the Contract, rendered timely completion impossible. Warren dep. 146:16-147:7, 148:25-150:4; Zamora dep. 26:24-27:14, 73:15-74:11; Ex. 33, 42 (detailing persistent rain in June 2002), 43. Some of the rain was heavy (several inches in a day), Dep. Ex. 21, which could effectively halt trenching work for an additional day. Furthermore, some work had to be completed before other work could be done, so ATSIC equitably required 35 days. Zamora dep. 70:24-7:6; Dep. Ex. 17 (schedule printout).

53. On August 16, 2002, USPS issued its Termination for Default, effective July 31, 2002. From July 15, 2002, to July 31, 2002, it was impossible for ATSIC to complete the work, even if the rainy weather cleared, because ATSIC remained under the USPS order to "cease all work."

54. F.D. §H.6a expressly predicates the Postal Service's right to terminate a supplier for default on the prior requirement that the supplier not cure a failure within ten days . . ."after receipt of the notice from the Contracting Officer specifying the failure." The Contracting Officer expressly acknowledged the requirement of a cure period in the first Show Cause letter. Mot. Ex. 3.

55. The Postal Service notice letter (third Show Cause letter) never provided a cure

notice that specified the items to be cured, Dep. Ex. 9, as required by F.D. §H.6a. ATSIC repeatedly stated that, if the Postal Service would fulfill its responsibilities of providing payments due to ATSIC and rescind its prior instructions not to complete the control room, then, with proper consideration for weather delays, the Project could and would be completed timely. Zamora dep. 97:23-98:7, Dep. Ex. 17.

56. Because the Postal Service Contracting Officer issued a "stop work" letter the same date as the third Show Cause letter, Dep. Ex. 32, the "stop work" letter would have made the cure period a nullity. Because of the Postal Service's failure to provide time to cure, which is a condition precedent to the right to terminate for default, the termination must be deemed to be for convenience pursuant to F.D. §H.6g.

57. On May 1, 2002, the USPS Contacting Officer issued a letter to ATSIC explicitly revising the Contract completion date to September 10, 2002. Dep. Ex. 5; Warren dep. 121:7-24 (ATSIC relied on revised date).

58. On June 20, 2002, the USPS Contracting Officer issued Modification No. M02 on Contract No. 123125-00-B-3153 (the AMC Project) in which, in consideration for ATSIC's agreement to be terminated for convenience from the AMC Project contract and pay USPS $52,137.10 from ATSIC's P&DC Project receipts, the Postal Service agreed in writing to a revised completion date on the P&DC Contract of December 19, 2002. Dep. Ex. 53; Vento dep. 155:17-21.

59. The Postal Service's (i) failure to approve change orders and modifications for more than ten months, (ii) failure to rectify over many months its orders to ATSIC not to proceed with certain portions of the work due to failure of the Postal Service to provide design plans, which was

completely within its hands (SEC was an engineering firm), (iii) disingenuousness by Stuhl telling ATSIC on-site that work was acceptable and then writing reports to Goddard that it was not, and (iv) failure to pay approved requisitions timely and to approve requisitions for work actually completed, all of which unfairly and unreasonably lengthened the period required for completion of the Project, constitute a breach of the covenant of good faith and fair dealing. Mot. Ex. 1.

Furthermore, USPS first issued its second Show Cause letter with a September 10, 2002, completion date, followed by its Modification No. 02 on the AMC Contract specifying a PD&C Contract completion date of December 19, 2002. Then it asserted a July 15, 2002, completion date on June 20, 2002, which it knew from the construction schedule was inadequate to complete the five weeks of work remaining. Dep. Ex. 17. This short period to a new completion date, after two assertions of a later completion date, evidences neither good faith nor fair dealing.

For all the foregoing reasons, USPS acted with conscious indifference to the rights, obligations, and interests of the Plaintiffs; with improper motive; and in a manner of unfair dealing. Such actions of USPS constitute a breach of the covenant of good faith and fair dealing with regard to the Contract and the bonds issued by International Fidelity for the Contract. Accordingly, the termination for default of ATSIC under the Contract was improper, not in the best interest of USPS, and should be converted to a termination for convenience.

