IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

CASE NO. 03-1953C
Sr. Judge Margolis

ADVANCED TECHNOLOGY SYSTEMS INTEGRATORS CORP. and INTERNATIONAL FIDELITY INSURANCE COMPANY,

Plaintiffs,

vs.

THE UNITED STATES
Defendants

99 N. E. 4th Street
Miami, Florida
Wednesday, 9:00 a.m.
October 12th, 2005

DEPOSITION OF JOSE ZAMORA

Taken on behalf of the Defendant before LOIS E. GUFFEY, RDR, Notary Public in and for the State of Florida at Large, pursuant to a Notice of Taking Deposition filed in the above cause.

APPEARANCES:

LAW OFFICE OF E. SCOTT GOLDEN
644 S. E. 4th Avenue
Ft. Lauderdale, FL 33301
By: E. Scott Golden, Esq.
Attorney for Advanced Technology.

HENRICHSEN SIEGEL PLLC
1648 Osceola Street
Jacksonville, FL 32204
By: Helen Albee, Esq. BY TELEPHONE
Attorney for International Fidelity.

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20004
By: Michael J. Dierberg, Esq.,
Appearing on behalf of the Defendant.

*** I N D E X ***

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JOSE ZAMORA | 4 | 52 | 97 | 100 |

EXHIBITS FOR IDENTIFICATION


| | |
|---|---|
| 31A, Modification 11 | 59 |
| 34, letter 3-18-02 to Stuhl | 31 |
| 35, change order, 3-6-02 to Stuhl | 75 |
| 36, field investigation report | 75 |
| 37, letter, 3-6-02 to Stuhl | 79 |
| 38, letter, 3-6-02 to Goddard | 80 |
| 39, letter, 3-18-02 to Stuhl | 82 |
| 40, letter, 4-3-02 to Goddard | 84 |
| 41, letter, 4-19-02 to Stuhl | 84 |
| 42, fax response, 7-15-02 to Stuhl | 86 |
| 43, fax, 7-18-02 to Goddard | 88 |
| 44, letter, 8-9-02 to Stuhl | 90 |
| 45, fax, 8-20-02 to Zamora | 92 |
| 46, letter, 11-1-02 to Zamora | 94 |
| 47, letter, 10-25-02 to Goddard | 95 |
| 48, response to field investigation | 99 |

Thereupon:

JOSE ZAMORA

was called as a witness and having been first duly sworn, was examined and testified on his oath as follows:

DIRECT EXAMINATION

BY MR. DIERBERG:

Q. We are here for the deposition of Jose Zamora. Mr. Zamora, where do you live currently?
A. The full address, Miami Florida.
Q. What is your address?
A. 19958 Northwest Eighth Avenue.
MR. DIERBERG: I am Michael Dierberg, attorney for the Department of Justice.
MR. GOLDEN: I am Scott Golden, attorney for Advanced Technology.
MR. DIERBERG: On the phone is Helen Albee for International Fidelity.
MS. ALBEE: That's correct.

BY MR. DIERBERG:

Q. Mr. Zamora, have you been deposed before?
A. Once.
Q. When was that?
A. Four or five years ago.
Q. Was that in connection with Advanced

Technology?

A. Yes.

Q. What was that about?

A. It was for Sawgrass Mills, a project they had done there.

Q. And what happened?

A. It was relating to a shooting that happened just before the mall had opened.

Q. Well, since you have been through it once before I will refresh your memory on the general process. If you need to take a break for any reason, bathroom, et cetera, we can go off the record. If you don't understand a question I ask, please, ask me to ask the question again.

A. Okay.

Q. I can perhaps rephrase it. What have you done to prepare for today's deposition?

A. Other than basically showing up, I am no longer employed by ATC so --

Q. Have you reviewed any documents?

A. No. I have no documents to review.

Q. The subpoena to you was a subpoena demanding you to bring documents with you to the extent you have documents. Did you bring any documents?

A. I have no documents. When I left ATC I left all documents. I have nothing in my possession.

MR. GOLDEN: Could I remind both of you not to speak over each other. Don't answer when he is still asking and don't start your next question until he finishes his answer.

BY MR. DIERBERG:

Q. Have you talked to any former employees of ATC since leaving Advanced Technology?

A. Yes.

Q. Who have you talked to?

A. Mostly the techs. That was in reference to them calling me with questions relating to projects that were ongoing already.

Q. Who did you talk to?

A. Most of the technical team there, of which aren't there anymore.

Q. Who is the part of the technical team?

A. There is a Richard Rebolito. I have spoken to Tom -- I am not sure what his last name was.

Q. This was to inquire about them becoming part of a current project you are working on?

A. Yeah.

Q. Have they become a part of that project?
A. As far as I know, I believe so. I haven't really had contact with anybody there in the last two months or so.
Q. How about Vincent Vento have you talked to him?
A. He has called me two or three times with reference to this, but that was mostly phone messages. I have never actually had the time to sit and talk to him.
Q. My understanding is you were in Africa on this past Thursday. You returned from Africa; is that correct?
A. Correct.
Q. Today is Wednesday. Will the jet lag that you might have or had -- do you still have jet lag?
A. No. I am fine.
Q. Would that prevent you -- would the return prevent you from answering the questions today in an honest and truthful way?
A. No. I don't see why it should.
Q. Can you tell me about your education?
A. I had two years of community college and a year at FIU here in Miami.
Q. What is FIU?

A. Florida International University.
Q. Do you have any engineering education?
A. No.
Q. Where are you currently employed?
A. ITF Group.
Q. What does that stand for?
A. Just the initials.
Q. Where is that company based?
A. We are based out of Miami.
Q. What do they do?
A. We are -- my division is the security group so we design and install security systems.
Q. How many employees; do you know?
A. Here in the States we have only got like four.
Q. What about abroad?
A. Abroad we have a couple of dozen.
Q. What's the typical size of a project you guys worked on?
A. Size as far as?
Q. The cost of the project, the --
MR. GOLDEN: I object to relevance. You can ask but I don't see how it's relevant.
THE WITNESS: Yeah. I would rather not answer that one.

BY MR. DIERBERG:

Q. Unless there is a privilege you have to answer the question.

A. Other than it doesn't relate to this. I mean that's a project, and for security reasons, that's it, due to the nature of the customers that we have overseas.

Q. You can't say the --

A. No.

Q. -- size of the project?

A. No.

Q. You are not going to answer the question?

A. No.

Q. What is your role at ITF?

A. Basically to lay out and design the security systems and then facilitate the installation.

Q. I don't know that I need to know the name of this person but what is the person you report to? What's the -- would be the title of the person you report to?

A. That would be the owner of the company. And his name is Serge Pereira.

Q. How long have you been at ITF?

A. Six months now? Since February.

Q. Where were you before that?
A. ATC.
Q. When you say ATC, were you at ATC International or were you at Advanced Technology?
A. It was ATC International at that time.
Q. Were you ever employed by Advanced Technology?
A. Yes.
Q. When were you employed at Advanced Technology?
A. I came on board in 1995?
Q. When did you leave Advanced Technology?
A. When it was -- when it turned into ATC International.
Q. When was that?
A. I don't have the exact date. It was three or four years ago.
Q. When you -- when you say Advanced Technology turned into ATC International, did your role change?
A. No.
Q. What was your role when you started ATC International?
A. I believe I was a project manager at that time.

Q. And when you left Advanced Technology you were a project manager, correct?
A. Correct.
Q. When did you start as a project manager at Advanced Technology?
A. At the same time. I mean it wasn't a -- it was basically, for the employees, a name change.
Q. No. I am sorry. At Advanced Technology did you start in 1995 as a project manager?
A. No. I started there as a technician in '95.
Q. Then what was your next role or job at Advanced Technology?
A. Over the years just kind of worked up to technician, to service, to managing projects.
Q. When you say service, what does that mean?
A. Service technician.
Q. What is the difference between a technician and a service technician?
A. Basically the same.
Q. What was your --
A. More responsibilities over time.
Q. What were your responsibilities as technician and service technician?
A. As a technician it was more like a helper.

Q. What about service technician?
A. I was pretty much on my own to do service.
Q. Was there a particular system that you specialized in or a certain part of the project you might work on?
A. It was mostly access control and CCTV.
MR. GOLDEN: Can I interrupt you for just a second. Can we go off the record for a second?
MR. DIERBERG: Uh-huh.
(Discussion off the record)
BY MR. DIERBERG:
Q. So you said you worked primarily on access control and CCTV?
A. Correct.
Q. When did you become a project manager?
A. Had to have been four or five years after I was there. I don't really have an exact date. It wasn't like an instant promotion. It was more, all of a sudden, you are doing the job.
Q. Do you recall what project that was that you were working on?
A. No, I don't.
Q. Was it -- do you remember if it was the Advanced Technology -- sorry -- the P & DC project

or any of the postal projects?
A. It was well before that.
Q. Now you said that Advanced Technology turned into ATC International. Could you explain that?
A. Like I said, as far as we knew, it was basically a name change. We didn't -- it was more of an administrative -- the employees, nothing changed.
Q. Let's go over the employees at Advanced Technology. Before Advanced Technology became ATC International who were the employees of Advanced Technology?
A. I wouldn't be able to give you exact names.
Q. Do you remember how many employees there were at the time?
A. There had to have been like ten, 15 somewhere.
Q. Is this full-time employees or are you talking about people on the project?
A. Those were full-time employees, like office personnel and --
Q. And then when it became ATC International how many employees were there?

A. I believe it was about the same. I don't -- at that time I don't remember if anybody specifically came on.

MR. GOLDEN: Objection to the designation "when it became." There is no evidence regarding it becoming. He said from the -- Mr. Zamora talked about, from the employees' point of view, what changes occurred, but there is no evidence here that one became --

MR. DIERBERG: Are you objecting to his answer?

MR. GOLDEN: No. I am objecting to the question.

MR. DIERBERG: What was the objection to the question?

MR. GOLDEN: When you said "when it became." And the "it" obviously referred back to --

MR. DIERBERG: Advanced Technology.

