IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

CASE NO. 03-1953C
(Sr. Judge Margolis)

ADVANCED TECHNOLOGY
SYSTEMS INTEGRATORS
CORP. and
INTERNATIONAL FIDELITY
INSURANCE COMPANY,

Plaintiffs,
vs.

THE UNITED STATES
Defendants

99 N. E. 4th Street
Miami, Florida
Tuesday, 10:30 a.m.
October 11th, 2005

DEPOSITION OF GREGORY WARREN

Taken on behalf of the Defendant before LOIS E. GUFFEY, RDR, Notary Public in and for the State of Florida at Large, pursuant to a Notice of Taking Deposition filed in the above cause.

APPEARANCES:

LAW OFFICE OF E. SCOTT GOLDEN
644 S. E. 4th Avenue
Ft. Lauderdale, FL 33301
By: E. Scott Golden, Esq.
Attorney for Advanced Technology.

HENRICHSEN SIEGEL PLLC
1648 Osceola Street
Jacksonville, FL 32204
By: Helen Albee, Esq. BY TELEPHONE
Attorney for International Fidelity.

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20004
By: Michael J. Dierberg, Esq.,
Appearing on behalf of the Defendant.

*** I N D E X ***


| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| GREGORY WARREN | 4 | 112 | 151 | 161 |

EXHIBITS FOR IDENTIFICATION


| | |
|---|---|
| 13, meeting notes | 24 |
| 14, memo from Jose | 26 |
| 15, meeting notes | 29 |
| 16, memo, USPS settlement | 59 |
| 17, fax to Goddard, 5-13-02 | 62 |
| 18, memo to Warren, 5-16-02 | 71 |
| 19, letter, 6-10-02 to Goddard | 80 |
| 20, payment authorization | 84 |
| 21, letter, 7-19-02 to Goddard | 88 |
| 22, letter, 8-2-02 to Whalen | 97 |
| 23, letter, 1-18-02 to Stuhl | 129 |
| 24, 3-25-02 field investigation | 129 |
| 25, letter, 4-3-02 to Goddard | 130 |
| 26, letter, 4-9-02 to Tomsed Corporation | 136 |
| 27, letter, 4-18-02 to Goddard | 138 |
| 28, joint check letter | 140 |
| 29, settlement agreement | 142 |
| 30, Modification 10 | 144 |
| 31, Modification 11 | 146 |
| 32, letter, 7-15-02 to Vento | 147 |
| 33, letter, 7-18-02 to Goddard | 149 |

Thereupon:

GREGORY WARREN

was called as a witness and having been first duly sworn, was examined and testified on his oath as follows:

DIRECT EXAMINATION

BY MR. DIERBERG:

Q. We are here for the deposition of Greg Warren. My name is Michael Dierberg. I am an attorney with the Department of Justice and I will let the other attorneys introduce themselves.

MR. GOLDEN: I am Scott Golden. I am here on behalf of Advanced Technology.

MS. ALBEE: Helen Albee, representing International Fidelity Insurance Company.

MR. DIERBERG: And just for the record, Ms. Albee is appearing by phone today.

BY MR. DIERBERG:

Q. Mr. Warren, have you been deposed before?
A. One time.
Q. What year was that; do you recall?
A. I believe it was in '97, I think.
Q. So you are somewhat familiar with the process of depositions?
A. They never finished it. They were just

then proceeding. They started it and never finished because both parties agreed to walk away.

Q. I will explain some of the basics of a deposition. If I ask you a question and you don't understand it you can ask me to repeat the question. If you need a bathroom break or something like that you can ask to stop and we can stop and take a break. Let's see. What did you do to prepare for today's deposition? Did you do anything to prepare for today's deposition?

A. No. I just tried to get here. That was the biggest thing, try to be on time. That was the --

Q. We appreciate that.

A. Right.

Q. Did you review any documents before today's deposition?

A. Oh, I met with Mr. Golden last week, I guess it was. For the first time, by the way. I have never met him before.

Q. Now is Mr. Golden representing you?

A. Representing me?

Q. Yes.

A. No. He's representing Advanced Technology as far as I know.

Q. How long did you guys meet?
A. Hour. It was lunchtime.
Q. And you didn't review any documents then?
A. I reviewed documents that were, I guess, in files of Advanced Technology.
Q. Do you recall what you discussed?
MR. GOLDEN: I object to that. He was an employee of Advanced Technology.
THE WITNESS: No, I am not. I was never an employee of Advanced Technology.
MR. GOLDEN: He was a representative of Advanced Technology at one point, and our discussion is privileged as relates to the items that occurred during the time that he worked for Advanced Technology.
MR. DIERBERG: We can discuss it at a break, but whether or not he was an employee of Advanced Technology I guess we will take that up at a break whether or not it would be privileged. You are instructing him not to answer the question?
MR. GOLDEN: With regard to the items that he and I discussed, yes.
BY MR. DIERBERG:
Q. Can you talk about your education?

A. I don't think -- that's apparently clear there is nothing to do with this.
Q. You have to answer the question. I mean I am just -- I am not -- this is just for background.
A. That's information for me to know. I mean it's just -- I went to high school, part college, and I have been in the construction development business for about 25 years.
Q. Tell me about your work experience prior to Advanced Technology.
A. All related to construction, commercial construction, hi-rise, office, hotel; years ago, museum, prison, just all general contracting, construction management development type work.
Q. What was the job you held prior to Advanced Technology?
A. I was the president of Constructa Builders.
Q. And how long were you president there?
A. The official title was for two years. I was with them as an executive for six years.
Q. What kind of -- what did they do?
A. They were developers, developer/builders, hotel, mixed-use facilities, condos, retail, that type of product.

Q. How many employees did that company have?
A. It used to have at one time 50, somewhere around there.
Q. And what were your responsibilities as president?
A. I was responsible for completing projects that they -- we were either in the role as development manager or the actual general contractor.
Q. Then why did you leave -- sorry -- what's the name of the company?
A. Constructa.
Q. Constructa Builders?
A. No. That was pretty easy. As I watched the market in year 2001 I started to realize that they weren't -- they didn't have enough cash to do the things that I wanted to do. They were based out of Paris, and my experience is to do larger projects. I could see in my crystal ball that they weren't investing to proceed. Well, the project that I said that I was deposed on, which was Billboard Live was the last bid of a retail project on South Beach, which was a $25,000,000 nightclub. That was in the retail portion of it. I stayed there to make sure it was completed. Then we had a

grand opening on September 8, 2001.

Then three days later I was watching the Towers come down on the video screens in that place which was also adjacent to my building. At that point, because I knew Vince Vento before, after a couple of conversations he said that it would be a wise idea to get into the security business and would I be interested in doing it because of my experience in large projects and so forth, that we would go after -- we would form a new group. We would look for money as investors and we would target the airport, seaport-type work. It all made sense to me at the time. I said this all sounds really interesting.

Q. Sorry. What year was that?

A. When we had the discussion?

Q. Or what year did you leave --

A. I left Constructa in December of 2001.

Q. And what year -- in 2002 then you started with Advanced Technology?

A. Actually, for -- because I had plenty of built up tenure and, you know, not back pay but severance, I decided for the first time in my life I would take a couple of months off. And during that time from about November to January I was

really off. I wasn't working. So I was -- as a -- I guess you could say as a good-faith effort to get the partnership off the ground I was working with Vince and several people there to get ATC International off the ground, but more -- he -- he had this thing going with some old business. The partners essentially said that, you know, the partners essentially said that can't be part of anything that we do. I was very clear to that. I didn't want anything to do with that in terms of us going forward. But I would help him, you know, consult with him, because I saw he had a bit of a situation that he needed to get a project closed out so we could all focus on going forward.

Q. So sometime in 2002 you became an employee of Advanced Technology?

A. No. I was never an employee of Advanced Technology. I became an employee of ATC International I think in about March of 2002.

Q. What was your title?

A. At that time it was COO, chief operating officer.

Q. And what did ATC International do?

A. ATC International was focused on putting together a larger type -- he -- he was more

involved with like hi-rise type of work and things of that nature and some small governmental projects and things of that. We wanted to broaden it. And the original scheme was to go public. So it was to build it up with enough business in order to go public.

So our market, like I said earlier, was to go after, you know, seaports, airports, things of that nature, because with my ability to oversee large projects I was going to try to come together and hook up with the larger general contractors and construction managers to find a niche that we could get involved in that type of work. That was really the interest that I had.

Q. So when you joined ATC International did they have any projects ongoing?

A. No. No.

Q. When was their first project?

A. Oh, shoot. When was the first official project? Hum. Hum. Let me think about that. I don't recall right now. I am drawing a blank because my -- what I was -- we were most concerned with was -- I was trying to get them out of this small office in downtown Miami.

So I ended up building a new office for

them to expand, to get ready for growth and that type thing. So that was really taking a lot of my time. And Vince and the other partners were supposed to be focusing on the investors and the sales. I swear I can't think of the first one.
Q. Was it in 2002?
A. Yeah. I will walk out the door and it will hit me. I just can't remember.
Q. First half of 2002?
A. Yeah. It was the first half someplace. I just don't remember the actual project, which is --
Q. When did you leave ATC International?
A. End of 2002.
Q. End of --
A. End of 2002, December 2002.
Q. And did ATC International wind down at that point?
A. No. What it was is -- to make it as short and sweet as possible is we got too much overhead and we just -- I was bored with it because it wasn't happening fast enough. And the contracts we were looking for from the government and so forth were just taking their dear old time to come out. And I was a high-paid employee. That was the only reason I was going to go into this thing; and just

couldn't survive. We were drawing down -- we had two partners and -- that came in with some money, and well spent. It's -- you know, it's taken off since and the place I built for them has gone pretty well as far as I know, but I haven't stayed in a whole lot of contact.

Just sucking too much overhead, and I got flat bored with it, so I went back in the development and construction work.

Q. In December of 2002 do you recall how many projects they had ongoing?

MR. GOLDEN: Objection to the relevance.

THE WITNESS: I just don't remember. Like maybe five or six. I don't remember. You know, I don't know why I can't remember. I should remember.

BY MR. DIERBERG:

Q. How many employees did ATC International?

MR. GOLDEN: Objection. Relevance.

THE WITNESS: Should I just not answer or what?

MR. GOLDEN: No. You can answer.

THE WITNESS: Oh. Probably ten, ten to 12, somewhere around there.

BY MR. DIERBERG:

Q. When did you start doing work for Advanced Technology?
A. I -- I think that I tried to do some things -- I started looking at what they were doing in December of '01. Then around January or February of '02 tried to help them along, somewhere in that area.
Q. Why did Mr. Vento ask you to become involved in Advanced Technology?
A. He just needed, you know, my advice in, you know, that type work. He wanted -- appreciated my advice. Because he had worked for me -- my -- my original relationship with Vince was that he was a subcontractor of mine years ago doing security for a condominium project. That's how I knew Vince. So he's seen me, quote/unquote, in action and just thought I was part of the lure of getting these -- be a partner and he just wanted my advice.
Q. On some of the documents you are listed as or referred to as the COO, I believe, for ATC. Is that -- that's a misstatement in a letter if you are referred to --
A. ATC International, yeah.
Q. But it appears as Advanced Technology, not ATC International?

A. No.
Q. But you were never COO for Advanced Technology?
A. No. Not at all. In fact I was quite clear about making no prior projects for the partnership have anything to do with us, as the new partnership going forward. It was pretty much that simple. We wanted it that way, because we wanted to start all new accounts and everything like that. And as we looked into it, you know, anyone -- you know, within a very short period of time we could see that everything wasn't rosy so we wanted to, you know, see -- to make sure that we started out fresh. And I would do that with anything. Had nothing to do with just that. It's just -- that's the way it would be.
Q. For the work you did for Advanced Technology did you have a defined role or some responsibility?
A. No. There was no -- I just kind of found the -- you know, the time and stuff for them to sit in on meetings. I mostly tried to guide the project manager, Jose Zamora and give my advice to Vince on what needed to be done, that kind of thing.

Q. How many full-time employees did Advanced Technology have let's say from the time you started until the time that it closed?
A. Probably the same, nine or ten; ten, twelve, something in there.
Q. Who were the most important people or the most powerful people in the company?
A. Most powerful people? Wasn't a big company.
Q. Sorry. Mr. Vento?
A. Vince was the owner and president of the company. Pretty much that simple. Jose was the project manager.
Q. How active was Mr. Vento?
A. Every day. Every day.
Q. What types of responsibilities would Mr. Vento handle?
A. Vince was primarily handling the financial part of it and anything that was -- needed to cross his desk in terms of any legal.
Q. Did you work in the same office as Mr. Vento or the same building?
A. Uh-huh. Yeah. I just kind of used it temporarily, because I hated that office and didn't want to be there that long. And that's why I

insisted if I was going to stay involved we would be finding a new office. So it was kind of a very temporary arrangement.
Q. Throughout 2002 you stayed in that office?
A. Uh-uh.
Q. When did you move?
A. We eventually moved to the new office sometime I think in third quarter of 2002.
Q. So that was after the termination --
A. Yes.
Q. -- for Miami PD and C?
A. Yes.
Q. So Mr. Vento was the president and owner. Jose Zamora was the project manager?
A. Correct.
Q. Who were the other key employees?
A. I am trying to think of her name. Mariana Knoenitzer, I believe. She was the bookkeeper. John -- begins with a C. Can't think of his name right off the top of my head. John C. Can't think of his name.
Q. What did he do?
A. He was -- I am not sure what his role was with Advanced. He was involved with that project, the first one, I think for awhile in some kind of

capacity. I don't -- I am really not sure.

Q. What about John Bodnar. Is that who you are taking thinking about?

A. No. It was Steve Bodnar.

Q. Steve Bodnar?

A. No. He was the CFO with ATC International. He tried to assist also with closing out Advanced. John -- I will think of his -- you must have his name there someplace.

Then there was the salesman, Robert. Was it Robert? Yeah. Robert. And then there was --

Q. Do you recall Robert's last name?

A. Don't know. It's terrible. Gail was his attorney but that wasn't -- she wasn't an employee. Scopinich. I can't say the name. I want to say John Castilino, Cassanova, something like that. Then there were some secondary guys out in the field.

Q. What types of projects did Advanced Technology do?

A. The only one I knew about -- and I don't know if they acted as -- if they were Advanced when they did the condo for me -- they may have been, but the only one I was aware of that was ongoing or finishing up was the post office project.

Q. What was the relationship between Advanced Technology and ATC International?
A. The relationship? Other than the fact that Vince was the president of that and eventually became president of ATC, there was no relationship.
Q. Was there any business they did in common?
A. No.
Q. No projects they worked on together?
A. No. That's why -- I was pretty clear earlier. There was -- needed to be a totally fresh company, which was ATC International, completely separate from Advanced, period.
Q. What about Advanced Technology Communications, LLC? Are you familiar with that company?
A. No.
Q. Never heard of it?
A. Don't recall it.
Q. How about Vamm Leasing, V-A-M-M?
A. Heard of it and don't know what it was. Had something to do with Vince. Don't know, though.
Q. When did Advanced Technology shut down?
A. I don't know how you would define shut down. I mean I guess when the post office

terminated it, that was really the only ongoing thing they had going. So if you would call that shut down. They didn't pursue anymore business under that name. It was during the time -- as near as I could tell that was it. So it was more of -- I mean Vince handled anything that had anything to do with closing of anything. I don't know what shut down means to you.

Q. Well, for example, the employees of Advanced Technology when were they let go?

A. I would say probably right around then.

Q. Why did Advanced Technology shut down, wind down?

MR. GOLDEN: Objection. No predicate.

THE WITNESS: Why?

BY MR. DIERBERG:

Q. Uh-huh.

A. Because as near as I could tell there was no sense in pursuing any work under their name, because there was a new partnership about to be formed, and my recommendation to Vince was just to finish what they had and be done.

Q. What was the new partnership?

A. ATC International.

Q. So that ATC International would continue

doing some of the same types of projects that Advanced Technology had done in the past?

MR. GOLDEN: Objection. Relevance.

THE WITNESS: I don't know. I don't know. I can tell you that I would never do another government job because that's why I didn't -- I don't do those work -- those jobs anymore.

You want my opinion of it? That is the worst work there is, and I did that work when I first started in this business. It's inefficient. It's set up for problems because of the way it's done, with low bidders and bad draws and claims orientation. That's why I got into the private sector work. So when I went back to even help with it, it was like -- I thought if we were going to do this kind of work at ATC International I said I probably won't be around much longer, because I won't put up with this kind of nonsense.

BY MR. DIERBERG:

Q. In connection with the work you did with Advanced Technology did you review any of the financial statements?

A. Of Advanced?

Q. Uh-huh.

A. Absolutely not, no. That was purely Vince. Didn't want to know.
Q. Do you know -- are you aware of what kind of reporting they did?
A. What kind of reporting?
Q. Financial reporting.
MR. GOLDEN: Objection. Ambiguous.
THE WITNESS: Don't know. I mean -- do you mean -- reporting to who? I mean normal reporting, I guess. I don't know. You know what I mean, like --
BY MR. DIERBERG:
Q. But you never saw any financial reports?
A. Not a financial report, no. Just more or less Vince telling me that, you know, that this job was sucking him out of cash, and it was primarily -- in order to finish the thing we had to find out a way to get them to work with us to finish it. That was pretty much it. But I stated that in the documents to Jerry Goddard as well, I mean clearly, over and over again.
Q. From the time you first became involved with Advanced Technology to the time that the contract was terminated how many times do you think you visited the construction site?

