IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

CASE NO. 03-1953C
(Sr. Judge Margolis)

ADVANCED TECHNOLOGY
SYSTEMS INTEGRATORS
CORP. and
INTERNATIONAL FIDELITY
INSURANCE COMPANY,

Plaintiffs,
vs.

THE UNITED STATES
Defendants

99 N. E. 4th Street
Miami, Florida
Monday, 9:36 a.m.
January 9, 2006

DEPOSITION OF VINCENT JAMES VENTO

Taken on behalf of the Defendant before LOIS E. GUFFEY, RDR, Notary Public in and for the State of Florida at Large, pursuant to a Notice of Taking Deposition filed in the above cause.

APPEARANCES:

LAW OFFICE OF E. SCOTT GOLDEN
644 S. E. 4th Avenue
Ft. Lauderdale, FL 33301
By: E. Scott Golden, Esq.
Attorney for Advanced Technology.

HENRICHSEN SIEGEL PLLC
1648 Osceola Street
Jacksonville, FL 32204
By: Helen Albee, Esq. BY TELEPHONE
Attorney for International Fidelity.

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, DC 20004
By: Michael J. Dierberg, Esq.,
Appearing on behalf of the Defendant.

*** I N D E X ***



| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
| --- | --- | --- | --- | --- |
| VINCENT VENTO | 4 | 131 | 167 | |

EXHIBITS FOR IDENTIFICATION


| | |
|---|---|
| 49, Advanced Technology financial statement | 28 |
| 50, faxed memo to Suretek | 36 |
| 51, letter with financial statement, 6-30-01 | 38 |
| 52, revised financial statements | 40 |
| 53, contract modification | 155 |
| 54, letter to Stuhl, 1-18-02 | 158 |
| 55, letter to Grzymala | 159 |
| 56, field investigation report | 161 |
| 57, letter to Goddard, 2-11-02 | 163 |
| 58, letter to Stuhl, 2-11-02 | 164 |
| 59, letter to Grzymala, 2-12-02 | 165 |


PREVIOUSLY MARKED EXHIBITS MENTIONED:


| | |
|---|---|
| 34 | 53 |
| 16 | 57 |
| 18 | 97 |
| 31 | 104 |
| 31A | 104 |
| 9 | 108 |
| 21 | 110 |
| 32 | 124 |
| 10 | 124 |
| 22 | 127 |
| 29 | 167 |

Thereupon:

VINCENT JAMES VENTO

was called as a witness and having been first duly sworn, was examined and testified on his oath as follows:

DIRECT EXAMINATION

BY MR. DIERBERG:

Q. Mr. Vento, could you, please, state your full name.

A. Vincent James Vento.

Q. Where do you live?

A. 2208 South Miami Avenue, Miami, Florida 33129.

Q. My name is Michael Dierberg. I am an attorney for the Department of Justice.

And Mr. Golden, if you will introduce yourself.

MR. GOLDEN: This is Scott Golden, here representing Advanced Technology.

MS. ALBEE: Helen Albee on behalf of International Fidelity Insurance Company.

BY MR. DIERBERG:

Q. Mr. Vento, you have been deposed before?

A. Yes.

Q. How many times have you been deposed

before?

A. I don't know. Two or three times. I am 60 this week, so a couple of times.

Q. If you don't understand a question, ask me to repeat the question and I can rephrase it or just ask the same question again. Are you taking any medications that might affect your memory?

A. Well, I took a cold pill this morning because I have a terrible head cold but --

Q. Do you think that would affect your memory?

A. I don't think so. I may be slower.

Q. Is there any other reason why your memory might be affected today?

A. No. Not that I can think of.

Q. Can you tell me about your education?

A. Graduated high school in New York, moved to Florida, went to college here, Miami, but I did not get a degree, and for the most part I have lived here ever since.

Q. What were you studying in college?

A. Actually, it was going to be law at one point, but I settled with history.

Q. What about your work experience?

A. I have actually been in the security

business since 1974.

Q. How did you get into the security business?

A. I worked for a company that went into the security business as one of their ventures, and ultimately I was asked to manage that group in Pennsylvania for them for the Northeastern U.S.

Q. That was a company that installed security systems?

A. Correct.

Q. What was the name of that company?

A. Apeco.

Q. Could you spell that?

A. A-P-E-C-O.

Q. How long were you with Apeco?

A. Five -- probably four or five years. Four years, probably.

Q. And how long were you manager of Apeco?

A. Probably a year and a half, something like that.

Q. Then what year did you leave Apeco?

A. Probably -- I think around '74, I think I said.

Q. Where did you go after that?

A. I started my -- actually, I started a

business with a friend, and we worked in the security business for about a year.

Q. What was the name of that company?

A. Oh, God. I am not certain. I think it was Photo Scan of South Florida, something like that.

Q. Then after that?

A. And then after that I started my own business.

Q. What was that?

A. That was called -- it was just silly names back then, but Video Dome.

Q. And what was that?

A. That was a company that specialized in closed circuit television systems.

Q. Installation of the CCTV systems?

A. Right. Exactly.

Q. How long was that company in operation?

A. Until 19 -- somewhere around '87 to '88.

Q. And why did -- I assume that Video Dome is no longer in operation?

A. Correct.

Q. And why did it cease operations?

A. I sold half of the business at my bank's suggestion to a partner, and we ended up having a

major battle over ownership, and in the long run it destroyed the company.
Q. What did you do after Video Dome?
A. I rested.
Q. How long did that last?
A. About eight, eight months, a year, year and a half. I don't really recall.
Q. And then after that?
A. After that I had, I suppose, kind of like a part ownership or something in a company called Security Maintenance Corp., and they had a large project in Alabama. And as a partner I signed on the bond, and they were in trouble, and I decided that I needed to come in there and fix the project.
So that's how I ended up going back to work.
Q. Then how long were you with Security Maintenance Corp.?
A. Until '94.
Q. Did the company cease operations in '94?
A. I ceased the operation, correct.
Q. Why is that?
A. Because I had all of the partners that weren't doing anything. So we agreed to disagree, and I tried to buy them out. They wouldn't be

bought out. So we ceased operations.
Q. I don't think you have said this yet, but Security Maintenance Corp. was an installer of security systems?
A. Correct.
Q. Was it specifically CCTV or all sorts of --
A. CCTV and Access Control.
Q. What did you do after Security Maintenance Corp.?
A. I probably waited awhile, and I think I had already formed it, but I think I actively started Advanced Technology Systems Integrators in 1995.
Q. Who were the original owners of Advanced Technology Systems Integrators?
A. Just myself.
Q. And this company, Advanced Technology Systems Integrators, was that the same company that was involved in the contract for the Miami P&DC project?
A. Yes, it was.
Q. Was there ever a name change?
A. No.
Q. Then after Advanced Technology Systems

Integrators what did you do? Let me change the question. When did Advanced Technology Systems Integrators close down?

A. I don't know. I think administratively in 2004 or something like that. I don't think we renewed it after that. Our attorney said it wasn't necessary any longer.

Q. But as far as, I guess, ceasing employment were there any employees in 2004?

A. No.

Q. When was the last time you employed anybody at Advanced Technology Systems Integrators?

A. Other than the post office job, 2001.

Q. So when the Miami P&DC facility, that contract, was terminated, that was the last time anyone was employed at ATSIC?

A. Correct.

Q. When I say ATSIC --

A. I know it's confusing.

Q. -- it refers to Advanced Technology Integrators Systems Corp. Is that okay?

A. Yes. That's fine.

MR. GOLDEN: Let him finish his question before you answer.

THE WITNESS: Sorry.

BY MR. DIERBERG:

Q. So after ATSIC stopped employing people, what did you do then or what was your --

A. Well, I -- this was after September 11th, and I was actually working with one fellow, Greg Warren, who was the president of a company that we did business with, and they were -- looked like they were closing down the construction division, which he was the president of, and at the same point I had some other friends that were in the security business that I had known for many, many years, and they came to me with an offer of starting a new company just to focus on government business and to utilize our expertise and reputation on new projects.

Q. What's the name of that company?

A. That's ATC International.

Q. That's where you work now?

A. Correct.

Q. Going back to ATSIC. For the whole time that it existed were you the sole owner?

A. Yes.

Q. Who were the key employees of ATSIC?

MR. GOLDEN: Objection. Vague. You can answer.

BY MR. DIERBERG:
Q. Let's start in the -- we will start in the more recent time and work backwards. In 2002, which is the year that the P&DC contract was terminated, who were the key employees?
A. Well, the only employees then were -- for a little while, and then he ended up working for ATC International -- was Jose Zamora. Probably just Jose.
Q. And then working backwards in time, who were the other key employees that you employed?
A. I am very bad with names. I apologize, but let's see.
Q. Maybe it's easier to go by position. Again, we are speaking in 2002. Let's say January of 2002, when the project was still going on. The project was terminated in August. So between January and August of 2002.
A. Just Jose Zamora.
Q. You were the CEO --
A. I was CEO.
Q. -- and president or did you have a title?
A. I suppose I was both.
Q. Did you have a chief operating officer?
A. No.

Q. What about a chief financial officer?
A. No.
Q. Any other positions you can think of, key positions during that time frame?
A. There weren't any positions during that time frame.
Q. What about prior to that time? Were there any other key positions that someone might have held?
A. In 2000 and 2001 we would -- we had an accounting department, but I can't remember the name of the girl that worked there, that ran it. We had an operations department. Lynn Coia was the operations manager. And --
Q. When did she leave the company or not work for ATSIC?
A. Sometime at the end of 2001, probably, to the best I can recollect.
THE REPORTER: Could you spell Coia?
THE WITNESS: C-O-I-A.
BY MR. DIERBERG:
Q. At the time, in the 2002 time frame, let's say, January to August of 2002, you were active in other ventures or other companies, correct?
A. Just ATC International, and I was

finishing up the post office job, which the partners agreed to allow me to do.
Q. I am sorry. The partners of who?
A. ATC International. I mean I was paid by them, so I think it was important for them to decide whether or not I could do this.
Q. How active were you in that time frame of January to August of 2002 in ATSIC?
A. Not very active.
Q. And could you elaborate on that?
A. Well, for the most part, by that time the -- the relationship between myself and the post office had totally deteriorated, and Greg felt it was best that I not be involved in the project any longer, other than making some decisions. And I agreed with him. He believed that he would do better working with them alone.
Q. And Greg Warren was an employee of ATC International, correct?
A. He was an employee of ATC International later on. Correct.
Q. But you believe at some point he was an employee of ATC -- of ATSIC?
A. No. He was never an employee of ATSIC.
Q. How is it that he started doing work for

ATSIC?

A. Because as an agreement that we had with the partners that he realized that I needed to resolve this project, and they all agreed that there was such a vendetta that if we didn't resolve this project that they would go out of their way to hurt us in any way they could. So he felt that it was best to close out the job as -- as rapidly as possible.

Q. In a given work week how much time do you think you spent on ATSIC in the January to August 2002 time frame?

MR. GOLDEN: Objection. Lack of predicate. You can answer if you know.

THE WITNESS: I really can't tell you. I don't know. Not a lot.

BY MR. DIERBERG:

Q. How many times did you visit the job site during that time frame?

A. Maybe once, maybe twice.

Q. Do you recall when you visited?

A. No. I -- I think I visited -- it might have been within that time frame, it might have been earlier -- with the representative of the bonding company, the engineer. I can't think of

his name right now.
Q. Is that Joseph Stuhl?
A. No.
Q. You are not speaking of --
A. Please. I am already sick.
Q. Who was the engineer of -- who was the engineer employed by?
A. It's an engineering firm out of -- that was employed by our bonding company to look at the job.
Q. Richard Sexton?
A. That's it. Sexton.
Q. So that was one visit you met with Sexton to visit the facility. Was anyone else there that you know of?
A. What? At that visit?
Q. Uh-huh.
A. Well, I mean the people that were working there were there but -- you know.
Q. Anyone from the postal service?
A. No.
Q. You don't recall exactly when this was?
A. No.
Q. Or a general time frame?
A. As I said, I assume it would have been

probably in January or something like that, and it may have been earlier.

Q. Do you think there was another visit to the facility?

A. I would think that, you know, if for no other reason than just to confirm the progress myself that I would go out there and look around. So no one would even be there. When I say no one would be there, because I didn't introduce myself to anyone. I just looked around.

Q. You said you weren't very involved, but what was the extent of your involvement during the January to August of 2002 time frame?

A. Mostly financial.

Q. Would you prepare financial reports?

A. No.

Q. You would review the financial reports?

A. No. We didn't have any financial reports. We only had one project. That was it. The post office, they paid us or we did not have any money, unless I lent it to the company.

Q. As far as the financial involvement, what was your involvement?

A. Trying to make sure that the subs were paid and that the work progressed, give Greg the

tools he needed to finish the job.

Q. I would like to ask you about ATC International. That company started as ATC International Holdings, Incorporated; is that correct?

A. ATC International Holdings, Incorporated.

Q. That was incorporated in 2002, correct, March?

A. I believe so.

Q. In the time of incorporation you were the CEO?

A. I was for about a month or two, and then I resigned that position.

Q. Who were the original owners of ATC International?

MR. GOLDEN: Objection. Irrelevant.

BY MR. DIERBERG:

Q. You can answer.

MR. GOLDEN: You can answer. It's up to you. I can't tell you not to answer the question. As far as I am concerned, it's not relevant to --

THE WITNESS: Check the Secretary of State.

BY MR. DIERBERG:

Q. You have to answer the question. The question is: Who are the owners of ATC International?
A. At that time we were five or six of us.
Q. And who were they?
MR. GOLDEN: Can we go off the record a second and let me talk to you?
MR. DIERBERG: Uh-huh.
MR. GOLDEN: Can we talk outside for a second? Would that be all right?
MR. DIERBERG: Sure.
(Whereupon, Mr. Golden and Mr. Dierberg leave the room and return.)
MR. DIERBERG: Back on the record.
BY MR. DIERBERG:
Q. Again, sir, who are the owners of ATC International?
MR. GOLDEN: Again, objection to relevance and speculation. You can answer.
THE WITNESS: Okay. Chris Carvallo (phonetic), Vincent Vento, Greg Warren, Steve Bodnar, John Costanzo.
BY MR. DIERBERG:
Q. What percentage did you own?
MR. GOLDEN: Objection to relevance.

THE WITNESS: Now that is totally
irrelevant, so --
BY MR. DIERBERG:
Q. Again, unless this is an issue of
privilege you have to answer the question.
THE WITNESS: Do I have to answer the
question?
MR. GOLDEN: I am not telling you not to
answer the question but I see no relevance.
THE WITNESS: Neither do I, so I refuse to
answer the question.
BY MR. DIERBERG:
Q. On what grounds?
A. On the grounds that I think you're going
into areas that had nothing to do with the post
office contract, and that I am here for a
deposition in reference to ATSIC and the postal
contract. And then I am only going to answer
questions relating to ATSIC and the postal
contract.
Q. You are obligated to answer the questions
I ask unless there is an objection of privilege.
And as I understand, there is no objection
regarding privilege?
MR. GOLDEN: I don't agree with your

statement of law. I don't think he's obligated to answer anything that is not germane to this, and I don't see it as being germane.

Having said that, I am not telling him not to answer. That's a decision he is --

THE WITNESS: That's right. I am telling you I am not answering.

BY MR. DIERBERG:

Q. You are refusing to answer the question?

A. I am refusing to answer questions that don't relate specifically to the case between the United States Post Office and ATSIC because I don't see what the relevance is.

Q. Well, if need be we will come back to that, depending how things go today. Either we have to stop the deposition and contact the court or -- we will see how it goes for now. We can come back to that.

MR. GOLDEN: Why don't you ask questions that are related? Then we will deal with the rest of the stuff later.

BY MR. DIERBERG:

Q. So originally you were the CEO of the company and then you resigned, according to the Secretary of State's records, in August of '02; is

that correct?
MR. GOLDEN: Which company are you talking about now?
MR. DIERBERG: ATC International.
THE WITNESS: I may answer again only because I started to answer yes. That's correct.
BY MR. DIERBERG:
Q. And why did you resign?
A. Not important.
Q. You are refusing to answer the question?
A. Again, it's not -- has no reference or relationship to the U.S. Post Office.
MR. GOLDEN: Objection. Relevance.
BY MR. DIERBERG:
Q. After August of 2002 did you continue to be involved in ATC International?
A. Yes.
Q. In what capacity?
A. Day-to-day operations.
Q. What did ATC or what does ATC International do?
MR. GOLDEN: Object to relevance.
THE WITNESS: We are back to the same thing. Obviously, you can ascertain, by the

fact that the only thing I have done all my
life was security installation, video and
access control, that their job -- their
business is similar to that, period.
BY MR. DIERBERG:
Q. Why was ATC International formed?
A. I answered that.
Q. What was the answer?
A. She can go back and read it.
Q. I believe I never asked the question.
A. It was after September 11th and we felt there was an opportunity to do work with the government. And a lot of other people wanted to be involved in it, and they wanted to put up the money to do that, and they asked me to be a part of it.
Q. I would like to ask you about ATC Biometric Technology. Are you familiar with this company?
A. Yes.
Q. And what is this company?
A. This was a company -- again, it's the same thing. This has nothing to do with the post office, so I am not answering it. I want to answer questions about the post office, not interested in answering questions --

Q. I will get to it. There is a connection to -- this to ATC.

A. Then keep asking. When we get to the good ones, I will answer them.

Q. So you are refusing to answer a question about ATC Biometric Technologies?

A. I am refusing to answer any questions that don't relate specifically to the case at hand, which is the U.S. Postal Service against ATSIC.

