IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ADVANCED TECHNOLOGY SYSTEMS
INTEGRATORS CORP. and
INTERNATIONAL FIDELITY
INSURANCE COMPANY,

Plaintiffs,

vs. No. 13-1953C
(Senior Judge Margolis)

THE UNITED STATES,

Defendant.

* * * * * * * * * * * * * * * * * * *

DEPOSITION OF: RICHARD T. SEXTON

DATE TAKEN: September 21, 2005

TIME: 8:55 A.M.

PLACE: 501 West Church Street
Suite 300
Orlando, Florida

REPORTED BY: TAMARA L. GULKER, RPR
and NOTARY PUBLIC

* * * * * * * * * * * * * * * * * * *

APPEARANCES:

HELEN H. ALBEE, ESQUIRE
Henrichsen Siegel, PLLC
1648 Osceola Street
Jacksonville, Florida 32204

On behalf of the Plaintiffs

MICHAEL J. DIERBERG, ESQUIRE
U.S. Department of Justice
Civil Division
1100 L Street, Northwest, 8th Floor
Washington, D.C. 20530

On behalf of the Defendant

- - - - -

EXAMINATION INDEX

TESTIMONY OF RICHARD T. SEXTON
DIRECT BY MR. DIERBERG 4

EXHIBIT INDEX

| Defendant's | | |
|---|---|---|
| 1 | Telephone Conversation Memo, 4/10/02 | 19 |
| 2 | Telephone Conversation Memo, IFIC, 4/10/02 | 22 |
| 3 | E-mail to Mr. Whelan from Mr. Sexton, 4/10/02 | 24 |
| 4 | Fax to Mr. Sexton from Mr. Warren, 4/16/02 | 25 |
| 5 | Letter to Mr. Vento from Mr. Goddard, 5/1/02 | 28 |
| 6 | Letter to Indemnitors from Mr. Whelan, 6/6/02 | 34 |
| 7 | Letter to Mr. Goddard from Mr. Sexton, 6/14/02 | 36 |
| 8 | Letter to Mr. Goddard from Mr. Sexton, 6/14/02 | 36 |
| 9 | Letter to Mr. Vento from Mr. Goddard, 7/15/02 | 39 |
| 10 | Letter to Mr. Vento from Mr. Goddard, 7/15/02 | 40 |
| 11 | Letter to Mr. Warren from Mr. Sexton, 8/13/02 | 42 |
| 12 | Letter to Mr. Vento from Mr. Goddard, 8/16/02 | 45 |

CERTIFICATE OF OATH 53

CERTIFICATE OF REPORTER 54

ERRATA SHEET 55

P R O C E E D I N G S

THEREUPON,

RICHARD T. SEXTON,

having first been duly sworn by the reporter to tell the truth, the whole truth, and nothing but the truth, testified as follows:

MR. DIERBERG: This is Michael Dierberg. I'm an attorney with the Department of Justice, and we are here for the deposition of Richard Sexton in the case of Advanced Technology Systems Integrators Corp. versus the United States.

Helen, would you introduce yourself?

MS. ALBEE: Yes. I'm Helen Albee with Henrichsen Siegel, and I represent International Fidelity Insurance Company and Advanced Technology.

DIRECT EXAMINATION

BY MR. DIERBERG:

Q. Mr. Sexton, have you been deposed before?

A. Yes, sir.

Q. How many times?

A. Three or four. I'm not sure specifically.

Q. Have you been deposed in connection with Advanced Technology Systems Integrators Corp.?

A. No, sir.

Q. If you don't understand a question that I ask,

just ask me to repeat the question, and I can repeat it for you.
What have you done to prepare for this deposition?
A. I had my secretary pull the files, and I spent maybe half an hour last night just briefly seeing what was there.
Q. So you looked at some documents?
A. Yes, sir.
Q. Did any of those documents refresh your recollection?
A. To a certain degree, depending on what the issue is.
Q. And did you bring those documents with you?
A. Yes, sir.
Q. Have you been asked to be an expert in this case?
A. No, sir.
Q. Have you been asked to perform any work in connection with this case after the termination of the contract?
A. My office has, yes, sir.
Q. And who in your office?
A. John Sury.
Q. And what is his role or what is he going to do, or what has he been doing in this?

A. He's been in the process of assisting Helen in connection with the review of documents.
Q. And have you assisted him in any way in the review of these documents?
A. I reviewed some of his work product, but I have not looked at the documents or gotten too involved.
Q. Did he ask you to review the work product, or how did you become involved in reviewing his work product?
A. Our process is when he formulates some work product that he use a peer review in connection with some of the work product that ultimately goes out or is prepared based on source documentation.
Q. When you say peer review, what does that mean?
A. He requested that I take a look at something in connection with his methodology and analysis of some files that he's received.
Q. You're not his superior, are you?
A. Yes, I am.
Q. Do you know why John Sury was asked to do this rather than you?
MS. ALBEE: Objection. Go ahead.
A. Because I asked him to get involved in that.
BY MR. DIERBERG:
Q. And why did you ask him to get involved?
A. I don't specifically know the reasons why. It

could have been workload. It could have been I was unavailable to review the documents. I'm not 100 percent sure why that -- how that transition happened.

Q. And have you also brought a copy of his work product that you reviewed?

A. No, sir.

Q. What is his work product that he is --

MS. ALBEE: Objection.

A. I don't recall. All I know is at some point in time I reviewed some of his work product post-receipt of documentation from the government, but what that is, I don't recall.

BY MR. DIERBERG:

Q. You don't recall the subject or what it was about?

A. It was in connection with the damages sustained by the government and the documentation that they had provided during the course of discovery, I assume.

