IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ADVANCED TECHNOLOGY SYSTEMS INTEGRATORS CORP. and INTERNATIONAL FIDELITY INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 03-1953C<br>(Senior Judge Margolis) |

DEFENDANT'S APPENDIX TO PROPOSED
FINDINGS OF UNCONTROVERTED FACT

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

DONALD E. KINNER
Assistant Director

OF COUNSEL:

STEPHEN D. LOBAUGH
Attorney
Law Department – Civil Practice
Commercial & Appellate Litigation
United States Postal Service
475 L'Enfant Plaza SW
Washington, DC 20260

MICHAEL J. DIERBERG
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Class. Unit 8th Floor
1100 L St., N.W.
Washington, D.C. 20530

April 28, 2006

Attorneys for Defendant

# TABLE OF CONTENTS

PAGE(S)

Affidavit of Jerry Goddard ..................... 1

Affidavit of Joseph Stuhl ..................... 8

Exhibits

A. Relevant Portions of P&DC Contract ..................... 12

B. Notice to Proceed, Dated October 3, 2000 ..................... 42

C. Letter Dated August 2, 2001 from Ronald Grzymala to Vincent Vento (Notice to Cure) ..................... 44

D. Letter Dated January 4, 2002 from Ronald Grzymala to Vincent Vento (First Show Cause Letter) ..................... 46

E. Letter Signed By Jerry Goddard, March 12, 2002 To International re: Status of Project ..................... 48

F. Letter Dated March 15, 2002 from Joseph Stuhl to Jerry Goddard (Field Investigation Report) ..................... 50

G. Letter Dated April 4, 2002 from Joseph Stuhl to Jerry Goddard (Field Investigation Report) ..................... 53

H. Letter Dated April 16, 2002 from Joseph Stuhl to Jerry Goddard (Field Investigation Report) ..................... 59

I. Letter Dated May 1, 2002 from Jerry Goddard to Vincent Vento (Second Show Cause Letter) ..................... 62

J. Facsimile Dated May 13, 2002 from Greg Warren to Jerry Goddard re: Settlement Letter and Schedule ..................... 64

K. Letter Dated May 24, 2002 from Joseph Stuhl to Jerry Goddard (Field Investigation Report) ..................... 69

L. Letter Dated June 10, 2002 from Joseph Stuhl to Jerry Goddard (Field Investigation Report) ..................... 73

M. Payment Authorization No. 17 ..................... 78

TABLE OF CONTENTS (con't)

PAGE(S)

[Exhibit N Omitted]


O. Settlement Agreement re: AMC Project .......... 93

P. Modification No. 10 to P&DC Contract .......... 95

Q. Modification No. 2 to AMC Contract .......... 97

R. Modification No. 11 to P&DC Contract .......... 99

S. Letter Dated July 15, 2002 from Jerry Goddard to Vincent Vento (Third Show Cause Letter) .......... 101

T. Letter Dated July 19, 2002 from Greg Warren to Vincent Vento (Response to Third Show Cause) .......... 103

U. Letter Dated July 15, 2002, With Handwritten Notation That It Was Delivered July 31, 2002, From Jerry Goddard (Stop Work Order) .......... 110

V. Letter Dated July 25, 2002 from Joseph Stuhl to Jerry Goddard (Field Investigation Report) .......... 113

W. Letter Dated August 2, 2002 from Greg Warren to Frank Whelan .......... 117

X. Letter Dated August 16, 2002 from Jerry Goddard to Vincent Vento (Termination for Default) .......... 113

Y. Letter Dated July 31, 2003 from Jerry Goddard to Vincent Vento re: Excess Reprocurement Costs .......... 123

Z. Letter Dated September 26, 2002 from Jerry Goddard to Vincent Vento re: Final Decision as to Excess Reprocurement Costs .......... 127

AA. Plaintiff ATSIC's Response to Defendant's First Request for Interrogatories .......... 131

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ADVANCED TECHNOLOGY SYSTEMS INTEGRATORS CORP. and INTERNATIONAL FIDELITY INSURANCE COMPANY,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

No. 03-1953C
(Senior Judge Margolis)

AFFIDAVIT OF JERRY GODDARD

I, Jerry Goddard, being duly sworn, hereby state as follows:

1. I am over the age of 18 and have personal knowledge of the matters set forth herein and if called as a witness could competently testify thereto.