60. The "supplier is not liable for any excess costs if the failure to perform the contract arises from causes beyond the control without the fault or negligence of the supplier." F.D. §H.6c. USPS's unrescinded orders not to proceed on portions of the Project, the severe inclement weather, USPS's failure to make timely payments, and USPS's premature notice requiring ATSIC to cease

the work, each of which was a sufficient cause of ATSIC's failure to have completed the Project by the date ATSIC was terminated, were all beyond the control and without the fault or negligence of ATSIC.

61. The Project was adequately manned when there was work to do. Warren dep. 115:11-116:7 (staffed according to conditions), 116:8-118:18 (can't do much of the work in the rain); Zamora 38:22-39:1 ("there was (sic) always personnel to find the work that needed to be done"). Even SEC acknowledged on June 10, 2002, that "my inspection revealed that some progress has been made by ATC and it appears they are increasing their effort at this facility." Dep. Ex. 19.

62. Among other things, Section 6.9.3b7(6) of the Purchasing Manual requires that, in a termination for default, the Postal Service "[i]nform the supplier that the termination is subject to Clause B-9, *Claims and Disputes*." The Postal Service Notice of Termination neither contained the specified language nor contains a copy of Clause B-9 (F.D § H.3 of the Contact). Dep. Ex. 12. Accordingly, the Notice of Termination was substantially and fatally defective and cannot serve as the basis for a termination for default.

63. Section 6.9.3b7(a) of the Purchasing Manual requires that, if a contracting officer is going to issue a notice of termination for default, he must do so "<u>immediately</u>" upon determining that termination is proper. The Show Cause letter was issued July 15, 2002, before the completion date had elapsed. Dep. Ex. 9. Nonetheless, ATSIC responded with its reasonable basis for the delay (including weather issues and USPS financing issues) by July 19, 2002. Dep. Ex. 21. The Contracting Officer obviously made his decision in July to terminate ATSIC for default, because he issued the termination "effective July 31, 2002." However, he delayed issuing the Notice of

Termination until August 16, 2002. Dep. Ex. 12. This delay cannot be construed as "immediately,"as required by the Postal Service. Accordingly, the Notice of Termination cannot serve as the basis for a termination for default.

64. The USPS did not award attorneys fees to ATSIC, and ATSIC is seeking review. Second Amended Complaint, ¶¶ 29, 43, 48, 54, and 65.

65. ATSIC is entitled to attorneys fees pursuant to the Equal Access to Justice Act, 5 USCA §504, and 28 USCA §2412.

66. The parties executed as of June 19, 2002, an Agreement of Settlement Between the Parties ("Settlement Agreement") settling a dispute regarding another contract between the parties designated Contract #123125-00-3153 (on the "AMC Project"). Dep. Ex. 29. Under the terms of the Settlement Agreement, Postal Service was to receive the sum of $52,137.10 solely on the condition that it "be withheld from Contract No.123125-00-B-3154 [the P&DC Project]." Dep. Ex. 29 at Par. C. This requirement is corroborated by Mod. 2 of the AMC Project, which provides that $52,137.10 was to be withheld from . . . contract no. 123125-00-B-3154." Dep. Ex. 29, 53; Vento dep. 153:20-154:8, 155:2-9; Warren dep. 141:20-143:7.

67. The Settlement Agreement explicitly provides and binds the USPS that it is "intended to constitute full and final . . . disposition of all matters arising under the Contract No. 123125-00-B-3153, [and] shall constitute a full release and complete accord and satisfaction as to any and all claims, demands or causes of action, actual or constructive, legal, equitable, or contractual, either party has against the other which arise under [Contract No. 123125-00-B-3153]" and "shall constitute a full release." Dep. Ex. 29 at Par. D.

Respectfully submitted on this 28th day of April, 2006.

E. SCOTT GOLDEN & ASSOCIATES
Attorneys for Plaintiff Advanced
Technology Systems Integrators Corp.
644 S.E. Fourth Avenue
Fort Lauderdale, FL 33301
Tel.: (954) 764-6766 ext. 2
Fax: (954) 764-6789
Email: esglaw@bellsouth.net

s/E. Scott Golden
E. Scott Golden

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by electronic transmission to the following persons as of this 28th day of April, 2006.

Michael J. Dierberg, Esquire
U.S. Department of Justice, Civil Division
Commercial Litigation Branch
1100 L. Street NW, Room 12116
Washington, D.C. 20530

Helen H. Albee, Esquire
HENRICHSEN SIEGEL, P.L.L.C.
1648 Osceola St.
Jacksonville, FL 32204

s/E. Scott Golden
E. Scott Golden