MR. GOLDEN: -- Advanced Technology. There is no evidence here that it ever became.

MR. DIERBERG: He testified it did. That it went from Advanced Technology to ATC International. You shouldn't testify for him.

MR. GOLDEN: I am not testifying for him.

The judge will make the determination regarding his testimony. That's not the issue. The issue is I am objecting to your characterization of what he said. I don't believe that is what he said. And so -- anyway, just an objection for the record.

BY MR. DIERBERG:

Q. So what about the office? Where was the office of ATC International?

A. At that time I believe we were at -- we were in the Design District off of Miami Avenue and like 36 Street.

Q. Was that the same office as Advanced Technology when Advanced Technology closed?

A. Yes.

Q. What were you told about the change from Advanced Technology to ATC International?

A. Excuse me?

Q. What were you told about that, about the change from Advanced Technology to ATC International?

A. Like I said, at that point, for the employees, as far as we know, it was basically a name change. We didn't change offices, we didn't -- it was just a new name. That was all

handled on an administrative level.
Q. Did anyone discuss this with you, the change?
A. Not specifically that I remember.
Q. In general terms?
A. Like -- in general terms it was like I said, just a name change.
Q. Did Mr. Vento -- prior to the end of Advanced Technology did Mr. Vento discuss with you being a part ATC International?
A. What do you mean by that?
Q. Did he ask you to become a part of ATC International?
A. No. Like I said, as far as we knew, it was basically a name change. I mean our duties never changed.
Q. Did you do any work on the AMC project? When I say AMC project do you know what I am referring to?
A. The post office, yes.
Q. There are two different facilities, correct, the AMC facility and the P & DC facility?
A. Correct.
Q. So did you do any work on the AMC facility?

A. Yes.
Q. What did you do for the AMC facility?
A. On that one I -- once it was already started I was pretty much facilitating the installation on the security end.
Q. Were you project manager?
A. Yeah. Technically I guess you could say I was project manager.
Q. But you didn't start off as project manager on that project?
A. Excuse me?
Q. Did you start off as project manager on the AMC project?
A. What do you mean did I start off?
Q. Let me rephrase it. When the AMC project began were you the project manager?
A. Yes. On the security end.
Q. What other end is there? What other part?
A. There was a high voltage section of both of those projects.
Q. So you were not the project manager on the high voltage aspect?
A. No. There was an electrical, I guess, contractor that was overseeing that.
Q. Who was that?

A. Gill McDonald.

Q. And was he also the project manager as far as the high voltage on the P & DC project?

A. Yes.

Did you lose her.

MR. DIERBERG: Are you still there, Helen?

MS. ALBEE: Yes.

BY MR. DIERBERG:

Q. How did the two postal projects, the AMC and the P & DC project, how did they compare to the other projects that Advanced Technology had been working on?

A. In --

MR. GOLDEN: Objection. Ambiguous, vague.

THE WITNESS: They were both security projects. I mean other than that.

BY MR. DIERBERG:

Q. What about as far as the size of the project? Was it typical of the size of the project that Advanced Technology worked on it?

A. As far as the security end it was pretty much up there with most of the other projects.

Q. You mean size wise?

A. Size wise.

Q. I think you said you started in 1995 --

A. '95.
Q. -- with Advanced Technology. What did you do before Advanced Technology?
A. I worked for a company named Amtell Security.
Q. What did you do for Amtell?
A. It's -- I was there for two years. I started off as a technician inside, assembling circuit boards, then moved into installation for a year.
Q. What did you do before Amtell?
A. Before that I was going to FIU.
Q. When you started with Advanced Technology in 1995 how many projects did Advanced Technology have ongoing? Do you recall?
A. Not an exact number.
Q. Ballpark?
A. If I gave you a ballpark it wouldn't be -- it wouldn't be right. I know there was a lot of projects.
Q. What about at the time that the contract was terminated, the P & DC project was terminated? How many projects did they have ongoing?
A. I couldn't give you an exact number.
Q. Was it more than one?

A. Yes. More than one.
Q. Are you referring to ATC International or are you referring to Advanced Technology?
A. At that time it was Advanced Technology, at the time of the P & DC.
Q. So at the time of the termination of the P & DC project you think they had more than -- they had at least one project ongoing?
A. Yeah.
Q. Do you know what that project was?
A. Like I said, to give you names of projects I wouldn't be able to say 100 percent. That was too far ago.
Q. On the P & DC project when did you first become involved in that project?
A. Both of the projects, for the most part, started at the same time, as far as plans and everything.
Q. And you were involved at the outset of the project?
A. What do you mean?
Q. When the P & DC project started you were involved in the project?
A. Yeah.
Q. Were you involved as project manager?

A. At that point, yes. On the security end, again.
Q. And so essentially there were two project managers on the P & DC project; there was yourself and Gill McDonald?
A. Also; on the electrical, correct.
Q. Was there anyone else?
A. No, at that point.
Q. Who did you report to as project manager on the P & DC project?
A. At that time it was directly to Vince Vento.
Q. Did that change over time?
A. Yeah. Once Greg Warren came on.
Q. Then you reported to Greg Warren?
A. Correct.
Q. What were your responsibilities as project manager on the P & DC project?
A. It started off as ordering the equipment and, you know, facilitating, making sure everything was there and the logistics of the installation.
Q. Did you have any responsibility for doing scheduling?
A. What do you mean, as far as responsibility of the scheduling?

Q. Did you prepare schedules, construction schedules?
A. Yes.
Q. How often did you prepare them?
A. They were pretty much -- they were like weekly schedules.
Q. And you did weekly schedules throughout the project?
A. For the most part. There was like a -- as I recall, we started off like a master schedule and then, for the most part, we tried to adhere to that.
Q. Towards the end did you not do the weekly reports or weekly schedules?
A. There was reports, but as far as a schedule, like I said, there was always a schedule we were trying to adhere by.
Q. And you would update those?
A. Yeah. It would get updated.
Q. Every week?
A. Yeah.
Q. What about monitoring the daily progress? Did you prepare a daily report on the -- what was done each day?
A. Yes. There was daily reports. That was

part of the contract that had to be submitted. I don't honestly remember if they were daily or weekly, but I remember there were reports that had to be submitted along with payments.

Q. So the purpose of preparing these reports was really for the payment requests?

A. Yes. I believe it was a requirement.

Q. Were you responsible for hiring people to work on the project?

A. Not directly.

Q. When you say not directly, what do you mean?

A. The installers were basically our installers, so we -- what was hired on was more the electricians, which fell under Gill.

Q. And so who hired the installers?

A. The installers were part of ATC --

Q. And --

A. -- at the time.

Q. -- who hired them?

A. Would have been the operations manager at that time. I had nothing to do with the hiring of people.

Q. What about monitoring cash flow? Did you monitor cash flow?

A. No.
Q. Did you have anything to do with financial reporting?
A. Not at the beginning of the project.
Q. What about towards the end?
A. Towards the end it was more of a -- just the reports of what -- as far as what was needed to complete the project and so forth.
Q. Have you had any experience preparing cash flow reports --
A. No.
Q. -- or any sort of financial statements?
A. No.
Q. What about contact with subs and suppliers? Were you the primary contact with subs and suppliers?
A. With some but not all of them.
Q. Which ones were you primary contact for?
A. The contact end was more on the equipment as far as like the CCTV and the access control.
Q. So the CCTV, that was -- is it Vicon?
A. Vicon.
Q. And the access control, that was Hirsch?
A. Hirsch.
Q. Who did you talk to at Vicon?

A. I honestly don't remember the name.
Q. Was there one person in particular you talked to?
A. Yes. I believe there was one person that was kind of like in charge of like the post office. It was like a post office division, but as far as who it was, I couldn't tell you.
Q. What about Hirsch? Who was the contact there?
A. That was Scott Elliot.
Q. So any other suppliers that you were the primary contact for?
A. Those were the main ones.
Q. Who handled the other suppliers?
A. That was a function of the office. I couldn't really say specifically who it was.
Q. What about the subs?
A. As far as their work, it would have been me on the job site.
Q. Who were the subs?
A. Exact names, I don't know. Because there was installers also, so I don't know to tell you now which were which. I don't know.
Q. What were the biggest challenges in completing the P & DC project?

A. The biggest challenge is -- towards the end was really the weather.
Q. How was that a challenge?
A. At that time there was a lot of rain, so it was hard to -- we're at the point where time is critical, so a lot of days lost because of the weather.
Q. What time frame are you talking about?
A. I believe it was towards the end of the summer. I couldn't give you an exact -- exact date, because that was too far back.
Q. Are we talking about one month period, several months, a year?
A. I believe it was over a couple of months.
Q. What were the other challenges you faced in completing the P & DC project?
A. If you could give something a little more specific. I don't know. That's kind of --
Q. Were there any technical challenges in completing the project?
A. Technically, it was the same as any other project. I mean it's -- you have -- you have your same technology challenges. At that point I didn't see anything that was different than any other project.

Q. Had you worked with Hirsch before?
A. No. I had never worked with Hirsch before.
Q. What about Vicon?
A. Vicon, yes, I had worked with Vicon before.
Q. And the particular system that Vicon provided had you worked on that before?
A. I don't believe so. Not that specific model number.
Q. What about the turnstiles? Who produced the turnstiles? Is that Dortech?
A. I remember the manufacturer.
Q. Tomsed?
A. Tomsed.
Q. Tomsed?
A. Yeah.
Q. Had you worked with Tomsed before?
A. No.
Q. What about the gates? Had you worked with that particular supplier of gates before?
A. With that type of gate system, cantilevers, yes.
Q. Who was the supplier of the gates?
A. I believe it was Dortech at that time.