A. Hum. I don't recall. Couple. Two, three, somewhere in that area. Could have been more. Don't know. Just don't remember.
Q. Do you recall how many times you met with Jerry Goddard of the postal service?
A. Probably three or four. Maybe more. I mean some of the documents would be able to say that.
Q. What about Joe Stuhl?
A. Once or twice. Probably twice.
Q. Did you deal with anyone else at the postal service that you recall?
A. Yeah, maybe. But not as -- like a key player.
Q. What about conversations over the phone? How often would you talk to Jerry Goddard over the phone?
A. Oh, I -- you know, there was a period of time when I was speaking to him, you know, once a day. The idea was they had a -- I managed to convince him to settle on the -- I don't know what it's called. They had a name, NBC, something or other. Got him to agree to settle on the first one and on the basis to try to proceed to finish the second one, you know.

I said, if you will allow them to finish this and you will work with us and you saw that things were wrapped up on that one fairly, you signed off on it, if we could go forward on that basis, then there is -- there is hope to finish this thing, you know, on a fair basis. And that was the conversation, the intent of the conversations. I said I don't have any -- I mean my -- my work history is clean, in terms of, I have never been in a claim. I just don't work that way. I don't like that, you know.
Q. Do you know who Fabio Perez Polo is?
A. Fabio Perez Polo. No.
Q. No?
A. I don't think so. Unless he's got a nickname.
MR. DIERBERG: I would like this mark this as Exhibit 13.
(Defendant's Exhibit No. 13 is marked)
MR. GOLDEN: If I can just ask. It's Exhibit 13 because in prior depositions you've had 12 exhibits?
MR. DIERBERG: Yes.
MR. GOLDEN: Okay.
THE WITNESS: Okay.

BY MR. DIERBERG:
Q. Have you had a chance to read this exhibit?
A. You want me to read the whole thing?
Q. No. Have you had a chance to read it to yourself?
A. No. I just scanned it.
Q. Do you want to read it?
A. I guess. I wrote Fabio. I don't know why I wrote it.
Q. Have you had a chance to read this?
A. Uh-huh. Okay.
Q. Can you tell me what this is?
A. These are notes that I took with a meeting with Jose trying to figure out -- I don't know. See, I can't -- USPS, PD & C. I don't know if PD & C was the second one or first one. Yeah.
Q. It says, under Mod -- looks like something number 3, 45 days. "Jose said they did analysis with Fabio previously and we concluded we can't prove 45 days are" -- it's hard to read on the last word. Does this refresh your memory about Fabio?
A. Who does Fabio work for? I don't --
Q. This doesn't refresh your memory about anything?

FERNANDEZ & ASSOCIATES
(305) 374-8868

A. Fabio. Fabio. No.
Q. But you recall a conversation about not being able to prove 45 days?
A. Do I recall it? No. That's why I wrote the note. I don't recall it.
Q. Okay.
MR. DIERBERG: I would like to mark this as Exhibit 14.
(Defendant's Exhibit No. 14 is marked)
BY MR. DIERBERG:
Q. If you could just read that to yourself.
A. Okay.
Q. Have you had a chance to read this?
A. Uh-huh.
Q. Can you tell me what this is?
A. Memo from Jose to me giving a status. It appears that -- in order to finish out that project.
Q. And is the handwriting at the top yours?
A. Yes.
Q. I would like to ask you about -- looks like section B with a circle around it. It says, "I am working to fully understand overall cost risks to get out of the USPS projects." Does that "I" refer to you?

A. Yes.
Q. And do you recall why you were working to fully understand cost risks to get out of the USPS projects?
A. Sure. Because we, you know, Vince being one of the key partners in ATC International going forward, it was important to me in my future to know that he was going to be solvent and be able to not get, you know, in a financial bind that would otherwise hinder us to proceed further, because I was, in my mind, taking a big risk switching in what I consider a big industry career change. And that's what I was concerned about; that's clear.
Q. So when you refer to a cost risk, what is a cost risk?
A. Cost risk to advance. And Vince --
Q. And so at this time was it an option to get out of both projects?
A. Was it an option?
Q. That was considered -- it wasn't an option considered by Advanced Technology to attempt to get out of both the AMC and the P & DC project?
A. Well, I can't recall when we settled on the first one. That's the AMC?
Q. Uh-huh.

A. So if this happened before I don't know how to answer the question. I mean I was trying to make an assessment on what it was going to take, cash flow, I guess, to finish it or just an approximation. But the intent was -- as I said before, I recommended to Vince that he finish the project, you know, because I just thought that was the thing to do. Forgive the boy scout response, but it was the right thing to do. And he needed to know, I guess, what it was going to take.

Q. And it says that you are working to fully understand the overall cost risk. What did you do to fully understand the overall cost risk?

A. Well, I -- I went through with Jose as many things as I could to figure out what work had to be finished. I went through some of the receivables -- not receivables, payables -- to figure out what was owed on certain key things that had to be, you know, brought to the project. Pretty much that's it.

Q. Do you recall when you did that with Jose?

A. Well, it says the 15th, so I guess somewhere around March of '02.

MR. DIERBERG: I would like to mark this as Exhibit 15.

(Defendant's Exhibit No. 15 is marked)

THE WITNESS: Joseph Vidal. He was an employee of Advanced, I believe. Okay.

BY MR. DIERBERG:

Q. Have you had the chance to read this?

A. Uh-huh.

Q. Can you tell me what it is?

A. More of my notes. One is the meeting of that took place between Joseph Stuhl, Jose and Jerry Sheib (phonetic). I forget what he did, but he was with USPS. On the 21st of March, and other notes that -- I had a meeting with apparently Joseph Vidal or Jose Zamora on the 25th of '02.

Q. On the first page it says: "Joseph believes it's four months versus Jose, two months." Do you recall this discussion?

A. I wrote the note. I don't recall the discussion.

Q. What about -- do you recall the discussion about: "Joseph believes the difference is due to our bad reputation"?

A. That's -- I -- when I -- I write a note I do it for a reason. I wrote the note. I thought it was a strange statement, you know.

Q. But you don't recall anything else about

that discussion related to --
A. Other than what I wrote in here, no. I mean I had my opinions of people but that's not important.
Q. As you were reading, you mentioned Joseph Vidal, that he was another employee of Advanced Technology?
A. I think so. I think that was Joseph. I don't remember the last names. I had Tom for John there. I am embarrassed, but I just can't remember the name. I don't know why.
Q. Do you recall what Mr. Vidal did?
A. I think Joe was like one of the foremen in the field; not the direct foreman but foreman. He could have been a subcontractor, too. He may not have been an employee. Now that I think about it, he was a subcontractor. Yeah.
Q. Do you recall what company he worked for then?
A. No.
Q. At the bottom of the second page it says: "Asked Jose to give me daily cash flow chart for the next 30 days."
Do you recall asking him for the cash flow chart?

A. No, I don't recall. I just know, if I wrote the note, then I asked for it.

Q. Do you remember if he actually gave you daily cash flow charts over the next 30 days?

A. I -- I don't recall. He did pretty much what I asked him to, you know. Not exactly to the letter of the law, but he probably provided me some kind of information. Do I recall it, no.

Q. So the last two documents I have shown you, one was dated 3-15, one was March 21st, and March 25th. Do you recall any other discussions that you had in March of 2002 about the P & DC project?

A. You know, just -- I mean you probably have information there that -- letters I wrote to Jerry Goddard that were, you know, subsequent or, you know, discussions that I had with him to that effect. I had instructed Jose to write responses to the many letters that Stuhl would generate that were problematic and antagonistic and things of that nature. The exact discussions, no. Were there discussions going on, of course.

Q. What sorts of discussions did you have with Mr. Vento about the financial problems that Advanced Technology was having?

MR. GOLDEN: Objection. No predicate.

THE WITNESS: The problem is -- as I saw it, was real simple, and I told Jerry that, and I wrote it in a letter. If you play fair and release the monies like you said you would, as we closed up the first one, this project can be finished. If you play this game of taking 75 percent of all the dollars and squeezing blood out of a rock and not playing along with the good faith effort to finish, you're going to force termination. There is no way that they can finish. I mean I am letting you know now that that's the only way this can finish. Do you want to do it Jerry? Yes. Okay. Good. Great. Let's go back to work. You know. Because we -- we -- I tried to establish some kind of trust with him by finishing -- you know, closing out the other one. If I didn't establish any kind of trust, then he wouldn't have closed out the first one, okay. There was just no way. Why should he -- you know, if he felt the way he did.

But as we went along, I kept informing him, look, you have to release the money. You can't keep holding it back. We can't pay the

accounts, I can't get you the parts. So it's force majeure. What do you want to do? Shoot me now. Don't keep dragging us through this thing. Don't keep dragging us through this thing if you don't want to do it so we inch along, go a little further.

BY MR. DIERBERG:

Q. Are you referring to letters at this point or conversations you had with him on -- over the phone?

A. I am referring to both, both. When we would meet, talk on the phone -- and part of the negotiation was, you know, to discuss -- for me also to discuss with him to see whether or not he was going to be a fair player.

Q. Uh-huh.

A. You know. And -- because Vince was convinced they were going to terminate. And I said, well, we have got this far. I mean he has shown some good faith. Let's keep going. Let's keep pushing it to see what he does.

But now that I look back -- and I was kind of -- I felt like it was unfortunate. Because I said to Vince, you know, it probably would have been better for you financially just to let them

FERNANDEZ & ASSOCIATES
(305) 374-8868

terminate you when they did. But if nothing else, you're showing a good-faith effort. You are still proceeding. You let them terminate you. Don't you walk off the job was my exact words to him. I said because you walk off, you don't have anything to stand by. But if you -- you push and try to finish this thing -- and what I believe can be done -- this isn't rocket science, guys. But I said what we do have here is what I see as interference, severe interference to the point that they're -- they may not let you finish.

Q. Do you recall any other -- or any face-to-face meetings that you had with Mr. Goddard in March?

A. Yeah. I recall some, yeah. Just having --

Q. Tell me about the first one you recall.

A. The first one, the first meeting at all?

Q. Yeah.

A. The first one was just to try to just establish what it is that they wanted to do. Did they want to allow AT -- Advanced to finish or not. And his statement was yes. But you have a lot of convincing to do. I said, "Okay, let us try."

Q. Do you recall when that first meeting was?

A. Hum. I don't know. February, March of '02, somewhere in that area.
Q. Who else was in the meeting?
A. Jerry, Jose. I think Vince went to one meeting and that was it. I don't remember that. Because I did tell Vince to back out because of the personal comments that I heard out of Jerry and Joe Stuhl saying they thought he was a crook. And I said, look, we are not going to get anywhere if you are going to attack him. I said that's unprofessional and keep it to yourself. This is your opinion. I said your opinion of him is your opinion. I said that if you will let me try to do this I will try to do it. I said because -- and I told him my background. I said this is not a hard project. I says, it's just filled with a lot of antagonism and a lot of people that -- it looks like they are trying to sabotage a project, meaning some of the individuals that don't necessarily work for USPS but were contracted them to be their representatives. And I said, this is ridiculous. I said, if you want to finish the job, let them finish the job. Okay? Isn't it better for you not to have a claim? I said, that's the way I work my life, you know. So that's how we started off and

we got the first part done.
Q. I am sorry. But you were still referring to the first meeting that you had?
A. Yeah. That was the first meeting, kind of along those lines, just --
Q. Where was this meeting held?
A. United States Post Office, at the site.
Q. This is the P & DC site?
A. Whatever you call it. Right.
Q. Do you recall anything else that you guys discussed at that time?
A. No. It was just, you know, let us finish what's got to be done.
Q. What did Mr. Goddard say? Do you recall what he said at that meeting?
A. Well, he tried to go back into the history of what had happened in the past, and I said that wasn't important to me because, in any new relationship, the past is not going to help you, okay. Do you want to go forward Jerry? Yeah. Okay. Well, tell me what needs to be done. Pretty much --
Q. Do you recall anything else he said?
A. Like I said, he had his personal opinions of Vince, but no. I don't -- I mean he kept -- let

me think. I mean that's kind of the general gist. It was kind of to get to know and try to figure out what had to be done. I didn't really have time for all the other stuff. You know, what was your -- you know, what are your most important items? We are trying to figure out what is hot? Take it one at a time. I said, we can't finish this overnight. You do you recognize that, right? Yeah. Okay. What's your estimate to finish? I don't know. It's going to take me time to figure out where we are at. You know?

Q. So when was your second meeting?

A. Two or three weeks maybe later after that, somewhere in that area.

Q. And who was there?

A. Usually Jerry. I think on -- I don't remember if I met Joe Stuhl on the first meeting or the second meeting. I don't recall. It might have been the second meeting that Stuhl was present.

Q. Who else?

A. Jose Zamora. I mean I don't remember -- I finally told Vince not to get to the meetings. There was just one meeting. I said, you just don't need to go to the meetings. Let them not see you. Leave it at that. Because there is a personal

thing here with you, and leave it at that. So he agreed not to go.
Q. Anyone else at the meeting?
A. Whoever signed in. I don't know. Jerry -- I think Jerry passed out a sign-in sheet, I recall. I don't remember.
Q. This was at P & DC also?
A. Yeah.
Q. What did you discuss at that meeting?
A. Same -- basically the same. Okay. When do we finish? How can we negotiate? Da, da, da, da. I was focusing in -- I mean without seeing some old letters -- to try to finish, wrap up one, then move forward on the other.
Then, once we were past that one, I would explain to Jerry, look, unless you release the money more on a fair basis, if you are going to continue to withhold retainage at 75 percent I said that's unacceptable, not going to happen, won't work, can't do it. We don't have that kind of cash flow. It's not available. It's that simple. Do you want to proceed? Yes. Okay. Well, then release the money. Okay.
Q. So it was all about the money?
A. All about the money?

Q. I mean was there -- did you guys discuss anything aside from payments and 75 percent retainage?

A. Is there something you want me to say that we are talking about? You keep asking me questions like you know something I don't know. Do you want me to address something? Put it on the table and I will address it.

Q. I am just asking questions.

A. Okay.

Q. I wasn't at these meetings so I really don't know.

A. I mean did we talk about the weather one day? Probably. Don't know. Did we say we have children? We may have discussed that. Yeah. Could have been. Don't know. I mean it's natural human discussions. We probably had them. Don't remember. Wasn't important.

Q. Right.

A. Our primary objective was to figure out what had to be done, how we could attack it, you know, what they had to do. It was a give and take situation. This is a negotiation. This is not all you and no me. I said, you got to give a little bit and not do all the taking. I said this guy

FERNANDEZ & ASSOCIATES
(305) 374-8868

that you have writing the reports are inaccurate, they're antagonistic and a lot of them are completely false. In one meeting he says this is that and next meeting -- then he follows up with -- the paperwork says totally something different. I said, I don't know where you guys are going with that. I said I thought it was ridiculous.

Then it was like the -- you know, sometimes later on he would get into the drama of being the representative of the U.S. Postmaster General and he can do this and that because he has the power to. I said, well, yeah, you could crush the guys. I said, you're doing a pretty good job right now. What are you going to do, Jerry? Finish it. Don't keep talking about it. Do you want to proceed?

Get my gist here?

Q. Yes.

A. You either want to proceed or you don't want to proceed. That's the only way it works in negotiation. We were in a negotiation stage. We weren't in anything other than that. And we were proceeding. But as payouts came in they kept getting cut or monies were not being released accordingly, I said, what are we doing here? What

are we doing?
Q. Anything else about that second meeting that you remember?
A. No. It was just more of trying to just get finished.
Q. How about the next meeting? When was that?
A. I would need notes or stuff to recall, because I don't recall all the meetings. Only other -- other -- I mean we had several site meetings and things like that, followup conversations on the phone, responding to correspondence and this, that and the other thing. And I think one final meeting I had with Jerry was off-site, I believe at a Holiday Inn in Fort Lauderdale. He agreed to meet me.
And I went over there to meet with him. We had a beer, and I was trying to discuss it pretty much, you know, don't terminate. Don't do that. I said this -- you know -- you didn't -- you didn't allow them to finish.
Q. I think you mentioned the time. I missed when you said you had this meeting at the Holiday Inn in Fort Lauderdale.
A. I don't remember the time. It was

probably --
Q. Okay.
A. -- probably right about that same week or so before or during, you know, the termination, when I thought he was going to terminate. Whenever that was. In June, July, August? I don't even remember now. Probably July. I don't know.
Q. Can you tell me more about what you guys discussed at this meeting?
A. Yeah. I just told him -- I says, I just think that what you are doing is wrong as a professional and a human being. It's that simple. It's wrong. You have the power because you have all of the government backing up, and you're going to put a small company out of business and go after some guy personally because you don't like him. That's exactly what I said to him.
Q. What was his response?
A. He never really had much to say at that point. He knew I was right, as a man.
Q. Do you recall anything else that he said at the meeting?
A. Not a lot.
MR. DIERBERG: Ellen, are you still there?
MS. ALBEE: Yes.