Q. Sir, you have no right to refuse to answer any questions unless there is an objection as to privilege.

MR. GOLDEN: You have no right --

BY MR. DIERBERG:

Q. And your counsel could tell you that.

MR. GOLDEN: You have no right to ask questions that relate to his personal life and have nothing to do with the case at hand. The government is not entitled to know everything about every person unless it relates to the case at hand. The government has no reason to be asking these questions. So if you want to state a relationship, that's fine. If not, we will ask the judge whether there is a relationship.

THE WITNESS: Right.

MR. DIERBERG: All I need to ask is questions. I don't need to explain. Obviously, you know this. All I need to ask is questions that might lead to the discovery of relevant evidence. So you know, I don't have to explain to you the relevance of this information.

I ask you questions, you answer them, unless there is an objection as to privilege.

MR. GOLDEN: There is no -- the concept that some company that's never been named in any of the pleadings in this case will lead to relevant evidence is at best speculative. It is not calculated, which is what is required, calculated, to lead to admissible evidence, and, therefore, it seems not relevant to me. Mr. Vento is making his own decisions on answering them, but I am making the objection that it is not relevant.

BY MR. DIERBERG:

Q. So again, you're refusing to answer a question about ATC Biometric Technologies?

A. I refuse to answer any questions that don't relate directly to the case between the

United States Postal Services and ATSIC.

Q. I have asked you a specific question about ATC Biometric Technologies. My question is -- I believe was about the ownership of ATC Biometric Technologies.

MR. GOLDEN: I don't recall that that was the question.

BY MR. DIERBERG:

Q. Let me ask you another question. What was the ownership of ATC Biometric Technologies?

MR. GOLDEN: I object on the basis of relevance. And to the extent that you think it is supposed to lead to evidence that is relevant or calculated to lead to admissible evidence, it's speculative.

You can answer if you choose to.

THE WITNESS: And again, I am willing to answer any question that relates to the case between the United States postal office and ATSIC, and I will not answer any other questions.

BY MR. DIERBERG:

Q. You are refusing to this answer the question about the ownership of ATC Biometric Technologies?

MR. GOLDEN: Asked and answered.
MR. DIERBERG: No, it is not asked and answered. He's not answered the question. He is giving me some general platitude about something that is -- the question is very specific.
BY MR. DIERBERG:
Q. Are you refusing to answer a question about the ownership of ATC Biometric Technologies?
MR. GOLDEN: Now you're harassing him, because he's told you he's refused.
THE WITNESS: The definition of a platitude is incorrectly used there.
BY MR. DIERBERG:
Q. I apologize for that.
A. There is no compliment here.
Q. The question is very specific. I asked you a question, and are you refusing to answer that question?
A. I refuse to answer any questions -- this is the fourth time I have said this -- that does not relate to the case between the United States Postal Services and ATSIC.
Q. Are you refusing to answer the specific question I have asked?

A. I refuse to answer any questions.

MR. GOLDEN: That question you can answer.

THE WITNESS: What's that?

BY MR. DIERBERG:

Q. Are you refusing to answer the specific question I asked?

A. Yes.

MR. DIERBERG: I would like to mark this as Exhibit 49.

(Exhibit 49 is marked.)

MR. GOLDEN: Before you ask any questions, for the rest of the exhibits you may bring out, let's let him testify as to the exhibit and then let her mark it; or mark it and then let him testify directly from that exhibit. That way I don't have to compare. Not that you would do anything on purpose, but that way I don't have to compare and make sure he's testifying with regard to.

MR. DIERBERG: You would like him to review that one?

MR. GOLDEN: That would be better.

BY MR. DIERBERG:

Q. Have you had a chance to review this document?

A. Yes.
Q. I would like to ask you what this document is.
A. This looks like a copy of a document that I sent to Helen Albee or to International Fidelity at their request, and it would have been -- looks like the final statement as of December 31st, 2002 for Advanced Technology Systems, ATSIC.
Q. Do you have any reason to believe the information provided here is inaccurate?
A. I would think it's fairly accurate.
Q. In what way would it not be totally accurate?
A. Because there was no accounting department for Advanced Technology Systems Integrators in 2002.
Q. So who would have prepared this statement?
A. Quick Books.
Q. You prepared this on Quick Books?
A. Yes.
Q. What is your accounting background?
A. Limited.
Q. What's that?
A. It was probably enough to -- certainly enough to read financial statements, and the

concept behind most of these accounting systems are -- you put the information in and you get the system out.

Q. Have you taken an accounting course before?

A. No.

Q. But you had prior to this time prepared a financial statement using a similar system to Quick Books?

A. No.

Q. This is your first time preparing any sort of financial statement?

A. I just went to the system that was available at that moment in time and I printed this out. Then I kind of recall that.

Q. There is an entry on the first page, loan receivable, ATC Biometric. Do you recall what that is?

A. No.

Q. You don't recall any loan to ATC Biometric?

A. No.

MR. GOLDEN: Objection to relevance.

BY MR. DIERBERG:

Q. Do you know -- strike that. Do you recall

any loan to ATC Biometric?
A. No.
Q. Did ATSIC ever make any loans to affiliates?
MR. GOLDEN: Objection.
THE WITNESS: I don't recall.
MR. GOLDEN: No predicate. Vague. Overbroad. And he's already answered anyway.
BY MR. DIERBERG:
Q. Go ahead.
A. Not that I recall. We didn't have any affiliates, really.
Q. May I ask -- because I think the question may have -- could have been clearer. Did ATSIC make any loans to any companies in which you were also an owner?
A. No, not that I recall.
Q. So if there is a -- strike that. Were you a part owner of ATC Biometric Technologies?
MR. GOLDEN: Objection to relevance.
THE WITNESS: We are back to the same thing again. It's not relevant to this case.
BY MR. DIERBERG:
Q. You are refusing to answer it?
A. Yes.

Q. In ATSIC's initial disclosures the company mentioned Raphael Rojas. Do you know who he is?
A. He was an engineer consultant that we used on the postal project.
Q. And what did you use him for?
A. To prove Stuhl incorrect and to make sure that we did everything within the bounds of Dade County code and other such required codes.
Q. When was he engaged?
A. I believe, you know, in 2000 or 2001.
Q. I mean you say Stuhl was incorrect or to address some issues related to Joe Stuhl. Can you explain that some more?
A. Well, you realize that Stuhl was an assistant on this project and that the architect of the project and the one that was in charge of the project was arrested for criminal fraud charges from the U.S. Post Office, and unfortunately, we had a decent working relationship with him, and he was a buffer between ourselves and Stuhl. And when he was removed, I sent a letter and verbally requested that Stuhl be removed from the project for his inability -- in other words, he was only capable of doing electronics -- and to have him removed because there was such a severe personality

conflict. And this is in 2000 -- that it would diminish the ability of ATC to finally complete any project with the post office.

Q. This is a letter you sent to?

A. Goddard. And it was discussed in detail at a meeting, and Goddard refused to terminate Stuhl and said we had to just live with him.

Q. Then shortly after that you hired Raphael Rojas?

A. I can't give the specific dates, but I would say pretty close to that.

Q. What did you ask him to do specifically?

A. Whenever Stuhl would -- Stuhl's modus operandi would be that he would walk around and see something that -- he looked through the entire project and say, hey, that looks good, that looks good, this looks good. Okay. We would say, you need to sign off here. He would say, I want to review my notes. I can't sign off here.

And then he would go back to Orlando, or wherever his main office was. And we would wait a week or two, and we would be calling, hey, we need our pay, we need our pay.

Then he would send back a scathing letter rejecting our pay request and saying that we didn't

do this, we didn't do that, we didn't do this and we didn't do that. Then we would have to send back a letter saying, yes, we did do this, we did do that, we did do this, and we did do that.

Then he would say, well, I have to come down and reevaluate. Then another week or two would go by while he diddled around in Orlando. Because he said, I have other things to do. I am not at your beck and call. Then he would finally come down, show up and walk through again and say everything was fine, everything was fine. We would say, again, please, sign off. He would say, again, I am going to check my notes.

Then he would usually go back and then cut our pay recs in half and send it back and say, I will approve this. So it became apparent to us that his intention was to never to allow this project to finish.

So we hired, actually, two people. We also hired an architect. And when we walked around at the beginning of the project after the first few months, when Stuhl was alone, they would walk around as professional engineer and be able to validate, not that Stuhl gave a damn anyway, but they would be able to validate that we did this in

the hopes that down the road we would place a claim against the post office for all the extended overhead, and costs and everything else that they cost us on this project. That's why we hired Raphael Rojas.

Q. Who was the architect you hired?

A. Fabio -- Fabio Perez, I think, or Fabio Polo Perez.

Q. And as for Mr. Rojas, at what point did he stop working on the project?

A. Probably when we couldn't afford to pay him anymore, but it might have been in early 2002.

Q. Was he asked to do any reports of any kind?

A. I believe whatever reports he did, for the most part, were all in our claim on the first post office. We placed a claim on AMC against the post office for several hundred thousand dollars.

Q. What about Fabio Perez Polo?

A. He would have worked mostly with him. The engineer was primarily all the outside dirt work, how the conduit would run, and the architect was more of an oversight of how the project was managed by Stuhl.

Q. Was Mr. Rojas involved in the project in

any other way?
A. Not that I recall.
Q. What about Perez Polo?
A. He may have tried to help out as a partial project manager during certain periods of time.
Q. Now previously we discussed Exhibit 49, which was a financial statement. Were there financial statements like this prepared on a periodic basis?
A. No.
Q. Any sort of financial statements that you recall being prepared prior to that time?
A. No.
MR. DIERBERG: Let's mark this as Exhibit 50.
(Exhibit 50 is marked.)
THE WITNESS: Okay. I have reviewed it.
BY MR. DIERBERG:
Q. Could you tell me what the first page of this document is.
A. Excuse me. This looks like a memo from myself to our bonding agent in Orlando or wherever she was. I think she was in Orlando.
Q. Did you send this fax or this memo to Suretek?

A. I don't recall sending it, but it's -- it seems logical that I would have, if she sent it to me and I was corresponding with her.
Q. In the second page of this document, Exhibit 50, is a -- looks like a fax from Dina Marinaro to yourself; is that correct?
A. Correct.
Q. Do you recall receiving this?
A. Not really, but I know at that time we were talking about, you know, filing new surety agreements and doing a bunch of things, so they probably required this information.
Q. Later on in this exhibit there is a personal financial statement. Then there is a financial statement for ATSIC. Do you have any reason to believe those statements, the ATSIC statements, are incorrect?
A. Well, they're a compilation, so obviously they -- I am sure they had some errors in them, but I don't -- there is nothing that I can think of that would make them seem that they would be critically -- which was the words that -- that they were not somewhat correct.
Q. At the time that -- let me ask you this. Do you recall or do you know who prepared these

financial statements at that time?
A. Probably Quick Books.
Q. Who would have input the information?
A. Bookkeeper.
Q. Do you recall who that is?
A. No. I think you asked me that question earlier and I didn't remember her name.
Q. But sitting here today, you don't have any reason -- there is nothing in here specifically that you would think is inaccurate?
A. No.
Q. I would like to mark the next one as Exhibit 51.
(Exhibit 51 is marked.)
THE WITNESS: Okay.
BY MR. DIERBERG:
Q. The top of page -- of the first page of Exhibit 51 there is some handwriting there. Do you recognize that handwriting?
A. Might be my handwriting.
Q. Which part? All of it or a certain part of it?
A. Only because it says, file Suretek bonding. Even though that may not say bonding to you, it means bonding. And usually, if I read

something, I file it, and I write a note on the top what to do with it.

Q. Essentially, this is a document that you would have seen?

A. I don't recall it at all, but I would think there is a strong possibility. Then again, I don't know if everything was stapled to it that's on here.

Q. On the first page of Exhibit 51 it indicates it's a fax from Stephen Knorr of Advanced Technology Systems Integrators to Evelyn Rodgers at Suretek. What was Stephen Knorr's position at the company?

A. He worked for us for awhile, and he was both -- kind of an operations and finance manager. So he handled both.

Q. He was employed by ATSIC?

A. Yes, he was.

Q. Do you know -- do you recall when he left ATSIC?

A. Sometime in 2001.

Q. Was he the top person as far as accounting and as far as accounting in the company?

A. I would say so.

Q. Do you know if he prepared the statement

FERNANDEZ & ASSOCIATES
(305) 374-8868

following the first page, the June 30th interim statement?

A. I would think he did.

MR. DIERBERG: Mark this as Exhibit 52.

(Exhibit 52 is marked.)

BY MR. DIERBERG:

Q. Have you had a chance to review this document?

A. Yes.

Q. Exhibit 52 contains some reviewed financial statements; is that correct?

A. Yes.

Q. These are reviewed financial statements of Advanced Technology Systems Integrators?

A. Yes.

Q. And these were done by Robert Felix?

A. Seems that way.

Q. Did you engage Robert Felix?

A. I believe so.

Q. And why did you engage Robert Felix to do the reviewed financial statements?

MR. GOLDEN: I assume -- you are saying you here. You mean the company?

MR. DIERBERG: Let me rephrase it.

MR. GOLDEN: If that's the question, you

need to be specific.

BY MR. DIERBERG:

Q. I understand that the -- well, let me ask you this. The company engaged Robert Felix to do a reviewed financial statement?

A. I believe so.

Q. Were you the point of contact with Mr. Felix?

A. Probably not.

Q. Who would have been the primary contact?

A. The bookkeeper or whoever handled the finances of the company.

Q. You do know why the company engaged Mr. Felix?

A. We needed an accountant, and somebody probably recommended him. That's all.

Q. But do you recall why the company needed reviewed financial statements as opposed to just internal unreviewed statements?

A. It may have started -- this is just -- may just be an assumption on my part, but if you look at the earlier notes to the bonding company, they ask for reviewed financials. And when we originally submitted them they were just compilations but a promise of a review. This would

be the next year, so this is probably a reviewed statement for that reason.

Q. And in your experience is the information that the bonding company requested -- is that typical of bonding companies to ask for that kind of information?

A. I don't know. I haven't dealt with that many bonding companies, but I would think it's logical that they don't want to put a bond in a company they feel at that moment in time is financially unable to complete a project.

Q. Who handled the business development for the company?

A. Probably --

MR. GOLDEN: Objection. Vague.

BY MR. DIERBERG:

Q. Is that term clear to you? Business development in the sense of developing sales for the company, getting new business for the company.

MR. GOLDEN: That actually wasn't my concern. "For the company," we are talking several times.

BY MR. DIERBERG:

Q. ATSIC.

A. You mean ATSIC.

Q. Right.
A. Probably myself was one of the primary people, and then we would track bids on occasion, but mostly it was relationship contracts.
Q. Did you have another salesman in the company?
A. I think we had one or two guys that came and went in between.
Q. What about in the January to August 2002 time frame? Did you have any salesmen?
A. No, no.
Q. I would like to go back to -- let's see. Exhibit 50. Do you still have Exhibit 50? I would like you to turn to the last page.
A. Okay.
Q. The title at the top says, "Schedule of uncompleted work, all work, bonded and unbonded, if cost plus, please indicate." Do you recognize the handwriting in this form?
A. This looks like my handwriting.
Q. Does this appear to be accurate as to the jobs that the company, ATSIC, was working on at that time?
A. It's five years ago I can only assume at that moment in time this is what I believed we were

working on.

Q. Could you tell me about the change, over time, in terms of the number of projects ATSIC worked on?

MR. GOLDEN: Objection, vague, but you can answer if you can.

THE WITNESS: I don't quite understand what you are asking so why don't you ask me one more time.

BY MR. DIERBERG:

Q. Was it fairly consistent, in terms of the number of contracts that ATSIC was working on from inception until the fall of 2002?

A. No. I -- I think like it went up and it went down.

Q. What was the peak number of contracts? Not in terms of the number of contracts, but what year -- what time frame was the peak, in terms of number of contracts?

A. Probably 2000.

Q. Then turn back to Exhibit 52. Actually, we will come back to this one. Let's go to -- again, on Exhibit 51, the last two pages.

A. Okay.

Q. The last two pages are schedules of

contracts in progress. The page where the Bates stamp number 3301 is as of June 30, 2001, and the last page of this exhibit Bates stamped 3302 is as of December 31st, 2000. Do you have any reason to believe that these are inaccurate?

A. No.

Q. On the second to the last page, Bates stamped 3301 on the left-hand side it has a job name. Do you recall any of these projects?