Q. When did you review this?

A. It was the early part of this year.

Q. And what feedback did you provide to him?

A. I don't recall.

Q. What's your educational background?

A. I have a BA in economics from Binghamton State University in New York.

Q. Do you have an engineering background?
A. No, sir.
Q. And that was your last degree, was a BA?
A. Correct.
Q. What was your work experience prior to joining Lovett Silverman?
A. I worked for a mechanical contractor in New York in the field during the construction of a cogeneration plant, assisting the project manager. Post that project I moved into their office and assisted in pricing change orders, reviewing documents, and assisting in the preparation of a claim against the contractor on that project.
Q. How long did that last, that particular -- I'm sorry, who were you working for at the time?
A. The Norman Company.
Q. And how long did you work for Norman?
A. From the summer of 1990 until December of 1991.
Q. What did you do after leaving Norman?
A. I was retained or was hired by Lovett Silverman.
Q. What was your initial role at Lovett Silverman?
A. Lovett Silverman was the expert retained to assist the Norman Company in connection with the claim, so I bridged the gap between Norman and Lovett Silverman, assisting them on that claim. I initially was involved, in

addition to that, with surety assignments, CPM scheduling, and have learned as I've gone in connection with the disciplines that Lovett Silverman performs.

Q. Okay. Since, I guess, December of 1991 or whenever you started with Lovett Silverman, can you tell me what activities or what various roles you've had or things you've done at Lovett Silverman?

A. In connection with surety work, we have -- I have performed performance bond claim analysis and review, analysis of payment bond claims, project site review, reletting of projects and managing the completion of the work, reviewing contractors' records when they have requested financing, and a multitude of different roles in connection with surety bond claim issues. In addition I develop and prepare CPM schedules. We work for contractors, owners, and developers in preparing schedules, reviewing schedules, providing feedback on CPM schedules. In addition I work in preparing and reviewing affirmative claims, whether it be productivity claims, delay claims, acceleration claims, manpower issues, etc.

Q. These affirmative claims are claims against the company hiring the contractor?

A. In some cases. In some cases we have a claim and we work for the owner in reviewing the claim submitted by the contractor. It depends on the matter.

Q. How much of your work is done for sureties?
A. Probably about 60 percent, plus or minus.
Q. What about the remaining part?
A. Probably split between CPM scheduling and claims work, but that varies year to year.
Q. I'm sorry, split between CPM and what?
A. Claims.
Q. Okay. In connection with a performance bond claim, what do you typically do? Is this a standard procedure of some process you follow?
A. It depends on what the client asks for. Every client is different in what they want us to do.
Q. Do you typically have an engagement letter when you start to work?
A. No.
Q. Do you do a lot of work for International Fidelity?
A. We used to do a fair amount.
Q. In 2002 how much of your business was with International Fidelity?
A. I have no idea. I couldn't even -- I guess I'd have to look at my files to see what percentage of our files were International versus somebody else.
Q. In a typical situation where you're hired by a surety, do they hire you for a specific purpose or do you

have a general retainer, some general --
A. I don't understand the question.
Q. When you are hired, are you hired for specific limited purposes?
A. It depends on the surety and it depends on the case.
Q. When were you engaged for Advanced Technology?
A. I believe it was February 2002.
Q. And who contacted you?
A. Frank Whelan.
Q. And did he give you a specific purpose?
A. He requested that we meet with the principal and meet with -- attempt to meet with the obligee and get a look at the project.
Q. When you say principal, who are you referring to?
A. ATC.
Q. And when you were engaged by International Fidelity, was there an engagement letter?
A. I don't recall if there was a specific letter of engagement.
Q. I mean, you were engaged. Was this over the phone or letter or --
A. I believe it was a phone call with "Here's a matter that we have down in the Miami area, and we'll get you the information that we have on file in connection with

it." I don't know what prompted this specific issue, whether it was a letter from the obligee or not. I'm not really sure.

Q. Had you done any work for International Fidelity before that?

A. In connection with this job?

Q. No.

A. Yes.

Q. How many times had you done work for International Fidelity before?

A. Are you asking me how many projects I've worked on?

Q. Yes.

A. I have no idea. Many.

Q. More than five?

A. Yes.

Q. More than ten?

A. Probably.

Q. So after this, after you initially engaged in February of 2002, what did you do?

A. I attempted to contact the principal and the obligee to set up a meeting to obtain information.

Q. And did you contact them?

A. Yes, I did.

Q. And when was that?

A. Probably in February. It might have been the late part of January.
Q. Did you talk to them individually or was it one call or --
A. I don't recall. I don't recall if I talked to any of these people with International Fidelity on the phone, but I reached out to both the principal and the obligee separately, and if I talked to the principal and the obligee, it was not with either one of them on the phone at the same time.
Q. But it wasn't a face-to-face meeting?
A. Ultimately we did meet, yes.
Q. Okay. But initially it was a phone call?
A. Correct.
Q. And what did you discuss in the phone call with -- do you recall which one was first, whether it was --
A. I have no recollection of which was first.
Q. In the call with Advanced Technology, who did you talk to?
A. I know I reached out to try to talk to Vince Vento. I don't know if the meeting was arranged via his secretary or not. I'm not certain.
Q. But did you talk to Vince, though, before there was a meeting?

A. I believe I did.
Q. And what did you talk about in this first phone call?
A. On those first calls we have little information. I don't know if he called or if I called Mr. Vento before or after receiving documentation from International Fidelity. It could have been something as simple as we know there's an issue out there and we'd like to meet and discuss it.
Q. But it could have been more than that; you just don't recall?
A. Yes, that's correct.
Q. And what about with the Postal Service? Who did you talk to at the Postal Service?
A. I believe I spoke with Jerry Goddard.
Q. And do you recall what you discussed?
A. I purpose of my call was to arrange a meeting with him to look at the AMC project, and I don't know if there was anything other than that.
Q. When you were engaged by International Fidelity, was it specifically for the AMC project or were both projects, the AMC project and the P&DC project, combined?
A. If my memory serves me correctly, the AMC project was the project that there was an issue with. I don't know if there was any claim-related activity in connection with

P&DC, but I was aware that that other project was there because it was a bonded project by International Fidelity.