2. On September 8, 2000, Advanced Technologies Systems Integrators Corp. ("ATSIC") and the United States Postal Service ("USPS") entered into a fixed price construction contract, number 123125-00-B-3154, for the construction and installation of security improvements for the USPS's Processing and Distribution Center, Miami, Florida ("P&DC"). The P&DC facility is also sometimes referred to as the General Mail Facility ("GMF"). The P&DC is the central distribution point for USPS mail in Miami, Florida.

3. At or around the same time that ATSIC and USPS entered into the P&DC contract, ATSIC and USPS also entered into a similar contract for the construction and installation of security improvements for the Miami Air Mail Center ("AMC"), which is the USPS facility in Miami which handles mail being transported by air. The AMC contract was terminated for default in January, 2002.

4. From the inception of the Project through termination and reprocurement of the Project, at all times I was either the contracting officer or project manager / contracting officer's representative ("COR"), or both.

5. The P&DC contract required that the work to be performed under the contract must be completed within 230 days. A Notice to Proceed was issued on October 3, 2000, with a start date of January 15, 2001, and a required completion date of September 2, 2001. Exhibit B is a true and correct copy of the Notice to Proceed.

6. The work required to be performed by ATSIC in connection with the P&DC facility ("Project") included the installation of a closed-circuit television system and cameras to provide remote monitoring of activities, exterior gates and vehicle barrier controls, exterior fencing, an access control system using proximity card readers to limit access to the P&DC building to authorized personnel, and turnstiles to limit access to, and egress from, the P&DC building.

7. By letter dated August 2, 2001, the contracting officer, Ronald Grzymala, issued a letter to ATSIC notifying them of USPS's concerns regarding ATSIC's progress on the Project, and requesting that ATSIC's deficiencies be cured. Exhibit C is a true and correct copy of the August 2, 2001 letter.

8. ATSIC did not complete the project by the required completion date of September 2, 2001.

9. On or about February 21, 2002, I was assigned as the contracting officer for the Project in lieu of Mr. Grzymala.

10. By letter signed March 12, 2002, I responded to a request for information from plaintiff International Fidelity Insurance Company ("International") regarding the status of the project. Exhibit E is a true and correct copy of this letter.

11. By letter dated May 1, 2002, I provided a second show cause to ATSIC, directing ATSIC to show cause why it should not be terminated for default. Exhibit I is a true and correct copy of this show cause letter. This letter was sent by certified mail on May 1, 2002.

12. On or after May 29, 2002, ATSIC submitted payment authorization No. 17 for approval by USPS. The amount of the payment authorization was reduced to $63,000.00, and payment authorization No. 17 was approved by USPS on June 12, 2002. I do not recall any certified request for payment submitted by ATSIC to USPS after payment authorization No. 17. Payment authorization No. 17 was also the last payment authorization approved by USPS. Exhibit M is a true and correct copy of payment authorization No. 17.

13. Prior to June 11, 2002, representatives of ATSIC and USPS disputed a variety of items regarding the Project, including, but not limited to: (1) ATSIC's failure to complete the Project by the completion date of September 2, 2001; (2) the adequacy of ATSIC's staffing of the Project; (3) the lack of regularly updated construction schedules provided to USPS; (4) the amount of excess reprocurement costs from the AMC project and the manner in which excess reprocurement costs from the AMC project would be paid by ATSIC; (5) the timing of approval of requested contract modifications by USPS; and (6) the timing of approval of payment authorizations by USPS.

14. ATSIC and USPS entered into a settlement agreement regarding the excess reprocurement costs for the AMC project. I signed this settlement agreement on behalf of USPS on June 19, 2002. Exhibit O is a true and correct copy of this settlement agreement. In addition, the parties memorialized the $52,137 offset to the P&DC contract in Modification No. 10 to the P&DC contract. Exhibit P is a true and correct copy of this modification to the P&DC contract.

The parties also memorialized the amount of the offset in Modification No. 2 to the AMC contract. Exhibit Q is a true and correct copy of this modification to the P&DC contract.

15. In June, 2002, ATSIC and USPS executed Modification No. 11 to the P&DC contract. The typed portion of Modification No. 11, showing a revised completion date of June 30, 2002, was based upon the date ATSIC had earlier requested as the revised completion date. Some time prior to the execution of Modification No. 11, ATSIC requested that the revised completion date be changed to July 15, 2002. Thereafter, we agreed to strike the June 30, 2002 revised completion date, and agreed to a revised completion date of July 15, 2002. I signed Modification No. 11 on behalf of USPS on June 20, 2002. Because I was not given two copies from ATSIC with original signatures, I copied the modification signed by Mr. Vento, then signed the original and signed the copy. I sent the copy with my original signature to ATSIC. Exhibit R is a true and correct copy of Modification No. 11, with my original signature and the original signature of Mr. Vento. ATSIC did not make any requests to USPS for modification, other than the request for an extension of time submitted on July 17, 2002, after Modification No. 11.