Q. What were the other major components of the system that you were installing?
A. That was pretty much it. You had CCTV, the access and the gates.
Q. Can you think of any other challenges that you encountered in the P & DC project?
A. Not -- not specifically.
Q. How often did you talk to Vince Vento about the P & DC project?
A. Weekly, if not daily.
Q. What about when Greg Warren became the -- became involved? How often would you talk to Mr. Vento?
A. At that point most of my contact was with Greg Warren. I couldn't say specifically how many times I -- at that time I had to speak to Vince.
Q. How often would Mr. Vento attend -- let me change the question. How often would Mr. Vento visit the construction site on the P & DC project?
A. I couldn't tell you specifically. I mean he was there -- he was there quite a bit, but I couldn't say he was there every day or he was there every week or --
Q. When Mr. Warren became involved did Mr. Vento become less involved on a day-to-day

basis at the project?
A. On the project, itself, I couldn't say specifically, I mean as far as visits and all that, administratively; I don't know.
Q. How often did you go to the construction site on the P & DC project?
A. I was there every day.
Q. What about the office? Did you go back and forth between the office?
A. Yeah. I mean it was like a daily thing.
Q. How much time did you spend at the office and how much time at the site?
A. That would vary. Most of the time was spent on the job site.
Q. Who was your contact at the postal service?
A. That was -- the main contact was Jerry Goddard and Joseph Stuhl.
Q. How often did you talk to Jerry Goddard?
A. Couldn't say specifically. I spoke more with Joseph Stuhl than with Goddard.
Q. How often would you talk to Mr. Stuhl on the P & DC project?
A. That would vary. I couldn't say whether it was daily or weekly but I gather it's -- monthly

visits, I think they were.
Q. How many face-to-face meetings did you have with Mr. Goddard on the P & DC project?
A. There was a lot of meetings. I couldn't say exactly how many.
Q. Was it more than five?
A. Over the time, yeah.
Q. What about Mr. Stuhl? How many meetings did you have with him on the P & DC project?
A. He was present at just about all of the, I guess, the main meetings. They pretty much revolve around him.
Q. When you say main meetings, what do you mean?
A. Like there was the monthly meetings for the building and the progress reports. We had more day-to-day contact with the architect while he was still there in the beginning of the project.
Q. Who else did you talk to at the Advanced Technology's office? Were there other key people, key employees who you had talked to about the P & DC project?
A. Not really. It was more directly with Vincent, directly with Greg Warren.
Q. I would like to show you a document. What

number are we on now? Do you recall?
MR. DIERBERG: For Helen's benefit this is a letter from Jose Zamora to Joseph Stuhl, dated March 18th, 2002.
BY MR. DIERBERG:
Q. Mr. Zamora, if you could take a minute to read and look through this document.
(Exhibit 34 is marked.)
BY MR. DIERBERG:
Q. Have you had a chance to read this?
A. Yeah. Looked it over.
Q. Is that your signature at the -- on the signature line?
A. Yes.
Q. This is a letter you sent to Joseph Stuhl?
A. Correct.
Q. I would like to ask you to explain this chart that's attached to the letter. Can you tell me what this is?
A. This is a section of a scheduling program of Microsoft project. It doesn't have all the dates or anything attached to it.
Q. Why aren't the dates attached to it?
A. I couldn't tell you that.
Q. Can you tell me a little bit about this

Microsoft program? What does this program do?
A. It's basically designed for scheduling.
Q. What does it do for scheduling?
A. Allows you to put in your tasks and assign times and resources to them.
Q. If you look at the left-hand side you have like a column with ID number, and then the next column has an "i." What does that I mean; do you know?
A. I couldn't tell you because it's not complete.
Q. What about the checkmarks? Do you know what the checkmarks are?
A. On these I couldn't tell you if it's -- if it denotes completed or what.
Q. Or the -- there is a box with two smaller boxes inside. Do you know what that is?
A. No, I couldn't tell you.
Q. Or at the top next to -- on the first ID number, number 1, there is a check. Then there are two other icons next to it. Do you know what those are?
A. No, I do not.
Q. Or number 4 there is a check and then another item -- go off the record.

(Whereupon, there was a brief interruption.)

MR. GOLDEN: Assuming that's Joann, I guess you and I do have to discuss this now.

MR. DIERBERG: Off the record.

(Thereupon, a brief recess was taken after which the following proceedings were had:)

MR. DIERBERG: Helen, I think we are not going to have Joann.

MR. GOLDEN: This is Scott. I told Joann just to go ahead and go back to work.

MS. ALBEE: Okay.

MR. GOLDEN: So we avoid this argument.

Okay. Back on the record.

BY MR. DIERBERG:

Q. Again, turning to Exhibit 34, at the bottom right corner there is a legend that has -- identifies various codes or I guess markings?

A. Correct.

Q. I don't see a whole lot of these markings on the page.

A. That's what I told you. This isn't all of the schedule.

Q. So you think there was more to the schedule and it wasn't printed out?

A. Quite possibly. I mean it's too far back

to remember actually submitting it, so I couldn't tell you what was actually part of it.

Q. This Microsoft program could you use this to do critical path analysis?

A. Yes.

Q. Did you do a critical path analysis at this time in March of 2002?

A. Couldn't tell you if it was at this time or not. I know there was one done during the course of the project.

Q. There was just one done?

A. That I am not sure. We worked off one schedule that was constantly updated, so I couldn't say specifically one way or the other.

Q. Do you know if it was towards the end of the project, beginning of the project, this critical path analysis was done?

A. I couldn't tell you.

Q. Do you know who Fabio Perez Polo is?

A. Yes. He was an architect, I believe?

Q. Did he do some work on the P & DC project?

A. He had worked on one of them. I couldn't tell you which one it was. It possibly was the P & DC.

Q. What did he do?

A. I know he had done a couple of schedules and some letters and so forth.

Q. What was the purpose of him doing the letters and schedules?

A. That I couldn't say specifically. I just know that he was kind of there. I am not sure if he was there as an employee or what his real function was.

Q. You don't know why he was there?

A. No.

MR. DIERBERG: Let's go off the record.

(Discussion off the record)

BY MR. DIERBERG:

Q. I show you what has been marked as Exhibit 13 (indicating). For your benefit these are notes dated March 15th, 2002.

A. These are whose notes?

Q. Why don't you read it. Then I will ask you some questions about it.

A. Okay.

Q. Have you had a chance to read this document?

A. Yes. I have read over it.

Q. Do you recognize the handwriting?

A. No.

Q. Do you know whose notes these are?
A. No, I do not.
Q. On the the first page, "Re: USPS PD & C Mod number 3, response from SEC." Second line says: "45 days, Jose said they did the analysis with Fabio previously and we concluded we can't prove 45 days are" -- can't make out that last word. Does that refresh your recollection as to Fabio Perez Polo and what you might have been doing on the P & DC project?
A. No. He was present at a few meetings and he wasn't there for very long. So I couldn't tell you how -- how often he was there.
Q. I would like to show you what has been previously marked as Exhibit 5 (indicating).
A. Okay.
Q. Have you had a chance to read the document?
A. Yes.
Q. This is a letter from Jerry Goddard to Vincent Vento, dated May 1st, 2002. Do you recall seeing this document?
A. I believe I did read it at one point.
Q. In this letter, Mr. Goddard indicates that the notice to proceed on the above referenced

project was issued January 15th, 2001 for the 230-day construction term. The revised contract completion date is now September 10th, 2002. Next paragraph he identifies some failures to perform, and the second bullet point is: "Failure to provide submittals." Do you remember any discussions about a failure to provide submittals?

A. In the beginning of the project I know there was a lot of back and forth with the submittal process but I don't remember which project it was on, because the two projects unfortunately were kind of intertwined as far as the starts of them.

Q. What about the failure to provide backup documentation for change requests?

A. Not sure what that refers to.

Q. Or a failure to provide updated construction completion schedule?

A. All I can say is there were schedules done. As far as whether they weren't submitted as per the request or not, not sure.

Q. What about failure to adequately man the project?

A. For the time that I was there and the work needed to be done there was always personnel to

find the work that needed to be done.

Q. Failure to supply required equipment/materials?

A. From what I remember, everything was there for the installation. As far as the time frames of it I am not -- I couldn't say.

Q. What did you do in response to this letter, if anything?

A. I couldn't say what happened after this letter. I mean it was too far back.

Q. I would like to show you what has been previously marked as Exhibit 16. This is a memo from Greg Warren to Vincent Vento, dated May 13th, 2002. If you could take a minute to read this.

A. Okay.

Q. I -- I would like to direct your attention to the chart that is attached to this memo. Do you recall why you produced this document?

A. This was, from what I remember, towards the end of the project, and this is what was required to complete it as far as dollarwise.

Q. And you did produce this document, right, this attachment?

A. Most of the spreadsheets look like it's -- I think I did.

Q. Did someone assist you in this?
A. Yes. It would have had to have been like the accounting department and everything.
Q. Do you recall who in the accounting department?
A. At that time I couldn't tell you who it was.
Q. But you remember that somebody from the accounting department helped you?
A. Yeah.
Q. On the first page of the memo, the only page of the memo, it refers to a final strategy regarding the USPS situation. What was that about?
A. That would have been between Vincent and Greg.
Q. And the last paragraph says -- last sentence: "Obviously this is not ideal but we need to formulate a response today."
Do you recall why there was a need for a response?
A. No, I do not. Again would have been between them.
Q. Looking again to the chart on the first page, the left-hand column, there is no title to the columns. I guess it's just various items,

correct, that needed to be completed?
A. Yeah. These would have been attached to the items to be completed.
Q. And then the second column, manufacturer, contractor, those are items that had been completed but still not paid, correct?
A. I couldn't tell you if they had been completed and not paid or if it was just amounts due.
Q. What about the third column, materials?
A. I believe those are costs associated with those -- with those tasks. Materials required to complete those tasks.
Q. And then the farthest right column, total cost, that's the cost just for the labor, correct, the labor days, number of men?
A. Yeah. That looks like it's for the labor. Doesn't correspond with the others.
Q. Then on the second page of that spreadsheet, under "manufacturers," the first one is Hirsch, and that second column is 45,000. The third column is 15,000. Is 45,000 amounts owing to Hirsch for work that's already been -- or for items that have already been provided?
A. I believe so, but I am not positive. I

believe that first line is what's -- what's due.