MR. DIERBERG: Okay.
THE WITNESS: I think that -- he said, "I would consider it," but in fact he didn't. He knew he had his mind made up. But I did manage to get him to eke out the words, "I would consider it" because that's just me trying to keep the -- I was trying to keep the ball in motion, trying to keep the positive motion right down to the end.
BY MR. DIERBERG:
Q. Do you recall any other meetings with Joe Stuhl?
A. I think there were only two meetings with Joe. I didn't really want to meet with him, to be honest, but -- I mostly had Jose meet with him when it was necessary, you know, walk the project, in terms of what was done, things of that nature.
Q. When you met with Joe Stuhl was there always Jerry Goddard there also?
A. No. We -- the first one was cordial. We walked around and we looked at things, and I said, well, you got to understand. This is not hard. Why is this so difficult? What is going on here? What am I missing? You know.
Q. Do you recall about when that was?

A. It was probably the first meetings, you know. I guess it would have to be in March, somewhere in that area, you know. They might have --
Q. Jerry Goddard wasn't there?
A. No. On the walk-through Jerry wasn't there. I was trying to establish the human interacting of who was doing what and what kind of person they were, you know. And then after I had that walk-through with him I figured it out.
You have to understand. I -- I -- my business is to know -- try to know which way someone is going to move on me. Because I deal with projects, you know, hundred times bigger than that thing. I try to figure out the dynamics, the people dynamics to see whether or not there is something that is workable or if there is something we need to fix in terms of the people not handling it or really what is the interactions of the project, who is the key players, how do they interrelate, who makes the decisions, who doesn't. And that was where I was trying to go. I was trying to figure out what was going on, because I said this is not that difficult.
Q. What did you figure out?

A. What I figured out was that there was a definite interference going on by the key individuals that were involved on the other side of the fence other than Advanced.

Q. Why do you say there was an interference?

A. Because of the way letters were being written versus the way discussions were happening. We would walk through and I would hear this, that and the other thing. Then all of a sudden, a letter would come through with all of these, you know -- you know, deficiencies and this, that and the other thing right when we were trying to figure out a way to put the personal side of the thing aside and move forward. And you know, even to the fact -- I think Jerry got frustrated at Joe for writing certain reports.

But he was insisting that that it was this way, this way or that way. And it wasn't all his way. His comments in the letter were not accurate in many cases. That's why I said to Jose you need to respond to these things. You can't let it sit. And I know that he did to some of them. I don't know how many. But when I was there, around there, I got him to respond to as many as he could. I said this guy is building a case. I can see it

coming. He's building a case.
Q. So are you saying that Joe Stuhl would say something to you personally or say something to Jose and then put something else in a letter?
A. On several occasions, yes.
Q. Do you remember what those occasions were?
A. I think the best way to do was to compare a letter that he wrote and a letter response from Jose, you know, as far as, you know, what was done or what was acceptable, what wasn't done, things of that nature. It was pretty much related to that kind of stuff.
Q. So are you saying that Mr. Stuhl would say some things are acceptable orally but tell you -- either in person or over the phone or he would tell this to Jose, that certain things were acceptable, then in a letter he would say they aren't acceptable?
A. Let me give you perfect example. If you sign off an AIA document approving the fact, the funding should be released. Then what have you done? What is your role? You have certified that work is complete. Correct? Right?
Q. I am not here to testify.
A. Is that correct? Answer is yes. Because

that's the way the AIA document is signed. Look at the certification. So when he signs off on something and later goes on and says it's not acceptable, or it's incomplete, or it's far less of a percentage complete, I said to myself, wait a minute. You shouldn't have signed that document stating that, Joe. So -- and I told Jerry that's not right. What is going on here? Then they --

Q. I am sorry. So I understand this better, you're saying AIA document, which stands for?

A. American International Architects, I believe.

MR. GOLDEN: I think it's American Institute of Architects. I might be wrong.

THE WITNESS: American Institute of Architects. I have seen the term so many times.

BY MR. DIERBERG:

Q. So he signs off on a form?

A. It's a form generated by AIA, which -- they generate all of these forms used throughout the construction industry as a basis of many things, contracts and pay applications. There is a form, I think G 703. I think that's the form. Then you have a schedule of values attached to

that. And that schedule of values totals up to the total contract of work under an -- plus any change orders that have occurred. And then each month the contractor bills and says he's this much percent complete. He submits it.

In this case Joe is the acting representative of the USPS to certify it. Do you agree? Then he sends it on to them to pay. They wouldn't pay ever unless they agree. So I started noticing where they were going back on something they signed off on. I go, well, what are we doing here? I mean you can't do that.

Q. Do you recall in particular which one they went back on?

A. No. It was addressed in the letter, though. I did address it. And then, worse than that, then he started getting all of this drama going about how there was fraud, and this that and the other thing because they billed for something they didn't have, didn't produce or something. I don't remember what it was.

I go, if it wasn't there why did you sign off on it? Maybe it was stolen. According to here, it's here someplace. What's up with you guys? I said don't start that fraud word. That's

pretty strong language. If someone did something -- I said, the way you guys have been holding pay applications I am surprised that anything got by you. If you -- are you stating you missed something? Come on, guys. That's a double-edged sword there.

Q. Do you recall when you had this discussion?

A. It's all in the same time frame. We didn't spend a lot -- probably three or four months of my life is in that time frame, whether it was somewhere in first to second quarter of --

Q. But was it face-to-face meeting where you discussed this fraud allegations?

A. Yeah. One of them, yeah.

Q. What was his response?

A. Just posturing, you know, that kind of response.

Q. Do you recall discussing a joint check arrangement with International Fidelity?

A. I recall the matter but I don't remember all the details.

Q. Do you remember in general terms what that discussion was about?

A. Who was the discussion with? Help me.

Q. Well, I am asking you. I don't --
A. Well, I mean are you saying do I recall a discussion. Discussion with who?
Q. With anyone, about a joint check arrangement with International Fidelity.
A. Why I brought that up. I am trying to think. I may have, as part of a matter to get the post office to be comfortable that -- with wherever the money was released to, it would go to. Because it was a bonding job. May have. That would have been the only reason I probably would have had that.
For example, you know, in my business, if I see a supplier -- I mean, if I see a vendor or contractor that's going down that I think is in financial trouble, it's not in my best interest to make him go down, okay. Because I got to replace him. In my business, also, I know that's definitely going to cost me a hell of a lot more money, that if I find a way to nurse this guy through, unless he just skips town, okay. I would contact his vendors, get his cooperation and say, look, let's pay these guys. I want to make sure this money is going to these guys and you are not taking this money and putting it elsewhere.

So that would have been my natural reaction, probably, to say, well, let's get the key guys. You guys cut the checks, because there is no way -- if I can't get this material here, I can't finish your job. Because it's one of the key components, as small as it you may be, whether it's software, whether it was turnstiles, whatever the heck it was. There was some stuff there that was -- like had to get there. And vendors would hold back because of whatever. That's probably where I was headed with that.

Q. But do you recall a discussion or you just --

A. I don't remember who I had the discussion with, but I know that would have been a strategy that I would have tried to use.

Q. Okay. This was previously marked as Exhibit 4.

A. This guy was a consultant, I think. Is he a consultant for International?

Q. Why don't you read it and then we can talk about it afterwards.

A. Okay. Yeah.

Q. Have you had a chance to read this document?

A. Yeah.
Q. Can you tell me what this is?
A. This is a letter to Lovett, Silverman, construction consultants, who I think was acting as some kind of a consultant for the surety.
Q. This is a letter that you wrote and sent to Lovett, Silverman?
A. Yes.
Q. I would like to direct your attention to that middle paragraph. At the bottom it says: Your suggestion to solving this dilemma, coming from International Fidelity, suggests we initiate immediate payment to purchase the turnstiles and the gates for the project. In order for us to complete the P & DC project in a timely fashion, ATC proposes we use a joint check arrangement to purchase all of our remaining materials and services.
Do you recall International Fidelity suggesting that you initiate immediate payments?
A. Do I recall it?
Q. Uh-huh. Yes.
A. I don't recall it. I wrote this letter based on, you know, what I thought we were trying to accomplish.

Q. Do you recall anything more than what's in that -- this letter about International Fidelity's suggestion?

A. No, not really. I don't think I had that line of discussion with him.

Q. The last sentence doesn't refresh your memory about the joint check arrangement suggestion?

A. Yeah. It's pretty much what I just got through telling you, that I would have been a proponent to doing that if that's what it took to finish the job.

Q. The joint check arrangement would be between International Fidelity and Advanced Technology to the suppliers or subcontractors?

A. Who -- whatever made the people with the funds comfortable. If that's what worked, fine. I don't know how -- I mean typically that's not the way it works, because in this case, unless the bond is stepping in, the money shouldn't go to them, as near as I understand the law. It still has to go to Advanced first, as far as them having a joint check between Advanced and their supplier. That's where I was going with it. I don't think at this point International Fidelity was allowed, unless

they take over.

Q. At around the time of this letter do you recall asking for financial assistance from -- let me rephrase the question. Did you at any time ever ask for financial assistance from International Fidelity?

A. Hum. Financial assistance. I don't -- I don't recall. I mean I -- I don't recall. If I wrote it -- I mean if you are now going to ask me a question and hand me a letter I wrote, why don't you hand me the letter and go from there. I don't recall.

Q. It's not a memory test.

A. Kind of aggravating. You go through the conversation, then you hand me the letter. Hand me the letter and work that way, okay? I will respond that way. I don't recall. If I did -- I don't know if I would, because I don't think, unless the bond company is involved, that that would be something they can do. Would I have suggested it to avoid a problem? I could have suggested it, yeah. My total motive for them all was to not get into a claim. So whatever things that anyone can do feasible, then do them. I mean you're the surety. Okay. You got Vince bonded. You know, is

it really that good? My whole life I have never called in a bond, because, to me, bonds are useless. And right now I am doing $250 million dollar projects and convincing lenders how useless they are.

No offense, you know, but you don't want to go on the basis that you are going to work with someone and you're going to have to call the bond in. Because it's like an insurance policy. You don't read the fine print until you put in the claim. You will find out how really useless it is. Okay. So I could have suggested it, yeah. Why don't you guys help yourselves, both of you help yourselves out of this thing so this guy Vince and Advanced can finish it. But I mean that's highly unlikely because I don't think the bond -- I don't think -- I don't think, unless they take over, they're allowed to do anything.

Q. So you say you could have but you don't recall --

A. No.

Q. -- whether or not you did?

A. It doesn't sound like a procedure, but I don't know.

Q. I would like to show you what has been

previously marked as Exhibit 5.

MS. ALBEE: I am sorry. Did you say 5?

MR. DIERBERG: Yes. Exhibit 5.

MS. ALBEE: You started sequentially. Now are you doing something different because you started with --

MR. DIERBERG: No. This was previously marked as Exhibit 5.

MS. ALBEE: Okay. I gotcha. If you could indulge me and just, you know, identify it.

MR. DIERBERG: It's dated May 1st, 2002. It's the second show cause.

MS. ALBEE: Thanks.

THE WITNESS: Okay.

BY MR. DIERBERG:

Q. Have you had a chance to read this document?

A. Yes.

Q. Could you tell me what it is?

A. I am not 100 percent sure because I get them confused. Which is the first phase? AMC or which? I don't know which phase we're in here at this point, first or the second. One we negotiated out and closed up.

Then we proceeded. That was the second

phase, to me.
Was the AMC the first phase and this GMF the second phase?
Q. The P & DC was the later project?
A. What was the first one?
Q. AMC was the one that was terminated earlier, but this refers to GMF.
A. No, it was settled. It wasn't terminated. It was retracted and settled. That first one was done. So P and D -- he's not referencing which one this is to me. If it's PD and C.
Q. I will just ask. Do you recall which one this is about?
A. That's what I am trying to determine. I am going to guess it was P & DC but I don't know. That's why I am asking you, I mean, to get reminded here. I am going to guess it is the second. I don't remember. And he doesn't reference it like he has done before.
Q. But do you recall whether or not they were still working at this time on the AMC project in May of 2002?
A. No. I don't recall. But we can easily figure that out if you just show me that termination and settlement document that we agreed

to settle completely and revoke the termination. That will tell you the answer to that question. I am trying to establish a timeline here in my mind and I don't remember.

Q. Without asking you about this document in particular, do you remember a show cause letter around this time frame for the P & DC project?

A. I am trying real hard to give you the right answer, but you are not helping me to give you the right answer by showing me when the other one was settled so I can respond correctly.

Q. Uh-huh.

A. I can respond if I have that --

Q. Right. You just want to see when the AMC project was settled?

A. Exactly.

Q. I am not sure I have that document but I will look for it.

A. I will be more than happy to give you an accurate answer.

Q. This might help. I won't mark this. I will just show this to you. This is -- for your benefit, this is a document dated May 13th, 2002. It's a fax from Greg Warren to Jerry Goddard (indicating).

A. As of May 13th we still hadn't officially settled the AMC in terms reducing it to writing and we were in that process, but to answer your question is -- where I was going with it is that I am referencing contract numbers of this (indicating). He's giving -- this particular one is a contract number of that (indicating). So I am not familiar with that one. That's how I delineated the two. The two different ones, they don't match that. So I don't know what that relates to.

Q. Would you recall -- before the P & DC project was terminated do you recall receiving more than one show cause letter?

MR. GOLDEN: Objection. Ambiguous.

THE WITNESS: No. They didn't come to me. They went to Vince.

BY MR. DIERBERG:

Q. Did you ever see a show cause letter prior to July of 2002?

A. Don't recall.

Q. Let's see. Let's mark this as Exhibit 16.

(Defendant's Exhibit No. 16 is marked)

THE WITNESS: Okay.

BY MR. DIERBERG:

Q. Have you had a chance to review this document?
A. Not in a lot of detail. I read the memo, but I understand what the attachment is, which is pretty much an assessment for cost to the company.
Q. Could you tell me what the memorandum is?
A. You want me to state what it is? It's a memo from me to Vince regarding the USPS settlement issue, cost to complete.
Q. Then attached to that is a document entitled, "Final accounting breakdown." Could you tell me what that document is?
A. That was my request of Jose to put together what it was going to, you know, cost to complete, his best estimate.
Q. In the first paragraph it says: "Attached, please find a cost to complete document prepared by Jose Zamora. Although the numbers could be refined in some areas the overall estimate provides sufficient information to decide our final strategy regarding the USPS situation."
With regard to the final strategy can you tell me what options were being considered at that time?
A. They're just -- strategy is a word I use

in order to put together a plan, you know. That's kind of a run-of-the-mill word I use, but final strategy to figure out how to complete the job, what it was going to take.

Q. It says in the second paragraph, the last sentence: "The approximate net loss is $174,486."

Based on your awareness of Advanced Technology's financial condition at that time could Advanced Technology absorb a loss of $174,486?

A. I didn't have the complete knowledge of Advanced Technology, okay. I got bits and pieces on a need-to-know basis.

Q. But based on what you knew at the time did you believe that they could absorb that kind of loss?

MR. GOLDEN: Objection. No predicate. Asked and answered.

THE WITNESS: I am going to assume it's possible.

BY MR. DIERBERG:

Q. But you don't know?

A. Don't know.

Q. Do you recall any discussions regarding the final strategy or strategies regarding the USPS situation?

A. As was always. I always recommended they finish the project. Don't let it go to a claim situation.

Q. What about discussions with people at Advanced Technology?

A. Same thing. I mean I don't -- I am not understanding your question. Any time I discussed it with anybody my intent was to continue to finish it. It wasn't my decision not to finish it. It was only Vince's decision if he chose to make it. If he did -- he didn't at that time because it never happened. Everyone kept proceeding. It's obvious.

Q. So this time --

A. They did not walk off. They were terminated.

Q. Uh-huh. I would like to mark this as Exhibit 17.

(Defendant's Exhibit No. 17 is marked)

THE WITNESS: That's the one you showed me before. Yeah. This is --

MR. GOLDEN: There is no question pending. Let him ask a question first.

THE WITNESS: Sorry.