A. Yes.

Q. Which projects do you recall?

A. Billboard, Green Diamond.

Q. Start with Billboard. What was that?

A. Billboard was a -- actually, a nightclub that was being built on South Beach, and the reason I remember is because they went bankrupt and we never got paid. Want to go to the next one?

Q. What were you doing in this project?

A. We were installing a video surveillance system but a very high end system that they wanted to be able to be in California and watch -- this is, you know, odd. Everything that was happening there at that moment in time, five years hence, today, it's not a big deal to do that. But back then it was quite unusual.

Q. You said you also recall Green Diamond?
A. Green Diamond.
Q. What was that?
A. Green Diamond, and actually -- Green Diamond was a condominium on Miami Beach, and they also went bankrupt.
Q. What about Miami Beach Convention Center?
A. Miami Beach Convention Center was normally a maintenance contract, and I think they had some extra money to buy some camera equipment so they bought the camera equipment.
Q. What about Maurano?
A. Maurano was a condominium project on Miami Beach, on South Beach, and that was a related project and it finished fine.
Q. Ocean Two?
A. Ocean Two was another related project and it finished without any issues.
Q. Shore Club?
A. Oh, yeah. Shore Club. Shore Club went bankrupt also.
Q. What was that?
A. That was a condominium on South Beach also.
Q. In 2001, 2002 time frame did ATSIC have

FERNANDEZ & ASSOCIATES
(305) 374-8868

other problems with clients going bankrupt or not being able to pay?

MR. GOLDEN: Objection. Relevance. But you can answer.

THE WITNESS: Well, as I indicated here, obviously, three of these clients had financial problems. So between that and not getting paid by the post office and all of the manpower being put there it created a substantial financial burden on ATC.

BY MR. DIERBERG:

Q. What other projects in 2001, 2002 did not pay?

A. Those are -- I think I named them, that are on this list.

Q. Then turn to the 52 on midway through. It's Bates stamped 3266.

A. Could you be a little more explicit?

Q. I haven't asked the question yet.

A. No. Page. I don't know what page.

Q. 3266?

THE WITNESS: That's it?

MR. GOLDEN: Yes.

BY MR. DIERBERG:

Q. There -- some contracts here appear to be

different. Could you review those and see if any of these contracts -- in any of these contracts were you not paid?

MR. GOLDEN: Over and above the ones he already mentioned?

MR. DIERBERG: Yes.

MR. GOLDEN: Okay.

THE WITNESS: No. Not that I see off the top of my head.

BY MR. DIERBERG:

Q. What was the contract with Dade County Schools?

A. Installation of a video surveillance system in the schools. They may not have ever happened. What happened is Dade County ran out of money, so -- but I don't recall, because it doesn't have the school names. So we would bid a project and we would be awarded the project but we would not receive notice to proceed. Then, when they had the money, they would issue a notice to proceed.

So it may have been that, because none of these projects were even started as of this date. So the odds are that they probably never were started.

Q. In 2002 were you still looking for new

business for ATSIC?
A. No. I explained that.
Q. Why is that?
A. Because we were closing out ATSIC. The only project that I had was the U.S. Post Office, and I was responsible to close out that project. I hadn't --
Q. Go ahead.
A. That's it.
Q. So the plan was that the last project for ATSIC would be the Miami P&DC project?
A. Correct.
Q. And when did that plan develop?
A. Probably at late 2001.
Q. ATSIC had a loan with Hemisphere National Bank; is that correct?
A. Correct.
Q. Who was the primary contact with Hemisphere?
A. Probably it would have been me, as far as the loan went.
Q. When did you get that loan?
A. I don't recall. I think -- I really -- either late 2000 or early 2001, something like that.

Q. What was the purpose of the loan?
A. Additional capital for the company.
Q. Was it a revolving -- was it a line of credit or was it a --
A. A lump sum.
Q. Lump sum. What were the terms of the payment?
A. I believe it was a five-year payout.
Q. And could you withdraw additional funds after that?
A. No. I could request that they extend the line.
Q. That was the only loan you are aware of for ATSIC?
A. I believe we had a $50,000 note with the bank also at one point which we paid off.
Q. When did you pay that off?
A. I paid it off in 2002.
Q. Do you recall what month?
A. No.
Q. What was the nature of that loan?
A. Probably same thing. Operating capital.
Q. In 2001, 2002 did you attempt to get any other loans?
A. No.

Q. Again, when I say you, I meant ATSIC.
A. I am aware of that.
MR. GOLDEN: I think -- unless you say otherwise, let's assume that's what you mean.
MR. DIERBERG: Yes.
THE WITNESS: Okay.
BY MR. DIERBERG:
Q. In 2002 did you attempt to get more credit from Hemisphere?
A. I think I just answered that.
Q. I missed the answer. What is the answer?
A. No.
Q. And why not?
A. I have already answered that, also. I said that I decided in 2001, late 2001, that ATC -- ATSIC was no longer viable and that we needed to put all of our resources into finishing the post office, and that was it. So there was no reason to think about looking for new business or, obviously, acquiring any other debt.
Q. What about just acquiring funds to continue operations?
A. The only operation that needed to be continued was the post office.
Q. And did you consider obtaining more credit

for that contract with the postal service?

A. No. I felt they had already sucked enough blood out of us, and at this point I just wanted to finish the job and I would use whatever personal funds I had available to do that.

Q. Did you believe or do you believe that had you asked for a loan in 2002 you could have -- that the company, ATSIC, would have qualified for additional credit?

A. I doubt it.

Q. Aside from lawsuits by suppliers and subs have there been any lawsuits against ATSIC?

A. I am not aware of any.

Q. Has ATC -- ATSIC brought any suits or -- have they brought any suits?

MR. GOLDEN: Other than this one?

MR. DIERBERG: Yes.

THE WITNESS: No.

MR. GOLDEN: Maybe a short break?

MR. DIERBERG: Sure. Take a break?

THE WITNESS: Okay. Listen. Before we go off the record I have to leave at 3:00 o'clock. I have one appointment that I can't cancel so I have to leave here at 3:00 o'clock.

MR. DIERBERG: Well, if we --

THE WITNESS: Until 3:00 if it's required.

MR. DIERBERG: If it's a problem we may have to bring you back.

THE WITNESS: I can always come back.

MR. DIERBERG: Okay. Go off the record.

(Thereupon, a brief recess was taken after which the following proceedings were had:)

MR. DIERBERG: Back on the record.

MR. GOLDEN: Helen, are you there?

MS. ALBEE: Yes, I am.

MR. DIERBERG: I am going to show the witness Exhibit 34, what has previously been marked Exhibit 34.

THE WITNESS: Okay.

BY MR. DIERBERG:

Q. Have you had a chance to review this document?

A. Yes.

Q. The first page of this Exhibit 34 is a letter from Jose Zamora to Joseph Stuhl. You are not copied on this but do you recall seeing this document before?

A. No, but --

Q. What about the schedule on pages -- the second through fourth pages of Exhibit 34?

A. It's a Microsoft project schedule, but I don't remember seeing it. I mean I could read it.

Q. Did you -- in the 2002 time frame did you review project schedules?

A. Not really.

Q. If I were to ask you for each of these items on the schedule, when they were completed, would you be able to answer that question?

A. No.

Q. For example, if I asked you about the CCTV interior mount fiber modules would you know when that was completed?

A. I believe the check mark means it's completed and the square means it's in progress.

Q. So --

A. There is another chart that should go with this, which is a bar chart, and that would tell you when they were completed.

Q. But from memory, for example, on terminate fiber optics with connectors, do you recall when that was completed?

MR. GOLDEN: Talking about line 22?

MR. DIERBERG: Yes. Line 22.

THE WITNESS: No, I wouldn't.

BY MR. DIERBERG:

FERNANDEZ & ASSOCIATES
(305) 374-8868

Q. Another example, line 24, run fiber-optic cables exterior, would you know when that was completed?

A. I mean you just happened to pick one, but I believe that there was one run of fiber-optic that wasn't completed because it was part of a change order, and they did not want us to do it until we did something else. But they wouldn't give us award to do the other thing, so it was one of those change orders that they jerked us around on for about a year.

Q. So that was an explanation as to why it was not complete at this time, but do you recall when it was completed?

A. It was never completed by us. They never -- never approved the change orders until the end of the project, and then he terminated us.

Q. As to any of these items where there was a square, for example, item 7, 8, 29, 39, 47, 55, all the other items that have boxes next to them do you recall when those were completed?

A. Well, like control room window, remaining console sections, we were directed not to work in the control room any longer because they had never taken into consideration -- they needed

air-conditioning or something and they had to do their work before we could do our work. So therefore, we couldn't finish our work.

Q. When was that?

A. That was -- that was sometime -- I think it started in two thousand-- in the end of 2001 and probably continued rolling on. Obviously, by this date they still hadn't resolved what they needed to do there.

Q. What about number 7 and 8, control room window?

A. That's what I just discussed.

Q. Okay. 29 would be the same thing? Same answer?

A. Control room window. That's the same item. I believe it is.

Q. And item 39?

A. Install -- I suppose that is supposed to be fencing.

Q. Do you recall when that was completed?

A. That -- to my knowledge, that was completed but there is a lot of different points. Like in other words, the way I would read this, whether it -- I know the project or not, that's gate one. Then if you go to the next page you will

see gate two, gate three, gate four, gate five, gate six. So they all have to install fencing, and they all don't have the fencing installed. So in other words, the gates, themselves, are all installed. This would be the fencing in between the gates that wasn't installed, which would be the funniest thing. It's the simplest part, but there must have been a reason that they weren't installed; in other words, the gates are the big money, the gates are all the headaches, the gates are where you have to cut underneath the concrete and do all the other work. Those were all installed. The simple part is the fencing.

Q. And let's assume -- actually there is a date on this schedule. It's dated --

A. March 20th.

Q. -- March 20th, '02. You believe the check mark would indicate -- for each of the items check marked that it was completed as that of date?

A. I believe so.

Q. I would like to show you what was previously marked Exhibit 16 (indicating).

A. Okay.

Q. Have you had a chance to review this document?

A. Yes.
Q. Exhibit 16, the first page is a memo from Greg Warren to yourself. Do you recall ever receiving this memo?
A. Basically.
Q. When you say basically, what do you mean by that?
A. I remember asking them for worst -- worst -- worst-case scenario, and this is obviously that document.
Q. On this document he doesn't mention the worst-case scenario, does he? Do you see a reference to worst-case scenario?
A. If you ask Jose to do something, you get the worst-case scenario.
Q. Did you ask Jose Zamora to do this?
A. He did.
Q. I am sorry. Who did?
A. Greg did.
Q. Greg Warren asked Jose to prepare this?
A. Jose would be the logical person that prepared this, because he was mostly involved on the day-to-day items in the contract.
Q. And did you ask Greg Warren to ask Jose to do this or how did Greg Warren ask Jose to prepare

this report?

A. I don't recall if I asked Greg Warren to prepare this or if Greg Warren decided to prepare it on his own.

Q. Do you recall any discussions regarding this cost-to-complete document?

A. Yeah. A little bit.

Q. What do you recall?

A. I just recall sitting down talking to Greg about it once or twice and looking at the numbers and seeing what was real, and what wasn't real, and what seemed to be more of a realistic bottom line.

Q. That was after this document was prepared?

A. It would be in reference to this document, so it would have to be after it was prepared.

Q. Do you recall any discussions leading up to this cost-to-complete document?

A. No. Not really.

Q. In your discussions with Mr. Warren what was your conclusion or what did you say to Mr. Warren about the cost-to-complete document?

A. No. I think we both decided or I decided that we needed to continue on and that it would be, whatever was remaining, at ATSIC's responsibility to figure out how to pay for the rest of the old

bills for the -- in other words, it was an adequate amount of funding as long as they gave us our change orders, which they ultimately never did anyway. But if they would have given us the change orders that they verbally gave us for months prior to this, it would be more than -- it would be an adequate amount of money to pay for the existing project to be completed. And the major issues would be to pay the older vendors that hadn't been paid yet, and that would be ATC's responsibility, but it wouldn't be the post office's responsibility.

Q. On the first page, the second full paragraph, the last sentence says the approximate net loss is 174,486. At the time that you saw this did you agree with that estimate?

A. Again, I don't recall specifically, but I believe that we estimated that probably the real number after negotiation would be somewhere around a hundred or $110,000.

Q. Why the difference?

A. The difference would be that the vendors that were not paid up until that point would realize that their only hope of getting paid would be whatever we could pay from whatever assets were

left of Advanced Technology Systems Integrators or what I personally had, so that they would accept a lesser amount. Very traditional in South Florida; called a buy-down at the end of a project.

Q. And in the first full paragraph, the second sentence, it says, "Although numbers could be refined in some areas, the overall estimate provides sufficient information to decide our final responsibility regarding the USPS situation."

What discussion was there about a final strategy?

A. Well, I think what I meant by that or what he meant by that is, when Greg initially started on this project, he was optimistic and couldn't understand -- because he hadn't worked with the government before -- couldn't understand how their ultimate goal wouldn't be just to finish the project as fast as possible. By this time he had realized, as I had realized the year before, they never really wanted us to finish this job. They were just going to suck this thing dry, like they did AMC, until they felt there was nothing left to suck dry. Then, at that point, they would terminate us.

I think at that point he felt the same

way. So he wanted me to understand that the fight would cost more money than maybe I imagined it would cost and did I want to continue to do this. We both determined that, yes, we had no option, we had to continue to finish the project and continue to document where we stood, and all of the things that Stuhl was doing, and Goddard at that point, to basically derail the project.

Q. So in this time frame, May of 2002, you believe that the government wasn't going to allow you to complete the project?

A. I didn't believe Stuhl or Jerry Goddard would ever let us finish the project completely.

Q. What's the basis for that belief?

A. AMC.

Q. Could you explain?

A. Well, in AMC -- which frankly we had even more problems than in P&DC, the -- besides the billing go around, where it would take a month and a half to finally get to the point where we would submit a pay rec that they would accept, and of course during this period of time the clock is ticking, so then, in addition to that, they played the availability game. Whenever we needed something to be looked at they weren't available to

look at it.

Then they played the verbal authorization game. The verbal authorization game is, okay, I am going to approve this and get started on it now, and send me the change request and I will sign it. Well, we tried that on AMC once or twice, and then they ended up not approving the change orders. And we had already done some of the work. So we refused to do any change orders without doing that, without a signed change order. At this point, of course, they never did sign the change orders. I mean it goes on and on.

They would -- on the gates, we would be installing the gates, and somebody from the post office would come out and say, you can't install them now. We would say, why can't we install them now? They would say, well, we have too much traffic. Can we install them on the weekends? Yes, you can install them on the weekends.

We come out on the weekends. What are you doing here? You can't do that. You can't work here on the weekends.

Couldn't install the gates. Then we had that -- Goddard in the middle on installing the gates.

And we had the light fixtures on the garage roof that our electrician did, and it killed them. Because they loved that the electrician did such great work, but they made him hate them before the project was over, where he didn't even want to work on P&DC any longer.

We were installing light fixtures, and we called to their attention that there were a lot of errors in the way they were designed and that if we install the light fixtures the way they said they would blow down in a hurricane, and we needed to drill through the pavement from the second floor garage into the first floor. And it took them months and months to finally approve it and to -- we had to do all of the engineering. And then -- and I can't remember how they wangled this around, but we ended up never getting paid for it. And we had to have a special company come out and core and then build special plates to put underneath so, in essence, if the pole went down, it would have to rip the concrete out from the first floor to the second floor.

We did a value engineering of the project, because Stuhl had individual conduits going to each location. And we said, if you run two massive

FERNANDEZ & ASSOCIATES
(305) 374-8868

four-inch pipes around the whole facility, not only can we expedite the job but we can add additional cable at your cost that you could have for spares in the future. The way you are doing it, every time you want to add a camera it could cost $20,000 to add a camera.

They thought it was a great idea but wouldn't approve it. They finally approved it, only not as a value-engineered proposal that would allow us to make more money.

Finally, despite all of that, because -- we just threw so much money at this project that we were finally at the point where the project was completed, where the computer systems were up and running. The camera systems were running, and they still terminated us. While we were having meetings trying to train people on the system, they terminated us.

So at that point, you tell me, if you were me, how much faith you would have in dealing with these people.

Q. So all of the items you just mentioned, they were all related to the AMC project, correct?

A. Well, those were all related to the AMC project. Then there is the whole other P&D story,

you know.
Q. Just for clarity, so the gates you were talking about the gates, how they wouldn't allow you to --
A. Well, the gates at P&DC, they did the same thing.
Q. Which is that they --
A. That there was too much traffic and they couldn't be done this day, they couldn't be done on that date. Then where we had to -- I believe we had to create an alternate gate -- none of that was in the contract -- to allow traffic through for us to build the new gate. And then it got to -- we built the new gate. They turned around and said, oh, didn't we tell you? We want the alternate.
Q. When did these issues come up?
A. These issues came up in -- they might have come up in early 2002, but probably mostly 2001.
Q. Then you mentioned that there was an issue about working weekends. Was that also an issue on the P&DC project?
A. I don't remember at all.
Q. As far as the AMC project --
A. I remember that we went out one weekend or two weekends to do the gates and we were turned

away.
Q. And also on the light fixtures you were talking about the AMC project?
A. Yes.
Q. Were the light fixtures and this issue about building them for hurricane --
A. Right.
Q. -- protection, was that also an issue on P&DC?
A. Right. I don't believe so. I don't believe there were any light fixtures on P&DC. There may have been but I don't recall it.
Q. Then on the value engineering on the conduits was that also an issue in P&DC?
A. Yes. And I don't remember whatever happened. I know we never received anymore money.
Q. Do you remember how the conduits were handled in the P&DC project?
A. When you say how they were handled --
Q. Well, you were discussing the AMC project, I believe, how you do a larger conduit, correct --
A. Right.
Q. -- to save some money?
A. I believe we proposed exactly the same thing at P&DC.