Q. And so you did have a meeting with Vince Vento?

A. Correct.

Q. Who else was there?

A. I don't recall.

Q. Was Jerry Goddard there?

A. Initially I met with Mr. Vento separately, and then I believe I met with Jerry Goddard on site to review the AMC project.

Q. When you met with Mr. Vento, do you recall when that was?

A. Probably early February.

Q. And what did you discuss?

A. Project-related information. At that point we had little information, and the purpose of our meeting was to obtain more information to provide to International Fidelity in connection with whatever issues were involved with the project.

Q. Do you remember anything that he said at the time?

A. Not specifically.

Q. Did you discuss a termination or the possibility of a termination of the AMC project?

A. I don't recall if there was a termination at that

point in time. I would have to check notes or whatever in connection with that.

Q. Do you recall discussing the P&DC project at that time?

A. Yes, we did.

Q. And what did you guys discuss about the P&DC project?

A. While I was down there, I think we went and visited the P&DC as well, just because I was there and I didn't want to make a separate trip if I didn't have to, just more of a look around. "This is another International Fidelity bonded project. Let's go get a look at it." So we did.

Q. Were there any concerns at that time about the P&DC project?

A. I don't recall if that was on the radar screen in term of claims activity. It was more of, "It's down there," if my memory serves me correctly, "let's both take a look at it." I don't think there was any claim activity on it at that time.

Q. Did you talk to anyone from the Postal Service while you were there?

A. Yes.

Q. Who did you talk to?

A. Jerry Goddard.

Q. Do you recall anything that he said?
A. In connection with what?
Q. Anything he said.
A. We walked the job. He expressed his concerns in connection with the performance of ATC, whatever the issues were on the project.
Q. Do you remember what those concerns were?
A. I don't recall specifically. I believe they were in relation to performance issues.
Q. In general terms do you remember what those performance issues were?
A. I don't know if it was relative to the CCTV system or whatever. I think it was a general concern. Whether it was timing, the job wasn't done on time, or specific quality of the work, I'm not certain.
Q. Did you talk to anyone else while you were at P&DC?
A. I remember that the architect was there. Jerry Stuhl I think his name was.
Q. And what did you talk to him about?
A. He and Jerry were the two that walked us through the project.
Q. And did Mr. Stuhl express any concerns about the project?
A. I'm certain he did or I wouldn't have been there,

but I don't specifically know what they were.

Q. Did you have any other conversations or meetings in February about the P&DC project?

A. No.

Q. What about March?

A. I don't recall that we met again on the P&DC.

Q. You don't recall ever meeting on P&DC after February of 2002?

A. No, sir, I don't recall. I don't think so. I only visited that job one time.

Q. So no conversations in March that you recall about P&DC?

A. I don't know that P&DC was an issue at that time. There may have been some payment bond claim activity, but I don't remember if there was -- I don't think there was a performance issue on that project that we were actively pursuing.

Q. Do you recall any issues about the AMC project during that time?

A. There were a number of payment bond claims on that as well. Subsequent to our meeting, we requested information from both the Post Office and ATC; and if my memory serves me correctly, they ultimately resolved the AMC project.

MR. DIERBERG: Can we go off the record?

(Discussion off the record.)

MR. DIERBERG: Let's mark this as Exhibit 1.

(Exhibit No. 1 was marked for identification.)

MR. DIERBERG: Back on the record.

BY MR. DIERBERG:

Q. I've given Mr. Sexton what we have marked as Exhibit 1, which at the top is marked "Telephone Conversation," and it looks like it might be "Memo."

A. Correct.

Q. Is this your handwriting?

A. Yes, sir.

Q. Can you take a minute to read it?

A. Okay.

Q. Can you tell me what this is?

A. These are my notes in connection with a discussion I had with Jerry Goddard on April 10.

Q. One of the first bullet points or perhaps the first bullet point says, "Teetering on termination on 2nd project." The 2nd project refers to the P&DC project?

A. Yes, sir.

Q. And do you recall what Mr. Goddard said about teetering on termination?

A. That was probably his statement to me.

Q. What about "ATC struggling for cash flow"? Do you remember his statement about that?

A. I don't remember his statement.
Q. Do you remember any discussion about Advanced Technology's cash flow?
A. With Mr. Goddard?
Q. Yes.
A. If I read the rest of this memo, it seems that his belief is that ATC doesn't have the money to finish the project.
Q. Do you recall discussing this or are you just reading your notes?
A. I'm reading my notes. I don't remember.
Q. Do you remember anything more about the conversation than what's on the notes?
A. No.
Q. As to the first bullet point, teetering on termination, do you recall whether or not you had discussed with anyone the possibility of termination on the second project prior to April 10?
A. I don't recall that.
Q. What about cash-flow problems with Advanced Technology? Have you discussed this with anyone else prior to April 10?
A. With whom?
Q. Anyone.
A. I don't remember what my discussions were. I

don't know that cash flow was an issue.

Q. Or any financial problems with Advanced Technology.

A. The cash issues we dealt with were in connection with some payment bond claims and why there were issues that were not resolved, but I don't think we got to the point where we were discussing, "Do you have the money to pay these?" It was more of, "What are your issues in connection with the validity of these claims?"