16. As of July 15, 2002, ATSIC had not completed the Project.

17. By letter dated July 15, 2002, from myself to Vincent Vento, USPS issued its third show cause to ATSIC. Exhibit S is a true and correct copy of the Third Show Cause letter.

18. On or about July 19, 2002, I received ATSIC's response to the third show cause letter. Exhibit T is a true and correct copy of ATSIC's response which I received.

19. At a meeting held at approximately 1:00 pm at the Project site on July 31, 2002, I, on behalf of USPS, issued a stop work order to representatives of ATSIC, including Greg Warren and Jose Zamora. Exhibit U is a true and correct copy of the stop work order. Mr. Warren refused to sign receipt of the stop work order, therefore Sgt. Perry P. Puglisi of the Postal Police

Department wrote on the stop work order that Mr. Warren refused to sign for receipt. ATSIC was not told by USPS to stop work prior to being given this stop work order on July 31, 2002. Although the stop work order is dated July 15, 2002 and addressed to Vincent Vento, I never sent the letter to Mr. Vento and instead delivered the stop work order by hand to ATSIC representatives on July 31, 2002. As of July 31, 2002, ATSIC had still not completed the work on the project.

20. By letter dated August 16, 2002, from myself to Vincent Vento, USPS terminated ATSIC for default. Exhibit X is a true and correct copy of the termination for default, which USPS provided to ATSIC on or about August 16, 2002. At the time that we terminated ATSIC for default, I and other officials within USPS believed that it was in the best interests of USPS to terminate for default, and otherwise appropriate to terminate for default, because ATSIC failed to complete the project by the revised completion date, progress on the project was not satisfactory, and the project was not adequately manned. Furthermore, I did not believe that ATSIC had been entitled to an extension beyond the revised completion date July 15, 2002 based upon excusable delay.

21. By letter dated July 31, 2003, from myself to ATSIC, we informed ATSIC that we calculated excess reprocurement costs to be $683,404.69. Exhibit Y is a true and correct copy of the July 31, 2003 letter.

22. By letter dated September 26, 2003, from myself to Vincent Vento, we issued USPS's final decision with respect to excess reprocurement costs for the project, demanding payment in the amount of $683,404.69 for excess reprocurement costs. Exhibit Z is a true and correct copy of the September 26, 2003 letter.

23. International is not a party to any agreement with USPS regarding the Project. International did not enter into a take over agreement with respect to the Project, and International did not otherwise take over completion of the project. International has not financed the completion of the project under any performance bond. International did not request that USPS withhold payment from ATSIC prior to USPS's approval and payment of any progress payments or other payments to ATSIC.

24. "Clause B-80 of the USPS Purchasing Manual," identified by plaintiffs in paragraph 18.3 of the second amended complaint, is not a part of the P&DC contract. Exhibit A is a true and correct copy of relevant portions of the P&DC contract.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my personal knowledge.

Dated the 28 day of April, 2006.

Jerry Goddard

On the __ day of April, 2006, before me personally appeared Jerry Goddard, known to me to be the person whose name is subscribed herein.

In witness whereof I hereunto set my hand and official seal.

Notary Public

MARY A. REED
NOTARY PUBLIC
FORSYTH CO., GEORGIA
MY COMMISSION EXPIRES AUG. 19, 2007

MARY A. REED NOTARY PUBLIC FORSYTH COUNTY, GEORGIA

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ADVANCED TECHNOLOGY SYSTEMS INTEGRATORS CORP. and INTERNATIONAL FIDELITY INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 03-1953C<br>(Senior Judge Margolis) |

AFFIDAVIT OF JOSEPH STUHL

I, Joseph F. Stuhl, III, being duly sworn, hereby state as follows:

1. I am over the age of 18 and have personal knowledge of the matters set forth herein and if called as a witness could competently testify thereto.