Q. Then the 15,000 would be what's remaining?

A. Remaining to purchase.

Q. And the same way with Vicon?

A. Correct.

Q. For Hirsch and Vicon can you explain at this point in time -- this is May of 2002 -- what did that $45,000 represent? What was owing? Why was there money owing to Hirsch?

A. At that point I believe we had most of the materials in-house so it had to have been just like a balance due.

Q. Is that the same way with Viacon?

A. Correct.

Q. What about Ocean Rentals? What's that for?

A. I couldn't tell you which rentals that was for. I mean I know we had rented -- a lot of equipment was rented. I don't know specifically what came from that.

Q. What about Richards Electric?

A. Richards Electric, that is an electrical supply house so that would have been like conduit and stuff like that, I believe.

Q. Turning again to the memo on the first

page, the -- midway through the second paragraph says: "The bottom line is that the USPS is willing to settle today for $264,080 total remaining to be paid and it seems our total costs outstanding plus our costs to complete exceed $438,567. The approximate net loss is $174,486."

Do you recall discussing any of these numbers with anyone at Advanced Technology?

A. Other than submitting them to Greg, no. Couldn't say specifically if I had actually spoken to anybody else.

Q. Was this cause for alarm that the approximate net loss is 174,486?

MR. GOLDEN: Objection. No predicate.

THE WITNESS: That's an administrative deal. My job was just to put the numbers together.

BY MR. DIERBERG:

Q. I would like to show you what was previously marked Exhibit 17 (indicating). This is a -- can I change with you?

A. Okay.

Q. Have you had a chance to review this document?

A. Yes, I did.

Q. Exhibit 17 is a fax from Greg Warren to Jerry Goddard. Have you seen this document before?
A. I believe I did read this before.
Q. I would like to direct your attention to the last page, which is a schedule similar to the schedule we saw before except this one has some dates.
A. Correct.
Q. And did you create this document?
A. I couldn't say specifically, but it's probable.
Q. Who else could have created this document?
A. At that point it was probably -- I would say it was me. I said there was one schedule that was created and that's what was used throughout the project.
Q. Before you mentioned the CPM schedule. Is this what you are referring to as the CPM schedule?
A. CPM?
Q. Yeah.
A. I never mentioned a CPM.
Q. Critical path?
A. Oh, the critical path. Don't know if this one was the critical path or not.
Q. You said this computer program has the

capability of doing a critical path --
A. Correct.
Q. -- analysis?
A. (Witness nods head.)
Q. But you don't know if that was done and just not made it as an attachment?
A. Correct. I don't know.
Q. How did you determine these dates?
A. At that point it was based on work that needed to be done. I couldn't say specifically now why X number of days compared to others.
Q. But for each item you input the start date and finish date, correct?
A. Correct.
Q. Can you tell me the status of the purchasing as of May 10th, 2002 for each of these items?
A. It would have to be what -- the dates are there. I couldn't say specifically why, why those dates at this point.
Q. But each of these items needed to be purchased? I guess the turnstiles needed to be purchased?
A. At this point I couldn't tell you datewise whether they were there or not.

Q. For other items, for example, the turnstile installation, can you tell me what the status was as of May 10th, 2002?
A. No.
Q. Same for main lobby construction?
A. Correct.
Q. For each of these items, if I asked you the you status as of May 10th --
A. I couldn't tell you.
Q. I would like to show you what has been previously marked as Exhibit 18 (indicating).
A. Okay.
Q. Exhibit 18 is a memo from yourself to Greg Warren, correct?
A. Correct.
Q. Do you recall any discussions with Donna TePas at TriState?
A. I know I have spoken to her on the phone. I honestly couldn't say if I actually met with her or not.
Q. Why were you talking to her?
A. According to the letter it was to have her complete the project.
Q. Do you recall?
A. I don't know if this was before or after

the termination, though.

Q. Do you recall who initiated the idea of contacting TriState?

A. It had to have been either Vince or Greg.

Q. And do you recall any of the discussions you had with Ms. TePas?

A. No, I couldn't say. No.

Q. Do you know whose handwriting this is on the page?

A. I believe it's Greg's but I couldn't say positively.

Q. This note says: "6-18, JZ said her price was 215 K to finish with exclusions."

Does that refresh your memory about a conversation you had with her?

A. Because I know I had spoken to her on the phone and it was a couple back and forth, but specifics, I couldn't say.

Q. Do you know why TriState was never asked or didn't -- let me rephrase the question. Do you know why TriState did not complete the project at the request of Advanced Technology?

MR. GOLDEN: Objection. Ambiguous, vague.

THE WITNESS: I do not know.

BY MR. DIERBERG:

Q. I would like to show you what has been previously marked as Exhibit 20 (indicating).
A. Okay.
Q. Have you had a chance to review this document?
A. Yes.
Q. The first page of the document is facility and fixed mechanization project contract payment authorization. Do you recall seeing this document?
A. Not specifically this but this one is a payment application.
Q. Do you recall any discussions around this time frame about a payment application?
A. Yeah. I went through most of the payment applications with Stuhl.
Q. You were the primary contact with Stuhl on the payment applications?
A. Yeah, at the time of review.
Q. What would you do?
A. At that point we would basically go through, we would present -- this is what we would like to be paid for. Then he would verify whether the work was done or not.
Q. Do you recall any discussions about this payment application in particular?

A. I couldn't say specifically. On this one.
Q. If you look at the second page of this document it's a spreadsheet. Did you produce this spreadsheet?
A. This is a -- this is a standard AIA document. This is what was used for all of the billing.
Q. And who produced this document?
A. I probably helped fill it all in, fill in the numbers. The document, itself, is existing.
Q. Did anyone assist you in filling in the numbers?
A. At that point it had to have been the accounting department.
Q. In the fourth page through the last page of this document are pictures of gates. Do you know why there are pictures of gates attached to this document?
A. We were probably at that time asking for payment on the gates. We were asking for payment on the gates.
Q. Handing you a document previously marked as Exhibit 30. It says, "Contract modification number 10."
A. Okay.

Q. Have you had a chance to review this document?
A. Yes.
Q. Have you seen this document before?
A. I couldn't say specifically if I have seen this one.
Q. Do you recall any discussions about contract modification number 10?
A. Not specifically.
Q. Were you involved in the discussions regarding contract modifications in general?
A. In general, yes, but I couldn't say specifically, no. There were a number of modifications.
Q. The handwritten portion where it says: "This settlement is also based on approval," et cetera, do you recall any discussions about that?
A. No.
Q. I hand you a document that's been previously labeled as Exhibit No. 31. This is modification number 11. I would like to give you some time to read this (indicating).
A. Okay.
Q. Have you had a chance to review this document?

A. Yes.
Q. Do you recall receiving this or do you recall seeing this document?
A. Once again, more than likely yes, but specifically this modification I couldn't say one from the other. There were several modifications.
Q. Do you recall any discussions about this modification?
A. Not specifically.
Q. Do you recall any discussions about the items contained in the modification?
A. Specifically?
Q. In general terms.
A. In general terms, I mean there were several modifications. But to say specifics, conversations on one or the other, I couldn't say that far back.
Q. I would like to show you what has been previously marked as Exhibit 9 (indicating).
A. Okay.
Q. Have you had a chance to review this document?
A. Yes.
Q. This is a letter from Jerry Goddard to Vincent Vento, dated July 15th, 2002. Do you

recall seeing this document?
A. I couldn't say specifically but I probably did read it.
Q. In the -- regarding title it says: "Third show cause, Miami Florida, GMF security access and control system." Do you recall any discussion about a third show cause letter?
A. Not specifically.
Q. In general terms do you recall any discussion about a third show cause?
A. In general I know we discussed the termination of this but I am not sure specifically the third show cause.
Q. As of this date, July 15th, 2002 was the project complete?
A. I couldn't say specifically on dates.
Q. I would like to show you what was previously marked Exhibit 10.
A. Okay.
Q. Exhibit 10 is a letter from Jerry Goddard to Vincent Vento, dated July 15th, 2002. Do you recall seeing this document?
A. Once again, probably did see it but I couldn't say specifically.
Q. On the bottom right-hand side there is

some handwriting. Do you recognize the handwriting?
A. No.
Q. It indicates it was delivered at -- by Jerry Goddard to Greg Warren on July 31st, 2002. Do you recall when you saw this document? When you might have seen this document?
A. It probably would have been at this meeting with them.
Q. But you don't recall specifically when you first saw this?
A. No.
Q. Do you recall whether you -- do you recall when you were first told, either orally or in writing, to stop work?
A. I believe it was at this meeting. I think I was there with Greg Warren at the meeting.
Q. And who was at the meeting?
A. I couldn't say specifically.
Q. Do you remember where the meeting was?
A. I believe it was at the P & DC. If I am not mistaken, it was in the conference room.
Q. Do you recall any discussions at that meeting?
A. No.

Q. I would like to show you what has been previously marked as Exhibit 21. This is a letter, dated July 19th, 2002 from Greg Warren to Jerry Goddard. Would you take some time to read this document.
A. Okay.
Q. Have you had a chance to review there document?
A. Yes.
Q. Do you recall seeing this document?
A. Not specifically the letter but I do remember the weather charts.
Q. Do you recall any discussions about the items in this letter?
A. In general with Greg Warren.
Q. And what did you discuss?
A. My part was mostly the delays due to the weather.
Q. Sir, are you the one who found this preliminary local climatological data for Miami, Florida?
A. I believe so.
Q. Can you explain what this -- can you explain how to read this document?
A. No, I could not.

Q. Let's take -- the left-hand column says DY. Would that be day?

MR. GOLDEN: Objection. Speculation.

THE WITNESS: Couldn't tell you.

BY MR. DIERBERG:

Q. What input did you have in asking for -- let me rephrase the question. What input did you have in requesting an extension to August 16th, 2002?

A. I couldn't say specifically.

Q. In general.

A. In general, other than discussing with Greg Warren I couldn't say specifically.

Q. In this letter it indicates that there were 37 days of rain in the last 48 days. For every day that it rained were you prevented from doing any work, whatsoever, on the project?