BY MR. DIERBERG:

Q. Have you had a chance to review this document?
A. Yes.
Q. And this is -- looks like a fax from you to Jerry Goddard, dated May 13th, 2002; is that correct?
A. Correct.
Q. I would like to direct your attention to the last page of this exhibit which, at the bottom, refers to proposed schedule to complete project. Do you recall seeing this document?
A. Do I recall seeing it?
Q. Yes.
A. I do now. I mean it was attached to my fax.
Q. Could you tell me what this is?
A. It is a schedule prepared by Jose Zamora to, I believe, complete the P & DC, I believe. Doesn't reference it but I mean that's -- yeah. Probably. P & DC. Yeah. It would be that time frame.
Q. Do you recall why this schedule was produced?
A. Jerry requested it.
Q. Did you guys produce schedules on a

FERNANDEZ & ASSOCIATES
(305) 374-8868

periodic basis like this?
A. Periodically when he requested it to demonstrate, you know, what could be done. I mean that was pretty much -- you know, you don't do a schedule every day. It's not necessary. Pretty much do it every two weeks or every month or so. But this is a request.
Q. Okay.
A. In that this request is based on assumptions, okay. You do what you say you are going to do and that schedule is possible. If you don't do it, it isn't possible. That's very clear. That's with any schedule in construction.
Q. Could you explain to me the various items in this list like the -- looks like the second column from the left, at the top it has "i" in the -- I guess in the title category. Do you know what that second column from the left is?
A. Unfortunately, I am at the stage in my life I need glasses. I don't have them. I can't read it. Next is three. I can't read it.
Q. Well, some have checks. Do you know what a check indicates in that column?
A. No, I don't, no.
Q. Then the third column is "task name" and

the fourth column is "duration." How much knowledge do you have or how much knowledge did you have at that time about the progress for each of these items under the task name?
A. Based on what -- it was limited to understanding the overall, but the details prepared by Jose -- I relied on Jose for the detail because he was the day-to-day guy.
Q. For example, if I asked you -- it says here the duration of five days for turnstiles. Would you remember or do you remember what work needed to be done for turnstiles?
A. No. I can't remember.
Q. Same question, for example, on Hirsch software. Under purchasing says ten days. Do you recall what work needed to be done on the Hirsch software?
A. No, not -- are you asking me if I can define to you every single piece of item that would be required to be done to do that? No, I can't do that.
Q. I guess I am trying to understand to what extent you were involved in the schedule, how much knowledge you have of the schedule?
A. I didn't put the schedule together. I had

Jose do that. But, again, you know, the amount of work that, from my standpoint, it took to finish there seemed completely doable to me.

I mean we put, five, six, seven, eight $9,000,000 of work in place every month doing hi-rises. So to me this seemed fairly simple. But all the little pieces and parts which form the complete puzzle were not there. Either a vendor had them or part of it was there, and you know, it still had to be paid for, to get this here, to turn that on, to make that work, you know. There was some substructure stuff that had to be done in order to receive parts, but some of the key parts were -- the intent was to try to get those things there so they could tie things together and turn the system on see if everything worked.

Q. Let me step back and ask you a general question. How much time in this time period, let's say from March to July of 2002, did you spend on Advanced Technology?

A. I don't recall the actual time. I mean I put time in to write memos. To me that means I could be a -- I don't recall -- like person -- I mean we were again trying to get ATC International off the ground, which was important to me.

MR. GOLDEN: Move your hand.
THE WITNESS: Oh. Sorry about that.
BY MR. DIERBERG:
Q. But was it most of your time you spent on Advanced Technology?
A. I mean at the beginning I would say probably 50-50, somewhere around there.
Q. And what responsibility did you have for the day-to-day progress at the site?
A. That was Jose's job.
Q. So I am at this point in time, May 13th, 2002 -- and I don't want to ask you each and every item. Are there items in the list under task name that you do recall the status of that particular task at that time?
A. No. That's just a Jose question. My intent was to get things in a -- to make a list and complete it, you know, get a list of what was outstanding, assign tasks, length of the task, make sure we have all the tasks and get them done.
Q. I think you said before that you thought that this schedule was realistic.
A. Yeah.
Q. Is that correct?
A. Again, this is just not that difficult

that -- everybody is cooperating. It isn't.

Q. Why do you think it was a reasonable schedule, aside from the fact that it was not that difficult?

A. Why?

Q. Uh-huh.

A. Because of just my past experience knowing what I can get done on things that are much more difficult, you know.

Q. Did you analyze each of the tasks and the amount of time it would take?

A. Did I personally?

Q. Uh-huh.

A. No. I don't do that now. You asked me how long it takes me to build a 40-story building, I can tell you right now. Don't have to put it on paper. It's automatic. I can tell you it will take me probably 22 to 24 months and I can tell you what stage approximately I am going to be in the first four months, then the next four months. But that's after repeatedly doing it. You get a feel for knowing how long something takes.

Do I get down to all of those details of what goes where? No, it's not necessary for me. That's what Joses are for. Because as they are --

come in up in the business, they are there to track the details. So he was -- he was the most knowledgeable of the fine details of what was going on. So unless I had a negative feeling of him, which I didn't, I had to take from what he gave me as being accurate.

Q. Would you periodically ask him about the progress on each of these items?

A. Probably. I mean do I remember when I did it? No. As a natural course of events I probably did.

Q. How did Advanced Technology document the progress at the site?

A. Just -- you know, there is a document, okay. They're responding to reports that were issued by Joe Stuhl about what was done, what wasn't done. There is a document. Issuing payment applications in terms of percentage complete. There is your document. Meeting notes. There is your documents.

Q. There was never a construction log done?

A. Construction log?

Q. Yeah.

A. What do you mean by a construction log? There are all kinds of logs.

Q. Construction log would show a daily -- you know, what was on --
A. Daily report?
MR. GOLDEN: Let him finish before you answer.
THE WITNESS: Okay.
BY MR. DIERBERG:
Q. Any sort of daily document that would show on a daily basis.
A. I don't know. I don't know.
Q. Aside from the documents you mentioned earlier, the letters, memos, that kind of thing, any document that would show the progress on a day-to-day basis?
A. Just what I told you, you know. That kind of thing.
Q. Well, in other projects you have done throughout your career what's the typical way for documenting progress?
A. Everybody has a little different, but usually as -- a site person will keep a daily record of what -- who showed up, and who did what, and that kind of thing like that to a certain extent. But I think that -- you know, I know that some of that was probably done. Do I remember

seeing them? No. That kind of thing.
Q. Turning back now to this proposed schedule to complete, is this different from -- or how is this different from other documents you have seen in scheduling for construction projects?
A. It's just a different format of scheduling. There's many different ones. This is a simple program.
Q. Do you know how this -- what program this is?
A. No. I don't remember the name of it right off. It's not Prologue. No. I can't. I just don't recall. It's a real basic program. It will hit me when I walk out the door, but I just don't remember the name. People -- like Prologue, Timberline, people like that have these kind of programs, project management. There is -- you know, these are the simplest ones.
MR. DIERBERG: Mark this as Exhibit 18.
(Defendant's Exhibit No. 18 is marked)
THE WITNESS: Okay.
BY MR. DIERBERG:
Q. This is a memo from Jose Zamora to yourself, dated 5-16-02, correct?
A. Correct.

Q. And the handwritten notes, are those your handwritten notes?
A. Yes.
Q. On the top left corner you have a lot of -- looks like dates with circles, then slashes going through them, or Xs. Can you tell me what those are?
A. Yes. I have a system that I use, and even today, which is what I refer to as a suspend file system. I have a little rack with 30 days of the month, 31 days of the month, whatever. I write down on the day that I review the document, and then I will suspend it for a day, a week, whatever I think the urgency is or whatever so I don't forget it. Then I put it in. Every morning I check the suspended file, open it to see what I should be looking at that day in supplement to a to-do list or whatever.
Q. Why did you keep putting this on the suspend list?
A. Because based on -- that would mean that it was not getting completed, and I would keep tracking it until it got completed. And then I will write "file," which I did.
Q. Where do you write file?

A. Right up above the subject. Look for subject.
Q. So the last day you would have looked at this is -- I see a --
A. Probably --
Q. -- July 3rd?
A. Probably the last one I crossed off. Yeah. Somewhere around there, yeah.
Q. Your handwritten entry for June 18th says JZ. I presume it refers to Jose Zamora?
A. Yes.
Q. Said her price was 215 K to finish with exclusions. Her refers to Donna TePas?
A. Yes. I believe, yeah.
Q. What is the -- what does that mean, 215,000 to finish with exclusions?
A. It means that -- I think at the time we found out that they were talking to TriState to finish the project, which gave me the thought that maybe something was up. I was like, why are they involved? I said --
Q. When you say they, who are you referring to? They were talking?
A. I think the post office, Stuhl, or Jerry or somebody. I don't know if these people were on

FERNANDEZ & ASSOCIATES
(305) 374-8868

site doing other work or they were contacting them outside. And what I said to Vince and Jose was, well, you know, why don't you just get them -- get someone else to finish this thing, you know? Have them be responsible. Maybe they will -- they will be a better fit for getting things done out there. I said because now it seems to be getting more and more personal with Joe and the feelings. I said maybe we pay someone else to do it. So let's go out and find out what it would take. That's pretty much where it was going.

Q. That was your suggestion? You initiated the idea of going out and getting someone else to finish it?

A. I don't remember if it was my first -- I don't remember if I was the first to suggest it but I thought it wouldn't be a bad idea.

Q. Again, this part about "with exclusions," what is -- what exclusions would there be? What does that refer to?

A. Any time a contractor gives you a price they always give it to you with exclusions, qualifications.

Q. Under -- I guess in the bottom right corner it says: "Jose and I agree this is a bad

idea. Discuss again with Vince."
What was the bad idea?
A. I don't know. At the time I could have been talking about that or something else. May not have been specific to that. I mean I don't recall what the bad idea was, discuss again with Vince.
Maybe it might have been -- okay. Let me just write a note.
I might have come to the conclusion with Jose that based on the discussions that they were having that these people were really not someone that we wanted to get involved with, that they didn't have our best interests at heart.
Q. Do you recall discussing that with someone or is this your --
A. I probably discussed it with Jose.
Q. You recall discussing it with Jose or you are guessing that you discussed it with Jose?
A. I am trying to recall, but that's what my gut tells me, is that at that point -- you asked me why I wrote that note. I am trying to answer your question. The answer to your question is, based on my recollection is that I started to get the feeling at the time that this might have been a bad idea because of what was going on with these

people, and I do think it would be in Advanced or Vince's best interests to throw over the reins to them.

Q. Did you have any discussions with anyone at TriState?

A. Me? No.

Q. And you never met with anyone at TriState?

A. I don't think I ever met them. I think Jose is the one to meet them. I am pretty sure I did not meet them.

Q. How did you get this bad feeling about TriState?

A. I think there were some other things going on that I thought I recall. Them also talking to, you know, Goddard and Stuhl directly. So I said, well --

Q. How did you hear that?

A. I don't remember. I don't know if Jose told me. He may have told me. He may have said I have seen them, meeting with them, this, that and the other thing. Something triggered me to say, wait a minute, this doesn't sound Kosher.

Q. So was it Jose who was the primary contact with TriState?

A. Yeah.

Q. Do you know if Mr. Vento ever spoke with TriState?
A. I don't know. I don't remember that at all.
Q. Had you had any experience with TriState in the past?
A. No.
Q. The fact that you kept this on the suspension list until July 3rd does that mean still an option was being considered to have TriState complete the project?
A. No. That was probably when that option was -- was no longer viable. Didn't make sense to do it.
Q. And do you recall discussing why you decided not to go with having TriState complete?
A. My recollection of what it was is just what I got through telling you, which was at that time the further we went into it the more information we found, the more the deal didn't seem kosher and that they were in the best interest of Advanced. They had -- as I understand it, they were also giving prices to the post office to finish the job.
Q. And do you think you might have heard that

or you think you heard that from Jose Zamora?
A. I think so, yeah.
Q. What about going to some other company to find out if they might be interested in completing the project?
A. What about it?
Q. Did you ask about any other companies that might be able to complete the project?
A. No. At that point we -- just not enough time. We just had to keep moving forward. No one is going to step into that arena and take on that risk.
That's another problematic thing too of those kind of projects. The representatives are trying to push the risk to another contractor and probably going to ask them to bond as well. Maybe that's a requirement in the policies. Anybody that steps into that arena is going to have a very, very difficult time unless they can go in with absolutely no risk. And would the post office let them? I doubt it. They have their rules that -- the government.
Q. Was the cost here, the June 18th, that says 218,000 with exclusions, was that an issue as well?

A. I just wrote it. I don't recall if it was at issue or not. I probably was more -- I always look for the exclusions but I don't remember.

Q. But just the overall cost for TriState to complete was that an issue?

A. I don't remember. I don't know if it was in line with what they looked at. I mean we wrote some documents. What does it say here? I have addressed this before.

Could have been in the ballpark. I don't know. The thing is somebody else looked at it and said it's worth 215,000 to finish. That's all I remember. You know, whether or not they would be key, because you just -- you don't just step into those kind of pictures unless you have a no-risk option.

Q. I am going to ask you about a meeting on June 9th, 2002. I do have a document. I want to just --

A. Why don't you do it that way, because it gets -- make the hairs on the back of my neck go up.

Q. I do have a document but I want to see if you remember anything about a meeting --

A. With who?

Q. -- June 9th, Stuhl, Jerry Goddard and Jose Zamora.
A. Do I remember? No. But are you going to show me a document that will help me remember?
Q. You don't remember off the top of your head?
A. Do you remember what you were doing June 9th of 2002?
Q. No. But I got to make sure.
A. Okay. That's why I write those notes.
MR. DIERBERG: Mark this as Exhibit 19.
(Defendant's Exhibit No. 19 is marked)
(Discussion off the record)
MR. GOLDEN: We will go back on the record.
BY MR. DIERBERG:
Q. Sir, have you had a chance to review that?
A. No, I have not. Okay.
Q. Have you had a chance to read this document?
A. Yes.
Q. This is a letter from Joe Stuhl to Jerry Goddard in which you are copied on it. Do you recall receiving this document?
A. I don't recall it, but if it says I got

it --

Q. Does what he says in this letter -- is there anything that was not accurate?

A. Oh, yes. I am sure there were things that were not completely accurate. And I believe I asked Jose to respond to it, so you should have a corresponding -- or somebody should have a corresponding response from Jose Zamora.

Q. Do you recall anything in this letter that was inaccurate?

A. Well, he was nice enough to say, in general, my inspection revealed that some progress has been made. It appears they are -- ATC is increasing their effort at this facility. So he's acknowledging that we, you know, were doing work and it's moving along, da, da, da, da. I disagreed with his statements about, you know, the fact that -- what was complete in terms --

Q. What statements are you referring to?

A. In the last one. Not the last but third to the last paragraph, discussions about pay ap 17 approving a payment of 87 percent. He said it's 80 percent.

Well, okay. Some of that stuff is just subjective. It's not accurate. You say it's 75.

I say it's 70. That's the way those things go sometimes. And I know that. I said, well, okay, whatever. You know. So I didn't agree with that. He talks about things -- of equipment that was paid for by the U.S. Postal Service which has not been provided. I said, well, what are they? And, you know, that was just a statement. You say it, but what are you talking about? Don't make statements like that.

Q. What was his response?

A. I don't see any response. So I said -- I told Jose, respond. So there should be a letter that responds to this (indicating) in ATC -- or Advanced's files.

Q. But just from your memory, do you remember anything else about this letter that is inaccurate?

A. I see now he's positioning himself, though. He's saying now, Goddard, basically, if you want to approve it you go ahead and approve it. He's saying that we request Mr. Goddard give us written direction to proceed with approval of any further money, da, da, da, reaching nearly 90 percent state of completion. He's now posturing with Goddard.

Q. Well, but on the top of the inaccuracy do

you see any other inaccuracies in this document?
A. I just don't agree with everything that's said.
Q. In particular?
A. I am not going to go into anything particular. I say you need to find -- the letter must exist from Jose Zamora responding back. Because I said immediately respond to every single item there.
Q. But aside from what's in the letter do you recall anything here that's inaccurate?
A. I would not want to answer that question because I need the letter to refer to. I don't have an accurate memory of which ones that I didn't agree with specifically, but I can say in general I disagreed with the letter. It's a one-sided view.
Q. In this letter you discuss -- or it appears there was discussion about pay application number 17 and that it was discussed and agreed that ATC would be paid $63,000. Do you recall discussion about pay application number 17 and the reduction to $63,000?
A. I recall there was a discussion, and it was related partially tying back to the AMC. We -- on that settlement agreement where there was a

number, and I don't remember if it was 63 or not. But it was trying to like say, okay, we're wrapped up here, we will defer some of this here. I just don't remember.

Q. Do you recall any discussions about requesting additional 15 days?

A. To complete this -- no. I mean that might have been one of the items that he said that we said 15 days, and I would have said, well, we didn't say 15 days. We said this, with qualifications; if you do this, we do that, all that kind of thing. That's one of those things that we maybe responded to or Jose did.

Q. Mark this as Exhibit 20.

(Defendant's Exhibit No. 20 is marked)

THE WITNESS: Okay.

BY MR. DIERBERG:

Q. This is entitled, "Facility and fixed mechanization project contract payment authorization," looks like it's dated June 11th of '02. Do you recall this document?

A. Do I recall it?

Q. Yes.

A. I recall that it existed. I don't know if this is the exact one, but yeah. Payment

application number 17.

Q. And do you recall any discussions about payment application number 17?

A. Well, from the looks of it Jose billed for 93 and Jerry cut it to 63. And someone wrote "per negotiations." That's not my handwriting. It's probably Jerry's. But I don't know that to be a fact. That's it.