Q. What were the other issues, and specifically to the P&DC project, that made you believe that the government wasn't going to allow you to complete the project?

A. You know what? You asked me my history, and I have been in this business for all of my adult life. And you asked me about how I came back to this business in 1990 or thereabouts. And it was to finish a project at Anniston Army Depot in Alabama, and it was for a chemical weapons storage. We all had to be class -- had to have classified or restricted status on all of our employees that worked there. We had to be trained. We had to have all these things. And that project was the only other project I could remember in my 30 years in business that even came close to this project, where it was apparent that the consultant -- and in the case of -- there the contractor didn't want us to finish the job, for whatever their ulterior motives were. Whether they be personal, emotional or strategic, I have no idea. But I learned then that whether people like each other or they don't like each other that you play fair and you play by the book.

And they never played by the book on this

FERNANDEZ & ASSOCIATES
(305) 374-8868

project from day one. They couldn't stand me and I couldn't stand them.

Q. Could you give me some more examples of ways in which you thought they did not play fair or gave you reason to believe that they --

A. All right. Let's see. You asked me about the fiber run, and that just reminded me. They had a contractor prior to us there that was supposed to do some electrical work along this run on the -- probably that would be the north side of their facility, and they said the guy never did the work.

So could you do this work? Give us a change order. We gave them a change order for 25 or $35,000 to do the trenching and to do all of this work. And he said, look, you know, I am going to -- I will get this to you and so on. We trenched the whole project, we laid in the conduit, and then he came back and rejected our change order.

Q. This is on the AMC project?

A. This is P&DC. Rejected our change order. And that went on for months and months, things like that.

Q. Do you recall when that was?

A. That was in 2001 and it rolled into 2002.

The gates that needed to be installed there, they kept saying, well, we can't allow you to dig that hole. So we ended up having to -- where the main gates were, we had to end up having two large excavation machines come in and cut both sides of the roadway so that we didn't affect the roadway. Then we had to tunnel underneath the roadway. None of this was part of our contract. All we were supposed to do was core. They said, we will take care of you. They already took care of us. They're -- nothing ever came of that. I can remember.

Q. I am sorry. Are you saying that they verbally authorized --

A. Right. They verbally authorized things. That's why we were so insistent on change orders being written. But whenever we slacked off because we knew that we were desperately needed to do this work and it would be part of our other work, and if we didn't do this then you can't do everything on the other side, so we would do it -- we never got paid. That was a guarantee. The minute we started any change order without it being signed that we would never get paid for it.

Q. When was the last time you proceeded on

the P&DC project without a written authorization for the change order?

A. I believe that trenching along the side. And then there were -- replacement of some fencing that was knocked down by somebody else, that we did.

Q. Do you recall when that was?

A. No. Then there -- I suppose the biggest one is there was an alternate, and as I said, they let us start to do the project where they didn't accept the alternate where they weren't sure. And then they said, no, we want to do the alternate. And then to do the alternate would mean that what we did was incorrect. We had to move the gates around to allow for the alternate. And then in one of their deductive change orders they took the $37,000 away from us for something else.

You want me to go on?

Q. Yes.

A. I can recall where the electrician -- this is one of my rare visits there, when we literally had to pull the electrician because I thought he was going to punch Stuhl in the face. And this is a man that must be 70 years old that's been in this business all his life. He got so red I thought he

was going to drop dead of a heart attack. Stuhl went around, after we did all of the electrical work, with a tape measure. And he measured the distance between each box on each wall to see if they were off. And he found two boxes that were off by two inches. This is a huge electrical panel box. And it replaced an existing smaller electrical panel box.

And because it was off two inches he refused to accept it, even though it replaced an old box that was in that same exact spot. So we had to pull all the panels out and they had to rework all of that electrical just because of that.

Q. Did he say why it was important to wire -- why the two inches are important?

A. Absolutely. Because it's on the plans. That only worked -- that's a quote from Stuhl when it was to his benefit. Like when it was to his benefit not to do that, then he didn't say that.

Then there was a question about --

Q. I am sorry. On that issue on the box being two inches off, when did that issue come up?

A. Again, I don't recall. That might have been, again, 2001 and could have been 2002, you know.

There was a time, when you talk about change orders, when we went to Stuhl and we said -- and Goddard. Look, you undersized this conduit. Here is the NEC book. Here is the amount of wire. You undersized this huge conduit in there. And we already put it in because you told us to put it in. You directed us to put it in, and it's part of our contract to put it in. And now it's wrong.

So we need the change order to excavate this entire run and redo it and add a new conduit or we need to take out the copper that is going to go in there and put in fiber, and it will cost you this much to do the fiber.

They dragged that thing on until the very, very, very end, and I am sure that somewhere in the -- I can't think of their name. When the other company came out to do the work they gave them the change order to either put in the fiber or to reexcavate and redo it. But for us they wouldn't do anything. They just said, we will let you know. That was one of our change orders.

Q. Who first raised the issue about the size of the conduit?

A. We did when we came out there and one of our guys saw the size of the conduit, which was a

FERNANDEZ & ASSOCIATES
(305) 374-8868

substantial sized conduit. He saw all the wire in there. He said this will never meet any code. And it was their responsibility to make it meet the code, not ours.

Q. Do you recall which -- who this person was?

A. It was Stuhl.

Q. Who was the person at ATSIC who first raised this issue?

A. I think it was our electrician.

Q. Do you know what his name is?

A. Gill McDonald.

Q. Do you recall when this was that he raised this issue?

A. Probably, again, late 2001, early 2002.

Q. Who did he speak to about this?

A. He would speak to Stuhl or Goddard, but mostly Stuhl. Ninety-nine percent of the time he would speak to Stuhl.

Q. Did you have any discussions with anyone at the postal service about this? Did you personally have any discussions?

A. Not that I recall. I am sure it came up in a construction meeting that they would have. I know it was a written request and it was a big

thing.
Q. I want to come back to this meeting, somebody has more issues, but as far as discussions you might have had, how often did you talk to Jerry Goddard personally?
A. In the beginning probably more. But even at that maybe -- usually we talked to Goddard when he came down. And I think he would come down once a month or once every six weeks, something like that to check on the progress or when we were in the middle of a fight because we weren't getting paid and we were at a loggerhead. And then sometimes he would come down.
Q. Then you would speak to him personally?
A. Yeah. Yeah. I mean --
Q. Let's start with face-to-face meetings. Did you have any face-to-face meetings with Goddard in 2002?
A. If I did, it would have been one, and it would have been sometime in probably January or something that I can recall. And I am not certain. I remember one very confrontational meeting, and I don't recall when that was exactly.
Q. Do you recall what you guys discussed?
A. The usual. The usual was, when are you

going to approve our change orders? When are you going to pay us? And that was that. Then they will have whatever new show they had at that time, what we used to call the Joe Stuhl show of, I didn't pay this time because of this and I didn't pay that time because of that, and I was busy because of this. And you know, and now that you are here, let's try to resolve your pay rec.

Q. So Joe Stuhl was also at this meeting?

A. Joe Stuhl was usually at the meetings when Goddard was there because they conspired together. I mean he was the representative of the post office. So he was actually responsible for the project for the post office.

Q. But as far as this meeting in 2002 you believe that Joe Stuhl was there?

A. You know what? I don't want to say that because I can't picture him there so --

Q. Do you recall where the meeting was?

A. Usually they were in our trailer at P&DC. It was on a lot of P&DC, a construction trailer.

Q. Do you recall whether this meeting was at that trailer?

A. I would have to say I can't think of -- you know, the only other meetings we had, other

than in our construction trailer, either at AMC or P&DC, is when we were closing out AMC. We had a meeting in their conference room to close out the project. But then Stuhl terminated us anyway a week or so later. And when we first started, our first meeting was at the conference room, I think, at AMC. Other than that, almost all the meetings took place in our construction trailer.

Q. But again, the only meeting you recall in 2002 that you personally attended was this one meeting discussed, possibly in January of '02?

A. And I can't specifically say that it was in '02. I believe it was in '02.

Q. Do you recall anyone else who was at that meeting?

A. I mean our people -- probably I think Jose was there. You know what? And I don't picture Greg. I think Greg and I went to one meeting, and that was probably the last meeting that I went to. And that might have been the one in 2002. This might have been a little earlier because I don't remember Greg at that meeting.

Q. Did you have any meetings with Joe Stuhl without Mr. Goddard there?

A. Oh, all the time.

Q. You personally did?
A. Oh. No. I couldn't -- I couldn't stand him. And it's not a lot of people I can't stand, but this definitely put me -- I am going to put this until -- the day in my book until the day I die. So I very rarely attended those meetings, unless one of our guys felt like this was so important that either the consultant couldn't be there or somebody to document what he was doing. So --
Q. So you don't think you have attended any meetings in 2002 where Joseph Stuhl was present?
A. The only one -- as I said, I don't think it was a meeting. I think I once was there check on the job, when we were doing that, where I think -- when they all went berserk, when Stuhl refused to give the change order that we had already done and we had to dig underneath the concrete. I wanted to see how massive a job this was that we had to do, rather than just cutting across the driveway. I think I was out there then, and I think he might have been there then.
Q. Do you recall any discussion with Mr. Stuhl?
A. No.

Q. What about after termination, were there any meetings where you attended with either Joseph Stuhl or Mr. Goddard?

A. Not that I recall.

Q. Do you recall any meetings in 2002 with any representative of the postal service aside from Mr. Goddard?

A. I think we had a meeting when they terminated us, and it might not have been then. I think we had a meeting with their head of new security director. I mean security was a joke there, anyway. But that's a whole other story that I forgot to mention when you asked me again. But I think we had a meeting about moving all our trailers and everything, and I think nobody was available, and I went to that meeting.

Q. Do you know when that was?

A. That would have been July or August.

Q. Of what year?

A. 2002.

Q. What did you discuss at that meeting?

A. Just that we were terminated and to remove our product and that -- confirm where all our inventory was, and we wanted to confirm that it was all there, which we did. Subsequently, a couple of

pieces still went missing, but for the most part we validated that all the inventory was there. So that when they took the inventory they would not have to go buy it again, which they would do at retail and increase the price of the project by that amount.

Q. So this meeting took place after termination?

A. I believe so.

Q. Who else was there?

A. Would have been -- probably Jose would be there and maybe one or two of our other guys or subs there that -- that were responsible for the inventory or the materials on the site.

Q. But Jerry Goddard was not there?

A. You know what? I don't recall. I think he was and I don't remember that he was. I don't really think that I ever met with him in -- at -- I think I just met with them --

Q. How about Joseph Stuhl? Was he at that meeting?

A. I don't recall.

Q. What about phone conversations in 2002 with Jerry Goddard? Did you have any direct -- did you personally have any phone conversations with

Mr. Goddard in 2002?
A. I would think that I probably had one or two with him but I don't recall them.
Q. You don't recall the specific discussion?
A. No.
Q. Or any of the topics of discussion?
A. I know that once or twice I probably -- contrary to Greg's request, I got on the phone and I told him off, told him what an ass I thought he was and that, you know, some day something is going to come back to him. Because he did one or two things -- I can't remember what it was, but it was so onerous, it was such an egregious error of one human being to the other that I just couldn't bring myself not to go berserk on the phone. Otherwise I would just -- the acid would eat away at my stomach. And I called him on that once or twice, I think.
Q. Do you have a general idea of when those --
A. No.
Q. -- that took place?
A. No.
Q. What about conversations with Mr. Stuhl? Did you have any phone conversations; again, you

personally with Mr. Stuhl in 2002?

A. Our relationship was worse than mine with Goddard, so I would think not.

Q. What about any other representative of the postal service? Did you have any personal phone conversations with anyone from the postal service, aside from Mr. Goddard?

A. As I said, I believe the security guy, because he was the new security man, was absolutely in a tither and beside himself with what was going on. And we had a couple of meetings about that.

Q. I want to ask you. We interrupted your discussion of the issues you saw with the postal service and you believing that they did not intend to allow you to complete the project. We could take a break now or we could continue that.

MR. GOLDEN: I am thinking why don't we let him go ahead and continue that line of thought now and then take the lunch break, if that's okay.

THE WITNESS: Okay.

BY MR. DIERBERG:

Q. Any other issues aside from the ones you mentioned? And again --

A. A lot more than that. In fact, in our

conversation some of them came up. One of -- the first issue, the first major issue was the fact that for our employees to -- were required to have a background check before they could work at the post office. So -- and this is similar to what we would do if we were working on a military base. If we were working on a Federal Courthouse we have to do this. Of course, this is South Florida, and the great majority of all your employees here and your workers are of Latin descent, and many of them were not born in this country.

So we submitted like 23 applications to the post office. And at that time that -- I didn't know it at that time. The post office, unlike the government, doesn't have their own agency that does background checks. So they actually give this job to a -- to somebody that's a former government employee and they do the background check.

When we submitted these 23 or so applications, immediately, within six weeks -- this is -- I am being facetious. They returned an approval on Ed Hineman (phonetic), who was a white Anglo Saxon protestant, who was born in this country that was in the Air Force, and they returned an approval for -- God, one other -- I

think -- I think Jose. I think they approved Jose also, who was born in this country. And every other one was rejected and they needed additional information.

So here we are going to start a project, but we only have two people authorized to go into the airport to do a $2,000,000 project. So we went back and forth, back and forth. And this is, I think, actually the first time we got our attorney involved. We said, maybe you can shake them up. Maybe you can do something. And ultimately -- and we requested a 60- and a 90-day extension because we had nobody to work there.

And finally, what happened is at AMC on one end they started to let us work without the authorization, against federal policy and everything else, because it got to the point where it was ridiculous.

Ultimately, by the end of 2000 we had six people approved to do this $2,000,000 worth of work. And the rest of them all worked illegally there. The post office was fully aware of it. At this point it was part of our claim with AMC. And Goddard refused to get involved in that and said this is their policy but, yeah, I know they have a

big problem. And at one point they asked me, you know, can't we hire any other people, because these people are not easily trackable. And I am being polite as I am explaining it to you.

So that was a major, major delay. Then ultimately we ended up working illegally on both projects. In fact, that's when the security director at P&DC went berserk, because he realized nobody was wearing badges, because they didn't have any badges.

Q. When you say the security director, security person for the postal service went berserk, when did --

A. Oh, that happened in 2002. That's why I think that was the one meeting that I heard about.

Q. After termination?

A. No. This was before termination, way before termination. He finally acquiesced and basically closed his eyes.

Q. So that in 2002 there were people working on the project who did not have the security clearance?

A. Oh, yeah. Most of them.

Q. Any other issues you recall that make you think the government didn't intend to allow ATSIC

to complete the project?

A. I think it's important to note here -- I am not saying the government didn't intend to let us complete the project. Stuhl and Goddard never expected or intended us to finish this project. Unfortunately, they were the government. So in that respect you're correct. But I don't want you to think that I am some type of an idiot that thinks there was a conspiracy by the government against ATC. This was a major personality conflict that went on, and it started primarily with Stuhl. And it really, really got bad after Stuhl was able to terminate us on AMC and bring in the company that he wanted to use in the beginning.

And I will go back to that. Here is another major, major issue: We have bid this job, and one of the reasons that we were very competitive is that our bid -- they specified five different access control vendors, of which Casi Rusco is what they had used in the two other facilities down here. That's the only system Stuhl had ever put in was a Casi Rusco. We weren't a Casi Rusco dealer. In fact, not only were we not a Casi Rusco dealer, we were a direct competitor. We were probably one of the biggest thorns in their

sides and we were enemies with Casi Rusco.

When we were awarded the project we specified Andover, Andover Controls out of Andover, Mass. Stuhl immediately said, I won't accept Andover. I want Casi Rusco. And we said, you can't do that. Andover meets the specifications. And I think this was ATSIC's greatest failure was right at that moment we should have gone to war with the post office. I mean we really should have gone to war.

We submitted -- we gave them a submittal. That's why the submittals were never approved. We gave them a submittal that we could -- this building has Andover, okay. All of Broward County schools have Andover. All of the Broward County courthouses have Andover. Half of Dade County schools. West Palm Beach International Airport has Andover. But we gave them a proposal that was killer. It defied everything. It showed that we met everything. Still wouldn't accept it. He made it so adamant that he wouldn't accept it that there was a big war about this whole thing.