Q. And that was prior to April 10?

A. It's possible.

Q. Do you recall what you did in response to this phone call?

A. I believe I subsequently followed up with ATC.

Q. And you talked to someone at ATC?

A. I attempted to get in touch with Vince Vento, and I think I was pointing in the direction of Greg Warren.

Q. And did you talk to Greg Warren?

A. At some point I did, yes.

Q. Do you recall what you guys discussed?

A. If memory serves me correctly, they were trying to work out both the AMC and the P&DC projects, and he was in active discussions with the Post Office regarding dealing with both of those issues.

Q. Do you recall about when that conversation took

place?

A. I would have to look at my notes as to when that was.

MR. DIERBERG: I'd like to mark this as Exhibit 2.

(Exhibit No. 2 was marked for identification.)

BY MR. DIERBERG:

Q. I've handed Mr. Sexton what I've marked as Exhibit 2, which has at the top "Telephone Conversation Memo," dated April 10, '02, start 2:55. Can you take a minute to read it?

A. Okay.

Q. Does this refresh your memory as to a conversation on April 10?

A. Uh-huh.

Q. At that time?

A. Uh-huh.

Q. Aside from what's on the notes, do you recall any of the discussions with IFIC?

A. Generally, just reading from the previous exhibit, when I have a conversation with an obligee, I like to inform my client as to what the nature of that conversation was. This was probably a follow-up conversation with International Fidelity regarding my conversation with Jerry Goddard earlier on that day.

Q. And it says, "Conversation with International Fidelity, or IFIC." Who did you talk to at IFIC?
A. Frank Whelan.
Q. Did you ever talk to anyone at IFIC other than Mr. Whelan in connection with Advanced Technology?
A. I don't think so.
Q. That's during the whole course of this from, say, February 2002 through 2003?
A. He has been my primary contact on this. Whether we may have discussed issues with one of his superiors or associates, I don't recall. I don't think so.
Q. Do you recall any discussions about that second point, "Principal has not contacted surety re dollar difficulties"?
A. It probably means in connection with Mr. Goddard's statements regarding ATC's cash flow issues. When we had that discussion, I was informed that the principal has not been seeking financial assistance from the surety.
Q. But the principal would be the --
A. ATC.
Q. -- would be the surety?
A. No. The principal --
Q. The principal would be ATC.
A. Right.

MR. DIERBERG: I'd like to mark this as Exhibit 3.

(Exhibit No. 3 was marked for identification.)

BY MR. DIERBERG:

Q. I've handed Mr. Sexton what we've marked as Exhibit 3, which is a -- it looks like an e-mail. Can you take a minute to read this?

A. Okay.

Q. Have you read this?

A. Yes, sir.

Q. Okay. Can you tell me what it is?

A. It's a follow-up from a discussion that I had or a message that I left for Jerry Goddard.

Q. And this is an e-mail that you sent to Mr. Whelan on April 10?

A. Correct.

Q. I'd like to direct your attention to the second point, and I quote: "If there is a request for the surety to get financially involved in the P&DC project, please put it in writing and IFIC will respond."

Do you recall why Mr. Whelan asked or wanted the Postal Service to put it in writing?

A. You would have to ask Frank that question.

Q. Did you have any discussions about putting a request in writing?

A. That's possible.

Q. And what do you recall?

A. If the Post Office -- the Post Office wanted the surety to get involved, and at that point I don't know if there was a termination or a demand on the performance bond in connection with P&DC. If there was a request that International Fidelity get involved in the project, put that request in writing so we can review exactly what they want and how to respond to it.

Q. Could the surety have gotten financially involved without a request from the Postal Service?

A. You would have to direct that question to International Fidelity.

Q. So you don't know the answer to that?

A. I'm not the surety. I don't make those decisions or determinations.

Q. I'm not asking whether or not they should have or were thinking about it. I'm asking in your knowledge or your experience, is it possible for a surety to get financially involved, absent a request from the company who hires the contractor?

A. Yes, it's possible.

MR. DIERBERG: I'd like to mark this as Exhibit 4.

(Exhibit No. 4 was marked for identification.)

BY MR. DIERBERG:

Q. So we've marked this as Exhibit 4, and this is a letter dated April 16. Can you take a minute to read this?

A. Okay.

Q. Before I ask you about this document, do you recall any conversations related to the P&DC project that you had with anyone between April 10, the last e-mail that we saw, and this April 16 letter?

A. Repeat the question, please.

Q. Do you recall any conversations you had between the last e-mail on April 10 and this letter or fax on April 16?

A. Well, as this letter suggests, there was likely a discussion regarding the turnstiles and the gates that I probably had with Greg Warren.

Q. But you don't recall that discussion?

A. Specifically, no.

Q. Do you recall generally what you guys discussed?

A. There may have been an issue with moving the project forward, and Jerry Goddard or somebody indicating that the turnstiles were required out there, and it was just a cash situation as to why they weren't delivered. And it seems -- or implies from this letter that we had a discussion regarding ways to get those turnstiles and gates on the project.

Q. But you don't recall that conversation?
A. I don't remember exactly what it was or when it was.
Q. Do you recall a conversation with Mr. Whelan about this issue with the turnstiles?
A. I don't remember. It's possible, but I don't recall.
Q. Do you recall any discussion around this time about a joint check arrangement?
A. No, I don't. It seems to me in reading this letter that it's something that ATC is suggesting.
Q. But you don't recall any discussions about a joint --
A. We were not involved in any of those discussions, at least I wasn't.
Q. So this later is dated -- or fax is dated April 16. Do you recall any other discussions related to the P&DC project in April?
A. Prior to this letter, I probably sent a letter to Greg Warren. I know I had discussions with him regarding the status, and I know he was actively involved in attempting to resolve AMC as well as close out the P&DC project, but I don't recall what specifics we discussed about the P&DC project. I know there was a cross-claim from AMC in connection with the P&DC project that ATC and

the Post Office had worked out absent International Fidelity.