2. I am the President of Stuhl Engineering Consultants, Inc. (a.k.a. SEC) a licensed Engineering Business in the State of Florida, who's Engineering Business Number is 0005382. SEC is the final result of an Architectural and Engineering firm formerly know as Tuttle, Allen and Stuhl, and originally formed in 1956. I purchased the company from my father in 1984 and the current SEC was incorporated in the State of Florida in 1989-90. I have been working in the field of electrical engineering for over thirty-five (35) years. SEC has provided the design and construction administration of seven (7) security projects for different facilities within the Southeast United States for the United States Postal Service. SEC has had a working relationship with five (5) different IQC Term Architects for the United States Postal Service. We have an extensive list of over two hundred (200) completed projects during our fifteen (15) year

working relationship with the United States Postal Service. SEC has a pool of twenty different design professionals with various experience and degrees to provide the Mechanical and Electrical engineering that our clients request.

3. About the first of May 2000, SEC was contacted by Mr. Jose' Blanco, Architect in Coral Gables and asked to provide an engineering fee proposal for the investigation, design, drafting and construction administration of the Security Upgrades for the Miami Process and Distribution Center. On May 14, 2000, SEC began our investigation of the facility and during the summer of 2000, SEC designed the construction documents needed to obtain proposals from interested contractors. On August 16, 2000, construction of this project was awarded to Advanced Technology Systems Integrators Corp. (ATSIC) and they were given formal notice to begin work. SEC provided construction administration support services to Mr. Blanco during the first year of the construction. On November 19, 2001, SEC provided the United States Postal Service with a proposal to continue our construction administration service after the loss of Mr. Blanco as the project architect. From November 2001, until completion of the project, SEC acted in the capacity of project engineer for the United States Postal Service.

4. The work required to be performed by ATSIC in connection with the Security Upgrades at the Miami P&DC facility ("Project") can be summarized into four (4) categories. The General Conditions work, the Access Control System (ACS) work, the Closed-Circuit Television (CCTV) system work and the Intercom (IC) system work. The following will give a brief description of each category:

A. The general conditions portion of this contract required ATSIC to prepare the existing P&DC facility for the new security systems to be installed. The new security systems included a Closed-circuit Television system (CCTV), an Access Control System

(ACS) and an Intercom (IC) system. The exterior site work required of ATSIC included purchase and installation of the new ACS controlled, sliding vehicle gates, the new ACS controlled high-speed barrier vehicle arms, the new chain link security fencing, excavation and installation of quite a few miles of underground conduits with their associated conductors for the CCTV, ACS and IC systems. ATSIC was responsible for construction of the new vehicle barriers and gates, new concrete and asphalt areas at the new gates, patching and paving of the damaged parking and vehicle pavement, repair of all exterior building components that were damaged and the installation of two (2) new man gates in the perimeter security fence. The interior building work required of ATSIC included the addition of a new six (6) person turnstile, a new single (1) person turnstile, and four (4) new handicapped gates within the building. Additionally, ATSIC was responsible to construct a new control room; erect and paint a number of new security walls; modify and install existing or new ceilings; and to repair, patch and paint any damaged interior walls.

B. The new Access Control System (ACS) portion of this contract required ATSIC to provide, install, program and connect a series of components which were used to control entry and exit onto the site and into the building. The ACS was designed to give each employee, contractor or temporary worker a badge which would contain their picture and some specific employee information. Each badge contains a wire which resonates at a specific frequency when presented to a badge reader. Each badge is designed to allow an employee access into a specific area, but keep them from other secured areas. The ACS would store all the activity of each badge during the course of a day and could be used to track the movements of that employee. The ACS contains an

"Anti Pass-back" feature which prevents an employee from allowing another person to use their badge. ATSIC was required to provide, install and connect all the ACS components and to program and produce the first one thousand (1,000) employee badges and their associated data base. ATSIC was responsible for establishing a link between the ACS at the P&DC with the ACS at the Air Mail Center (AMC) to allow for the transfer of data between these two (2) systems. ATSIC was responsible for bring the ACS on-line and teaching the P&DC maintenance staff how to operate and maintain the system. ATSIC was responsible for maintenance of the ACS for the first year after final acceptance by the Postal Service.