A. From what I recall, yes. I believe at that point most of the work was outside.

Q. What work needed to be done at that point?

A. I believe it was like the gate work and work out in the parking lot. Couldn't say specifically exactly what was left out there.

Q. If I read the chart correctly I will just assume -- assume this to be the case. If, for

example, there was 1.3 inches of rain on -- take a different day. Let's say on June 14th. If I read the chart correctly there were point 07 inches of rain. Do you recall what work needed to be done on June 14th?

A. No, I couldn't say.

Q. What about June 15th?

A. I couldn't say.

Q. If I ask you for any of these days would you recall what work needed to be done on that day?

A. No, I could not.

Q. Do you recall, as of July 15th, 2002, what specific items needed to be done?

A. No, I do not.

Q. I would like to return to Exhibit 17 and turn to the last page of this document --

A. Okay.

Q. -- which is a schedule of days. If I were to ask you for each of these items on, let's say, June 15th, which of these items needed to be completed, can you tell me which items needed to be completed as of June 15th?

A. Which items needed to be completed by June 15th?

Q. Yes.

A. It would be all of them, according to this --

Q. No. I am sorry. This is a schedule that was done in -- a proposed schedule, correct, that was done in May?

A. May.

Q. -- (continuing) of '02, and it's a projection, correct, of things that needed to be done. And I am asking you just to use this as a reference of the items that still needed to be done after May. I am trying to determine what needed to be done after June. If you could tell me, for example, on June 15th, which of these items were complete and which of these items still needed to be done.

A. According to the schedule, everything should have been done by June 14th.

Q. But can you tell me if it was done by June 14th?

A. No, I could not.

Q. If I take a week later can you tell me what was done and what needed to be done as of June 21st?

A. No, I couldn't. No.

Q. July 1st?

A. No.

Q. And so as of July 15th, you couldn't tell me any of these -- which of these items needed to be done?

A. No, I couldn't.

MR. DIERBERG: Could I take a five-minute break?

MR. GOLDEN: Sure.

MR. DIERBERG: Off the record.

(Thereupon, a brief recess was taken after which the following proceedings were had without the witness, Mr. Zamora, being present:)

MR. GOLDEN: On the record. An issue has come up regarding the deposition exhibit marked 31 at the deposition of Greg Warren, which was taken on October 11, 2005. I noted that the item marked Exhibit 31 does not appear to be the same as the one that I asked the witness to review, in that the one that I asked him to review seems to have additional handwriting markings, and, therefore, simply to be appended to Mr. Warren's deposition, not in the body but appended just to note that I believe there is a discrepancy and that the one that I actually asked him to review we will mark as Exhibit 31A

for identification so that the record is clear as to what I believe occurred. And if Mr. Dierberg has anything he needs to say about that he is welcome.

MR. DIERBERG: I object to marking it as Exhibit 31A. I think we can discuss this for the record. And he has brought this to my attention. I think we don't know which document in fact Mr. Warren saw at that time. I didn't have a copy of either document at that time, so one document, I believe, Mr. Golden had. Whether the witness had one document or the other I don't know. But I think we should leave that as an issue to discuss later.

MR. GOLDEN: My sole purpose in marking it is so it can be identified if we ever have a reason to bring this to the court and there won't been a question six months from now what document I am talking about. It doesn't prejudice either party simply to mark it as identification. I have no problem with Mr. Dierberg maintaining all of his rights to object to it being introduced for any purpose. I would simply like it marked for purposes of identification and for no other purpose, so the

court can know what documents I am talking about.

MR. DIERBERG: I can agree to that.

MS. ALBEE: I have no objection to that.

MR. GOLDEN: Okay.

MR. DIERBERG: Go off the record.

(Discussion off the record, after which the following proceedings are had with Mr. Zamora:)

(Exhibit 31A is marked.)

BY MR. DIERBERG:

Q. Back on the record. Mr. Zamora, I would like to ask you again about Exhibit 21. At the bottom of the first page of Exhibit 21, and again, this is a letter of July 19th, 2002 from Greg Warren to Jerry Goddard. The bottom of this first page refers to cash flow delay of 24 days. Did you assist in coming up with this number of 24 days?

A. I couldn't say specifically.

Q. Or in general?

A. In general, probably.

Q. Do you recall why it was 24 days?

A. I couldn't say how -- a number, how the number of 24 days came up.

Q. Could you explain how cash flow contributed to a delay in the project? Let me

strike the question and ask you a different question. Do you believe that cash flow contributed to the delay in the project?

A. I would say yes. I know there were issues with some of the payments.

Q. What were those issues?

A. From what I knew, I think it was discrepancies between what Stuhl said was complete and what was complete.

Q. Anything else?

A. Payments. Specifically, I couldn't say what else. Too far back.

Q. After the termination of the project, the P & DC project, what did you do in connection with the P & DC project, if anything?

A. I believe after the termination that I had no involvement in it after that.

Q. Did you visit the site after termination?

A. I don't believe so, no.

Q. Did you have any meetings with Joe Stuhl after termination?

A. I don't believe so.

Q. How about any meetings with Jerry Goddard?

A. No, I don't think so.

Q. Do you recall any discussions about

missing equipment on the P & DC project after termination?

A. Not specifically, but I remember there was a spreadsheet or something that went through -- I think we did have to go through and check off what was there and what was not. I don't remember if it was like that day or afterwards.

Q. Did you have any communications during the P & DC project with International Fidelity?

A. No, not directly.

Q. Indirectly, though, you had some communications?

A. I believe it was towards the end of the project, if not at the end of it. And I couldn't tell you what they were. I know there was a representative there who visited the site a couple of times.

Q. Was that Richard Sexton?

A. Yes.

Q. Do you recall any discussions with Richard Sexton?

A. Not specifically.

Q. What about Frank Whelan? Do you recall any discussions with Frank Whelan?

A. I recall the name but I couldn't say who

that is.
Q. What about the -- are you aware that Hirsch submitted a payment bond claim?
A. I heard rumors of it, not specifically who was asking for claims. I don't know specifically.
Q. Were you involved in Advanced Technology's efforts to address the issues with Hirsch?
A. No. As far as I -- like all the payments and so forth, no. That was all administrative.
Q. What about Viacon?
A. Same thing.
Q. Did you do that with any of the suppliers?
A. No.
Q. When did you start the next project? Sorry. When did you start a project for ATC International?
A. I couldn't say specifically from the change of date to when we started the next project. I mean I couldn't say which it was.
MR. DIERBERG: I have no further questions.

CROSS EXAMINATION

BY MR. GOLDEN:
Q. Mr. Zamora, my name is Scott Golden. I represent Advanced Technology in this lawsuit and I

do have a few questions. You indicated earlier that, as far as you were concerned, you went from being an employee of Advanced Technology to ATC essentially seamlessly. All you were aware of essentially was a name change for those two companies; is that right?

A. Correct.

Q. Okay. Were you a corporate officer of Advanced Technology?

A. No.

Q. Were you a corporate officer of ATC?

A. No.

Q. Do you know if ATC and Advanced Technology had the same owners?

A. Other than Vince Vento, I don't know if there was anybody else involved.

Q. The last project I think you said that you worked on for Advanced Technology was the postal service project; is that correct?

A. I believe so.

Q. Okay. Was that -- was the postal service project an ATC project or was it an Advanced Technology project?

A. I believe it was an Advanced Technology project.

Q. And did every -- did anybody ever stop you in middle of that project and say now it's an ATC project?
A. No.
Q. You indicated earlier you did not recall what project you worked on next or what time frame that was. I don't remember what you said. But whatever project you worked on for -- worked on next did anybody ever stop you in the middle of that one and say we started as Advanced Technology and we're finishing as ATC? Did that ever happen?
A. No.
Q. So every project that you recall working on for these two companies was either for one company or for the other company; is that correct?
A. Like I said, as far as I was concerned it was a name change. I couldn't say we started one as one name and finished one as another.
Q. My question is: Do you recall ever starting one under one name and finishing any project under the other name?
A. No. I wouldn't say that.
Q. There was a little confusion earlier I think about the question of the master schedule, and there was a question about whether, when you

did updates, you just changed or amended that schedule or you actually did a brand-new schedule each time. What was your -- what was your procedure to update the master schedule? Did you do a brand-new schedule each time or did you somehow amend the old schedule?

A. Amended the original schedule. I don't believe we ever actually made a new schedule to start. The original one just kept growing and changing.

Q. I want to show you again what was previously marked as Exhibit 16, which is a memorandum from Greg Warren to Vince Vento, dated May 13th of 2002. The first question -- Mr. Dierberg already asked you about this memo and the attachment, but do you know for a fact that you ever saw the cover memorandum to this?

A. I couldn't say specifically if I did or not.

Q. You did indicate, though, I believe, that you had preparation -- you were involved in preparation of the attachment which actually has your name on it; is that correct?

A. Correct.

Q. The materials that are listed in the third

column that you indicated were necessary to complete these jobs -- or "job" is not the right word -- the tasks needed for this job -- did Advanced Technology have any of these materials on hand when the job terminated?

A. I couldn't say.

Q. The fact that these materials were required to finish the job, do you know -- does that mean they definitely were not on hand?

A. I couldn't say at that point if they were there or not.

Q. You -- in response to Mr. Dierberg's question you were looking at some of the items called "Manufacturers" on the third page of the exhibit, which is page 2 of the attachment. And specifically discussing Hirsch and Viacon, you indicated that you thought the first column was what was owed to them in total and the second column was what remained owed at this particular time. Is that your understanding of this?

MR. DIERBERG: Objection. That's not what he testified to.