Q. But you don't recall any discussions of how it went from 93 to 63?

A. Uh-uh. I just know they cut it and it was one of those -- I mean like you don't even say -- if you are going to cut something, you should specifically outline and point out what it is you are cutting so at least you can see how you got down to that point, and I don't see that. That's another one of those subjective, oh, we think it's this percent, you think it's that percent, and it ends up being wherever it is.

MR. DIERBERG: Take a break?

MR. GOLDEN: Yes.

(The lunch break was taken at 12:35 p.m. after which the following proceedings are had at 1:28 p.m.)

BY MR. DIERBERG:

Q. I show you what has been marked previously

as Exhibit 9.
A. Okay.
Q. This is a letter from Jerry Goddard to Vicent Vento. It doesn't show you being copied, but do you recall reading this document?
A. No. And it has the same contract number that doesn't tie it to anything. I am just going to assume he's right, but it doesn't tie the ones I have.
Q. Do you recall in July of 2002 that there was a show cause on the P & DC project?
A. Uh-uh. He said he's considering terminating.
Q. What was the status of the project at July 15th, 2002? Just as you recall. What was status of the project?
A. The exact sentence, I can't recall. The status, were we still attempting to complete the building, now I don't remember. We weren't terminated.
Q. I am sorry? At July 15th you were not terminated?
A. I don't remember the exact date, but it says right here he's considering termination so I am going to assume we were still not terminated.

Q. I am going to show you what has been previously marked as Exhibit 10. For your benefit this is July 15th, 2002 notice of suspension of work.

MS. ALBEE: Thanks.

THE WITNESS: Okay.

BY MR. DIERBERG:

Q. This is a letter from Jerry Goddard to Vincent Vento. On here there is a handwritten note that says: "Delivered by J. Goddard to Greg Warren, 1:05 p.m. on July 31st, 2002. Do you know whose handwriting that is?

A. It's not mine.

Q. Do you recall receiving this?

A. I don't recall. He says it. I don't recall.

Q. Do you recall a stop work order on the P & DC project?

A. Yeah. Eventually I remember we got one. At what time, I don't remember.

Q. Do you remember how Advanced Technology first heard of a stop work order?

A. No. You know, it was I guess mail. I don't know. I just know that the last conversation I had with Jerry, as I remember, I was trying to

talk him out of it, and that was at the hotel. Then if he sent it the next day or already he sent it, I don't know. I would eventually get it because we stopped after that. I just don't remember when.

MR. DIERBERG: Mark this as Exhibit 21.

(Defendant's Exhibit No. 21 is marked)

THE WITNESS: Okay.

BY MR. DIERBERG:

Q. Have you had the chance to read this document?

A. Yes.

Q. This is a letter from you to Jerry Goddard, dated July 19th, 2002. I want to ask you about in the bottom the first page, last two sentences. It says: "Combining the weather delay" -- sorry. "Combining the weather day delay of 37 days and cash flow delay of 24 days we are requesting a new completion date to be extended to August 16, 2002."

As to that sentence there do you recall how you came up with 37 days for rain delay?

A. Part of it was the data that we downloaded from the weather center which stated it was raining on all the days in between the times that we were

talking about.

Q. And just for any day that there was any rain you believe that there should be an extension based on that day of rain?

A. Oh, yeah. That wasn't just rain. At that particular time I used the word "torrential." In Florida that's the rainy season. What happens is it is torrential, and it can rain all day long virtually. There is no work. Plus, it says: "In response to your letter dated July 15th" which is obviously referring to this one. I am replying to this one because I read "considering termination," so I am referring to that letter right there.

Q. Turning to the third page of this document, which is an attachment to the letter you wrote, "Preliminary local climatological data for Miami, Florida," could you explain to me what this document is and how to read it?

A. Well, I am not an expert of reading these kinds of documents, but if I took a moment. It's day 1 through 30 for June out far in the left-hand.

Q. Does the 7 column indicate the amount of water in that day?

A. It's possible. I can be --

Q. If I were to ask you, for example, on the

7th of June, 2002 assume --
A. Well, go to the next page.
Q. Yes?
A. I would have to take time to refresh my memory but it was virtually raining every day.
Q. Let me ask you this. Do you see on the -- what page is this -- on the fourth page in the middle there is a handwritten arrow. Do you see that?
A. One, two, three, four.
Q. Do you see the handwritten arrow. Do you see that?
A. Yes.
Q. 0.01 inch or more I presume it rained? It says 21. Does that mean there are 21 days rain with point 01 inches or more?
A. Could be. I am not 100 percent sure.
Q. And if you go to the very last page it says 0.01 inch or more, 16.
A. We are now in July.
Q. Right.
A. Okay.
Q. So is that how you came up with -- you added those two periods of 21 days, plus 16 to come up with 37 days of rain in the past 48 days?

A. It could have been. Yeah. I am not 100 percent sure.
Q. But if I ask you for each day -- for example, on June 6th, could you tell me what work was being done on June 6th?
A. No.
Q. Or June 8th?
A. No.
Q. I would like to go back to another previously-marked exhibit. Let's go back to Exhibit 17. Can you find that? That's the May 13, 2002.
A. Okay.
Q. Then that has -- in the last page is a schedule. So this is a schedule of things that were anticipated being done as of, I guess, May 13th, 2002; is that correct?
A. Yeah. It would assume that it started before May 10th. Okay.
Q. So as of the date of this letter -- well, let me scratch that. I will ask a different question.
A. This came before the rain.
Q. Right. So I just want to ask you for each of the items. For example, purchasing, what of the

purchasing items were affected by rain?
A. Purchasing is affected by cash flow. Obviously rain doesn't always have anything to do with purchasing. That's the whole point. I had to purchase certain items, then get them there and install them.
Q. So purchasing wasn't affected by the rain?
A. Don't think so. Why would it be? No.
Q. On the turnstile installation, which of those items was affected by the rain?
A. On purchasing?
Q. No, no. Just the turnstile; next item, turnstile installation. Which of those items in turnstile installation was affected by rain?
A. Well, had we got the stuff when we wanted it, it wouldn't have been, because it was before the rain started in June. Look at the dates.
Q. Well, this was the -- do you recall whether or not the turnstile installation was complete?
A. No, I don't recall. I don't recall.
Q. But do you think --
A. It was assumed, if everything took place -- we got the money, we purchased them, they got here, we can start them and finish them by the

dates indicated right there. That was assumption.
Q. What about main lobby construction? Which of those items could have been affected by rain?
A. Same thing. That -- that if you are inside it shouldn't have. Unless they are not going to let you inside, for whatever reasons. If you were working inside you could still work. But that started before the rainy anyway. Doesn't have much to do it.
Q. Access control system. Any of those items are -- are any of those items exterior items that would be affected by rain?
A. There is other work outside, you know, that had to tie and finish to the work that was inside, like on your gates and your control arms and all that kind of stuff.
Q. Which of these items -- which of the exterior items had to be complete before completing the access control system?
A. I don't remember.
Q. What about the CCTV system?
A. There were CCTVs outside. Where, I don't remember. They're all over the place.
Q. Control room, what about that? Would that have been affected by rain?

A. Shouldn't have been. I don't know.
Q. The console?
A. No. The console. These things are probably tied into purchasing.
Q. And the gates and islands, some of those things are exterior?
A. Yeah. Most of this stuff is -- that is going to be affected by cash flow is inside. Most of the stuff that is affected by rain is outside.
Q. Of the things that were exterior work, which of those things had to be completed prior to doing some of the interior work?
A. That -- that's -- that detail is a Jose question. I have to reason -- go through everything in detail and figure that out. Jose can answer that better; I mean, what you would want to finish first before you -- because everything eventually tied together.
Q. Let's go back to exhibit -- what is this, 21? The last one?
MR. GOLDEN: 21.
MR. DIERBERG: 21. Yeah.
BY MR. DIERBERG:
Q. Again, at the bottom you request or attribute 24 days of delay to cash flow. How did

you come up with 24 days?
A. Probably from the time that we were supposed to get a payment. And then we got some money but not all the money. I would have to recreate that to figure out how I got 24.
Q. Now you have seen some of the documents in the June and July time frame. Does that refresh your memory as to any conversations you had in June or July of 2002 with Jerry Goddard?
A. No, unless you are going to show me a document you want to talk about. No. I mean we would talk off and on, on the phone, just about items. Like look, Jerry, you got to get us paid. Why are you doing this? Or that things of that nature. What day it took place, what time. I don't remember.
Q. Do you recall this meeting you had at Holiday Inn? Was that after this July 19th letter?
A. When does he say that the termination was official? Because it would have been before.
Q. It was prior to the actual termination?
A. Yeah. Because we weren't terminated. Otherwise I wouldn't have met with him. I would have had no reason.
Q. On this Exhibit 21 do you recall

discussing this letter with anyone at Advanced Technology?

A. Do I recall discussing this with anyone?

Q. Uh-huh.

A. I mean I cc'd Vince, so he must have got it. I would have hoped he would have gotten it. I would have talked with Jose, because I would have asked him to give me some of the information.

Q. But do you recall any discussions you had about this letter with Jose or Vince Vento?

A. No. Other than the fact that this was a time that we are still -- I wouldn't have written a letter like this had I not thought that there was still an opportunity to complete and continue going. So I was still trying to keep the process going. So I am sure we have discussed it internally.

Q. Around that time frame do you recall what kind of manpower Advanced Technology had on the job?

A. If it wasn't raining? I mean if it was raining on the outside, none, and maybe a few guys on the inside. I don't remember. I mean that would be something I just don't recall. It's a guess.

Q. When you received the stop work notice or order, ATC or Advanced Technology stopped work, correct?
A. Yeah. They told us to get off the site.
Q. And what --
A. Then they took control of whatever was there on the site.
Q. Then what did you do after that?
A. You mean personally?
Q. Did you continue working with Advanced Technology?
A. No. I just kind of like said, well, that's the end of that ball game pretty much. I mean you -- I don't know what you're going to do about it. I think you need to try and discuss it with your bonding company or whatever of that nature. At that point I am kind of like stuck. Nothing I can do.
MR. DIERBERG: Let's mark this as Exhibit 22.
(Defendant's Exhibit No. 22 is marked)
THE WITNESS: Okay. So he didn't -- so the final termination letter -- high five. So he says. Then I --
MR. GOLDEN: Hold on.

THE WITNESS: Go ahead.

BY MR. DIERBERG:

Q. Have you had a chance to read this document?

A. Uh-huh.

Q. Could you explain the handwritten note at the top. This is a letter from yourself to Frank Whelan at International Fidelity, and your signature has a void over it. Why does it say "void" over your signature?

A. Oh. Well, just -- I didn't send the letter. Letter didn't get sent.

Q. Can you explain why you didn't send the letter?

A. Something to do with -- I mean I wrote -- another note here: "Was not sent because I was told the same day as this letter that Vince canceled the check to Hirsch after it was sent overnight to them. It was not agreed by me."

That's why I didn't send the letter.

Q. Do you remember what the issue was with Hirsch?

A. Because what I wrote wouldn't have been true and -- about Hirsch.

Q. Who was the contact person at Advanced

FERNANDEZ & ASSOCIATES
(305) 374-8868

Technology with Hirsch?

A. Primarily it was Vince. The only reason I got involved with him -- well, first, Hirsch was in -- hired an outside consultant to employ some very nasty tactics about some outstanding balances due, harassing, threatening, pretending to be detectives and all this and the other things to where I finally got hold of some contacts that I knew and got that quashed. Then I think I finally got to -- or phone called the president of Hirsch or something like that to tell him, look, we need the software. It's job specific, you know. You guys have it and they are not -- you know, it's -- the post office specified this only and there is no place else for us to get an alternate. Can't we work something out? I will get you the check. You send me -- I mean there was a list of pieces and parts of software that -- didn't mention. The check was cut. I thought it was going overnight. Then I found out it did not. Then I was told later that's because we don't have the cash, we are not getting paid, and da, da, da. Then I said I am not going to send this letter because -- I just basically told him that we are going to settle with Hirsch and we're not. I said until that's settled

then I am not going to write this letter. Other than that, everything else in there is true.
Here is the spelling of Gail's name if you want it.
Q. I show you what was previously marked as Exhibit 12.
A. Okay.
Q. Exhibit 12 is a letter from Jerry Goddard to Vincent Vento dated August 16, 2002. Do you recall reading this document or seeing this document?
A. I don't recall, but I eventually probably would have seen it, because that would have told me the ball game was over. So my last meeting probably took place with Jerry sometime in the beginning of August is my guess. Because we -- as far as I was concerned, when I wrote the July 19th letter or August 2nd we were still in the game.
Q. What -- after August 16th, 2002 what work did you do for Advanced Technology on this project?
A. I -- as far as the post office related, if we were off the site we did not do anything there, but I probably advised him, you know, you may want to take some steps here to protect yourself.
Q. I am sorry. You said that to Mr. Vento?

A. Yes.
Q. In what sense, protect yourself? From what?
A. I mean it was obvious Jerry was determined he was going to go after Vince and go after his bond. He despised Vince, didn't like him. Which I thought was unprofessional, and I told him that. And I will tell him again and again. I don't like that kind of, you know, conduct by people. It's malicious.
Q. What gave you that impression?
A. Because I deal with people in the construction and development business, and if anyone ever tried the stuff he tried with me he never would have made it in our world of the private sector and talking to people and doing the tactics that he did. I just didn't care for it.
Q. What are you referring to specifically?
A. Just the interference, the comments, the --
Q. I am sorry. Take them one by one. What interference are you referring to?
A. Well, not meeting up with what we thought was an understanding to proceed to finish, you know. Yeah, we will do that. And then he would

later come back and say, we can't do that or just cut the pay ap.

It was just not a good way to do business, you know. He just wasn't proceeding in a matter of a business fair relationship. It was more setting the stage for the kill or for the claim. Once I sensed that I was like -- that's why I said, let me meet with you personally, Jerry, and let's talk and see if I can't talk you out of this as a human being. That's what I tried to do. I thought -- even at that moment I thought there was a tiny glimmer of hope. Then of course I found out later, week or two later, whatever it was, that the termination was official, and I just said, Vince, you know, he's going to come after you and your bond. Better protect yourself, whatever you got to do. So he got Gail more and more involved, because that was his outside attorney at the time.

Q. You also mentioned some comments by Jerry Goddard. What comments were you referring to?

A. I will save those. Those are just personal exchanges between he and I, and I don't think it's really necessary for the record. Because I can't corroborate what he said and he can't corroborate what I said.

Q. Well, just tell us --
A. I just didn't care for the way the whole thing went, you know, happened.
Q. What comments did Jerry Goddard make to you about -- you referred to some comments, and what those comments are.
A. He just didn't like Vince, thought he was basically a crook.
Q. Anything else that he said?
A. Oh, I don't remember. That was enough.
Q. What was your communication with International Fidelity around the time of termination?
A. International Fidelity? Well, he was getting information -- like I can't remember how the players go, but there was looked like two. Frank Whelan from International Fidelity was the actual surety, and this guy Richard Sexton, which I think was their consultant. And there was letters that went to Vince or -- and when I saw them I said, you know, you really ought to respond or tell them what's going on, that you're trying to get things done but you are -- that isn't going to happen the way it's going on right now. And you know, if I were you, I would secure whatever help

they can do for you because it is in fact a bonded job.

I said, now you get into an avenue that I am not an expert because I have never called in a bond and I don't know what happens. But I can tell you I have read the documents that bonds are written on, and they have changed significantly over the years. They are -- also, some of them are AIA documents, and, you know, procedures for cure on a bond are written in there. They have their own proceeds for cure, that -- like, for example, a bond that we carry in the commercial, if you just terminate someone, kick them off and they are bonded, the bonding company does have the right to cure. There are certain procedures they can do in their different -- in the bonds. They have the chance to go out and hire a contractor to finish the work. They have some options. I can't quote them chapter and verse but I know they have options. I said, you need to tell them that, you may want to state that this is coming. Because I don't think -- personally I told Vince -- I said, I don't think, personally, if you are bonded they can just kick you off and they just say good-bye, we'll sue you, have a nice day. I don't think they can

do that, but I don't -- I never saw the actual bond, to my knowledge. No. I never actually saw the bond so I could read through it and go look at this, you know.
Q. Say in the two months prior to termination how often would you talk to Frank Whelan?
A. I don't think there were a lot of conversations. Two or three.
Q. What about Richard Sexton?
A. Same. Two, three, four, somewhere in that neighborhood.
Q. Do you recall what you guys discussed?
A. No. I mean it was just about the job, status of the job, what was going on.
Q. After the termination did you visit the site after that?
A. No. No. I mean they were -- they locked you out. It states right in there. Took control of the stuff. Don't come back. We will arrest you.
Q. Do you remember any meetings with anyone from the postal service after termination?
A. Well, if there was I don't recall it. I mean there may have been but I don't recall.
Q. How about phone calls?

A. Maybe. But I still, when -- I stopped when I saw the official -- when -- I think I saw the official termination, because it was like, okay, Jerry, you have done it. Okay. There is nothing for us to talk about anymore. You have taken control. I mean that's it.