One of our operations guys at the time said, look, this guy is never going to accept Andover and no matter what the hell we do we are

never going to get him to accept Andover. Why don't we compromise and see if he will take Hirst? I know a guy at Hirst. We were not a dealer for anyone on that list. They said anyone on this list or equal.

So we went to Hirst. Well, we were competitors with Hirst, and now we have to climb into bed with Hirst. So it was a strained relationship from the very beginning. Then he rejected Hirst. And Hirst said, look, we have a connection in Washington and we feel that we could go over Goddard and Stuhl's head and that we can force them to use Hirst. And we said, have at it.

So they went to Washington and they talked to somebody in Washington, and Stuhl came back and said, okay, we will accept Hirst, but we don't consider it an equal. We consider it a lesser system than Casi Rusco. And again, we should have gone to war with them then. They actually reduced the price of our system because it was Hirst. Even though Hirst was an approved vendor of the U.S. Government and that Hirst was specified as one of the five or four vendors that they would accept on this project, they actually made us cut our price to give them Hirst. I don't remember the numbers,

but I am sure it's in the documentation.

So -- and they never approved the Hirst submittal. That's why these submittals were never approved, because they never approved the Hirst submittal, never got it back approved, but they let us install it.

Q. When did they give you the go ahead to install Hirst?

A. By now we were six months into the job. You could probably, you know, look at the pay apps when we delivered the first bulk of equipment. So we are probably six months into a job that a -- and that AMC job was only like a nine-month job -- or not even a nine-month job, I think it was only a seven-month job when they finally verbally approved Hirst. And we assume acceptance was by virtue of the fact that they made the first bill.

So we find ourselves in a project where we don't -- the representative of the government, Jerry Goddard, refuses to get rid of -- in the same period of time it refuses to get rid of Stuhl, although we are at a loggerheads on a daily basis with them, the architect is indicted on federal charges of bribery or something, and he's taken away, and he and Stuhl worked together, but they

won't terminate Stuhl.

Goddard decides that he is going to terminate his own project manager that was running this project for the first three months. I forgot to tell you that. Goddard wasn't in this project. Goddard was on a much higher level. But Goddard decided, after I went ballistic over the fact that they wouldn't get rid of Stuhl -- and he moved his guy out, and Goddard took over as project manager for the government. You can look at your records. You will see that Goddard was not the project manager of record.

And this was -- this is how you end a project. This isn't how you start a project. This is how -- you know a project is never going to end correctly. And that's how ATSIC started this project, installing Hirst six months or seven months into the project after the fact, without an approved submittal, without approved technicians working on the job, but everybody closed their eyes. That's how we started this project. So you tell me what you would think.

Q. Just for completeness, any other reasons in May of 2002 that you believe that they wouldn't complete the project?

A. It wouldn't allow.
Q. They wouldn't allow you to complete the project?
A. Not that that certainly isn't enough, but I think the fact that they still continued through Greg Warren, okay. And Greg Warren is a genius at what he does. He is -- I may not be -- I may -- I am respected in this industry -- I am hated in this industry but respected for my ability to know how to do things and to do things right and to make things work. And I have always had that ability all my life to do that. But sometimes the difference is Greg Warren will be a gentleman; whereas, I won't be a gentleman.
And when they took Greg Warren, who could sit there and build hundreds of millions of dollars of buildings, and basically ate him up and spit him out, and he couldn't figure out how to finish this project, I think it was the ultimate icing on the cake.
Q. When did that take place?
A. I think that probably took place sometime around May when Greg figured out what this memo is all about. You are right. We are probably never going to finish this project. Do you want to keep

on going? And I said, yep, keep on going. Let's keep on doing it.

Q. And anything else that led you to believe that may not allow you to continue or to complete the project?

A. Well, here is what my -- my thought was that they would keep us going until sometime around October or November. And the reason for that was that we believe that was the period of time when AMC would be finished. So Goddard could then terminate us from this project and -- they could take the guys that were finishing up AMC, which was, you know, 98 percent finished, but it still took them seven months or eight months to redo our work and $200,000 later. But that would be logical. Because what I felt Goddard's plan was from the beginning is when we had set the final date of July -- whatever it was, 15th or 16th, it wasn't that that was a termination date. If you read -- when they blackmailed us into that.

By the way, you will also see that all of the change orders that we had requested money for, they took away all that money. The way they took away all that money, which isn't written anywhere, all right, is that they went back to us and they

said, okay, this project should have been done by December of 2002 and it's now -- whatever it is, May. So we are charging you liquidated damages of a hundred dollars a day for another 120 or something. And then there was -- they came up with some other frakacta (phonetic) thing. I can't remember what it was. But we negotiated it out to a zero change order.

Then if you look at that change order, on that change order, which you will never see on a government change order, okay, it says, in essence, this is a settlement. Doesn't say this is a change order. It says -- and underlining -- this is a settlement and we don't have the right to go back and make claim against this. Because they knew we were preparing a claim.

And then -- and then I will -- I need my water break and the bathroom. If you also look at that, it basically says on July -- that's what it was. On July 15th you're to be completed. If you are not completed on July 16th, we start liquidated damages. So the intent here is we knew we would be in liquidated damages but they would let us work until they could get the other company done with the other project and then they (indicating) move

them into P&DC and finish P&DC. And that's it.

MR. DIERBERG: Okay. Should we take a lunch break?

MR. GOLDEN: That's fine.

MR. DIERBERG: How much time you guys think -- go off the record.

(Whereupon, the lunch break is taken at 12:09)

MR. DIERBERG: Back on the record.

BY MR. DIERBERG:

Q. Mr. Vento, you understand you are still under oath?

A. Yes.

Q. Before the break you were answering a question about -- I believe the question was -- in May of 2002 you believed that the government and Jerry Goddard, Joseph Stuhl were not going to allow you to complete the project and you were giving some reasons for that. Are there any other reasons, aside from the ones you mentioned?

A. Not that I can recall right at this moment.

Q. And if in May of 2002 you believed that Mr. Stuhl and Mr. Goddard were not going to allow you to complete the project, why did you continue on with the project anyway?

A. Because I had no choice. I either had to -- well, I suppose we always have a choice in life. My choice was either to abandon the project, in which case I would be wrong, or to maintain the project and to continue to pursue -- to succeed at the project and to document how we were doing that; then let them terminate, at which case we would have the ability to place a claim against the government and pursue them.

Q. Couldn't you have sued at that time for the claims or the issues that you had at that time?

A. Well, we already had placed a claim on -- for AMC, and at that time -- because the AMC project was done and it was terminated. And I was under the assumption, at least in this case, that -- or it was the determination of our attorney at the time that -- when the project was over we would produce a claim.

Q. And I think you said that in May of 2002 you thought that Mr. Stuhl and Mr. Goddard were going to give you until October or thereabouts?

A. Correct.

Q. And you believe, though, you could have actually completed it prior to that time.

A. Well, for the most part it -- if they

would leave us alone it would have already been completed, but, yes, we would have had it completed.

Q. So you believe this, despite your thoughts as to their intentions, that you were actually going to be able to complete the project?

A. Well, you have to understand something. That ATC -- ATSIC had the ability and completed the AMC project. And only after we were actually in the stage where they were signing off on the project did Stuhl terminate us.

So obviously, if there -- to us that meant that the hatchet could fall the day we were going in to have them sign off on the contract after it was fully operational and they had beneficial use. The hatchet could still fall. But we believed that we could complete it at least to the point where, if the hatchet fell, that we had mitigated our losses to, at worst case, the same scenario as AMC, which might be ten or 15 percent of the project, because we had been at 98 percent completion. We were, on this one, like 92 percent completion or something like that.

So each day that -- we pursued the project and continued a little further along and got more

work done. No matter how many delays they put in our way we still got things done, we mitigated our losses.

Q. I would like to show you what has been previously marked as Exhibit 18.

A. Okay.

Q. Have you had a chance to review this document?

A. Yes.

Q. And you recognize the handwriting on this document?

A. Well, I can tell by all the crossed-out dates on top that this is probably Greg Warren.

MR. GOLDEN: Mike, can I ask you to go ahead and let the witness look at the one that is going to be marked?

MR. DIERBERG: It is the same -- it's previously marked as 18.

MR. GOLDEN: Go ahead. My error.

BY MR. DIERBERG:

Q. Exhibit 18, previously marked as Exhibit 18. And you believe, because it's crossed out, that the numbers at the top, the dates, that this must be Greg Warren?

A. Usually Greg Warren would -- the way he

does his followup files. Or he will put a date on something, and then every morning a secretary would hand him back all of his correspondence with that date. He would go through it. If it were something germane to that day's activity or that needed to be done then, he would take it out. If not, he would cross it out, put a new date on it and then hand it back to the secretary to hand in again or to file it when it was completed. A little anal but it worked.

Q. This is a memo from Jose Zamora to Greg Warren; says cc, Vince. I presume that's you?

A. Yeah.

Q. Do you recall seeing this document? At least, let's say, the document without the handwriting portion?

A. I mean I know that we contacted TriState for a couple of different reasons, and to that end, you know, I know that I discussed this document at least.

Q. Do you recall seeing the handwritten portion or any of the handwritten portion?

A. No.

Q. Tell me what you remember about the discussions regarding having TriState complete the

project.

A. Well, again, if you look at the dates, they kind of all correlate in May, when I think Greg was at the point where he realized that, you know, what -- I had tried not to taint the situation -- that he kind of came up to the same conclusion that they would drag us along as long as they could.

So his thought was why not contact TriState, who we know that the government -- you know, that Stuhl has a vested interest. I don't know what level of vested interest, but Stuhl definitely had a vested interest and a relationship with TriState and that it was apparent that they would give the job to TriState.

Q. Did you contact any other company aside from TriState?

A. No. There would be no reason to. TriState was going to get this job. That was already written in the sand.

Q. When you say Mr. Stuhl has a vested interest in TriState, why do you say that?

A. Well, because prior to this, these two jobs, Stuhl had done one or two other jobs in Orlando and somewhere else, and he always used

TriState. And he recommended TriState. But in this particular case it was a competitive bid, and he couldn't go around the competitive bid, and we won it, not TriState.

Q. Do you know that TriState was one of the bidders on this contract?

A. Yes.

Q. Any other reason why you think that Mr. Stuhl had vested interest in TriState?

A. They were on a first-name basis. They knew each other very well and they had a very positive relationship; whereas, we had a very negative relationship. And all of our people saw that at AMC when they came in. So if there was ever any doubt in our minds, the doubt was erased once they started working on AMC.

Q. Who was the primary contact with TriState?

A. It was a female sales rep that was very bright, Donna -- I saw a -- I think it's TePas, something like that. I see Donna on here.

Q. Who was speaking with her on behalf of ATSIC?

A. Probably Jose would do most of the project, because Jose could walk her through the project and show her where we stood, and he would

be the most knowledgeable.
Q. Ultimately, ATSIC decided not to give the contract to TriState to have TriState complete, correct?
A. No. That's not correct.
Q. Can you explain?
A. Yes. There was a moment in time when we decided it would be better for us to pay TriState the 200 -- and I think they quoted us 200 -- two -- between 250 and 280,000 to complete the project. They didn't put it in writing. What happened is I think we had a brief meeting about it. I said, if you feel they can do it for that, and we know that Stuhl will buy into this, maybe we should pursue this.
So we tried to call back Donna a couple of times and never got a return phone call. We asked her to put it in writing what the date was. Not the date but what the price was. I think at that point she conferred with Stuhl and Stuhl -- this is conjecture on my part. All I know is that a week later, after they met with us and gave us a number and we tried to contact her, from that point on we never got a return phone call. We never heard from her again. Would not return any of our phone

calls.
Q. Based on what she had -- you originally discussed, it was around 250 to 270?
A. 250 to 280.
Q. You guys would have turned it over to TriState but they stopped returning your phone calls?
A. Correct.
Q. And the figure of 250 to 280, that would have come out of -- or that's not on top of the funds that were remaining on the P&DC project?
A. No. That was what they would charge from that point, supplying whatever equipment hadn't been supplied already, like Vicon Dooley (phonetic) and a couple of other items, and finishing the job and then warranting it for a year. Because we assumed that even though we had already asked Stuhl -- as an example, if you look at AMC, a good portion of their labor rate was predicated on a one-year warranty. And we said, well, why can't we warranty it? We are, you know, an authorized dealer for these products. You finish the job, we will warranty it and we will mitigate our losses. They said, no, we don't want you on the job site anymore. So they had to pay this company, Donna's

company, to warranty it. So that price included them supplying the remainder of the equipment, doing the complete installation of it and warranting it for one year.

Q. You know what information they had at that time to base their price?

A. Yeah. Everything.

Q. How did they get this information?

A. From us.

Q. Do you know if they made a trip to the P&DC project to inspect progress?

A. Absolutely.

Q. Do you know when they did that?

A. I just noticed it. It was on here. I think it was the 28th. It says, 5-28, walk project with Jose and will -- and get us price to finish.

Q. I am sorry. This is the handwritten portion?

A. Yeah. You see under -- let me know if this is okay with you. And it says that he walked the project and that they will get -- you know, and -- so Jose walked the project with them, too, and they were going to get us a price to finish.

Q. I would like to show you two different documents that have been marked previously. One is

Exhibit 31. Then a similar document, Exhibit 31A. If you could read these two documents.

A. Okay.

Q. Can you tell me what these documents are?

A. I think they are basically the same document, which is -- yes. It says, description of modification. Settlement of issues through ATC proposed mod 9 and U.S. Postal Service issued mod 10 and 11.

Q. This is modification number 11, correct?

A. It should say that somewhere on here.

Q. Top left says modification number M 11.

A. Okay.

Q. On 31, Exhibit 31 at the bottom there is a portion where it says, "shd" -- I presume that is should be -- 7302. And in Exhibit 31A that notation is not there. Do you recognize that handwriting?

A. You are losing me. Where are you?

Q. Like it says, "Shd be 7302." It's at the bottom in handwriting on Exhibit 31.

A. 7302?

Q. Yes.

A. Yeah. I don't know what that is.

Q. Do you recognize the handwriting?

A. No.
Q. Do you know if that was on the document when you signed it?
A. No. In fact, actually the two documents look like they're identical, except they're different.
Q. Is that your signature at the bottom of each exhibit?
A. Yes. And I would suggest that's the identical same document both times, but obviously somebody added something.
Q. Do you recall which one you signed or what -- which one was as it was when you signed it?
A. No.
Q. Your recollection is that the time to complete was extended until July 15th?
A. Correct.
Q. And are these your initials?
A. Those are mine.
Q. In the second paragraph looks like VV, V comma V. Is that your initials?
A. Yeah. I am sorry. I am smiling because I noticed something else. If you look at the two of them, the one that has the slb, shb or whatever, it says 7-15-02. Then it has my initials. Then it

has Jerry Goddard's initials underneath. If you look at the other one, you see now it says 7-16, but the 16 is much heavier and darker than the other numbers on the date. My signature initials are identical. If you look at the two of them you can see they're identical. But Jerry Goddard's signature is totally different. So obviously, somebody was manipulating this. And needless to say, of course, the other changes, the 7-15 on one, where, the other one, it hasn't been changed, and so on.

Q. But, again, your recollection is the date was changed to 7-15-2002, and that's what you agreed to in this modification?

A. Yes.

Q. And do you -- looking at either Exhibit 31 or Exhibit 31 A is there anything about either document that is not as you recall signing the document?

A. Well, I think the most important thing is that some of the things you asked me earlier about the blackmail and the maneuvers that they pulled, that this is one of those documents that is more evidence, evidencing exactly what I was saying. This is the one that has that, by signing this mod

both parties agree that all issues through mod 11, 5-29-02 are mutually agreed to and will not be made a part of any claim arising out of -- related to either contract, bah, bah, bah, bah. And the two contracts are the AMC contract and the P&DC contract.

So, in essence, they made us or tried to force us to sign away our rights to place a claim after the fact. Otherwise they wouldn't do this. I think at the same time we signed another document, and I wrote on that one that they had to commit to make us -- to pay us. And they actually owed us 98,000, but I was willing to settle for 63,000 just to get my money. And that was another document which I don't see here.

Q. But according to this modification number 11, any issues that occurred prior to this time you would not bring -- ATSIC would not bring a claim for those issues, and vice versa, the government would not bring a claim for any of those issues prior to this time frame in modification number 11?

A. Well, I think that, as I recall, when we spoke to our attorney she said we could still place a claim.

Q. Why is that?

A. Because -- and this is not the proper terminology. It was basically that this was tortious interference of business; in other words, we were being blackmailed into signing whatever we signed; otherwise they would not pay us. And as soon as we could prove that, then this would go out the window. We are talking about deleting probably 40 or 50,000 or $60,000 in change orders that they owed us money for. And they basically deleted all of those change orders by this and then subtracted an additional 52,000, I think it was, for the AMC project.

So this was a real coup for them to get this thing signed by us.

Q. What do you recall about the discussions leading up to this modification?

A. I mean I think the only discussion that I recall is that we pretty well did not have any choice, pretty much had no choice, whatsoever, and that we needed to sign whatever they placed in front of us to get some money into the project.