Q. Did you know that at the time in April?

A. I don't remember.

Q. Do you recall any other discussions that you might have had in April?

A. Specifically, no.

Q. Generally?

A. ATC and the Post Office were apparently trying to work out their issues on both projects.

Q. And you knew that at the time?

A. It would seem so from this letter.

Q. But you don't recall?

A. I don't know. You're asking me to remember something three-plus years ago in a phone conversation. I don't remember the time line of events.

MR. DIERBERG: Okay. I'd like to mark this as Exhibit 5.

(Exhibit No. 5 was marked for identification.)

BY MR. DIERBERG:

Q. Will you take the time to read this?

A. Okay.

Q. Exhibit 5 is a letter dated May 1, 2002, from Jerry Goddard to Vincent Vento and it's CC'd to Frank Whelan. You're not indicated as having been CC'd, but do

you recall having seen this document?
A. I was likely provided a copy from International Fidelity.
Q. Do you recall whether you were provided a copy?
A. I would have to look in my file.
Q. So if it's in your file, that would mean that you had received it obviously.
A. I would assume so, yeah.
Q. Do you recall -- whether or not you received it, do you recall discussing this letter?
A. I don't recall any specific conversations in connection with this letter.
Q. Do you recall any discussions regarding the possibility of termination of the P&DC contract around this time?
A. Nothing specific, but in general I think at that time ATC was still trying to work out their issues with the Post Office. We had little -- "we" being Lovett Silverman and/or International had little involvement in those discussions, little or none. We were kind of sitting on the sidelines seeing how they were going to work their issues out.
Q. And what is your typical role when there is the possibility of termination? What does Lovett Silverman generally do?

A. It depends on what our client asks us to do.
Q. In this case had International Fidelity requested you to do something?
A. We likely did a follow-up with ATC and/or Jerry Goddard, but I'm not certain exactly what our instructions were or what we did.
Q. You mentioned you were sitting on the sidelines. What is your role sitting on the sidelines?
A. We were not actively involved in any of these discussions, or at least I wasn't. So we were more requesting and/or reviewing information that was provided to us by the Post Office and/or ATC to the extent that any information was provided to us.
Q. But International Fidelity could have asked for the same information, correct?
A. Sure.
Q. I guess I'm trying to understand why they have you involved at all.
A. We're their eyes and ears down on the project to the extent that they look for information. They could have written a letter or we wrote the letter. It depends on how the matter went.
Q. When do you typically come off the sidelines?
A. It depends on the situation.
Q. And whose decision would that be to get you more

actively involved?
A. The surety directs us as to what they want us to do, and we go ahead and do it, depending on what the matter is.
Q. But you wouldn't have gotten more involved without a request from International Fidelity?
A. In some cases we would provide a recommendation as to what we think needs to be done. I don't recall on this specific project if that ever took place, but generally if our -- yeah, it depends on what our client asks us to do at the time.
Q. Around this time frame, May 1, 2002, do you recall what the status of the project was, P&DC, as far as the progress on the project?
A. No. We visited that job site one time back in April. What transpired since that time, I have no idea.
Q. You indicated that in some projects that you do CPM schedules.
A. Yes, sir.
Q. Did you ever do a CPM schedule in this instance?
A. I don't believe so.
Q. Were you ever asked to do one?
A. I don't think so, no.
Q. Did you ever discuss the possibility of doing a CPM schedule?

A. No, sir, not that I recall.
Q. In May of 2002, do you know whether or not Advanced Technology was considering having Tristate complete the project?
A. I don't know.
Q. Do you recall any other meetings -- or you said you had no further face-to-face meetings in May.
A. Not on this -- not on any project, I don't think so, no.
Q. Did you have any conversations in May?
A. We probably did follow up in connection with the status to the extent that there were unresolved payment bond claims and/or information that was previously requested that was not provided either by the principal or the obligee. We may have done some follow-up letters or phone calls in connection with that.
Q. And when you say the status, you're referring to the payment bond claims and information requested, correct?
A. The payment bond claims and then any performance information that was previously requested that may not have been provided.
Q. But you weren't following up on the status of the completion of the project?
A. We were following up with status in general on both of those matters. It may have been specific to

performance issues, and the response may have been, "We're working things out with the Post Office," or vice versa. I'm not certain.

Q. So you don't recall any conversations you had at that time?

A. Not specifically.

Q. Well, in general do you recall any of those conversations?

A. There may have been some, but I don't know if they were substantive.

Q. Did you ever see a copy of a CPM schedule done by ATC?

A. I don't know if we ever received that.

Q. Do you know if one existed?

A. I can check my files if you want.

Q. We can check them later, but do you recall any --

A. I don't remember. Generally when we receive information, we'll put it in a specific file, and normally there is a file for project schedules.

Q. And so your file, the project schedules, would contain all of the schedules you received for P&DC?

A. That's correct, and I don't believe we ever received anything on P&DC.

MR. DIERBERG: I'd like to mark this as Exhibit 6.

(Exhibit No. 6 was marked for identification.)

BY MR. DIERBERG:

Q. And ask you to read this.

A. Okay.

Q. Can you tell me what this is?

A. This is an indemnity letter from International Fidelity to ATC and/or the indemnitors.

Q. When you say an indemnity letter, what does that mean?

A. International Fidelity has a potential exposure in connection with this case with several payment bond claims, and they are asking for ATC to indemnify them in connection with that possible exposure.

Q. And this is a letter from Frank Whelan to Advanced Technology and three members of the Vento family, and you were CC'd on this letter, correct?