C. The new Closed-Circuit Television system (CCTV) portion of this contract required ATSIC to provide, install, program and connect a series of color cameras to be used to observe and record the activities both inside and outside the building. The new CCTV system was not designed to be used as a Criminal Investigative System (CIS) tool, but only in conjunction with the ACS and IC systems. ATSIC was required to mount cameras on the exterior of the building to observe the parking lots, loading docks and the gates and entrances onto the site. ATSIC was required to mount cameras at specific entry points to identify an employee or contractors that did not have an ACS badge needed to gain entry. ATSIC was required to mount cameras inside of the building to observe the loading dock and exterior building doors that were not connected to the ACS. ATSIC was required to purchase and assemble a console that was used to house all of the VCR recorders, Graphic Unit Interface (GUI), patch panels, fiber optic transmitters, camera controllers and miscellaneous CCTV, ACS and IC equipment. ATSIC was responsible for establishing a link between the CCTV system at the P&DC

with the CCTV system at the Air Mail Center (AMC) which would allow the AMC equipment to view and control the CCTV cameras at the P&DC remotely. ATSI was responsible for bring the CCTV system on-line and teaching the P&DC maintenance staff how to operate and maintain the system and all components and cameras. ATSIC was responsible for maintenance of the CCTV system and equipment for the first year after final acceptance by the Postal Service.

D. The new Intercom system (IC) portion of this contract required ATSIC to provide, install, program and connect a series of wall or pole mounted intercom stations to allow for an employee, contractor or visitor to call into the control room and talk with a security guard. The new IC system was designed to allow for two-way communications between the IC call station and the guard in the control room. ATSIC was also responsible to establish a link between the IC at the P&DC facility with the IC at the Air Mail Center (AMC) which would allow the Postal Police at the AMC to communicate with any of the IC call stations at the P&DC remotely. ATSIC was responsible for bring the IC system on line and teaching the P&DC maintenance staff how to operate and maintain the system and all components. ATSIC was responsible for maintenance of the IC system and equipment for the first year after final acceptance by the Postal Service.

5. On March 21, 2002, I was present at the Project site to meet with members of ATSIC and to inspect the construction in progress. By letter dated March 25, 2002, to Jerry Goddard, I provided a field investigation report based in part upon my visit on March 21, 2002. Exhibit F is a true and correct copy of this field investigation report.

6. On April 2, 2002, I was present at the Project site to meet with members of ATSIC and to inspect the construction in progress. By letter dated April 4, 2002, to Jerry Goddard, I provided

a field investigation report based in part upon my visit on April 10, 2002. Exhibit G is a true and correct copy of this field investigation report.

7. On April 10, 2002, I was present at the Project site to meet with members of ATSIC and to inspect the construction in progress. By letter dated April 16, 2002, to Jerry Goddard, I provided a field investigation report based in part upon my visit on April 10, 2002. Exhibit H is a true and correct copy of this field investigation report.

8. On May 21, 2002, I was present at the Project site to meet with members of ATSIC and to inspect the construction in progress. By letter dated May 24, 2002, to Jerry Goddard, I provided a field investigation report based in part upon my visit on May 24, 2002. Exhibit K is a true and correct copy of this field investigation report.

9. On June 9, 2002, I was present at the Project site to meet with members of ATSIC and to inspect the construction in progress. By letter dated June 10, 2002, to Jerry Goddard, I provided a field investigation report based in part upon my visit on June 9, 2002. Exhibit L is a true and correct copy of this field investigation report.

10. I was aware in June, 2002, that ATSIC and USPS executed a modification to the contract which established a revised completion date of July 15, 2002.

11. As of July 15, 2002, ATSIC had not completed the Project.

12. On July 24, 2002, Jerry Goddard and I met with Jose Zamora to inspect the construction in progress for the Project. By letter dated July 25, 2002, to Jerry Goddard, I provided a field investigation report covering the 49-day period from June 6, 2002, through July 25, 2002. Exhibit V is a true and correct copy of this field investigation report.

13. At a meeting held at the Project site on July 31, 2002, Jerry Goddard, on behalf of USPS, issued a stop work order to representatives of ATSIC, including Greg Warren and Jose Zamora.

I was present at this meeting. Mr. Warren refused to sign for receipt of the stop work order, therefore Sergeant Perry P. Puglisi wrote on the stop work order that Mr. Warren refused to sign for receipt. ATSIC had not completed the project by July 31, 2002.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my personal knowledge.

Dated the 27 day of April, 2006.

Joseph Stuhl

On the 27 day of April, 2006, before me personally appeared Joseph E. Stuhl, known to me to be the person whose name is subscribed herein.

In witness whereof I hereunto set my hand and official seal.

LAWRENCE H. KATZ
MY COMMISSION # DD426503
EXPIRES: July 30, 2009
1-800-3-NOTARY Fl. Notary Discount Assoc. Co.