BY MR. GOLDEN:

Q. Please, explain to me what your understanding of that is, because that's what I

understood you to say.
A. I would say that the first column is what was -- what was owed for materials that are already on hand, and the second column would have been for materials still needed to purchase.
Q. Okay. So are you saying that, as of the time that this accounting was put together, as far as you understood, both columns were still owed?
A. No. From what I understood is the first column is what was owed. The second column is what needed to be purchased.
Q. Okay. When you -- I just want to clear up this term "owed." When you say -- let's just talk about Hirsch and let's be very specific here. In -- on this page, Hirsch, it says, owed $45,000. Is it your understanding at the time that zero of that 45,000 had been paid or that some of that 45,000 had been paid?
A. From the way the document is I would have to say the whole 45 had not been paid at that point.
Q. And then Vicon underneath it, for $54,000 and change, the same thing?
A. Would have been the same thing.
Q. The items that comprise the rest of that

manufacturers column, you indicated one of them, for instance, Richards Electric, was a supply house?

A. Correct.

Q. If these items were general supplies needed to do the installations and whatever that were required in the project, why were they under this column marked "Manufacturer" or "Contractor"? Why were they not under the materials column?

A. I couldn't tell you why they were put there at that time.

Q. I guess the question I am asking is: Is it possible that what is -- it says here is owed to, as an example, Richards Electric, is some of the same items that are in the materials column as being needed to complete the job?

A. I couldn't say specifically. I can only go off what documents is there.

Q. Exhibit 17, the four-page document starting with a cover page from Greg Warren to Jerry Goddard, the final page Mr. Dierberg also asked you about had dates on it for starting and finishing work. By looking through this entire exhibit can you tell when this schedule to complete was prepared?

A. No.
Q. Can you --
A. Other than before the first starting date here. May 10 is the earliest date.
Q. So sometime before May 10th this schedule to complete was prepared?
A. Should have been, according to the dates.
Q. Can you tell from that whether these particular items that are listed on this closeout schedule had yet been done?
A. I would have to go with what's on the schedule. I couldn't tell you specifically whether one was done or started or finished.
Q. Okay. Let me address the question to finish, not start, because I understand something might have been started but still not be done so it's still on your schedule. So let's talk about finished. Does the fact that it's on the schedule indicate that those items had not yet been finished?
A. I would say yes, that they were on the schedule and, yeah, they wouldn't -- at that time would not have been finished yet.
Q. Was it necessary to do some of the items before you could do other of the items that are on

the schedule?
A. Yes. I -- on a normal schedule, obviously, some items had to be done before others. On this particular one I would have to go with what's on the schedule. I couldn't say what preceded what.
Q. But do you know if that's the reason why the start dates are not all the same?
A. Probably.
Q. Let me show you now Exhibit 20. This is the one that Mr. Dierberg asked you about the fact that there were some pictures of gates attached to the end of the exhibit.
A. Correct.
Q. Do you know who took these pictures?
A. Couldn't say specifically.
Q. Do you recognize whether these gates are on site when these pictures are taken?
A. According to the pictures, looks like they were taken on site.
Q. You are familiar with the site?
A. Yeah.
Q. Okay. So whenever these pictures were taken there is no question the gates were there?
A. Correct.

Q. Can you tell whether the gates had yet been installed at the time the pictures were taken?
A. No. It doesn't look like they had been installed completely yet.
Q. Can you tell from the document attached to this payment authorization request whether the gates were paid for? Are you able to tell that from that document?
MR. DIERBERG: Objection. Vague. Paid for by who?
BY MR. GOLDEN:
Q. Good question. Let me rephrase it. Can you tell from this document whether the government had yet paid Advanced Technology for the gates that were on site?
A. According to the document, 2,500 had been paid and 21,500 is being requested on this payment.
Q. Do you recall offhand whether the government made that payment of 21,500?
A. That I couldn't say. Only on this document it says that's what was paid on the previous applications.
Q. And the 21,500 is what remained to be paid?
A. Is what was being asked for on this

document.

Q. Looking at the front of the document, did Advanced Technology get all of the request that it made on this document?

A. According to this, they asked for 93,759 and were paid 63 -- or was to be paid 63,000.

Q. Do you know what was cut in order to reduce the amount from over 93,000 to 63,000?

A. No, I do not. It's not marked on the spreadsheet.

Q. So do you know whether the gates were part of what was cut by going from 93,000 to 63,000?

A. I couldn't tell you what the difference was for.

Q. You indicated earlier that there were delays due to weather, and the trenching that needed to be done on the project -- can the trenching be done during rainy weather?

A. No, it cannot.

Q. Can the gates be erected during rainy weather?

A. No, it cannot.

Q. Do the -- are the gates just physical gates or do they have like electronic components?

A. They're electric motors to control them.

Q. Were there any kind of card readers, something like that, for people to be able to get in and out of the gates?

A. On -- yes. There were some of the gates there was card readers.

Q. Can -- is it considered good workmanship to erect the electronic motors in the rain?

A. No.

Q. Is it considered good workmanship to erect the electronic card readers in the rain?

A. No.

Q. Are you aware of whether a lack of cash flow caused the company not to be able to purchase some materials that it needed for this job?

A. I know there was cash flow issues towards the end of the project. Whether or not they related to nonpayment, I couldn't say specifically.

MR. GOLDEN: Off the record for a minute, please.

(Discussion off the record)

MR. GOLDEN: We can go back on.

BY MR. GOLDEN:

Q. Mr. Zamora, I am handing you a multiple page document, dated March 6, 2002, which appears to be a letter from you to Mr. Stuhl. Attached to

it is a document entitled, "change order." I will give you a minute to review that document, please.

A. Okay.

Q. Let's begin by -- is that your signature on this document?

A. Yes.

Q. So this letter was prepared at your request?

A. Yes.

Q. What is the purpose of this letter, please?

A. From what I understand here, the -- there was a proposal for the gate, for one of the gates, that was not accepted at the time of the contract, and it looks like there they were resubmitting an updated price.

Q. Do you know whether this change order was accepted?

A. I couldn't say specifically. I don't remember.

Q. Is that typically the way you would submit for additional -- strike that. Is this typically the way Advanced Technology would submit for a change order?

A. Yes.

MR. GOLDEN: If we could mark this. What are we up to, 35?
(Exhibit 35 is marked.)
BY MR. GOLDEN:
Q. Mr. Zamora, next we have handed you a letter, dated March 5, 2002 which appears to be from Mr. Stuhl's office to Jerry Goddard with a copy to you. And I will give you a minute to review it and then I have a few questions.
A. Okay.
Q. Do you recall receiving this letter from Mr. Stuhl?
A. Not this one specifically. There was -- there were several reports from him.
Q. Was it common for you to receive a copy of Mr. Stuhl's field investigation reports?
A. Yes.
Q. Do you recall ever responding to any of those reports?
A. Yes. I believe I responded to most of them.
MR. GOLDEN: Mark this next, please.
(Exhibit 36 is marked.)
THE WITNESS: Go ahead.
BY MR. GOLDEN:

Q. This is a two-page letter from you to Joseph Stuhl, dated March 6, 2002 saying that you are responding to the prior day field investigation report. Is this your response to the letter that we -- that you just reviewed?
A. It appears so.
Q. Okay. Do you recall what the issue was that leads to your paragraph entitled, "Modification number 4"?
A. From what I recall, there was an issue with the depth and type of conduit that was used.
Q. And do you recall whether Mr. Stuhl, at his field review, approved what Advanced Technology had done?
A. It would have had to have been on the next report. It was just submitted as -- as contract here.
MR. GOLDEN: Could we get back 36, please.
BY MR. GOLDEN:
Q. All right. Let me ask you to review, in Exhibit 36, Mr. Stuhl's comment, and then you can review your response in Exhibit -- in the next exhibit.
A. Okay.
Q. Under the modification number 4 issue in

these two letters, had Mr. Stuhl approved the type of conduit and the depth at which Advanced Technology placed the conduit?

A. Appears that -- here that he did accept it.

Q. And did he, nonetheless, make this an issue in his letter to Jerry Goddard as if it was something wrong?

A. Want to rephrase that again?

Q. Despite the fact that he approved it, did he, nevertheless, make this an issue with Jerry Goddard as if Advanced Technology had done something wrong?

A. Yes. He's making light of a point that wasn't -- that didn't need to be.

Q. Was this the only time that Mr. Stuhl ever approved something in the field and then, in his written report, made it look different than what he had approved in the field?

A. That had happened on a few occasions.

Q. So this is not the only incident of that.

A. Correct.

Q. On your response on March 6th you indicate in a couple of places that you have not yet received the PDL -- that's all capitals -- to start

the work. What is the PDL?

A. I don't remember what the initials stand for, but I believe it was a document from the post office stating you're allowed to start the modifications; you know, approval letter.

Q. So without that document you were not allowed to start the modification?

A. Basically. It's not -- wasn't approved.

Q. So if Advanced Technology and Mr. Stuhl in the field agreed something needed to be done a particular way, required the modification to be prepared, the modification was prepared, it still had to be approved by Jerry Goddard before you could move forward; is that correct?

A. Correct.

Q. Therefore, if the work was not subsequently done by Advanced Technology it couldn't be done because the PDL hadn't been issued. Do I understand this correctly?

A. You're correct.

Q. So in modification number 2, in your March 6th letter where you say the PDL has not issued, and modification 9, where you say a PDL is not issued, as of this time Advanced Technology couldn't have done that work even if it wanted to,

was ready to staff it and had all of the materials, correct?

A. Correct.

MR. GOLDEN: Mark this as 37, please.

(Exhibit 37 is marked.)

BY MR. GOLDEN:

Q. Was there ever an issue with Mr. Stuhl about Advanced Technology's not having sufficient manpower on the job?

A. It was brought up in several reports.

Q. Let me show you another letter, dated March 6th, from you in this case to Mr. Goddard addressing two points. First there was apparently some kind of question about whether you had men on the job and you responded to that. Do you recall specifically what the issue was at that time regarding the men on the job?

A. It seems like it refers to one of the modifications that I guess Stuhl wanted to have done that we hadn't started because we hadn't had the approval to starting it.

Q. So apparently you again had some difficulty with the fact that Stuhl was indicating you weren't doing something and you weren't even approved to do it yet.