Q. In 2002 are you aware of any efforts to obtain financing from a bank by Advanced Technology?

A. By Advanced?

Q. Uh-huh.

A. In 2002.

Q. Uh-huh.

A. No. I am not aware of that.

Q. Any time prior to 2002 are you aware of any efforts to obtain financing by a bank?

MR. GOLDEN: Objection to relevance.

THE WITNESS: No. I got very limited data out of Vince. It was usually later on when -- to find payables, see what we owed people. Vince kept that all to himself.

MR. DIERBERG: Could I have a five-minute break? I may wrap up. I just want to break.

(Thereupon, a brief recess was taken after which the following proceedings were had:)

FERNANDEZ & ASSOCIATES
(305) 374-8868

BY MR. DIERBERG:

Q. Back on the record. Mr. Warren, after termination did you have any role in assessing the progress or seeing SEC in the assessment of the amount of progress that had been completed after termination?

A. SEC.

Q. Joe Stuhl. Sorry. I will rephrase the question. After termination I understand that Joe Stuhl and the postal service wanted to find out where the project was, how far complete they were, what items had been done --

A. Oh.

Q. -- what items were there, et cetera. Did you have any role in assisting them in determining what items had been done, what items were provided, et cetera?

A. I don't think they wanted us involved. I think they did that all by themselves. I never saw Joe Stuhl again after my last meeting with Jerry. It was over.

Q. Do you think the government intended to harm Advanced Technology?

A. Do I think, in my opinion?

Q. Uh-huh.

A. It's like anything with the government. It's not that -- the government you are dealing. It's the people who have the authority, in charge, and sometimes that authority can be used correctly or incorrectly.

Q. Well, the people in charge do you think they had an intent to harm Advanced Technology?

A. I don't know. I don't know how to respond to that. I feel that -- that they had positions in their world that they had to cover their butts, and probably the only way they were going to cover their butts is to in some cases document it -- completely one sided it, partially incorrectly. Intent, I don't know. I can't speak for them. I just got -- I think I am a pretty good judge of character, of people who I deal with and people who I don't want to deal with.

When I thought we were going down the road of coming up with a way to finish the project without getting anybody into a claim situation, I think -- I can't be sure of this, but I think that Joe Stuhl -- and you can see by the letter he's starting to posture with Jerry -- was constantly behind the scenes with Jerry saying that, you know, blah blah blah, blah blah blah, whatever, just

because he wasn't going to be part of it or didn't agree with it or whatever.

I mean he stood to benefit by that project going on for as long as it was going on because the government has to pay him to finish the job. Can I prove it? No. But he obviously was paid more money to finish the job. Jerry, on the other hand, was the government employee that tended to look at everything black and white. And I would try to tell him, Jerry, life is not black and white. There is some gray. Work with the gray here a little bit. It worked for awhile and we were getting through it, but I think at some point in time he finally figured if I don't cut it now that he might get in trouble. But that's just all my opinion.

Q. After you left ATC International did you do any work with Mr. Vento?

A. Do work with him?

Q. Uh-huh.

A. No. I have seen him, of course, but don't work with him, no.

Q. In what context have you seen him? Social context?

A. No. They asked me to come back maybe once

or twice to look at some documents and say, you know, what do you think. And I told them that, well, first of all, I think you should have dealt with this a long time ago with you and those guys. I really don't want to talk about it anymore. To me it's nothing more than a bad memory. It's not -- something I don't want to talk about. So I wasn't overly anxious to go talk with Vince about it, you know, but I did, out of courtesy.

Q. Do you recall when that was?

A. I think I did it once in January of '03 and maybe one time again -- they would know. I mean probably --

Q. After --

A. -- '05, maybe in '04, possibly in '04 I went over there one time and met, because then Gail got out of it. Then I said to Vince, you need to hire an attorney. This is not going away. You know, you need to deal with it. But I said, I think that you have been -- you know, you got -- you have been misjudged and I think it was an inaccurate termination. I said, it's not all one sided. You need to defend yourself. This is crazy. So he -- after that he hired an attorney. And I met Scott here last week for the first time.

Never even spoke to you.
Q. How about Jose Zamora, have you spoken to him since leaving ATC International?
A. He called me about nine to ten months ago, somewhere around there, because he said he left ATC International. He was with them a long time. I go, really? What are you doing now? He says, "I am doing this project in South Africa." I said, "South Africa, oh, wow. Since 911 I have been hesitant to travel anywhere that risky." That seemed risky to me.
And he had a gentleman -- they did the security business over there. I will be darned if I remember his name. But that they also wanted to get into development over here. And the reason he contacted me -- he called me. He said, the guy that you need to talk to is Greg if you want to build buildings and stuff, blah blah blah, and the guy goes, yeah, we are interested in doing that. Boom. That was it. Never heard from him again.
In fact, if you asked me if I could get hold of him, I have no idea where he went. I am going to guess he's in South Africa.
Q. What about any other employees of Advanced Technology? Have you had any contact?

A. There aren't anymore employees of Advanced Technology.

Q. Or former employees? Any former employees?

A. ATC International employees maybe, but no Advanced Technology employees, you know. I have seen Vince maybe a total of three times and that was about it.

MR. DIERBERG: Okay. I have no further questions.

CROSS EXAMINATION

BY MR. GOLDEN:

Q. Mr. Warren, I am Scott Golden. I represent Advanced Technology and I have a few followup questions from what Mr. Dierberg asked you and a few other documents to ask you about. Right near the end there Mr. Dierberg was asking you about whether you thought the government intended to harm Advanced Technology and you -- you talked instead in terms of authority and whether the authority was used correctly. Do you think the authority was used by the government correctly in this case?

A. Hum.

MS. ALBEE: Guys?

MR. GOLDEN: He's still thinking about it.
MS. ALBEE: I am sorry.
THE WITNESS: I would say in all cases, no. In some cases -- see, I am not familiar with how -- what their -- they can and cannot do. I was only familiar with what he said he could or could not do. I approached it from more of a private sector mentality to try to get some things done, but I don't think that they did everything correctly in terms of providing the information -- you know, providing information and a working relationship that was conducive to a successful project. But that's just my opinion.
BY MR. GOLDEN:
Q. Following up on that opinion, do you think the government used its authority correctly in cutting the pay requests to be sent that they did that were sought by Advanced Technology?
A. I don't know. I can only tell you this. I have never, ever seen anybody cut something to the root where you were dealing with retainage, you were getting 75 percent of your money withheld of what was done. I had never seen that before. Standard procedure is to hold ten percent back, job

is finished, ten percent is held in retainage. Then whatever is a punch list item or whatever is completed, then retainage is reduced accordingly if the punch list is completed. I think that it was an overreaction, a severe overreaction on how they inspected, restrain the cash flow. I mean I think it was a severe overreaction and led -- and led Advanced to think that they could -- that they were going to cooperate to finish. I think that was the most frustrating part.

Q. Okay. Let me direct your attention to Exhibit 12, which is the last of the exhibits I believe that we were just dealing with, and that's the August 16th letter from Jerry Goddard to Vincent Vento. At the top of the letter in the first paragraph it details three reasons for terminating. I would like to go to item three, the project is not adequately manned. You previously said there was a lack of materials due to lack of pay by the government?

A. Uh-huh.

Q. And that it had rained significantly during the -- during the immediately preceding period of time. Given the rain and the lack of materials would there have been any advantage to

the government or to the job by putting more people on the job?
A. No. I mean if you don't have -- absolutely not. If you don't have the materials to work with and connect or install, then guys are just standing around because they need to be standing around is ludicrous.
Q. Let me now direct your attention to Exhibit 21, which is the July 19th letter from you to Jerry Goddard when they -- when Mr. Goddard had asked for --
MR. DIERBERG: I am sorry. What -- Exhibit 21. Okay.
MR. GOLDEN: Yeah.
BY MR. GOLDEN:
Q. Let me direct your attention to page 1, the last line --
A. Uh-huh.
Q. -- which there is an indication that Advanced Technology was providing or submitting payment application number 18?
A. Uh-huh.
Q. Is that an indication that Advanced Technology had done some work since the last -- since the time of the previous payment submission

and therefore was seeking payment for the work?

A. Yes. Yes.

Q. So the idea that there was no work being done is opposed by the fact that Advanced Technology thought over $38,000 worth of work had been done; is that right?

A. Yeah. I mean that's --

Q. Can you do trenching? Could you have done trench work -- strike that. Could Advanced Technology have done the trenching work that was required on this job while it was raining?

A. No. It's an unsafe condition, and you're trenching -- and water that is going to fill up your trench. Defeats the purpose.

Q. Could Advanced Technology have done the gate work required on this job while it was raining?

A. Again you don't put -- I mean there are companies that go out and do stuff when they shouldn't, but you don't put people in harm's way that you wouldn't otherwise do the work yourself.

Q. Did any of the gate work involve electronic components?

A. Uh-huh. Yeah, there was; tied to gate arms and so forth, controls.

Q. If they had been installed in the rain would it have been possible to have ruined those electronic components?
A. Sure. You got to open them up to connect them. These withstand a certain amount of rain when they're completed and covered up but you got to actually open them up.
Q. Was there any other exterior electrical work that needed to be done on this job?
A. Let's see. The controllers, the gate arms, probably some closed circuit TVs, probably some underground conduits that, you know, needed to be run from a point, some short points, some lights out to some of the light poles, I think, and some of that kind of work.
Q. Should any of that work have been done while it was raining?
A. No. You don't.
Q. Let me direct your attention next to Exhibit 18, which is the May 16th, 2002 memorandum from Jose Zamora to you with writing that you identified as yours on it, and there is indication here on -- next to June 18th that the price was 215,000 to finish with exclusions. I think you indicated earlier that you understood that to be

the price that TriState was willing to come in to complete the job for; is that correct?

A. Correct.

Q. Do you have any reason to know why -- if the government asked TriState to come in and finish, why the government agreed to a contract of over 300,000 for TriState to do the same work?

A. No. I don't know why. I mean --

Q. Exhibit 17, which was the four-page cover and then letter --

MR. DIERBERG: I am sorry. What number?

BY MR. GOLDEN:

Q. Exhibit 17. The letter was from you to Jerry Goddard on May 13th and it had a one-page attachment to it. I would like to just address your attention to the very last line on the fourth page and the schedule. It says: "The schedule is based on receiving expedited payments with only a reasonable retainage taken."

Now what was amount of retainage that was taken at the end of this job just before Advanced Technology was terminated?

A. I believe it was 75 percent.

Q. And what would you consider a reasonable retainage?

A. Reasonable is ten.
Q. Do you actually know what the --
A. But let me explain.
Q. Yes.
A. You know, once again, in the buildings that I do and have done it's customary for a subcontractor to put in his contract that after his work is 50 percent complete that his retainage, which is standard ten, is reduced to five percent, you know. So he's going to push real hard to do -- make the owner happy, and everyone, including the lender. And then, if it's good, the owner will reduce it to five percent. So they only hold back five. So that will be the holdback until the end of the job. The customary is ten percent.
Q. Do you know if this schedule, which was called the project closeout schedule, was based on a retainage of 75 percent or some lower retainage?
A. Yes, much lower. That was the point. That was the whole point of discussion was pay us everything you can possibly pay us faster and get off this ridiculous constraint of holding back 75 percent.
Q. Do you actually recall, as we are sitting here, the amount of retainage called for in the

contract?
A. Oh, you mean in the beginning stages?
Q. Well, in the contract itself. Do you recall what the retainage percentage was?
A. No. I am going to guess it was ten percent because that's standard.
Q. Okay. Let me direct your attention to Exhibit 5, which was a second show cause letter dated May 1, 2002 on the GMF facility and which you indicated earlier you weren't quite sure which facility that was. But assuming that it was the P & DC facility, the one that's at issue in this case --
A. Right. I think that's what I had to assume there.
Q. -- what is the contract completion date set forth in this letter?
A. Well, he -- Goddard says himself the revised contract completion date is now September 10, 2002.
Q. Did you have reason to rely on the letterhead from Goddard in terms of your planning to complete the job?
A. Yes.
Q. You have indicated several times in your

testimony that some of the reports were -- I believe you used terms, false and inconsistent. In particular --

A. Some items in the reports.

Q. Okay. Which reports are you referring to? I am not asking you to identify them by date or name but which companies' reports and which individuals' reports are you talking about?

A. Well, this one here from Joe Stuhl that I said that instructed Jose to respond to this one year, June 10th, whatever exhibit this is. You guys know your exhibits. The one from SEC dated June 10th was not completely accurate.

Q. That's the June 10th, 2002?

A. Yes. The fact that every time he -- you know, a jury is saying second cause. You have failed to perform on contract with respect to failure to complete, provide submittals. That's all partial or misleading information.

Failure to provide submittals. Inaccurate. Submittals had to be provided in order for them to proceed. So there were submittals provided. Were there 100 percent? Can't dispute that. Don't know.

Provide backup documentation for change

requests. Totally inaccurate. Constantly, any time there is a change request before he would approve it he got the documentation.

Failure to provide updated completion schedule. Total inaccurate. You have seen them attached, provided in letters.

Failure to adequately man the project. Totally inaccurate. That's an opinion. People were on the job working. Even states so. This is May 1? Here is June 10th, SEC. In general, my inspection revealed that some progress was made by ATC and appears they are increasing their effort at this facility.

So he writes a letter after this guy sends this letter. So this is when I started becoming irritated because of the way they were going back and forth, to be so -- so, you know, in your face and making these statements just so he can cover his butt. Then you get a letter over here saying, yeah, it's getting a lot better but we got a report to make. Then you got to respond to the report. Because not everything is accurate.

Failure to provide commitment and materials. Yeah. Partially accurate, because we needed a lot more money to do so.

So that's what I am talking about.
Q. Just for the record the witness was looking at the May 1, 2002 letter from Jerry Goddard to Vincent Vento and also referred to the June 10, 2002 letter called a field investigation report by SEC.
Turn your attention to Exhibit 14. Bear with me a second while I find it. Exhibit 14 is the memo to Greg from Jose Zamora, dated March 15, 2002, and there is a handwritten A and B near the top of that. Whose writing was the A and the B?
A. Mine.
Q. Could you read A for us, please.
A. A, Vince's rough estimate is that it will take plus minus 187,000 to finish PD & C contract. Jose believes it will take 60 to 70 days to complete the work.
Q. Okay. So as of March 15th, more or less, you are -- Advanced Technology's estimate was approximately $187,000 to finish the work. Do you know if that was more or less than the amount of money that remained in the contract at that time?
A. I have to look at a pay application. I don't remember. I would have to look at a pay application. It's pretty simple. Where is the

payout number 17?

Q. Was it helpful to know when the contract was terminated there was still approximately $300,000 left in it?

A. Well, that's the answer to the question.

Q. So as of --

A. So there was.

Q. As of March 15th it was Advanced Technology's position they could have finished the job within the contract amount?

A. Yeah.

MR. DIERBERG: Objection. Foundation. You just testified for him as to the amount.

MR. GOLDEN: Okay. We can rephrase it this way.

THE WITNESS: Here is pay ap 17. I am going to respond in a completely factual manner. My intent is always to be straight up, fair. I have no -- I can't find any other way to do business. This period from January '02 to -- excuse me, May 20th '02 is the cutoff date, okay? Pay application number 17. So as of May 20th -- that's considering we got paid this amount, which we didn't (indicating) -- value of work completed. Amount of

retainage -- there was still -- add these figures up. 169 plus 69. There is about over 240,000 left, not counting any legitimate change order.

BY MR. GOLDEN:

Q. So let me ask the question again then. As of March 15th --

A. This is as of May and that's as of March. I am going to assume that, yes, there was enough money to finish, yes.

Q. Okay. Did Jerry Goddard ever indicate to you that he was relying on the reports from Mr. Stuhl and Mr. Stuhl's company, SEC, in issuing whatever letters Mr. Goddard issued?

A. Yeah. I mean that was his advisor he was -- used.

Q. On most of the occasions that Mr. Goddard wrote something regarding the project had he come in and visited the project himself or had Mr. Stuhl's company come to inspect the property?

MR. DIERBERG: Objection. Lack of knowledge.

BY MR. GOLDEN:

Q. If you know.

A. Joe's job was like any architect hired on

any job. He was a representative of, quote, the owner. The owner in this case was the government. So part of his responsibility was to review the progress of the job, report to the owner and make recommendations for payment or status of inspections.

Q. Did Mr. Stuhl ever tell you on a job that he was going to approve payment for something and then, when he made his report to Mr. Goddard, he had either eliminated that payment or reduced that payment?

A. According to -- I can't say that I can point out. I can just tell you that was the result. I can tell you that Jose told me that he said things were fine and then later would, you know, write a more negative report. But I can also state that he approved things and then later went back on the fact that, even though they were approved, you know, we are now telling you now that we didn't receive it or this, that and the other thing, which I found to be strange.