Q. I would like to show you what has been previously marked as Exhibit 9 (indicating).

A. Okay.

Q. Do you recall receiving this document?

A. Not specifically, but I think this was the last one that they sent us before they terminated us, correct.

Q. And this is a third -- in the re section it says, third show cause, Miami, Florida, and this is for the P&DC project. What did you do in response to this letter?

A. We sent back a letter stating -- if you look in here it says -- I got a kick out of this. Failure to present excuses within this time will be considered as an admission of non -- that none exists. I can't imagine the U.S. Government writing -- and this is obviously a form letter. I thought that was hilarious.

But we replied to this and listed all of the things we have accomplished. We listed all the ways that they delayed us; again, as we did in the -- and this is only three for P&DC. I think there was another two or three for AMC, also.

So this was part of their MO to send these. So we replied to it and explained why we were not in default and why they were in default, because they hadn't done this and they hasn't done that. They hadn't paid. They rejected X number of pay recs. They don't allow us to work here. They

haven't signed any of the change orders that we had, because we had new and additional change orders. So we responded to it in that way.

Q. I would like to show you what has been previously marked as Exhibit 21.

A. Okay.

Q. Exhibit 21 is a letter from Greg Warren to Jerry Goddard. It's cc'd to you. Do you recall seeing this document?

A. I believe so.

Q. You saw it at about this time, July 19th, 2002?

A. I believe so.

Q. Last sentence says, we are continuing with our efforts to complete the work and await your response. Would that indicate that ATSIC was still working on this project?

MR. GOLDEN: Objection to form.

THE WITNESS: No. I mean, as I recall, I think you asked me earlier about when I was ever there? It might have been on July 15th or 16th when basically our guy said that they're throwing us off the project. And basically, our people were not allowed to go on site from that date on.

Then I think we had a meeting after that at one point, when he terminated us, that we came back on site, did an inventory and had our equipment to move. But on July 15th or whatever that day was that he sent us that notice, they -- police for the post office would not allow us to enter that site any longer. So we couldn't do any work, obviously, because we were not allowed enter the site.

BY MR. DIERBERG:

Q. Do you know why he would say, on July 19th, we are continuing with our efforts to complete the work?

A. Yeah. For obvious reasons. Because we want to continue, and we are continuing our efforts. But if you won't let us in the door, and you won't pay us, and you can't accept the rain days that he -- we gave them -- the National Weather -- this happened to be -- I don't know how long you have been a Floridian, but I have been a Floridian for almost 40 years now. Sometimes you have a good summer and sometimes you have a bad summer.

This was one of the worst summers on record for rain, and it literally rained every day.

I think it says in here 37 rain days. The interesting thing is that's assuming -- I think the rain -- I learned this on my federal contracts. I think the rain has to be over one inch. Anything over one inch, or five-eighths of an inch or something like that is considered a rain day.

In Florida, the problem is, particularly in the Hialeah area, that they will have a torrential downpour that may drop a half inch in rain in an hour and flood everything, which means if you are doing outside construction work it will flood all your trenches and you can no longer pursue any work. You have to wait. You have to try to cover the trenches and then wait until the rain dissipates. And then it drains. Then that might take two days.

So anybody that lives in Florida or lives in Hialeah we are the first one to attest that Hialeah is the rain capital of Florida.

So they didn't want to take any of that into consideration or the fact that -- and I apologize. I remember -- I think I told you that our pay request was $98,000 or something to that effect? I see here, no, it was actually $110,000. Then they cut it down to 83,000. Then they finally

said, we will give you 63,000. So this was another typical Goddard/Stuhl deal. Here's where we are. Each one of these probably took a week as -- or two, as he visited it, then said no, and sent us a letter. Then we had to send back a letter, and so on and so forth.

So in all of those respects we were continuing to pursue the work, but we couldn't pursue the work on the site because the government wouldn't allow us on site.

Q. Will you look at the attachment to this document, which is like preliminary local climatological data for Miami, Florida. Have you seen this document before, this attachment?

A. I mean I have seen these documents.

Q. Do you know who obtained this information?

A. I think you can obtain it locally in just going on line.

Q. The -- I guess the --

A. In fact, here. You want to obtain it? Go to www.srh.noaa.government slash mia, and there it is.

Q. But do you know who obtained it? Who went to the website, assuming that's the case?

A. Probably Greg. Greg either obtained it

directly or he directed somebody to obtain it.
Q. The third -- let's see. The fourth page of this exhibit indicates that there are 21 days of rain of point 01 inches or more. Is that -- would you agree with that reading? And if you go to the last page it indicates 16 days. If you add the two amounts together you get 37 days.
A. Okay.
Q. So that indicates there were 37 days of rain of point 01 inches or more?
A. I believe so.
Q. Then on the third page, which is the information for June, looks like the 7th column indicates the amount of water, amount of precipitation that day. Does that seem correct to you?
MR. GOLDEN: Objection. Lack of predicate. And form.
THE WITNESS: As I read it here, it seems to be. I assume it's -- I don't know. Is it WTR? I suppose that's the weather for that area? Is that what we are talking about? On top of that is precipitation, PCPN? You are -- you know, as I said, I know what this is, but I am not an expert at reading it, that's for

certain.

BY MR. DIERBERG:

Q. If I were to ask you for each of these days, for example, the 10th of June, what work was being performed that day would you be able to answer that question?

A. I am sorry. Ask me that again?

Q. On June 10th what work was being performed at the project?

A. Well, this was the completion of the project. The primary work that was -- was not completed was mostly the outside work, because as I mentioned earlier, they changed the gates and then they wouldn't let us do the gates at a certain time. Then they had the trenching on one whole north side that they wouldn't give us a change order on.

So the majority of the work was outside. There was still a certain amount of inside work that certainly needed to be done. The control room at this time was still stopped because -- in fact, actually I think at the end they asked us for a change order for the air-conditioning, but then they never approved the change order for the air-conditioning. So there was still no work being

done in the lobby. So it meant you would walk into the lobby of this building and the entire ceiling would be exposed.

And our -- whatever they were, turnstiles were half up but they couldn't be mounted to the ceiling, because there was no ceiling, because there was no air-conditioning, and until they gave somebody the right for air-conditioning -- that would be one vendor, the AC guy. So he could work whether it was raining or not, but he couldn't work if we didn't have a change order.

Q. I am asking the specific days. For example, on June 10th what work was being done?

A. I have no idea.

Q. Or June 21st?

A. As I said, you know, I would have no idea of that. And the odds are even Jose or some of the people that were out there at that point, unless they had a notebook that specifically said what they did on June 10th, would not have an idea.

Q. How did the company monitor the progress on the project in terms of documenting the progress?

A. That would be between Greg and Jose and the other people on site.

Q. And you never saw whatever documentation was produced?
A. No.
Q. Where is the documentation stored now for ATSIC?
A. Whatever documentation that we haven't sent off to either Helen or so on is at my house.
Q. You have documentation related to ATSIC?
A. You know, I think I still have a -- I might have a box. I think almost everything went to Helen or, you know, on to Scott.
Q. You have a box of documents that was not produced to the government?
A. No. No. Nothing relating to the post office. You asked me about ATSIC. So I still have some documents on ATSIC. That's all.
Now as to the post office documents --
Q. Correct.
A. -- everything, to my knowledge, unless there are some documents left in our -- in the old files from ATSIC, or in bonding files or something like that, everything that was in the U.S. Postal Service files has been given to Helen Albee and I believe -- and Scott received it, a copy of that, too.

Q. But then documents that were responsive to our request to ATSIC, if you had documents like that that were ever responsive to the request did you produce any of those documents?

A. I gave everything to Helen Albee when you asked for your documents. And they came down and visited on one or two occasions and we went through those documents at that time.

Q. So you have no other documents that are responsive to our request?

A. Not -- not that I am aware of.

Q. On this Exhibit 21 it indicates a cash flow delay of 24 days. How do you -- do you know how Mr. Warren calculated a cash flow delay of 24 days?

A. No, not specifically. I can -- I can surmise, as I said earlier, that what would happen is we would call Stuhl and say we -- you know, we want you to inspect the site. We have the pay request. Then we would give him the pay request. We would send it to him in advance, of which most of the time he rejected that and said, no, don't send to me in advance. I wouldn't have time to look at it. Send it to me -- hand it to me when I get to the site.

FERNANDEZ & ASSOCIATES
(305) 374-8868

Then our people would walk through the site with him, and then he would say I will get back to you.

So the odds are that the 21 days were either one of two things: At that point Greg was the only one that ever got him to sign off on a document. And Greg was very, very good at being logical to the point where Stuhl started to realize what it -- I am sorry, this is just my own personal opinion -- but what a rogue and an idiot he really was. And he was forced, that he had no rationale left not to sign a document. It didn't affect the fact that he wasn't going to pay us, but I think we probably had a signed document where he approved a pay rec maybe for 110,000 and then went back and changed it to 83. And Greg probably calculated the 21 days based on the day he signed the document for 110,000. That would be my summation, my --

Q. But you don't know for a fact?

A. No, not -- certainly not. Assumption. I guess that's summation. Maybe we can summation this whole thing.

Q. In the interest of time, since you say you have an appointment at 3:00 o'clock, by the way --

A. I don't have to leave at 3:00. I have --

MR. DIERBERG: You have to leave at 3:00. We had no knowledge that he had to leave at 3:00, which we can discuss later on but --

MR. GOLDEN: I don't have a problem, if you are not finished, that we have to conclude it another time.

MR. DIERBERG: Okay. I guess I am thinking, rather than having some of these questions open, in case you think there are some clarifying issues you want to address, I prefer we get those clarifying issues out now, as opposed to later on.

MR. GOLDEN: You mean with regard to the items that you have already gone over?

MR. DIERBERG: Correct.

MR. GOLDEN: Are you finished with your direct?

MR. DIERBERG: No.

MR. GOLDEN: I don't know what other clarifying issues I have.

THE WITNESS: Right.

MR. GOLDEN: Let me suggest that we -- do you have any idea how much longer you think you probably will go?

MR. DIERBERG: I would say half hour,

45 minutes.

MR. GOLDEN: Let's see what we can get through.

MR. DIERBERG: My concern is I don't want to conclude the direct portion of it and then have it open for your cross, basically.

MR. GOLDEN: I am not sure I --

MR. DIERBERG: Basically, the topics we have discussed so far should be covered today. If there are other topics we need to discuss that I need to ask questions about I can ask those later, but just to give you time to complete at least the topics we have discussed so far.

MR. GOLDEN: I am loathe to start my cross until you finish your direct, because whatever I conclude on cross -- do on cross I don't want you to come back later on -- the cross should limit what you then come back on redirect. If I do my cross before you do your -- complete your direct, then it keeps things open in a way that I don't think is suitable.

MR. DIERBERG: If I finish your direct and there are five minutes left and there isn't enough time, then since the rest is just you

coming back or maybe Helen asking some questions, can't we do that over the phone?

MR. GOLDEN: Well, that's -- I am not sure what your concern is.

MR. DIERBERG: The concern is that it's kept open just for your purposes, that our direct is closed, we can't ask any further questions on direct, then you have all the time not only to discuss with Mr. Vento whatever questions you may want to ask, et cetera, it becomes a totally different environment when you have months to look at the deposition to -- the time to get questions about things we have discussed is now --

MR. GOLDEN: We can solve that. I won't discuss with him prior testimony. And I would anticipate that unless you feel like you have to come back, if we can do it by telephone, then -- because if you finish your direct and you believe you probably will be able to do that within the time, look, I am going to try to finish my cross and be done today. And if you can finish in the next half hour or 40 minutes I think we will be done today, because I don't anticipate you will have a huge amount.

I have a few things to go over. I have a few things in response to what you have done today. But if we can get a long way into that, I won't discuss with him the specific questions and specific answers. And let's try to find out some later time in the week even, because we won't have much to do. If you can appear by telephone, we can finish it that way for -- on your cross. But we may not have to get to that. But I am not going to start my cross.

MR. DIERBERG: How much time do you think you need so far?

MR. GOLDEN: I don't know. Probably -- I will say with yours and with mine no more than 25 minutes so far, I think. Maybe less.

MR. DIERBERG: Wait. Ms. Albee, how much time do you need?

MS. ALBEE: I am not going to need anything.

MR. DIERBERG: That gives me 15 minutes to complete. I don't have enough time. Is there no way you can reschedule this?

THE WITNESS: No.

MR. DIERBERG: Is it something you could do and come back?

THE WITNESS: Not today.
MR. GOLDEN: How about --
THE WITNESS: It's not the end of the world if I stay an extra ten or 15 minutes. I have to physically be in my office by 3:45. The problem is it's usually a 20 or 30-minute trip from here and it will be traffic.
MR. GOLDEN: It will be worse. Let's see what we can do.
THE WITNESS: We wasted four minutes already.
BY MR. DIERBERG:
Q. I am going to show you Exhibit 10 and Exhibit 32.
A. Okay.
Q. Exhibit 10 is a letter from Jerry Goddard to Vincent Vento, has a handwritten notation on the bottom, "Delivered by Jay Goddard July 31st, 2002." Do you recognize the handwriting on Exhibit 10?
A. The handwriting on the left I think is Greg Warren's.
Q. You mean on the right.
A. Well, I am sorry. On mine.
Q. You are looking --
A. I am sorry. I am looking at two different

documents.
Q. Yeah.
A. Which document do we look at? They don't ever have --
Q. Exhibit 10. It's on the bottom.
A. I am sorry. I do. All right. Okay.
Q. Exhibit 10, do you recognize the handwriting?
A. Okay. This is 10. No, I don't.
Q. What about on Exhibit 32?
A. I believe that's Greg Warren's.
Q. Do you recall receiving or seeing this document with or without the handwritten notes?
A. No. I don't specifically recall receiving it, but I am sure that this is the day that he terminated us and this is when I said that they had their police officers out there and made us leave the job. On the 15th.
Q. So why -- if it was dated on the 15th, do you know why there is a note on July 31st, 2002?
MR. GOLDEN: Don't speculate. Just tell him what you know.
THE WITNESS: Well, if I can't speculate, then I have no idea.
BY MR. DIERBERG:

Q. Do you know, do you recall any meetings or any events that happened on July 31st, 2002?

A. I believe that what had happened is we were sent this -- faxed this notice, and our people were thrown off the job on the 15th. Greg had tried to create some communication with Jerry Goddard, and I think that this is where Greg tried to meet with him alone or have a beer or talk to him or do something about this whole thing. And at that time I think Goddard just handed him back this letter. And that would make sense, because then this is probably Goddard's handwriting on 10, and this is Greg dated the same day that basically, hey, you know, he told us there is no way. You are out.

So we received the letter on the 15th, we stopped work on the 15th, we were thrown off the job on the 15th.

Q. What's the basis for your belief that it was July 15th?

A. Because that was the day -- the liquidated damages would start the following day. So -- and I explained to you that we were under the assumption that, okay, on the 15th will be the last day without liquidated damages. And then they said,

no, we are not going to do liquidated damages. We got you for enough and you're out.

Q. So between -- your belief is between July 15th and the end of the month ATSIC performed no work on the project?

A. We weren't able to perform any work. We were barred from the facility.

Q. I would like to show you what has been previously marked as Exhibit 22.

A. Okay.

Q. I would like to ask you on Exhibit 22. This is a letter from Greg Warren to Frank Whelan, International Fidelity. There is some handwriting in the upper right-hand corner. Do you recognize that handwriting?

A. No.

Q. The handwriting says, "This letter was not sent because I was told the same day as this letter that Vince canceled the check to Hirst after it was sent overnight to them. It was not agreed by me."

Do you recall cancelling a check to Hirst?

MR. GOLDEN: Objection to relevance.

THE WITNESS: Not -- not specifically, but I am certain that there was a possibility that I did. And we were in negotiation with Hirst,

and they were supposed to supply product first, some software, and then we would send them a check. And I think they ended up sending us -- I -- believe this or not, I think they sent us some kind of bogus software, and we were sending the check out, and then we found out it wasn't real. But I am not certain, honestly. It's been too long.

BY MR. DIERBERG:

Q. Before I asked you about reasons why you thought that Mr. Stuhl and Mr. Goddard were not going to allow you to complete the project. Were there any new issues that came up after modification 11?

A. As I recall, I don't think there were necessarily any new issues. I think the issue was that nothing changed. In essence, Stuhl was not making himself available. We still did not have some of the other mods signed. He had promised they would all be signed like the next day, a bunch of mods for the air-conditioning and everything else. So in essence, they -- they untied your right hand and then they tied your left hand tighter.

So they didn't complete the other part of

the verbal agreement that we had to allow us to pursue the remaining work which would allow us to complete the project.

Q. When was there a verbal agreement?

A. There were, unfortunately, more verbal agreements than there needed to be, but that was probably because Greg is too idealistic and still believed that -- Jerry's word. He already had given up on Stuhl a long time ago; but that Jerry's word meant something.