A. Yes, sir.

Q. So you received this letter?

A. Yes, sir.

Q. On the second page, the first sentence says, "If you wish us to defend these claims, we demand that you post collateral with the surety in the amount of $115,579 within ten days of the date of this letter and provide us with a letter setting forth any and all defenses you may have to each claim."

Do you remember whether any collateral was posted?

A. We are not involved in that component of it, so I wouldn't know.

Q. Okay. On the third page it identifies three separate claims, one from Hirsch Electronics. Do you remember anything about a claim from Hirsch?

A. Yes. We received information in connection with the payment bond claim from Hirsch.

Q. And what information had you received by this date of June 6, 2002?

A. I believe -- you know, again, you're asking for a time line of three years ago, but I believe we had claim information submitted by Hirsch, a proof of claim form and whatever support information they provide.

Q. And do you remember any discussions about Hirsch prior to this date or around this date?

A. Typically what we would do, and I'm assuming this is before June 6, we would send a letter requesting information from the principal regarding the claim by Hirsch Electronics and/or any one of these other folks here.

Q. Do you remember what the claim from Hirsch was about?

A. Not specifically, no.

Q. What about Sunbelt Rentals? Do you remember anything about that claim?

A. I assume they're an equipment rental company, but I don't know.

Q. And what about Vicon Industries?

A. They were, if my memory serves me correctly, a material supplier. I don't know if it was the CCTV or whatever. I'm not certain.

MR. DIERBERG: Let's mark this as Exhibit 7.

(Exhibit No. 7 was marked for identification.)

MR. DIERBERG: Let's go ahead and mark 8.

(Exhibit No. 8 was marked for identification.)

BY MR. DIERBERG:

Q. Have you had a chance to read these documents?

A. Yes, sir.

Q. Exhibit 7 is a letter from yourself to Jerry Goddard regarding Vicon Industries, a claim by Vicon; is that correct?

A. Yes, sir.

Q. And then Exhibit 8 is a letter from yourself to Mr. Goddard regarding a claim by Hirsch Electronics; is that correct?

A. Yes, sir.

Q. What is the purpose of sending this letter?

A. Hirsch and Vicon submitted payment bond claims,

and to the extent that the principal has any defenses, we want to know about it, so we probably sent a similar letter to ATC. In connection with any concerns the obligee might have with the product or performance of these or any costs associated with defective or deficient installations or equipment or material, we want to know about that in the process of investigating the claim.

Q. And what if there are deficiencies? What's the consequence of that?

A. It depends on what they are. If the claimant is submitting a claim for monetary compensation and the obligee indicates to us that their work is defective and have incurred costs in connection with that, whether it be material and/or the performance of something, we utilize that information in evaluating the claim.

Q. And do you advise the surety on whether and when to make payment on a payment bond?

A. In some cases, yes.

Q. Did you provide some advice regarding this payment bond claim?

A. I don't recall if we followed these claims through to resolution or if that was something handled by International Fidelity.

Q. What's the typical process within the firm Lovett Silverman in terms of evaluating whether or not to pay on a

payment bond?
A. We will review the documentation provided by the claimant, the principal, the obligee, and provide -- or usually discuss and then and/or provide, if it's requested, a written recommendation as to our opinion of the claim.
Q. And if there are no deficiencies associated with the equipment provided, when typically would a payment be made from a surety on a payment bond?
A. You would have to ask the surety that question.
Q. So in June of 2002, do you recall any discussions, any other discussions you may have had regarding Advanced Technology and the project?
A. Other than what we are talking about here, no. It's possible that we had follow-up discussions with Jerry Goddard and ATC regarding the status of the project.
Q. You don't recall any discussions?
A. No.
Q. Not even the general gist of those conversations?
A. We were never actively involved in performance issues on P&DC at all.
Q. When you say performance issues, you mean performance bond issues?
A. Correct.
Q. And that's because International Fidelity didn't ask you to be involved in the performance bond issues?

A. No. I don't know if there was ever a claim made under the performance bond on that project by the government. I don't know the circumstances why we weren't involved. I just know we weren't involved.

MR. DIERBERG: Let's mark this as Exhibit 9.

(Exhibit No. 9 was marked for identification.)

BY MR. DIERBERG:

Q. Exhibit 9 is a letter from Jerry Goddard to Vincent Vento, and it's copied to Frank Whelan. Do you want to take a minute to read this?

A. Okay.

Q. It doesn't show you being copied on this letter. Do you recall seeing this letter?

A. We likely received a copy.

Q. You don't recall seeing a copy?

A. I don't remember.

Q. Do you remember around the time being informed that there was another letter about the possibility of termination?

A. It's possible.

Q. But you don't recall?

A. Again, I'd have to go back and look at my file.

Q. The second sentence says, "The revised contract completion date is now July 15, 2002." Were you aware at that time that there was a revised completion date?

A. To the extent that I was aware, it would have been information provided to me by either ATC or Jerry Goddard.

Q. You don't recall?

A. I don't know.

MR. DIERBERG: Let's mark this as Exhibit 10.

(Exhibit No. 10 was marked for identification.)

BY MR. DIERBERG:

Q. Have you had an opportunity to read this?

A. Yes, sir.

Q. Exhibit 10 is a letter from Jerry Goddard to Vincent Vento dated July 15, 2002. You are copied on this. Do you recall receiving this?