A. According to the letter, yeah.
MR. GOLDEN: If you could mark this 38, please.
(Exhibit 38 is marked.)
BY MR. GOLDEN:
Q. Next we have a March 18, 2002 letter from you to Mr. Stuhl. Let me rephrase it. We have actually three letters, all dated March 18th, 2002 from Mr. Zamora to Mr. Stuhl and let me ask you to just to review all of them together as a composite to see if they are from you.
A. Here.
Q. Were you the person who sent each of these three letters?
A. It appears so.
Q. Were there occasions in which you didn't actually sign the letter, you just had your name typed in, such as on these letters?
A. That I couldn't say. I don't know if they were actually sent out or if other copies were sent out. But everything that was sent out was always signed.
Q. Okay. Do you know whose handwriting is on the first page?
A. That is mine.

Q. And on the second page?
A. Also.
Q. And then there is an intermediate third page which is not a letter. Do you know whose handwriting that is?
A. That is mine.
Q. Can you tell me what that says?
A. "Respond to SEC letter, dated, sent to USPS. See attachment."
Q. And then on the fourth page there is also handwriting. Is that yours as well?
A. Yes.
Q. Okay. Does any of this help you to know whether any of these letters were sent or not?
A. These copies, I don't think were sent. They may have been revised and then resent.
Q. I see. Do you know what the purpose of these letters was?
A. Had to have been in response to letters from Stuhl.
Q. Now each of these letters addresses item numbers, item 1, or 2 or 3. Would those correspond to letters from Mr. Stuhl?
A. They should.
MR. GOLDEN: Mark this the next exhibit,

please.
(Exhibit 39 is marked.)
BY MR. GOLDEN:
Q. Were all of the letters that you sent to Mr. Stuhl or Mr. Goddard accurate to the best of your knowledge when you sent them?
A. Yes, they were.
Q. You didn't put anything in letters to be posturing or anything like that?
A. No.
Q. Next we have April 3rd letter from you to Mr. Goddard attached to a payment authorization request. Let me ask you to review that, and let me know when you're finished.
A. Okay.
Q. What was the purpose of the April 3rd letter you have before you?
A. It appears we're disputing a deduction in one of the payments.
Q. How much was the deduction?
A. According to this, 75 percent.
Q. Is it true that when payment requests are made by a contractor such as Advanced Technology that different people can reasonably dispute exactly how much should be paid under that payment

request?
A. Normally, yeah. It's never carved in stone.
Q. Actually, face her. I will talk louder. In your experience have you ever seen a situation where a 75 percent payment reduction from what was requested was reasonable?
A. No. The variants are usually minimal, never really to that extent.
Q. This letter also addressed something having to do with pay application 15. Can you tell me what that was?
A. Not without seeing 15.
Q. What is your point in the letter about pay ap, application 15?
A. The deduction was made on pay ap number 15. And it's being resubmitted on pay ap number 16.
Q. Is the pay ap 16 the one that's attached?
A. Yes. 16 is attached.
Q. Is there somewhere on here where 16 is designated? Because I have never seen that.
A. Yeah. Here we go. 16 (indicating).
MR. GOLDEN: I am asking for a number. I am sorry. Could you, please, mark that the

next exhibit. I apologize.

(Exhibit 40 is marked.)

BY MR. GOLDEN:

Q. I have handed you now a letter, dated April 19, 2002. It appears to be a two-page letter from you to Mr. Stuhl. Could you review it, please, and let me know if that is, in fact, a letter from you?

A. Yes, it is.

Q. Do you recall the purpose of that letter?

A. This is a response to one of his field reports.

Q. Okay. And without going through all of the responses and all of the items, as you said earlier, the -- all of the responses were what you understood to be the situation at the time you wrote these letters?

A. Correct.

Q. Okay. That would be fine. Will you, please, mark that the next exhibit?

(Exhibit 41 is marked.)

MR. GOLDEN: What's the date?

MR. DIERBERG: April 19th.

MR. GOLDEN: Thank you.

THE WITNESS: Okay.

BY MR. GOLDEN:

Q. We have for you a multiple page for your review, a multiple-page document, a total of six pages. It appears to be a fax from you to Mr. Stuhl followed by the letter from you of three pages to Mr. Stuhl, followed by a couple of pages of shop drawings from AMP NetConnect. Can you tell me the purpose of this letter, dated June 24th, '02 was?

A. Response to a field report from Mr. Stuhl.

Q. Leave aside for the minute that you might have had disagreements with Mr. Stuhl about the amount of work that was done or what was done. Was Mr. Stuhl generally, in your opinion, thorough in terms of his review of the -- when he did his field inspections?

A. From what I remember, yes. Most of the reports were fairly thorough.

Q. So if there was a discrepancy, in terms of what Mr. Stuhl thought should be done versus what Advanced Technology was doing on the job, did you generally find those discrepancies in Mr. Stuhl's reports?

A. When there were, yes.

Q. Okay. All right. And can you tell us

what the purpose of the June 24th letter before you is?

A. That's just a response to his field investigation report, dated June 10th.

Q. So if you, in this letter, mention that you have a discrepancy on behalf of Advanced Technology with Mr. Stuhl then this is a recitation of your opinion of that situation?

A. Correct.

MR. GOLDEN: Madam Reporter, could we mark this the next exhibit, please.

THE REPORTER: 42.

(Exhibit 42 is marked.)

BY MR. GOLDEN:

Q. Next we have a two-page document. The cover page is a fax, then a one-page letter that appears to be from you to Mr. Goddard. Could you review it and let me know if that is in fact your signature?

A. Yes, it is.

Q. Did you send that letter to Mr. Goddard?

A. Appears so.

Q. Can you tell me the purpose of that letter, dated July 18, 2002?

A. Correction of a date on a letter

previously sent.
Q. Okay. And can you tell us what the underlying purpose of the letter was? Not just the date correction but the underlying purpose that of letter.
A. Stating there had been delays due to the rain.
Q. All right. Are you aware of whether Mr. Goddard, in fact, was made aware of the delays due to the rain?
A. Beyond sending him the letters?
Q. Yes. Did you ever have any communications with him that would let you know that he knew that was Advanced Technology's position?
A. Other than sending us a letter, I couldn't say if I had spoken to him to follow up with it or not.
Q. Let's go back to the situation as it existed. Was there a lot of rain in the period right around and before July 17th of 2002?
A. I would have to go with what's on the documents. I mean I couldn't say specifically. I remember there was bad weather, but I would have to go with what's on the -- what was listed at that time.

Q. Now you indicated here that there -- that it had rained 40 of the last 45 days. At that time was that your understanding of the situation?
A. Yes.
Q. Okay. Would the rain have stopped you from doing the outside work at the -- on the project?
A. Yes, it would have.
MR. GOLDEN: If we can mark that next exhibit, please.
(Exhibit 43 is marked.)
BY MR. GOLDEN:
Q. Handing you for review a two-page letter, dated August 9, 2002 from you to Mr. Stuhl.
A. Okay.
Q. And is that -- did you in fact write this letter?
A. Yes.
Q. Okay. And can you tell me what the purpose of this letter was?
A. This is a response to a letter from Stuhl.
Q. Okay. And there is some handwritten -- there is a handwritten note in the upper right of the letter. Do you know who wrote that note?
A. I believe that's Greg Warren.

Q. You are familiar with his handwriting?
A. And his initials (indicating).
Q. And on the second page there is also some handwriting. Do you know who wrote that note?
A. Also appears to be Greg.
Q. Greg -- what is Greg's note? Is Greg's note to you or to somebody else?
A. That is -- appears to be me.
Q. What was the purpose of Greg's note to you?
A. Jose, Joe Stuhl will be here tomorrow to do inventory on -- I am not sure what that is -- to be present. Like he's telling me I need to be there to meet with Stuhl.
Q. Mr. Dierberg asked you earlier about whether you had done anything on the project after the termination. I want to make a distinction between the technical legal date of the termination and the winding up of the project. Without regard to the technical legal date, when -- after Advanced Technology was no longer doing any work on the project were there some things you needed to do to wind up Advanced Technology's position on the project?
A. Like I said, it was inventory, and I

believe there was a meeting or two afterwards with Stuhl to go through what equipment was there and what was not there.

Q. Were you present for those meetings?

A. I know I was there for at least one or two.

Q. Okay. Mark this the next exhibit, please.

(Exhibit 44 is marked.)

MR. GOLDEN: May I have 44 back for a minute, please?

BY MR. GOLDEN:

Q. In what has now been marked Exhibit 44 there is a reference in what is marked as item 1 as a need to get ID badges. Now your letter is dated August 9th. Do you know as of August 9th, 2002 whether ATC had technically been removed yet from the job?

A. I couldn't say. I am not sure what the exact termination date was.

Q. Okay. Do you know if the date of the termination letter is the same as the date of termination that is set forth in that letter?

A. I couldn't say if they were the same date.

Q. Okay. I show you now a fax transmittal from Jay Goddard to Jose Zamora, a total of three

pages, regarding Miami GMF dash security with a comment handwritten: "Items missing from ACS system only." Do you recall ever receiving this fax?
A. I couldn't say specifically if I received it.
Q. There are 16 numbered items at the bottom of the first page of the fax. Could you just take a minute and look through and see if you recall whether or not any of those items were on site?
A. I couldn't say specifically if they were all there or not.
Q. I am curious about number 16. It says 1,500 employee ID badges were missing. Was Advanced Technology responsible for 1,500 employee ID badges?
A. I don't remember what the total number of badges was that we were supposed to supply.
Q. Had they ever -- to your recollection, had the badges ever been supplied to the job site?
A. I don't remember specifically if they were for P & DC at that time. I know we supplied badges, but there was a mixture of two projects when we did the badges.
Q. Okay. I am not sure I asked the question

this way before, so I will ask it again. Do you recall whether any of the items in number 1 through 16 were actually ever brought to the job site?

A. I couldn't say accurately whether they were or not.

MR. GOLDEN: Could you mark this the next number, please.

(Exhibit 45 is marked.)