Q. Do you have an opinion as to the amount of the job that was left to do when Advanced Technology was terminated?

A. Do you mean an estimate in my head?

Q. Yes.
A. Geez. I would say, you know, that we were within -- TriState said it was worth 215. We probably thought it was worth somewhere in the neighborhood of 200 to $300,000, somewhere in that neighborhood. Now do you say that -- what -- after we were terminated? Restate the question.
Q. At the time that you were terminated.
A. Which was August 16th?
Q. August 16th.
A. 215,000 came before that. I just want to make sure I am saying this correctly. Yeah. As of June 18th she was saying it was 215, so that's two months later. No, it wouldn't have been that much. It would have been, you know, a hundred to 200,000, tops.
MR. GOLDEN: Off the record.
(Discussion off the record)
BY MR. GOLDEN:
Q. We are back on the record. I am going to show you now a document dated January 18th, 2002 to Mr. Joseph Stuhl on ATC letterhead written by John Costanzo. Is John Costanzo the person whose name you couldn't remember earlier?
A. Yes. I thought it was Costanza.

Q. And let me have you review that letter and see whether, in the course of your getting up to speed, you ever saw that letter (indicating).
A. No, I don't remember ever reading that before.
Q. Okay. It -- in item three there is -- in the letter there is a discussion about the use of a different kind of cable. Was that still an item that was at issue by the time you began to be involved in this project a month or two later?
A. I don't remember. But it's interesting, you know, now that Michael has had a chance to read this. It has a lot to say about things I was saying earlier about the fact that, you know, we would walk away thinking one thing, then a report would come later with another thing and the pay ap would be changed or the report would be different than what the walk-through said.
Q. So this is consistent?
A. It's kind of similar to what I was expressing, you know. In -- John eventually was just -- you know, I had heard him saying things and he was just like so frustrated and everything, but I didn't actually see this letter.
Q. So the behavior described here was

FERNANDEZ & ASSOCIATES
(305) 374-8868

consistent with the behavior you found when you --
A. Yeah.
Q. -- were dealing with Mr. Stuhl?
A. Yeah. I mean it's virtually everything I just told you, although they are just different items.
MR. GOLDEN: We can mark this 23.
(Exhibit 23 is marked.)
BY MR. GOLDEN:
Q. I show you now letter dated March 25, 2002 called field investigation report from Mr. Stuhl's company, SEC, and give you the time to review that letter and then I want to ask you a question about the second paragraph.
A. Okay.
Q. You've had a chance to read this letter?
A. Yes.
Q. The second paragraph indicates that you stated in a meeting with Mr. Stuhl and others that Advanced Technology would require approximately two more months to complete their work.
Obviously the work was not done in two months. And we have now seen that two months repeated several times in further documents. What was the holdup or was there more than one holdup

that kept the two-month periods to kind of be consistent? Why was the work not advancing that would have shortened that two-month period?

A. It was the -- the things I mentioned earlier. It was the cash flow payment and the ability to get an agreement on some of the things that were outstanding. There was -- you know, I recall there were some difference of opinion on what materials were acceptable and what weren't acceptable, what work was, you know, installed correctly, what wasn't. I mean there was just items that were -- again, like I said earlier, there is no black and white and everything. There is always gray. And we weren't in agreement with their position on certain things.

Q. Okay. If we can mark this as 24, please.

(Exhibit 24 is marked.)

MR. GOLDEN: Next I have a letter for you dated April 3rd under Jose Zamora to Jerry Goddard, copy to you (indicating). I am going to give you a chance to read that.

THE WITNESS: Okay.

BY MR. GOLDEN:

Q. Do you know when Jerry Goddard decided to impose the 75 percent retainage?

A. Well, it appears that it was going to be pay ap number 15. That was -- if this is correct, pay ap 15 is when it started.

Q. The --

A. Could have been before. I mean it's easy if somebody has the pay aps. We can tell.

Q. Do you know if Mr. Zamora wrote this letter of his own volition or whether you discussed it with him and then he wrote the letter?

A. It's highly likely I told him to write the letter, because I told him that he needed to respond to these things. So I would say in this event I probably told him to write the letter because I would have told him to copy me. Because I thought it was absurd.

Q. Okay. Exhibit 25.

(Exhibit 25 is marked.)

BY MR. GOLDEN:

Q. Next we have a letter dated April 9, 2002 from you to Tomsed, T-O-M-S-E-D, Corporation regarding the turnstiles and let me give you a chance to review that letter (indicating).

A. All right.

Q. What was the purpose of this letter?

A. It was to negotiate with Tomsed the

release of the turnstiles so we could complete the work, because they were not yet on the job site and I was negotiating terms that he could be -- feel comfortable with.

Q. Did Tomsed agree to the terms that were set forth in this letter?

A. Yeah.

Q. And --

A. I believe so, yeah.

Q. Did the letter require ATC to pay an initial amount toward the full payment?

A. Yeah. 50 percent, looks like, because I told him, Steve, you cut a check down there, too.

Q. Do you know whether that check was, in fact, sent to Tomsed?

A. Do I remember? No. But do I think it was? I think it was but I don't remember. I don't remember.

Q. Do you know whether ATC was paid for the remaining -- was paid for the payment requests that included the turnstiles so that it could pay Tomsed the rest of the money?

MR. DIERBERG: I am going to object. Vague, ambiguous.

MR. GOLDEN: I will rephrase.

BY MR. GOLDEN:
Q. Let me ask the question again. Under the terms of the -- of this letter how was the second portion of the money to be paid to Tomsed?
A. This second portion.
Q. The first portion was paid by the check we just discussed. How was the remainder to be paid?
A. The remaining balance to be paid will be dependent on the percentage paid to ATC by the USPS. Mr. Goddard has informed me that he would expedite payment for the turnstile. ATC anticipates we will receive 90 percent payment within three weeks of the inspection of the turnstiles.
But you know, here on this pay ap they cut it. We billed for 93 or more and they cut it to 63. And that was -- and then that one we were paid -- requesting payment for the -- all of the turnstiles. Material only.
Q. Material only? Is that what you said?
A. Yeah.
Q. You just read in here that Mr. Goddard told you that he would expedite payment. Do you recall having that conversation with Mr. Goddard?
A. Could I recall?

Q. Yes.
A. No. But I reduced it to writing so I know I had the conversation.
Q. Okay. And when was this letter to Tomsed?
A. April 9, 2002.
Q. Do you recall when, if at all, Advanced Technology received the $63,000 which included the payment that was supposed to be expedited?
MR. DIERBERG: Objection. Lack of foundation.
THE WITNESS: Well, I don't remember when we got paid 63,000 if that was in fact the amount. It looked like that was the amount approved, but that would not have paid -- because it's right here. We billed for a hundred percent of the materials to -- of the materials only, leaving all the labor to complete the work to be billed in the future, and all of that was not paid because, you know, it was cut by 30,000.
BY MR. GOLDEN:
Q. Okay. Wouldn't -- when Mr. Goddard indicated to you that the payment would be expedited, what time frame do you consider expedited to be?

A. Oh, well, expedited. I mean -- so my term -- my meaning of expedited is definitely, you know, no later than the dates approved to be paid by, but faster, because I used the word "expedited" in order to move things along. Because you know, the governmental process gets hung up sometimes with getting the payouts, because it sits on someone's desk. This person is out sick, blah, blah. There is always some excuse. And two or three days goes by. That's two or three days you don't want it to sit around. I said, Jerry, please, walk it through. That kind of thing.

Q. If ATC submits its report on a particular -- I am sorry -- submits its payment request on a particular day and you have been told it's going to be expedited, how long do you anticipate it will be until that -- the payment for that particular payment request will be received?

A. That's a tough question to remember. Okay. I would say that it would be ahead of the normal time frame turn around of any payment that they usually do. I can't give you an exact time frame. They have, by -- you know, all the contracts they have, you know, this time, this time, this time until you fill all your things out

and dot your Ts, jerk the chain. As long as everybody is playing ball right they will make it go normal, call it normal, which is 30 days or whatever.

And I said, look, you know, when they submit it, get it through the process and get it back to us. So it would -- in order to give you a dead ass -- excuse me -- accurate answer I would have to time this request with whatever pay ap, this pay ap (indicating) and say, okay, this is -- you know, this date versus that date. But --

Q. The document you are looking at for the payment has been what is marked -- what is this?

A. It says 17. I don't know if that's --

MR. DIERBERG: That's not it.

THE WITNESS: Oh, it's pay ap 17. All right.

BY MR. GOLDEN:

Q. Exhibit 20.

If we could, please, mark the Tomsed letter as the next exhibit, please.

(Exhibit 26 is marked.)

BY MR. GOLDEN:

Q. I hand you next a letter dated April 18th from Jose Zamora to Jerry Goddard.

A. Okay.
Q. Have you seen this letter before?
A. I must have, because I was copied on it and that was part of the process. Yeah. I have seen it because I knew about the rain delay.
Q. This is not the June rain delay, because this letter was written in April.
A. In April.
Q. Do you recall there was a problem with rain in the spring, as opposed to in the early summer?
A. Yeah. There was rain during that period of time as well but I don't remember. He states here -- he says -- wait a minute. 40 of the last 45 days.
Q. Do you recall whether you were at --
A. That explains -- while I am saying that -- if you ask me to cut to the question about how long I think it takes to finish something as opposed to when it got finished, it was simple. We kept getting interrupted by mother nature, cash flow and so forth and kept -- the sequence of events took place from April until about July.
Q. Do you recall whether Jose Zamora wrote this letter of his own volition or you asked him to

write it?
A. I would have told him to write a letter to document the truth and if this is what was going on that we needed to document what was going on.
Q. Okay. Mark this Exhibit 27, please.
(Exhibit 27 is marked.)
MR. GOLDEN: (Indicating).
THE WITNESS: Okay.
BY MR. GOLDEN:
Q. Under the April 18th letter, first of all, it appears to have your name on it. Are you the person that wrote this letter?
A. Yes.
Q. There is a list at the bottom of the first page going onto the second page of several items. Can you tell us what those items were? Not each specifically; generally, what those items were and why you discussed them in this letter. Let's start with what those items were.
A. The most critical items, materials needed to finish the project.
Q. Okay. What were you discussing about those items in this letter?
A. To get them to release funds under the joint check process so we could expedite the

release of materials.
Q. When you say them you are talking about --
A. UPS.
Q. USPS?
A. USPS. Sorry.
Q. You don't know whether USPS ever agreed to that?
A. No. They didn't. And I also told them, you know, retainage was ridiculous. We need to be paid every two weeks. The fact we were financing the job is because we have to work, put out cash and then go try to get the cash back, which was even a further hampering the situation.
Q. Is there anything else in that letter that raises concerns or difficulties with the USPS that we haven't already addressed today?
A. I don't understand exactly. Say that again.
Q. Are there -- does the letter address any other concerns between ATC and USPS that we have not already addressed today?
A. No. It's pretty much what I have been telling you through along here is that -- what it was we needed to do and that I thought that we were negotiating in a fair manner and that we were

resolving disputed items and we can keep going through. But I thought that the constraints they were doing were completely out of the ordinary and that they needed to relax those things significantly in order for it to work.

Q. If the government had agreed to the joint check process that you proposed in this letter --

A. Uh-huh.

Q. -- is it your opinion that ATC would have been able to finish the job in the timely manner, leaving aside these delays that might have been caused by rain?

A. Yeah. Not considering the rain, yeah, of course. These aren't big items.

MR. GOLDEN: Mark this the next exhibit, please.

(Exhibit 28 is marked.)

THE WITNESS: Okay.

BY MR. GOLDEN:

Q. I have handed you a document entitled, "Agreement of settlement between the parties" which is a one-page document appearing to be signed on the bottom by Vincent Vento and by Jerry Goddard. The last signature is Jerry Goddard, appearing on January 19th of 2002. Were you involved in the

negotiation of this resolution?

A. Absolutely.

Q. Okay. And do you recall which of the facilities this agreement related to?

A. The first phase, which I know as AMC.

Q. Okay. And let me direct your attention to paragraph C of the -- of the resolution or the agreement that indicates that a certain amount of money is to be withheld from another contract. Do you know which other contract that is?

A. That would be the second phase, which would be PD & C as I know it.

Q. And was it your understanding that the way the government was going to be paid for the amount of money that this agreement agreed to was from withholding from the second contract?

A. Yes.

Q. Was it your understanding that the government had any right to go after anybody else for that amount of money -- let me rephrase that. Other than withholding it from the second agreement, which is what paragraph C says, was it your understanding the government could obtain that sum of money by seeking it from any other person?

A. Seeking it from any other person. No.

Q. Was paragraph C the sole way the government was entitled to obtain that money?
A. Yeah. And it was my understanding that it would be deducted from retainage, you know, not to interrupt the cash flow, even though it didn't say that.
MR. GOLDEN: Mark this Exhibit 29, please.
(Exhibit 29 is marked.)
BY MR. GOLDEN:
Q. Next I am showing you modification number M 10, which I think is commonly referred to as just Modification 10 of the second contract. Were you involved in the negotiation of this modification?
A. Yes.
Q. I would like to direct your attention to the last typed sentence in the area called description of modification. That sentence reads: "The remaining materials will be paid as invoiced at 100 percent of the schedule of values under the normal payment request process."
A. Right.
Q. Were the materials purchased by Advanced Technology at the end of the contract, pretermination, paid a hundred percent of their value?

A. Not to my knowledge.

Q. You indicated earlier that the Tomsed arrangement required a payment from the government. Do you know if the Tomsed, which was the turnstiles --

A. Uh-huh.

Q. -- was paid a hundred percent?

A. I don't remember. I don't think so but I don't remember.

Q. There is also a handwritten part that says the settlement is also based on the approval of payment within five days in full of pay ap number 17 in the amount of $63,000, per a name I can't read, held on June 6, 2002.

A. Per meeting?

Q. Perhaps that's -- I can't tell.

A. Okay.

Q. But my question is: Were you aware of that being negotiated into this modification?

A. I believe I read this document. It was attention to me, and I gave it to Vince to sign because he was the signatory. It was also based on approval. Approval payment was in five days in full -- I don't know. I don't remember the meaning, okay, but it's Vince's initials.

Q. That was the next question. Are those Vince's initials?
A. Yeah. I am pretty sure.
Q. Are you familiar with his initials?
A. Yes. There is his initials, too.
Q. You are familiar with his signature?
A. Yes.
Q. That's his signature at the bottom?
A. Yeah. That's his signature.
MR. GOLDEN: If you can mark this.
MR. DIERBERG: You gave me an extra copy, right?
MR. GOLDEN: Oh, yeah.
(Exhibit 30 is marked.)
BY MR. GOLDEN:
Q. I am going to hand you modification M 11 which is known as modification 11. Again, this is appears to be a modification to the second contract. And I will give you a chance to read it and then ask you whether you were involved in the negotiation of modification of that.
A. Okay.
Q. Were you involved in the negotiation of this modification?
A. Yes.

Q. There are -- in the second paragraph under description of modification there are three -- strike that. Let me start over. In the second paragraph under description of modification there are three dates that have been crossed out and other dates inserted. Do you recall who made those changes and who agreed to those changes?

A. It looks like Vince's signature there and it looks like -- I am going to guess that looks like Jerry initials there, Jerry Goddard.

Q. Pointing to the initials in the middle of the page?

A. Uh-huh. I think it was because there was just some typos there and I noticed that -- just signed through it.

Q. Based on this do you know what -- what the new contract completion date was?

A. According to this it was 7-15.

Q. And do you know whether the contract was completed on that date?

A. No. I don't believe it was completed on that date.

Q. Okay.

A. I think we had -- they issued another notice of termination intending to -- or other

FERNANDEZ & ASSOCIATES
(305) 374-8868

cause for termination or something like that. I guess -- I don't remember without going back through here that the official was 7-31. But I don't think the thing was fully complete. Again, it wasn't complete because things didn't go like they were supposed to with cash flow, and rain and so forth.

Q. Thank you. Mark this next, please.

(Exhibit 31 is marked.)

MR. GOLDEN: Did you want to show him that?

MR. DIERBERG: Yeah. We have that. Exhibit 10.

MR. GOLDEN: No. It's the same basic letter but somebody wrote something different on the bottom.

MR. DIERBERG: In that case --

MR. GOLDEN: It wouldn't be the same.

MR. DIERBERG: Yeah. Can I see it a moment?

MR. GOLDEN: Sure (indicating).

BY MR. GOLDEN:

Q. You previously testified I believe that you saw this -- the typed portion of this letter; is that correct?

A. Uh-huh.
Q. Just for the record, this is the July 15th or a July 15, 2002 letter from Jerry Goddard to Vincent Vento ceasing all work on the job site. There was also some handwritten material at the bottom of this letter. Do you know who wrote that?
A. Yeah. I wrote it.
Q. Okay. And --
A. I think this is -- yeah. This is -- 2:45. This is probably where I met Jerry at the Holiday Inn, because he showed me the letter he was going to send but has not sent because there was also the letter the same day stating -- that's what was starting to aggravate me, this, which is the third show cause which said he's considering termination July 15th, 2002, which is certified and so forth. Then he told me he was going to do this. Then he showed me the letter. I said, Jerry, come on. And I basically says here -- I asked him not to terminate, give us until the end of August 31 '02. Think about it. I told him. That was July 31, '02 at 2:45 p.m.
(Exhibit 32 is marked.)
BY MR. GOLDEN:
Q. Giving you next the letter of July 18th,

2002 from Jose Zamora to Jerry Goddard regarding excessive rain in the last -- you have seen that letter before (indicating).