Q. And who was this verbal agreement between?

A. I believe, because I wasn't really involved in it at that point, that it was mostly Goddard and Greg.

Q. And after modification number 11 were there any other things that the government did to hinder ATSIC's performance in the contract?

A. Well, by doing the things I just said, they didn't have to do anything else. There was almost nothing to the project. But if there is almost nothing left to the project, you want to approve the final three or four change orders, then, in essence, you have condemned the project to failure.

Q. Which change orders occurred after

FERNANDEZ & ASSOCIATES
(305) 374-8868

modification number 11?
    A.   None.
    Q.   Which ones were requested after modification 11?
    A.   They were actually requested before modification 11, but they weren't addressed in modification 11, which is what we were, I think, upset about.  But again, that's conjecture on my part.
         But as I said, the AC -- there were a couple of things.  The window that -- they wanted to a cut out in the window or something like that, but they wouldn't approve the cutout in the window, and we had already bought the window.
    Q.   This occurred after modification number 11?
    A.   Again, just in case you are misunderstanding me, these were issues that were at hand before and after modification 11.  They were committed that they would all be signed the same day or within the next 24 hours of modification 11, which would allow us to complete the project.  They never were signed.  So therefore, they condemned us again to failure because they wouldn't sign the change orders to allow us to do these other things

to finish the job.

Q. Anything else that hindered ATSIC's performance?

A. Nothing other than what we have already discussed several times over, which I think is more than adequate, I might add.

Q. Were there any things aside from government -- you allege the government's hindrance of ATSIC's performance and the weather that delayed the project?

A. No, because everything could be equated to those two things.

MR. DIERBERG: I have no further questions.

CROSS EXAMINATION

BY MR. GOLDEN:

Q. Mr. Vento, on the P&DC project was there ever a substantial completion meeting?

A. I am -- I mean on AMC there was a substantial completion meeting and it was signed off. On AM -- on P&DC I believe that before the substantial completion meeting that there is another meeting that's like the pre-substantial completion meeting, and we had that meeting, which meant that we were down to within 90 something

percent, which was basically the retainage portion of the project. So it's pre-final completion meeting.

Q. Do you know if any portion of the security instrumentation that ATSIC put in the P&DC facility had been tested to see if it worked?

A. Most of the cameras were -- we would test that equipment before we installed it. We would bench test it to make sure it worked, that the only issue would be the infrastructure in between. In other words, if a wire was bad in between this point and that point.

Q. Mr. Dierberg asked you earlier about jobs that ATSIC was doing in the year 2000, and you said that was probably the high point, in terms of the number of jobs that ATSIC was doing. Were most of those jobs completed by 2002 or were you still working on most of those jobs?

A. No. All of those jobs, except for maybe one or two, were completed in 2001.

Q. I direct your attention, please, to Exhibit 51 if you still have that while you're there.

A. Yes.

Q. The accounts receivable aging page, which

I believe is the fourth page.
A. Right.
Q. Looking at the post office job, the fifth page. Post office job. As of June 30, 2001 this is only reflecting, as far as I can see, the AMC job. Is -- do I have that right or is there another post office job listed?
A. That's interesting you point that out, because I noticed that, too, and I was shocked that that's all there was at that moment in time. But the billing would only go on this sheet if they approved it, not when we issued a -- in other words, we issue an AIA statement. So it's not an invoice, and it doesn't go onto our accounting system. If they reject the AIA statement, then it doesn't go on the accounting system.
To go on the accounting system is almost when they write you a check or when they send you a notice that we are going to pay you. Then you have to write an invoice. Then it goes into the Quick Books system, because Quick Books does not have the ability to work through this.
So it may be that there was a lot more owing, but it wasn't at that point or where they had rejected it or something else. I don't have

any better answer than that. That's the only answer I can give you.

Q. So on the exhibits that you have -- that we have seen that shows lists of invoices from ATSIC and then payments by the government, those -- you are saying that those invoices are not necessarily the original amounts requested by ATSIC?

A. Oh, no.

Q. They're the amounts that the government had agreed to pay and, therefore, that's when they go to invoice? Am I --

A. Yeah. In other words, you know, the post office had their own spreadsheets, but their spreadsheets were predicated on their final approval. In other words, it's January 1st. And we do a walk-through with Goddard and say, you owe us $110,000. We hand them an AIA statement, $110,000, and a post office request for payment, 110,000. The post office. Then he walks back to -- or drives back to Orlando. Ten days later he rejects that pay request and says, not -- not going to pay you.

Then we come back and say, why aren't you going to pay us? And he just actually gives all

his reasons. We give all our reasons why. We go back and we review it. We agree to this, we disagree to that. Two more weeks go by. He comes back down. We re-walk the same 110. Now it's June 23rd, and now we are down to $58,000, okay, that he will approve. Now we have already gone a month, and we are desperate for the money, and then he says, approved, $58,000.

When he stamps approval and it goes to Jerry Goddard, then it went on their list as a paid request. So in other words, it would be almost impossible to be late on their list, because their list was after we already had gone -- been beat up for four weeks or six weeks of not getting paid.

Q. So the date on their list is the date they approved it?

A. The date they approved it. Then they have 30 days.

Q. Let me -- and the amount that was on their list was the amount that they approved?

A. That they approved. Not what we are requesting.

Q. Going back to Exhibit 51, which is the one I was asking you about --

A. Right.

Q. And that same -- I believe it's the fifth page. The second of the account receivables aging summary pages it shows an AMC amount that was not current but was beyond current by -- between one and 30 days. Do you know enough about the system to know how far out of the 30-day payment window they were in order for this to show?
A. 30 days?
Q. That is in here. Let me finish. From one to 30. That's here in the one to 30 column.
A. One to 30 column means it's -- it's weird the way they do this, but I think current means anything within what we consider our payment terms, which were ten days. So anything beyond ten days goes to the one to 30. So that goes up to 40 days. So it was somewhere within that 40 days. But again, that would be after, usually, the day that they had approved something.
Q. The payment terms of the post office by contract are 30 days. So this does not mean beyond the 30. It means beyond your normal 10?
A. It means it's up to 40 days. Okay?
Q. Uh-huh.
A. I also don't see on here is -- U.S. Post Office P&DC.

Q. No, it doesn't say that.
A. Which I don't understand.
Q. When doing the exterior for the P&DC project did -- was it necessary to install the gates first or the fencing first?
A. One -- the gates, you have to remove a portion of the fencing, and then you would have to do the construction work to -- the dirt work, put the conduit underneath the ground, repour the driveways, pour the curbs in this. When you did all that, then you would put the gates in place. You would pour slabs for the gates. Then you would put the gate motors in place and then the gates at that time.
Q. On Exhibit 34 Mr. Dierberg was asking you about the fact that, for instance, that the fencing showed that it was still yet to be done and you pointed out that had to do with all of the various gates.
A. Correct.
Q. And the question I am wondering -- was it possible to have the fencing complete until the gates were complete or was the final fencing work only done after the gates were installed?
A. You -- obviously, everything has to be in

place for you to do the fencing. The fencing is the mesh that goes around everything, and it would be the last thing to be done.

Q. Did they -- did -- were you ever -- I am sorry. Was ATSIC ever able to complete all of the gate work at the P&DC project?

A. I believe there was one gate that was not completed. I am not certain. For some reason I feel that there was one gate that they wanted us to do something with and it wasn't complete.

Oh, I know what it is. A truck hit the gate. It backed up into a gate, because it was a gate that was never there before, and they had just added this gate. And it hit the gate and there became a big dispute. We said, we are not going to pay for it. They said, we haven't accepted it yet so it's your problem and it's your gate. We said, no, we put it where you wanted it, and your truck hit it. They said, no, we didn't accept it, so it's your gate until we accept it. And I think that was still an argument at the end.

Q. Do you have a copy of Exhibit 16 in your file there? It would have been -- if not, I will have you look on this one.

A. I don't see it here.

Q. All right. Here is Exhibit 16 that's previously marked. I would like you to look on the first and second column of the -- what was called the final accounting breakdown. To refresh your recollection, you talked earlier about the fact this is a memo you got from Greg Warren.

A. Right.

Q. Greg was talking about how much he thought it would take to complete the project. I would like you to look at the first and second column and ask you whether those are amounts -- let's start with the first column. Are those amounts due to the contractor? And I believe there is a compendium on the next page. It might be easier to look there.

A. In other words, this -- most of -- as an example, turnstile lobby entrance. All turnstiles were installed and delivered, but we had not paid the contractor all the money yet. So that's what was owed there.

Q. Ultimately who paid the contractor there or who was responsible to pay the contractor? You? Or after it got turned over to TriState, TriState? Do you know who paid the contractor or who was responsible to pay the contractor?

A. I don't think anyone paid the contractor. I think that all of the post office's 600,000 or $800,000 bill after the fact did not include paying any of these venders unless the equipment wasn't on site -- unless all the equipment was on site.
Q. If you could look to the next page, please.
A. All right.
Q. One more. Next to the last. We are on the --
A. Last page (indicating).
Q. Looking on I think the third page overall but marked page 2 on the right, there is a list in the first column of manufacturers and, presumably, amounts that Greg thought were due to them or would be due to them to finish the contract.
A. Correct.
Q. Okay. And as far as you know, did the government pay all of those amounts?
A. I don't think the government paid any of these amounts.
Q. Okay. And so those amounts remained ATSIC's responsibility?
A. Correct.
Q. The second column --

A. All right.
Q. Go ahead and look at it to see what that is and then tell me who was responsible for those expenses.
A. I believe, for the most part -- funny thing. It says manufacturer's contractor and the other says material. But I think that's really your man -- the effective labor days. That would be the material required by ATSIC to complete that part. In other words, if there was electrical work we might need to buy -- according to this, $1,200 remaining to buy all the conduit for the job. And $500 miscellaneous, which meant he has no idea but he just plugged in a number.
The window was purchased and it was sitting there, but it's probably $300 for a frame or caulking material to put around the window.
Q. Okay. We understand that.
A. Okay.
Q. Even if someone else tries to, we will say, come in to complete the job on that day, right, with this work remaining to be done, how much did Greg Warren calculate would have been required to complete the job?
A. According to this, $85,000.

Q. Let's look at the total, not just that one column.

A. I am sorry. These two would be 85,000.

MR. DIERBERG: I am going to object. Lack of predicate.

THE WITNESS: Okay. Whatever that means.

BY MR. GOLDEN:

Q. Looking at Greg's memo or the last page can you tell me how much Greg Warren thought it was going to cost to complete the job?

A. Complete the entire job, he estimated to be $327,717.

Q. How much was due to you under the contract from the government?

A. 264,080.

Q. What would have been Advanced Technology's net loss if the project had been completed at that time based on these factors?

A. Well, based on paying every one of those vendors that was due to be paid, everything that was due to be paid, then, without any negotiation, we would have lost $174,486.

Q. You testified earlier you thought you could have negotiated that to a lower figure?

A. Correct.

Q. Do you understand how, then, why it took the government over $900,000 to finish this job?

MR. DIERBERG: Objection. Lack of predicate.

THE WITNESS: No. I am --

BY MR. GOLDEN:

Q. If you don't know, you don't know.

A. Honestly, I -- let me add one thing I think is very important, and that is that of that $327,000, only, as I said, 85,000 was required for ATC -- ATSIC -- I have to get it right -- to physically complete the job in total.

The balance of that was all money that was due to the vendors that have previously supplied equipment that weren't paid in full. Like Hirst was several hundred thousand dollars but we still owed them 45. We owed Vicon fifty something and so on. So I have -- it's a joke in Dade County about this project. The only project it cost more to finish after than it cost to do it from scratch.

Q. Let me take you back to your discussion about the fact that some of -- in fact, most of the employees you had on the job hadn't been approved for security purposes. The -- I want to make sure I understood what you said correctly. After it

FERNANDEZ & ASSOCIATES
(305) 374-8868

came back that only a very few employees were approved in the first batch -- I think you said two employees were approved?

A. Correct.

Q. You then indicated that they asked you to obtain different employees.

A. Right.

Q. Who asked you to do that?

A. It wasn't Goddard or Stuhl. It was somebody else at the post office that was in charge of that group.

Q. It wasn't Grzymala?

A. No, it wasn't. It was somebody else. And then we went back to Goddard and said, look, you know, we can't do this project, and you either need to give us more time, or you need to do this, or you need to kick this --

Q. I am not concerned about that.

A. Anyway, that's what happened.

Q. So all the employees that you were planning to hire and ultimately they let you use, did they all have all the proper paperwork? Did you have I-9's on all of these employees?

A. After -- I mean all of them may have gone around one time. In other words, they might have

been missing -- like the form didn't require a green card, because -- suppose the government doesn't relate to the fact that this is South Florida, and it's the same form you used in Podunk, Iowa. Then they decided they needed green cards. Then they required that everybody come back and -- whoever needed a green card. Then they also required a birth certificate. But they did not require a birth certificate the first time. But when it was all over, they only approved six workers.

Q. For the unapproved workers did you have something to show that they were authorized to work in the United States?

A. Yes.

Q. I mean they were either citizens, residents or had green cards?

A. Correct.

Q. Was there any implication that they didn't want you to choose people with Latin last names or Hispanic names?

A. Only for convenience.

Q. Did you -- was this discriminatory to you?

A. Well, it's not part of this, but it was very discriminatory, and it was very black and

white that it was discriminatory. The post office is the last of the good old boy networks in South Florida.

Q. Did Mr. Stuhl want TriState from the start, in your opinion?

A. From the start, he wanted Casi Rusco. TriState came in when I think he realized that he was able to get us out. And the minute he thought he could get us out, then he wanted TriState in there. And TriState walked AMC months before we were terminated.

Q. Was there any view on your part that Mr. Stuhl was trying to steer work to someone he was friendly with?

A. There was no doubt that he was friendly to them. There was no doubt they went out drinking together. There was no doubt that they went out to dinners together. I think he couldn't stand us. And the minute he saw that he had an opportunity to bring in somebody he liked, and that he could work with -- and maybe ultimately that's with your 900,000 came in.

Now he had a contractor that they could go out and have a drink and discuss what was going to happen next, and all of a sudden this project took

on a life of its own all over again.
MR. GOLDEN: I am sorry. I don't have extra copies of this, but I sent them to you before so I know you're familiar with them (indicating).
MR. DIERBERG: Right.
BY MR. GOLDEN:
Q. Are you familiar with a Joseph Errickson?
A. I don't think so.
Q. Okay. You don't remember a Joseph Errickson in relation to anything to do with the AMC or the P&DC jobs?
A. No. Not that I recall. Who did he work for?
Q. (Shakes head).
A. Don't know. Okay.
Q. You said earlier that Mr. Stuhl had a vested interest in TriState and I just want to clarify what you meant by that. Are you implying he had an ownership interest in TriState?
A. I -- I doubt he would be that foolish.
Q. And do you have any idea whether Mr. Stuhl was given any money above or below the table for work that he had steered to TriState?
A. I have no knowledge of anything like that.

Only opinions.

Q. You said earlier that the offer verbally that you received from TriState to complete the job in May was between 250,000 and $280,000?

A. Correct.

Q. Do you know why a couple of months later they charged the government approximately $345,000 on the contract to do the same thing?

A. Because they could.

Q. Do you know whether, if TriState had finished the project, it -- they would have taken over the warranty responsibilities for the project? If they had finished the project for Advanced Technology?

A. Yes. That was part of our agreement.

Q. Showing you what has been previously marked Exhibit 31A, modification number 11, one of the two modification number 11 copies that we have.

A. Uh-huh.

Q. Do you know who made the date changes in -- excuse me -- in the paragraph in the middle in which there are some things crossed out?

A. No, I don't, but I think -- although I don't understand the 16. This one says the 16. That's definitely fraudulent, because you can see

the difference. That -- that color -- this isn't an original, but see the thickness? Remember the only other business I ever worked in was the copy machine business. That was the APECO. So you learn these things right away. I used to testify in court. That was done after the fact. The 16 is a change. The 7-15-02 up here is a change, and that is a change. The original --

Q. The "that" you just said?

A. I am sorry. On the far side there is another date, completion, "completed the project by." Then over here it says 15 or -- of. Then liquidated damages of $100 to be reinstated beginning on -- then over here it says 7-16-02.

So I would think I wrote the 7 and the slash. I did not write the 16.

I wrote the other one where it says 15, which is in the same handwriting. Then there is another slash, and then there is an 02, and that is my handwriting and it's my initials.

The interesting thing is Jerry Goddard's signature here, which is different than on the other page, okay, is also a much thicker pen and parallels the other changes on here.