A. I believe we did.

Q. Do you recall any discussions about this letter?

A. No.

Q. Do you recall any discussions about a stop-work order?

A. No.

Q. Did you have any response to this letter? Did you do anything in response to this letter?

A. I may have had a conversation with International Fidelity regarding it, but I don't know.

Q. You don't recall any discussions with them about it?

A. No, sir.
Q. What about any other discussions you might have had in July of 2002? Do you recall any other discussions?
A. No, sir.
Q. And I think you said you only went to the P&DC site once, correct?
A. I believe that's correct, yes.
Q. And you had one meeting, right, early on with Jerry Goddard?
A. Correct.
Q. And you saw Joe Stuhl at that first visit?
A. Correct.
Q. Were there any other meetings, face-to-face meetings, you had with Mr. Whelan prior to August of 2002?
A. I don't believe I had any face-to-face meetings with Mr. Whelan regarding this project.
Q. What about Mr. Goddard? Any other face-to-face meetings with him?
A. No. We had intermittent conversations when we received some of the correspondence and/or request information, but we never got together face to face, no.
Q. What about Mr. Stuhl?
A. Aside from that AMC meeting, I did not meet with Mr. Stuhl.
MR. DIERBERG: I'd like to mark this as

Exhibit 11.

(Exhibit No. 11 was marked for identification.)

BY MR. DIERBERG:

Q. Have you had an opportunity to read this?

A. Yes, sir.

Q. Exhibit 11 is a letter from yourself to Mr. Warren dated August 13, 2002; is that correct?

A. Yes, sir.

Q. Before I ask about this document, do you recall any discussions that you had with Mr. Warren prior to this letter?

A. I believe we had a discussion regarding the points that are raised in this letter.

Q. And do you recall what you discussed?

A. Apparently we discussed the July 15 termination to which ATC had responded, apparently, based on memorializing that discussion in this letter.

Q. But you don't recall those discussions?

A. I don't remember what they were. I think the purpose of this letter was to memorialize exactly what we discussed, to put it on the record as well as to request in writing the items that he had indicated he would provide to me during that discussion.

Q. And from your standpoint, what you were concerned about was the payment bonds, correct?

A. No, sir, because there's a termination here, and it appears that the principal is actively involved in trying to address the performance issues on the project.

Q. So at this point you were concerned about the performance bond as well?

A. To the extent that we received any letters or correspondence in connection with the performance bond.

Q. But at this point were you involved in assisting International Fidelity in connection with the performance bond?

A. I don't know that there was any demand or request by the Post Office to International Fidelity regarding the performance bond.

Q. But were you assisting them in connection with the performance bond at this point?

A. To the extent that information was out there regarding performance issues on the project and the correspondence that we received, we were following up with both ATC and the Post Office regarding the status of those issues.

Q. I'm sorry, was that a yes or no? Were you helping them on the performance bond?

A. To the extent that the surety was involved in any issues on the project that they bonded, we were actively following up on the status of those issues. As I said

before, this letter indicates that ATC was in the process of discussions with the Post Office regarding the termination, and we wanted that information, and we requested it in writing here.

Q. Did you do anything else for International Fidelity to assist in the performance bond issues they had at that time?

A. Clarify the question.

Q. What did you do around this time to assist International Fidelity aside from what you have in this letter here?

A. My recollection is that ATC and the Post Office were in discussions regarding the P&DC project, and we were monitoring, to the extent that we could, the status of those discussions.

Q. Did you provide any advice to International Fidelity in August of 2002 or anytime prior to that regarding the P&DC project?

A. Not that I recall.

Q. So as you said, you were more the eyes and ears.

A. We were trying to obtain the information for International Fidelity regarding the status of the project, following up with both the Post Office and the principal regarding the status of those discussions to the extent that they were there.

Q. Did you ever provide any advice to International Fidelity regarding the P&DC project?
A. I don't believe so.
Q. Did you ever generate a report to be provided to International Fidelity?
A. Not that I recall.
Q. Were you ever asked to provide a report to them?
A. I don't know that that request was made in connection with the project at this time or shortly thereafter, so no.
MR. DIERBERG: Let's mark this as Exhibit 12.
(Exhibit No. 12 was marked for identification.)
BY MR. DIERBERG:
Q. Have you had a chance to read this?
A. Yes, sir.
Q. Exhibit 12 is a letter from Jerry Goddard to Vince Vento, and you are copied on this. Do you recall receiving this?
A. I believe we did, yes.
Q. And what did you do in response to this letter?
A. I likely had a discussion with Frank Whelan regarding the letter.
Q. Do you recall what that discussion was about?
A. No, I don't.
Q. Do you recall whether or not you had a

discussion?

A. I believe -- well, I don't know specifically, but if I were to receive a letter like this today, I would probably call my client.

Q. But you don't recall whether you had a conversation?

A. I don't know.

Q. What about any other conversations you had about the P&DC project in August?

A. I don't remember.

Q. So after the contract was terminated, did your role change at all?

A. I don't believe so because I believe the Post Office went ahead and solicited prices for the completion of the work.

Q. But what was your role post-termination?

A. I don't know that we did anything post-termination because I believe the Post Office was in the process of picking up the performance of the work, moving forward, and we were not involved in the project at all.

Q. So you're here today pursuant to a subpoena, and that subpoena asked you to bring some documents, correct?

A. Uh-huh.

Q. And have you brought those documents with you?

A. I brought my files in connection with both

projects. There are some files at my office that I'm not privy to because they were in connection with assisting Henrichsen Siegel upon receipt of the damages that I did not bring.

MR. DIERBERG: Let's take a break.

(A break was taken.)

MR. DIERBERG: Back on the record.

BY MR. DIERBERG:

Q. I have looked through -- Mr. Sexton brought in a box of documents, which is your files for the AMC project and the P&DC project; is that correct?

A. For the most part that's correct, yes.

Q. And there are some separate files that relate to your review of Mr. Sury's work product?

A. There were documents received in connection with the analysis of the damages component that I have not reviewed, that I am not privy to. I did not sign a waiver of confidentiality, a confidentiality agreement. Those files were in a separate area, and I did not pull those or look at those or bring those with me.