BY MR. GOLDEN:

Q. I am handing you now a number of documents. I think they're all dated November 1st of 2002. And there are various letters that go back and forth. Let me put it on the record. There is a one-page letter from Jerry Goddard to you, dated November 1, 2002, followed by a fax cover sheet from SEC, which is Stuhl's company, followed by a November 1st letter from Mr. Stuhl to you, followed by a November 1st letter from SEC to Mr. Goddard, followed by a November 1st letter from you to Mr. Goddard and a fax cover. And we are going to ask for this to be a composite exhibit, but let's just ask -- let me ask you a question or two did about it first. If you will just take a minute to look at the top -- the top page. We will deal with the rest later. Look at the top page and

let me know when you have done that.

A. Okay.

Q. Can you tell me what the purpose of the letter, which is the letter from Mr. Goddard to you on November 1st of 2002, is? Can you tell me what the purpose of that letter is?

A. It appears they're reducing the charges to ATC for equipment that was delivered after the fact, after the contract.

Q. Do you recall that after ATC stopped work on the contract that there were some continuing discussions regarding what kind of credits ATC should get?

A. Yes, there was.

Q. Were you involved in those discussions?

A. Generally. Couldn't say specifically which -- what it was.

Q. Okay. Now there is a lengthy, several-page letter from Stuhl to Goddard as part of this packet, detailing lots of items. At this time would you remember whether any of these items were or were not in place?

A. No, I couldn't say.

MR. GOLDEN: If we can mark this the next exhibit, please.

(Exhibit 46 is marked.)

MR. GOLDEN: Did you get a chance to see this?

MR. DIERBERG: Uh-huh.

BY MR. GOLDEN:

Q. Next I am handing you an October 25th, 2002 letter from you to Mr. Goddard. I am going to ask you to read it and then I will ask you a question about it.

A. Okay.

Q. First, is this a letter sent with your signature?

A. Correct.

Q. And the second paragraph questions a document that Stuhl Engineering Consultants had prepared. Do you recall at this time what that document was?

A. We were responding to a document from Stuhl. I believe it was the previous document.

Q. Do you have any independent recollection today with regard to what these various letters were responding to?

A. They were letters back and forth, responding.

Q. And this letter indicates that Advanced

Technology disagrees with the accuracy of Stuhl's document. Do you know if Advanced Technology prepared a written response to the -- whatever allegations Mr. Stuhl had made?

A. Other than it says here that we were going to, I don't know if there was one or not.

Q. There was also a statement regarding the preliminary cost to complete estimate.

A. Uh-huh.

Q. Did -- and Advanced Technology's request to be able to reduce those. Do you know if Goddard ever had allowed Advanced Technology to work to reduce the costs to complete the project?

A. That I don't know.

MR. DIERBERG: Fair to mark that Exhibit 47?

MR. GOLDEN: Yes, please. I am sorry.

(Exhibit 47 is marked.)

BY MR. GOLDEN:

Q. In your opinion, if the payments from the postal service had been received timely after the payment authorizations -- payment requests were sent in and there hadn't been a delay due to the rain would Advanced Technology have been able to complete the project in a timely manner?

A. That I can't really answer. I mean I would rather not give an opinion on that. The facts are the facts, and it's hard to say one way or the other.

MR. GOLDEN: May I just look at the exhibits for a moment, please?

MR. DIERBERG: The whole stack?

MR. GOLDEN: I know which one I need. I just don't know what to call it so --

MR. DIERBERG: (Indicating).

MR. GOLDEN: The one earlier. The one I need is the one that had the completion dates on it.

MR. DIERBERG: The schedule?

MR. GOLDEN: The schedule on it. This is all off.

(Discussion off the record)

BY MR. GOLDEN:

Q. Back on the record. I am showing you again Exhibit 17, the final page of the exhibit, which is the project closeout schedule that we referred to earlier that had the dates in it for closing out the project. Was it your understanding at this time that if Advanced Technology, in cooperation with the government, had had sufficient

funds and if the rain had not intervened that the project would have been able to be completed according to this schedule that's set forth here?

A. At that time they should have been able to have been completed.

Q. According to the schedule?

A. Yeah.

MR. GOLDEN: No further questions.

MR. DIERBERG: Off the record.

(Discussion off the record)

REDIRECT EXAMINATION

BY MR. DIERBERG:

Q. Back on the record. That's true. You are right. Well, no. Actually I am showing you Exhibit 42, and I would like to ask you to review -- we will mark this as Exhibit 48. It appears to be a similar or the same document, except there are different notations on the top. These are faxes dated July 15th, 2002 from Jose Zamora to Joseph Stuhl. Exhibit 42, just for the record, has at the top handwriting that just says "file," underlined. Then it has: "Faxed 7-15" -- looks like 7-15 or 7-19-02 -- "6:05 p.m."

Then Exhibit 48 has, at the left side: "GW, copy 7-15-02, faxed 60:09 p.m."

I do want to ask you a question about these documents, which is -- the letter attached to this document, it is dated June 24th, 2002. This appears to be a response to Mr. Stuhl's letter, correct?

A. Correct.

Q. This is a letter that you wrote? Why is the letter dated June 24th but it was faxed on July 15th?

A. That I do not know.

MR. GOLDEN: Objection. No predicate.

BY MR. DIERBERG:

Q. Do you know that this was faxed on July 15th?

A. That's what it's dated as.

Q. Whose handwriting is on Exhibit 42?

A. That is mine.

Q. What about Exhibit 48? Whose handwriting is that?

A. This is mine. One is mine. This one is not mine.

Q. So on Exhibit 48 the part that says "File 'USPS'" is not yours?

A. No.

Q. But the part that says "GW, copy, 6-15-02,

faxed 6:09 p.m." on Exhibit 48, is that your handwriting?

A. Yes, it is.

Q. But you don't know why -- do you know that it was faxed on July 15th, 2002?

A. Assuming it is, because that's what I wrote on there.

Q. You don't know why you would have faxed it on July 15th, even though the letter is dated June 24th?

A. 24th. No, I do not.

MR. DIERBERG: We mark this as Exhibit 48.

(Exhibit 48 is marked.)

BY MR. DIERBERG:

Q. I would like to ask you again to review Exhibit 46 -- no. Sorry. Let me try that again. I would like you to review Exhibit 47, which is a letter from yourself to Jerry Goddard, and I would like you to look at the very bottom of the page where it gives the name of the company. Can you read that?

A. ATC International Holdings.

Q. So that's the company you worked for at that time, ATC International Holdings?

A. That would have been.

Q. So sometime either on this date or prior to this date you started working for ATC International?

A. Correct.

Q. You don't recall when that date was, aside from prior to this date?

A. No, not specifically.

MR. DIERBERG: No further questions.

MR. GOLDEN: 47, 42 and 48. Actually 47 and 48 will be enough.

Helen, before I recross did you want to ask any questions on direct?

MS. ALBEE: Yeah. On that, no.

MR. GOLDEN: Thank you.

RECROSS EXAMINATION

BY MR. GOLDEN:

Q. Looking again at Exhibit 48, which except for the handwriting is the same as Exhibit 42, as we sit here today do you know if this fax cover sheet went with the attached letter? I know they are stapled together, but do you know that one went with the other?

A. Can't say. There is no date on the fax cover sheet for the reference.

Q. All right. And with regard to Exhibit 47,

when Mr. Dierberg asked you about the fact that this is on the letterhead of ATC -- well, it's actually, at the bottom, ATC International Holdings, Inc. When you sent out a letter -- let me ask. Would you have typed this letter yourself or would someone have typed this letter for you?

A. I would have probably typed it myself.

Q. And when you used whatever letterhead was available, did you specifically go through and look to see whether it was letterhead of one company versus letterhead of another company or how did you come across what letterhead to use?

A. At that point, when they had changed the name, it was kind of a one or the other. Until one was phased out completely. Like I said, for us it was just basically a name change.

Q. Okay. So it wasn't a matter of you saying, gee, I want to use this letterhead versus that letterhead. When you typed the letter you just grabbed whatever letterhead was there?

A. Right.

Q. Because that was there?

A. Correct. Yes.

Q. Did you intend to send this on a letterhead of one particular company versus the

other particular company?

A. I would say no.

MR. GOLDEN: All right. No further questions. Helen, any recross from you?

MS. ALBEE: No.

MR. DIERBERG: No questions.

MR. GOLDEN: We are finished.

THE REPORTER: Waiver?

MR. GOLDEN: I will. You have the right -- it's up to you -- to review this if it's transcribed. My suspicion is it will be transcribed and we can -- I guess she can e-mail you a copy to review and then you have a certain period of time, few weeks or something to review to see if anything was taken down incorrectly. If so, then you can make a note and let us know. She will include it when she does the final version. Do you want to review it or you don't? It's completely your choice.

THE WITNESS: No. We will leave it as is.

MR. GOLDEN: Okay. That's fine. Then your finished. Thank you for coming.

MR. DIERBERG: Off the record.

(Thereupon, the witness waived the reading and signing of the deposition and the taking of the

deposition was concluded at 3:13 p.m.

CERTIFICATE OF OATH

STATE OF FLORIDA )
) SS
COUNTY OF BROWARD )

I, Lois E. Guffey, RDR, CRR, and Notary Public in and for the State of Florida at Large, do hereby certify that the witness, JOSE ZAMORA, personally appeared before me and was duly sworn

Witness by hand and official seal this 12th of October, 2005, in the City of Hollywood, County of Broward, State of Florida.

Lois E. Guffey, RDR, Notary
Public, State of Florida

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA )
) SS
COUNTY OF BROWARD )

I, Lois E. Guffey, RDR, CRR, do hereby certify that I was authorized to and did stenographically report the deposition of JOSE ZAMORA, the witness herein; that a review of the transcript was not requested; that the foregoing pages, number from 1 through 104, inclusive, is a true and complete record of my stenographic notes of the deposition by said witness; and that this computer-assisted transcript was prepared under my supervision.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action.

DATED at Hollywood, Broward County, Florida, this 12th of October, 2005.

LOIS E. GUFFEY, RDR, CRR
Certified Realtime Reporter