A. Oh. Okay.

Q. You have seen that letter?

A. It's pretty clear. Yeah. He made a mistake on the date. That's why it was a little confusing. It's dated April 18th, when it should have been July 17th.

Q. Okay. So -- and did you recall Jose ever discussing this with you?

A. I don't recall it, but if he copied me on it I would have hoped that we had the discussion. I may have noticed it and said, wait a minute, this -- Jose, this isn't right, but I can't tell you if I did that or not.

Q. Okay. But you are familiar with Jose's handwriting or Jose's signature?

A. Somewhat, yeah. Let me compare it to something I have seen before.

Q. Do you know for a fact that Jose sent this letter?

A. It looks -- it looks correct. Do I know for a fact?

Q. Let me ask you. Do you know for a fact

that Jose prepared this letter?
A. Yeah.
MR. GOLDEN: Mark that.
(Exhibit 33 is marked.)
BY MR. GOLDEN:
Q. Did -- was there ever any indication that Hirsch -- I want to leave aside the payment issues with Hirsch and getting particular materials from them. I am just talking about your general -- that is Advanced Technology's general interaction with Hirsch. Was there ever any problem with Hirsch providing whatever technical expertise it needed or being willing to be forthcoming to assist on the project?
A. Yeah. There was a problem when they weren't getting paid, you know.
Q. Was there ever -- other than not being paid did you have a problem with them that you are aware of?
A. Not that I am aware of, no.
Q. Mr. Stuhl's company has submitted, after the termination -- I should say has submitted, for the period after the termination, payment requests to complete the job of approximately $130,000. In your opinion, based on the portion of the job that

remained is that excessive?

MR. DIERBERG: Objection. Lack of personal knowledge. Lack of foundation.

THE WITNESS: That I couldn't tell you. I just -- at what point in time is he saying it's 130,000?

BY MR. GOLDEN:

Q. From the time -- let me rephrase the question for you. Based on the remaining work that needed to be done.

A. Uh-huh. As of what date?

Q. As of the date that Advanced Technology was terminated from the job.

A. Went physically off the job?

Q. Correct. Do you find $130,000 of architectural fees thereafter to be excessive given the amount of work that remained under the contract?

A. Architectural fees, not work, not cost of work. Okay. That's a totally different matter.

Q. Did Mr. Stuhl and his companies payment solely?

A. That's -- that's -- yeah. 130 -- the original contract was for what? A million three? Standard architectural fees are about ten percent.

So 130,000 to administer the entire contract if it went perfect. So 130,000 to finish is excessive.
Q. Okay. And if the amount of work to finish -- well, let me ask a different way. By your last answer do you expect that the amount of architectural fees to finish should be approximately ten percent of the amount of work that needs to be done?
A. Uh-huh. That would be a fair amount.
MR. GOLDEN: I think that's all I have for now.
MR. DIERBERG: Helen, do you have some questions?
MS. ALBEE: No.
MR. DIERBERG: I do have some followup questions.

REDIRECT EXAMINATION

BY MR. DIERBERG:
Q. Mr. Golden started off with some questions about work that needed to be done, the effect it had, the rain. He asked about trenching work that needed to be done, whether the trenching work could be done amidst the rain. Do you recall what trenching work needed to be done, let's say, as of the middle of June of 2002?

A. I will guess and say that it was related to light poles or gates.
Q. But you don't know for a fact?
A. No.
Q. What about as of July 1st? What trenching work needed to be done as of July 1st?
A. This is where Jose is much better to answer the question. I couldn't tell you exactly.
Q. What about the gate work? Do you recall what gate work needed to be done as of June 15th?
A. Uh-uh. Some gate work.
Q. So you recall that the gate work had not been completed as of June 15th?
A. As of June 15th?
Q. Yes.
A. Probably not all complete, no.
Q. As of July 1st?
A. I don't remember.
Q. July 15th?
A. Don't remember.
Q. Mr. Golden also asked about expedited payments. Tell me what you remember about discussions with Mr. Goddard about expedited payments.
A. Well, that's a hard question. Like I was

trying to respond -- I should refer back to this. Like I was trying to respond was that expedited, to me -- and I wrote it in the letter that I don't have now. You showed it to me. Pay every two weeks. That's my idea of expedited. Because it -- and do the joint checks so that we are not taking the money, you know. Go right to the supplier, that kind of thing. So that's what I meant by expedited payment. But in no -- you know, but no, other than that, you know. If we submit a bill, process it in 24 hours or 48 hours, as opposed to a week or ten days. Do you know what I mean?

Q. Was expedited payments part of the contract?

A. Part of the original contract?

Q. Yes.

A. Not that I am aware of, no.

Q. Where would I find this as part of the agreement between the parties?

A. The original agreement or the negotiated attempt to complete? I am missing the question. I don't understand the question.

Q. Strike that question. What did Mr. -- what do you recall Mr. Goddard saying about expedited payments?

A. That he would expedite payments. I don't -- I don't -- he didn't say for sure that he would do them every two weeks. I just suggested that that would be expedited, that would be much beneficial to the project. The whole point was, do you want us to finish the job? Do you want to terminate or let us finish the job? Yes. Okay. Here's how we will be able to finish the job. If you do these things we will be able to do these things in the manner I told you, and schedule and time frames. If you don't do these things, then we can't do the things to finish on the date we told you. That fair and simple.

Q. I would like to go back to what we marked as Exhibit 5. This Exhibit 5 was a May 1st, 2002 document. I will hand it to you in a second. I previously showed you Exhibit 5. You couldn't recall whether or not that was for the AMC contract or the P & DC contract. Do you recall now whether or not that was for the AMC contract or the P & DC contract?

A. Based on information I have seen now it has to be the P & DC whatever contract.

Q. Do you recall any discussions about the September 10th, 2002 date?

A. Do I recall discussions?
Q. Yes. About that date.
A. These are dates that he wrote in the letter. He wrote it. The revised contract completion date is now September 10th, 2002.
Q. Do you recall any discussions about the revised completion date of September 10, 2002.
A. I don't recall any discussions. I mean --
Q. Was that part of the original contract that was the original contract completion date?
A. I don't know. I really don't know.
Q. Is it possible that was a typo?
A. Is it possible it was a typo? I doubt it. Not from Jerry.
Q. And on Exhibit 14 -- Exhibit 14 is a March 15th, 2002 document. Can you find that in your stack?
A. (Indicating).
Q. Mr. Golden asked you about this 187,000 to finish the P & DC contract. It says that's Vince's rough estimate. Did you discuss or did you assist Mr. Vento in calculating the 187,000 estimate?
A. I don't recall. Here I say it's his rough estimate, so I am saying he's probably done something and given it to myself and Jose.

Q. Did you do your own estimate at that time?
A. I asked Jose to do one, which is -- you already have that.
Q. But you didn't do your own estimate?
A. No. I didn't do my own estimate, no.
Q. Do you recall or do you know if this estimate of 187,000 -- does that include money that's past due and owing already to suppliers and subcontractors?
A. I don't recall.
Q. Mr. Golden asked you to estimate the stage of completion or how much more it would have taken to complete the project by the time of termination, and originally you estimated 200 to 300. Then you said maybe 100 to 200, tops, at the end time of termination. What's the basis of your estimate for a hundred to 200,000?
A. Just, you know -- I mean that's something that is very unscientific. I mean that was just a guess. It's not something that I would -- could I sit down and recreate it and come up with a number from back in those days? Yeah, I could do it pretty good, but it would take time. That was just a guess.
Q. By looking at the exhibit you have in

front of you, which is -- find it myself -- it says Exhibit 17. And that last page.

A. Which one is this?

Q. I think you just had it in front of you.

A. This one?

Q. It has the schedule.

A. Yeah. Okay.

Q. The document, it's a May 13th, '02 fax from Greg Warren to Jerry Goddard. Last page is proposed schedule to complete project. If I ask you for each of these items what needed to be completed at the time of termination could you tell me?

A. No.

Q. Could you tell me for each of these items what it would have cost to complete the termination?

A. Not without looking -- not without excessive review. I would have to have Jose working next to me and get a bunch of other documents and put them together. I mean stuff that I don't see.

Q. What other documents would you need to see?

A. Probably previous pay aps that were

submitted to the government, the 14, 15. I only see one pay ap here, payment application 18. That kind of stuff.

Q. At the time that the contract was terminated did you perform some analysis about the cost to complete?

A. No.

Q. Have you ever done an analysis of that since termination?

A. No.

Q. Could I look at this? I would like to ask you about Exhibit 30, which is modification number 10 (indicating). And I believe Mr. Golden asked you some questions about this. He asked you whether or not you were involved in negotiations or discussions of this.

A. Uh-huh.

Q. Could you tell me what those discussions were? Who did you discuss this modification with?

A. Jerry Goddard. He was the person to talk to.

Q. How did you discuss this? Was this in person? Over the phone?

A. A lot of the discussions on the settlement were over the phone, faxing back things. We

started the initial discussion once -- I mean you have this. I don't have a copy of it, but someone showed me a copy of the settlement and that kind of summation of the settlement. It was many discussions that led up to that. So that some were over the phone, but the initial discussion of, Jerry, do you want to -- can you go forward? Can we settle on this? Let's close the door on that one and go forward. Let's put all the issues on the table and let's come up with a number instead of this crazy, you know, comment from Stuhl saying it's worth this and we don't agree. Let's come up with what we think we can agree to and come to settlement, close the door on AMC and then go forward and finish PD & C. And he said, yeah, okay, fine. So we went through the evolution of the negotiation to come up with a number. Then we signed an agreement.

Q. Do you recall any discussions about this handwritten portion starting: "This settlement is also based on"?

A. I don't recall any, but somehow it took place and it was written in there. I mean that's not my handwriting.

Q. I would like to ask you about Exhibit 31,

modification number 11. Mr. Golden also asked you whether or not you were involved in discussions or negotiations about this modification. Can you tell me about the discussions you had about this modification?
A. Just that this was more discussions to settle mods, which were another word for a change order, modification, in the second phase, which is the PD & C, which is an extension of the contract as well.
Q. You don't recall any of the discussions?
A. I don't recall the discussions. I just know discussions took place in order to get the mod signed off for.
Q. Mr. Golden also asked you about your opinion about Joe Stuhl's fees that he charged. Do you know what work was performed after termination, what work needed to be done, any problems that TriState encountered or that Stuhl, Joe Stuhl and SEC, which is his company, encountered after termination?
A. Do I know personally, first-hand knowledge? No.
Q. Do you have any knowledge from any source?
A. No. No. I mean I just see -- all I did

was a quick look and said here is the original contract. It had 230 days attached to it. And his fee should be no more than ten percent of value of the work, which is kind of customary, pretty standard. That's 130,000 for the original.

So I deduced that 130,000 to finish the work, which couldn't -- shouldn't have taken that long, let's put it this way. It could have dragged on as long as anyone wanted it to, but it shouldn't have taken what is excessive.

MR. DIERBERG: No further questions.

RECROSS EXAMINATION

BY MR. GOLDEN:

Q. One question. Just so we are clear, when we are talking about the ten percent as a rule of thumb for the architect we're not talking about the creation of plans. We are talking about the oversight of the job, whether it's an architect or an engineer that's performing that function; is that right?

A. No. That would be less.

Q. Okay.

A. Ten percent should include the creation of documents and plans.

Q. Well --

A. What they call administrative walk-throughs and stuff is construction administrative, CA. That's where -- CA, construction administration, is a portion of that amount. They give -- they plug in so many visits, usually, two visits a month or whatever for the duration. They ask them what the scheduled relation is and they plug it in. If you, as an owner, say I want you to look four times a week, they are going to say I only got two times a week in the contract.

Q. So is there a standard rule of thumb? Let's say if you are going twice a month is there a standard rule of thumb as to what percentage of the contract that might be?

A. No. Not percentage. I mean you could say that it's probably worth -- let's say you have taken an architect at -- a principal architect in those days is a whole lot less than it is nowadays. Let's say a principal architect was probably making a buck, buck and a quarter per hour, okay. So you deduce it by saying each visit is worth eight hours. So you are saying -- say a thousand bucks a visit, okay. So if he visits twice a month, it's 2,000 a month times 24. There you go. There is

your answer.

Q. But in any event, that number would be no higher than a ten percent?

A. No. I don't think that would be unreasonable.

MR. GOLDEN: Okay. No further questions. Thank you. Anything further from you?

MS. ALBEE: No. Nothing from me.

MR. GOLDEN: Okay. Then we are finished. Thank you, Helen.

THE REPORTER: Do you want a copy if it's ordered?

MS. ALBEE: Yes. Well, yes. All very exciting. Luckily I had some of the documents which made it a little even more interesting.

MR. GOLDEN: I don't want a copy. She'll get a copy. We're in the same boat, only one pool of money. It's her money so --

THE REPORTER: Waiver?

MR. GOLDEN: You have a choice of whether to read this and waive -- read this or waive reading it. If you read it, then you have to review it and say I meant to say this and she took it as that and so forth. It's totally up to you whether you read or not. Most witnesses

that don't have a personal stake waive because they don't want to go through the time and trouble, but that's certainly your choice as to whether you waive or not.

THE WITNESS: I typically -- like can't you print it and send it to me?

MR. GOLDEN: Is that the way it would work?

THE WITNESS: I want to say it if I have an objection. I will read it.

MR. GOLDEN: Give her the name and address.

THE WITNESS: Gregory Warren, 13701 East Palomino Drive, Southwest Ranches, Florida 33330.

(Thereupon, the taking of the deposition was concluded at 3:41 p.m.)

CERTIFICATE OF OATH

STATE OF FLORIDA )
) SS
COUNTY OF BROWARD )

I, Lois E. Guffey, RDR, CRR, and Notary Public in and for the State of Florida at Large, do hereby certify that the witness, GREGORY WARREN, personally appeared before me and was duly sworn

Witness by hand and official seal this 14th of October, 2005, in the City of Hollywood, County of Broward, State of Florida.

Lois E. Guffey, RDR, CRR, Notary
Public, State of Florida

FERNANDEZ & ASSOCIATES
(305) 374-8868

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA )
) SS
COUNTY OF BROWARD )

I, Lois E. Guffey, RDR, CRR, do hereby certify that I was authorized to and did stenographically report the deposition of GREGORY WARREN, the witness herein; that a review of the transcript was requested; that the foregoing pages, number from 1 through 169, inclusive, is a true and complete record of my stenographic notes of the deposition by said witness; and that this computer-assisted transcript was prepared under my supervision.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action.

DATED at Hollywood, Broward County, Florida, this 14th of October, 2005.

LOIS E. GUFFEY, RDR
Certified Realtime Reporter

FERNANDEZ & ASSOCIATES
(305) 374-8868

FERNANDEZ & ASSOCIATES
444 Brickell Avenue
Miami, Florida 33131
(305) 374-8868

November 20, 2005

Michael J. Dierberg, Esq.
U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20004

RE: Advanced Technology v. USA
DEPO OF: GREGORY WARREN
TAKEN: October 11, 2005
# OF PG: 169
HELD UNTIL: November 20, 2005
Case No.: 03-1953C

Dear Mr. Dierberg:

The original transcript of the deposition listed above is enclosed for your files.

The witness did not waive reading and signing and was duly notified to come in and read the deposition transcript.

Attached to this letter you will find a copy of the corrections made by the witness. PLEASE ATTACH THEM TO YOUR COPY OF THE DEPOSITION SO IT WILL BE COMPLETE.

As of the above date, the witness has not come in to read and sign the transcript, which was noted on the original transcript.

Sincerely,

Lois E. Guffey, RDR
Registered Diplomate Reporter

cc: Helen Albee, Esq.

FERNANDEZ & ASSOCIATES
444 Brickell Avenue
Miami, Florida 33131
(305) 374-8868

October 17, 2005

Gregory Warren
13701 East Palomino Drive
Southwest Ranches, Florida 33330

RE: Advanced Technology v. USA
Case No.: 03-1953C

Dear Mr. Warren:

This letter is to advise you that the transcript of the deposition of GREGORY WARREN taken in the above-styled cause on October 11, 2005 is complete and awaiting reading and signing.
Please, arrange to stop by our office in Suite 718, 444 Brickell Avenue, Miami, Florida to read and sign this transcript. Office hours are from 9:00 a.m. to 4:00 p.m. Monday through Friday. The transcript is 169 pages long and you should allow yourself sufficient time.

If the reading and signing has not been completed prior to November 20, 2005 we shall conclude that you have waived the reading and signing of the deposition transcript. Your prompt attention to this matter is appreciated.

Sincerely,

LOIS E. GUFFEY, RDR
Registered Diplomate Reporter

cc: Original transcript

ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

IN RE:

Page No. Line No. Change Reason

________________________________________________
________________________________________________
________________________________________________
________________________________________________
________________________________________________
________________________________________________
________________________________________________
________________________________________________
________________________________________________
________________________________________________
________________________________________________
________________________________________________
____________

Under penalties of perjury, I declare that I have read my deposition and that it is true and correct subject to any changes in form or substance entered here.

________________ Signature:______________________

Date Name: (Printed)