Q. Looking at modification number 11, what

was the penalty Advanced Technology would have had if it did not finish by July either 15th or 16th? It's not clear from these documents.
A. Okay. We would pay liquidated damages of $100 a day. It said liquidated damages, $100, to be reinstated. Which confirms what I told you. What they never showed in the contract is they had always charged us liquidated damages from January, and that's how they negotiated out all of our change orders. Then they threatened to reinstate them on July 15th.
Q. Does it say if you don't -- that if Advanced Technology doesn't finish by that day that it can be terminated for cause?
A. No.
Q. Did you anticipate that Advanced technology could be terminated for cause, as opposed to being hit for liquidated damages?
A. No. They would have kept paying the liquidated -- we assumed we would pay liquidated damages until TriState was ready to take over the job. And our goal was we had to get it finished before TriState would take over the job. That was the race.
Q. Was modification number 11 presented by

the postal service in good faith, in your opinion?
A. I don't think anything the postal service did relating to P&DC in 2002 was done in good faith, and I don't think half of 2001 anything they did on AMC and P&DC was done in good faith. I think at that point they had their own agenda.
Q. Mr. Dierberg earlier asked you the reasons for not completing after the modification number 11 had been signed and you -- and he asked you was it the rain and was it -- and you indicated it was failure to sign the change orders. And you also indicated earlier that the other -- that any other reason is set forth in your -- I am sorry, in Exhibit 21, which is Mr. Warren's letter of July 19th. As far as you are aware, are all of the reasons set forth in Mr. Warren's letter of July 19th accurate? Did you understand them to have been accurate at that time?
A. You have got two different things. What Greg Warren is saying on -- oh, yeah. July 19th. Actually, I think it's more than this. I think he got tired of writing. But I think he does address all of the things that we said: The items that -- all the change orders that were not still not signed, the reduction in pay recs, again, and so

on.

MR. GOLDEN: Off the record for a second.

(Discussion off the record)

BY MR. GOLDEN:

Q. Back on. I handed you a one-page document on what appears to be the AMC contract.

A. Correct.

Q. It says, "Modification number 2." Let me know when you've had a chance to review it.

A. No. I know this document.

Q. Okay. Can you tell me what the purpose of this document was?

A. This was basically a final settlement agreement that Greg Warren reached with Jerry Goddard on converting the termination to a termination for convenience or mutual termination, and this was the amount we settled on at the end, not the amount that they asked for in the beginning.

Q. And does it say how this document affects the P&DC contract? I point your attention to the sentence just below the list of numbers.

A. Okay. The sentence just below the list of numbers -- there are two things. Total amount to be withheld from GMF, which is the P&DC project,

$52,137. Then underneath that, with the extension of 271 calendar days for revised completion date of 12-19-02.

Q. Okay. Was it your understanding, based on this document, that Advanced Technology would ever have to pay the $52,000 -- $52,137 out of its own pocket?

A. No.

Q. How did you understand that $52,000 would be paid or repaid to the government, if at all?

A. Throughout the change orders that -- there was, at that time, maybe $75,000 in change orders and extra work that they wanted us to do on the other project. So the goal -- and it's been awhile, so I don't know my numbers, but it was basically, look, this is a good deal where, according to Greg, we are getting out of them sticking a knife in our back. We are protecting the bonding company and --

Q. Were there comments --

A. Sorry.

Q. -- based on how that money was going to be paid back?

A. Through additional work and change orders that we were going to be awarded in the other

contract.

Q. Now it says it's going to be withheld from -- does that mean when you were receiving the money on the change orders they would withhold that amount for whatever you were supposed to receive?

A. They would withhold that amount at the end of the contract based on what was remaining on the contract, but the contract was supposed to be increased by so much. What they actually did, which isn't in here anywhere, but it's in probably a memo from -- after we signed this they went to 75 percent retainage. In other words, if we bill them a hundred dollars they would keep $75 to pay this down. And that wasn't the agreement. And that was one of the things that Greg had released when he got there.

Q. What is the date of completion for the P&DC contract based on the agreement here?

A. I am sorry. What?

Q. What is the date of --

A. 12-19-02.

Q. Okay. What date was this agreement signed?

A. Well, that's interesting, because it doesn't have any date of signature. And according

to this, Jerry Goddard signed it on June 20th. And I don't believe that's correct. But I don't know.

Q. Do you actually know what date Jerry Goddard signed it?

A. No, and I don't know what date I signed it.

Q. Do you know whether this was signed before, or after, or on the same day as Exhibit 31 and 31A?

A. Well, my assumption is that it was.

Q. It was what?

A. It was signed. In other words, they were all signed at the same time. But obviously, we didn't sign three or four of them. We only signed two. The rest of them just kind of appeared.

Q. Okay. Thank you.

If we could mark this the next exhibit number?

THE REPORTER: 53.

(Exhibit 53 is marked.)

BY MR. GOLDEN:

Q. Next we have a January 18, 2002 letter on company letterhead from John Costanzo to Joseph Stuhl and attachments to that letter. Just take a quick look to refresh your memory of what that

letter might be. You don't need to worry about the attachments. I won't ask you about them. Mr. Dierberg has to worry about that.

What was Mr. Costanzo's responsibility with regard to this job in January of 2002?

A. For a brief period of time he took over the executive project management position.

Q. In response to Mr. Stuhl's items, Mr. Costanzo says, in -- item 3 starts by saying, "Your comments to this item are contradictory." Then he goes on to describe some technical things, and at the end of item 3 he says, "Your approval on this project is requested and has a direct bearing on the critical path of this project."

Do you know whether Mr. Stuhl ever approved this change or any other change that would solve the issue here?

A. He approved -- you know, I have to go through each one individually, and this one is a really long one, but I noticed in here the AC that I was talking to you about earlier was here and never approved. Casters on the console. You put them on. Then they finally -- and they said, take those off. Those are stupid. Why would you want casters at any -- on a console if it's mounted or

against the wall? But still made a big issue of it.

So this was the conduit. And I think the issue with the fiber, that was a substantial change order. And ultimately I believe that this was one of the ones that was blackmailed out during the mod 11 that we were forced to do, but I don't think we ever got a chance to do it. They terminated us before then.

Q. You talked a minute ago about the air-conditioning. Was that item 5 that you're relating to?

A. Yeah.

Q. Then?

A. The casters and console were 4. Then a review --

Q. Then there is -- below item 6 there is reference to a letter. And it says at the end of the paragraph -- not item 6, paragraph, just below that: "This approval is also affecting the critical path," it says at the end.

Was that another item that affected how quickly Advanced Technology could complete the job?

A. Well, the major one was item 3, because these were all of Stuhl's errors and miscalculating

all of the conduit runs and the different corrections that would need to be made to have it done.

Q. Thank you. Let's mark this, please, Exhibit 54.

(Exhibit 54 is marked.)

THE WITNESS: Okay.

BY MR. GOLDEN:

Q. Let me direct your attention on this letter to -- from Gail Scopinich to -- let me first say, who was Gail Scopinich in January of 2002?

A. She was our attorney.

Q. So she was authorized to write this letter on behalf of Advanced Technology?

A. Yes.

Q. Okay. At the paragraph at the bottom of page 1 on this letter, dated July -- I am sorry, January 11, 2002 it indicates the difficulties with Mr. Stuhl and the demand Mr. Stuhl be removed, reading the second sentence.

Is this the removal demand you alluded to earlier?

A. No. We demanded long before this. This is just our attorney's addition of that demand. We asked for his removal almost a year prior to this.

Q. And I gather Mr. Stuhl was never removed during the period of time you were on this contract?

A. Correct.

Q. If we could mark this number 55, please.

(Exhibit 55 is marked.)

BY MR. GOLDEN:

Q. I have handed you a three-page letter -- I am sorry, four-page letter from Mr. Stuhl to Jerry Goddard called, "Field investigation report," dated February 8, 2002. I just want to ask you questions regarding the first couple of items, the ones listed as item 1 and item 2. The end of item 1 says that there is an error in the drawings and that ATC is to provide us, meaning the postal service, with a cost for installation of these two conduits. Was this change supposed to be at postal service expense or at Advanced Technology expense?

A. At the postal service expense.

Q. Do you know whether this was approved timely or was left hanging out there until at least May?

A. It was another one left hanging out there and not approved. And I have to say that either it was not approved or we submitted it -- and that was

one of those blackmail items in number 11 that we were forced to basically give them all these couple of thousand foot of conduit and retrenching for free.

Q. With regard to item 2, it apparently talks about concrete tire stops and so forth, at the end of item 2, second page, and it requests ATC to provide the postal service with the cost to do a certain portion of work. Was that supposed to be done at the postal service expense or at Advanced Technology expense?

A. No. Postal service expense.

Q. Did the post office ever approve the payment for that?

A. I am not -- well, I mean they never approved the payment for any change order that increased our project, so if it wasn't in mod 11, where you basically wiped out a lot of these, then, no, it was never approved. As I said, there was never a mod approved that made us any money.

Q. Item number 3, the last sentence, "By copy of this report we request that ATC stop work on the console until we have received all of the required drawings and information for this room."

Do you know if ATC --

A. Actually it's ATSIC.
Q. -- ATSIC was ever given authority to begin work on the console again?
A. No. And I want to clarify that the stop work and receive required drawings were not from ATSIC. It was from the post office. They needed to do the drawings.
Q. If we could mark that as Exhibit 56, please.
(Exhibit 56 is marked.)
MR. GOLDEN: What date is on the letter?
THE REPORTER: February 8th, 2002.
MR. DIERBERG: We marked that 55, didn't we? Do you have copy of that?
MR. GOLDEN: No. I handed it to you.
MR. DIERBERG: May I see it?
THE WITNESS: (Indicating).
MR. GOLDEN: I know I had two copies. Yeah. It's right here. No. It's in your hand.
MR. DIERBERG: This one? This is 56.
THE WITNESS: One below is SEC.
MR. GOLDEN: You got a number. That's 56. Scopinich is 55. I missed one. Figure out which one. January 18th is Costanzo to Stuhl.

MR. DIERBERG: 53.

MR. GOLDEN: That's 54. 53 is AMC mod number 2.

MR. DIERBERG: That's what I -- okay. I will straighten it out later.

MR. GOLDEN: Are you sure?

MR. DIERBERG: We can straighten it out later.

MR. GOLDEN: Okay.

MR. DIERBERG: This is Exhibit 57.

MR. GOLDEN: This will be 57, yes. I like to identify them first, but yes.

BY MR. GOLDEN:

Q. I have handed you a one-page letter, dated February 11, 2002, from you to the postal service, addressed, "Dear Mr. Goddard." You indicate in the second full paragraph -- I am sorry. Let me finish letting you read it.

A. Okay.

Q. You indicate in the first sentence of the second paragraph that you have been waiting for signed change orders for, in some cases, over ten months. Well, was that true as of February 11th of 2002?

A. Yes.

Q. And you indicated earlier that those change orders were never signed?
A. They were never approved, other than whatever they eliminated in mod 11.
Q. But mod 11 came -- it was discussed in May and actually approved in June, correct?
A. Correct.
Q. So it was well over a year that you had change orders outstanding?
A. Yes. Right. Which -- and all of those change orders precluded us from completing the project.
MR. GOLDEN: Hand that to the reporter so she can mark is Exhibit 57.
THE WITNESS: Just reminded me of something else but we have more than enough now.
(Exhibit 57 is marked.)
THE WITNESS: Okay.
BY MR. GOLDEN:
Q. Rather than -- sorry. I have given you a two-page letter, dated February 11, 2002, to Joseph Stuhl from you. Did this letter set forth the outstanding issues as of that date?
A. Certainly some of the major issues.

Q. Were any of these issues resolved prior to modification 11?
A. No. In fact, January 2nd, which was the completion date, Goddard used that as the date to begin liquidated damages. So the next day he started charging us liquidated damages, and that was negotiated in mod 11 --
Q. Was that --
A. -- which isn't shown anywhere but that's what happened.
Q. Was that despite the fact that you had been waiting in January as of -- nine months for some change orders that some had not been approved?
A. Right. And also the four change orders here were never approved. So March 31st came and went, obviously, without a completion, because you can't complete a project if -- you can't complete the change orders if nobody signed for them.
MR. GOLDEN: Mark that Exhibit 58, please.
(Exhibit 58 is marked.)
THE WITNESS: Okay.
BY MR. GOLDEN:
Q. Rather than belabor the same issues that you have discussed before, this indicates that it is the company's and your response to the ten-day

notice of intent to terminate.
A. Right.
Q. And were all of the items you listed as being problems in this letter accurate as of the date you signed the letter?
A. Yes, they were.
MR. GOLDEN: Mark that as Exhibit 59, please.
(Exhibit 59 is marked.)
BY MR. GOLDEN:
Q. Are there any other issues regarding the way the project was handled or the way that Advanced Technology was treated by Goddard or Stuhl that we have not asked you about that bear on Advanced Technology's ability to have completed the project?
A. I don't know if it -- specifically to complete the project, but in reading those documents, one of the other things that reminded me is that on the modification, where we paid a certain amount to the post office for the AMC project to be completed, it says on there, Joseph Stuhl, $10,000 for engineering. His first request for engineering fees on a job that was 98 percent complete was $39,000. And I said that it would be

FERNANDEZ & ASSOCIATES
(305) 374-8868

a cold day in hell that I would ever sign that document, and they finally renegotiated it down.

I am sure that they fed him money some other way, but they renegotiated it down to $10,000. So he actually charged the post office $39,000 after we were 98 percent completed with the project -- and it was running -- for him to come in and do that.

Additionally, our -- I saw on there that when we were terminated from that project that our attorney argued the fact that there should have been a cure date. In other words, the reason we were terminated was something to do with documentation or some software issues that they feel were not working correctly. And rather than saying, okay, you are completed with this job but you have a software issue, so we need you to cure this, we are giving you a notice to cure within ten days, or 72 hours or, you know, in writing, they terminated us.

Q. Okay. I have one more document to ask you about that I wasn't planning, so give me one second here.

Off the record.

(Discussion off the record).

MR. GOLDEN: I found it. It's Exhibit 29.
Back on the record.
BY MR. GOLDEN:
Q. Mr. Vento, I have placed in front of you a document previously marked Exhibit 29 entitled, "Agreement of settlement between the parties."
A. Uh-huh.
Q. It appears to be dated by you June 11, 2002. Was this in fact your signature?
A. Yes.
Q. Did you agree to this agreement -- to this settlement?
A. Yes.
Q. Were you present when Mr. Goddard signed this document?
A. No.
MR. GOLDEN: That's all I have. Thank you. I believe we will make a copy for this depo. We will do that.

REDIRECT EXAMINATION

BY MR. DIERBERG:
Q. On Exhibit 29 did you say you signed this document?
A. You mean on this document? Yes.
Q. That's your signature?

A. That looks like my signature.
Q. And earlier you were speaking about notice to cure, that there was one thing remaining and you were supposed to be given a notice to cure. You are speaking of the AMC project, correct?
A. Correct.
Q. You also believe that you -- actually you have already paid liquidated damages starting in January of 2002; is that correct?
A. Yeah. They were settled in the mod 11.
Q. Is that reflected in modification number 11?
A. What was reflected in mod -- no. Just like a lot of things weren't. Modification 11 doesn't say what any of the changes are. It just says anything from this date is settled with this amount.
Q. Is there any document that reflects that you paid liquidated damages starting in January of 2002?
A. I think if you look at some of their -- I am not certain, but I believe that Goddard would have listed liquidated damages on the pay recs that came back to us. I think the definitive point is -- whether he did or he didn't, it says in the

settlement agreement that liquidated damages will again continue or will resume as of this date. Well, they can't resume unless they have already been in existence. So he had charged us liquidated damages, and then he applied those monies against the change orders that we requested, some of the change orders.

MR. DIERBERG: I have no further questions.

MR. GOLDEN: Helen, do you have any questions?

MS. ALBEE: No, I don't.

THE REPORTER: Ms. Albee, you are ordering?

MS. ALBEE: Right.

MR. GOLDEN: Give us a second off the record.

(Discussion off the record)

MR. DIERBERG: Back on the record.

MR. GOLDEN: After she --

THE WITNESS: I have the right to read it.

MR. GOLDEN: Do you want to read it?

THE WITNESS: I forgot about that. That's right. I remember that.

MR. GOLDEN: Do you want to read it before

she says it's --

THE WITNESS: Even if she didn't invite me to lunch, I trust her.

MR. GOLDEN: All right. He's going to waive.

(Thereupon, the witness waived the reading and signing of the deposition and the taking of the deposition was concluded at 3:10 p.m.)

CERTIFICATE OF OATH

STATE OF FLORIDA )
) SS
COUNTY OF BROWARD )

I, Lois E. Guffey, RDR, CRR, and Notary Public in and for the State of Florida at Large, do hereby certify that the witness, VINCENT VENTO, personally appeared before me and was duly sworn

Witness by hand and official seal this 16th of January, 2006, in the City of Cooper City, County of Broward, State of Florida.

Lois E. Guffey, RDR, Notary
Public, State of Florida

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA )
) SS
COUNTY OF BROWARD )

I, Lois E. Guffey, RDR, CRR, do hereby certify that I was authorized to and did stenographically report the deposition of VINCENT VENTO, the witness herein; that a review of the transcript was not requested; that the foregoing pages, number from 1 through 171, inclusive, is a true and complete record of my stenographic notes of the deposition by said witness; and that this computer-assisted transcript was prepared under my supervision.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action.

DATED at Cooper City, Broward County, Florida, this 16th of January, 2006.

LOIS E. GUFFEY, RDR, CRR
Certified Realtime Reporter