Q. But they're your files; they're not Mr. Sury's files?

A. They're the office files.

Q. Okay. When I looked through the files, I didn't see any schedules for P&DC. Would you be able to locate

the file for the folder that would contain those files?

A. If they weren't in here, it's likely that we didn't get them. I can ask Mr. Sury through whatever he has if they're in -- if they're mixed in his stuff, to pull it, but --

Q. But in the event --

A. If it's not in there, then it's likely we had never received a schedule file for P&DC.

Q. Do you have a separate -- or do you normally do a separate file for schedules?

A. It depends on if the -- if our information request is responded to and there are schedules in there, we will create the file. If we didn't get a response because there was none or they weren't provided, I will not create a blank file for schedules.

Q. Also I notice they reference in one document related to the AMC project, it referred to an investigation into the termination of the AMC project. Do you remember an investigation regarding the termination of the AMC project?

A. When we got retained by International Fidelity, I believe it was under the performance bond and/or the termination of the AMC, and that was our initial investigation.

Q. And so what did you do in the course of that

investigation for the AMC project?

A. We met with the principal. We met with the obligee. We attempted to obtain information and documentation. I believe the Post Office had proceeded to work with ATC to get that situation resolved.

Q. And what was the result of the investigation?

A. I don't understand the question.

Q. Well, what did you determine?

A. You mean a conclusion in connection with the termination?

Q. Well, conclusion in connection with the investigation.

A. There was no conclusion because the surety did not perform under the performance bond because the principal and the obligee worked out the issues in connection with the project, so there was no resulting report or document in connection with that investigation. During the course of the investigation and review, the principal and the obligee continued to discuss the project and ultimately resolved it.

Q. And with respect to the P&DC project, was there a similar investigation?

A. I don't believe there was ever a demand to the surety for performance on that project, so we were monitoring it, but I don't know that the Post Office

specifically requested that a surety do anything in connection with that project.

Q. So you never did an investigation?

A. We never -- while we requested information in connection with it, we -- that was part of our investigation, I guess.

Q. So requesting information was the extent of your investigation?

A. To the extent of the P&DC project, yes. The performance issues were either addressed by ATC and/or the obligee.

Q. Did you ever reach some conclusion in connection with the P&DC project?

A. No, sir.

Q. Did you ever perform any analysis regarding the cause of the delay in the P&DC project?

A. No, sir.

Q. And you never did a CPM schedule for that P&DC project?

A. No, sir, not to my recollection.

Q. Did you ever perform an analysis regarding the options that the surety had in connection with the P&DC project?

A. Options in connection with what?

Q. Well, in connection with, for example, taking

over the contract.
A. We did not walk down that path on this project.
Q. Well, the surety did not take over the project, but was that discussed?
A. We did not do any analysis of options because I don't know that the obligee made a demand on the performance bond on the project.
Q. And is that necessary for the surety to take over?
A. You would have to ask the surety that question.
Q. Did he perform any analysis regarding the timeliness of the government's payments on the P&DC project?
A. Not that I recall.
Q. What about any analysis regarding the government's processing of modifications?
A. I did not do any analysis in connection with P&DC.
Q. What about any analysis regarding the delay claim?
A. We did no analysis on the delay claim or anything to that extent on P&DC.
Q. Do you anticipate doing further review of Mr. Sury's work?
A. To the extent that it's necessary, yes, I will.

Q. But you will not be retained as an expert in this case?

A. I don't think so. I don't know that. You would have to ask counsel that question.

MR. DIERBERG: I have no further questions.

MS. ALBEE: I don't have any questions.

MR. DIERBERG: All right. Thank you very much.

MS. ALBEE: Do you want to read or waive?

THE REPORTER: Are you ordering or waiting?

MR. DIERBERG: Order.

MS. ALBEE: He'll read.

THE REPORTER: Do you need a copy?

MS. ALBEE: Yes.

(Thereupon, reading and signing of the deposition were requested.)

(Thereupon, the deposition concluded at 10:35 a.m.)

CERTIFICATE OF OATH

STATE OF FLORIDA )
)
COUNTY OF BREVARD )

I, TAMARA L. GULKER, Registered Professional Reporter, the undersigned authority, do hereby certify that RICHARD T. SEXTON personally appeared before me and was duly sworn.

WITNESS MY HAND and official seal this 26th day of September, 2005, at the City of Melbourne, County of Brevard, State of Florida.

______________________________
TAMARA L. GULKER, RPR
Notary Public, State of Florida

CERTIFICATE OF REPORTER

STATE OF FLORIDA )
)
COUNTY OF BREVARD )

I, TAMARA L. GULKER, Registered Professional Reporter, do hereby certify that I was authorized to and did stenographically report the deposition of RICHARD T. SEXTON; that a review of the transcript was requested; and that the foregoing transcript, pages 1 through 52, is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the event of this cause.

DATED this 26th day of September, 2005, at the City of Melbourne, County of Brevard, State of Florida.

______________________________
TAMARA L. GULKER, RPR

E R R A T A   S H E E T

IN RE: ADVANCED TECHNOLOGY V. THE UNITED STATES

DEPOSITION OF: RICHARD T. SEXTON TAKEN: 9/21/05

DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

PAGE # LINE # CHANGE REASON

_________________________________________________________

_________________________________________________________

_________________________________________________________

_________________________________________________________

_________________________________________________________

_________________________________________________________

_________________________________________________________

_________________________________________________________

_________________________________________________________

_________________________________________________________

_________________________________________________________

_________________________________________________________

_________________________________________________________

_________________________________________________________

_________________________________________________________

_________________________________________________________

Under penalties of perjury, I declare that I have read my deposition and that it is true and correct subject to any changes in form or substance entered here.

DATE:__________ SIGNATURE OF DEPONENT:____________________