**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| ADVANCED TECHNOLOGY SYSTEMS INTEGRATORS CORP.<br><br>and<br><br>INTERNATIONAL FIDELITY INSURANCE COMPANY<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 03-1953C<br>(Senior Judge Margolis) |

**PLAINTIFF ADVANCED TECHNOLOGY SYSTEMS INTEGRATORS CORP.'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

COMES NOW Plaintiff Advanced Technology Systems Integrators Corp. ("ATSIC"), by and through its undersigned counsel, files its Memorandum of Law in Opposition to Defendant's Motion for Partial Summary Judgment, and states as follows:

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................ 3

SUMMARY OF THE ARGUMENT ........................................ 5

ARGUMENT ........................................ 6

I. STANDARD OF REVIEW ........................................ 6

II. DEFENDANT'S MOTION TO DISMISS INTERNATIONAL FIDELITY .................... 6

III. DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO COUNTS I AND II ........................................ 7

A. The Government's Position That it is Entitled to Summary Judgment

for "Any Claims Arising Prior to Modification No. 11" is Irrelevant as to ATSIC's Claims, but Requires the Court to Find That the Government Can Make no Claim Against ATSIC for Excess Reprocurement Costs ..... 7

1. The Effect of Modification No. 11. ..... 7

2. ATSIC was Unconscionably Coerced by the Government into Signing Modification No. 11. ..... 11

B. ATSIC has Established that Facts After the Execution of Modification No. 11 were Justifiable Cause for Excusable Delay ..... 11

1. The Government's Position that ATSIC Cannot Establish That it Was Delayed Due to Rain, Because Rain was Foreseeable, Ignores the Unopposed Facts in the Record ..... 11

2. ATSIC has Established that it was Delayed Due to the Postal Service's Conduct and Contract Modifications. ..... 16

3. The Postal Service Terminated the Contract Before the Termination for Completion Deadline Under Contract Modification No. 11. ..... 19

3(i). *The Contract required adherence to the completion date.* ..... 19

3(ii). *The Contracting Officer failed the fundamental requirement of acting in good faith.* ..... 20

4. There is Overwhelming Evidence of Other Governmentally-Based Causes of Delay. ..... 21

C. The Termination for Default was Procedurally Defective. ..... 26

1. Issuance of the Third Show Cause Letter was a Ruse. ..... 26

2. The Government Failed to Comply with the Requirement to Calculate Delay Days.. ..... 26

D. The Government Established Two Other Dates for Completion, Neither of Which was Reached Prior to Termination. ..... 28

1. USPS Terminated ATSIC Prematurely Under the September10, 2002, Date Specified in the Second Show Cause Letter. .......................... 28

2. USPS Terminated ATSIC Prematurely Under Modification No. M02 of Contract No. 123125-00-B-3153 of the AMC Project. ............... 28

3. The Postal Service Failed to Comply with Termination Notice Requirements. ........................................................................... 29

4. The Postal Service Notice of Termination violated USPS Purchasing Manual Notice Requirements. .............................................. 29

E. Concurrent Delay by the Government Excuses the Contractor. .......................... 30

F. The Government's Exclusive Remedy for Termination was Liquidated Damages. ..................................................................................... 31

IV. THE GOVERNMENT'S OBJECTION TO COUNT III IGNORES THE MANIFOLD FACTS IN THE SECOND AMENDED COMPLAINT ........................... 31

CONCLUSION ............................................................................................. 37

CERTIFICATE OF SERVICE ........................................................................ 37

TABLE OF AUTHORITIES

Cases

*Abcon Assocs. v. United States*, 49 Fed. Cl. 678 (2001) .......................................................... 22

*Alliant Techsystems, Inc., v. United States*, 178 F.3d 1260 (Fed. Cir. 1999) ............................. 17

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................... 6

*Appeal of Meyer Labs., Inc.*, ASBCA 18033, 1973 WL 1683 (1973) ........................................ 10

*Argent v. United States*, 124 F.3d 1277 (Fed. Cir. 1997) .......................................................... 6

*C. Sanchez & Son*, 6 F.3d 1539 (1993) ..................................................................................... 22

*Centex Corp. v. United States*, 395 F.3d 1283 (Fed. Cir. 2005) .................................................. 22

*Commerce Int'l Co. v. United States*, 338 F.2d 81, 167 Ct. Cl. 529 (Ct. Cl. 1964) .................... 22

*D.V. Gonzalez Elec. & Gen. Contractors, Inc. v .United States*, 55 Fed. Cl. 447 (2003) ........... 35

*Danzig v. AEC Corporation*, 224 F.3d 1333 (Fed. Cir. 2000) ..................................................... 26

*Discount Co., Inc. v. United States*, 213 Ct. Cl. 567, 554 F.2d 435 (1977) ................................ 16

*Empire Energy Management Systems, Inc. v. Roche*, 362 F.3d 1343 (Fed. Cir. 2004) ............... 27

*First Nationwide Bank v. United States*, 431 F.3d 1342 (Fed. Cir. 2005) .................................. 31

*Fru-Con Constr. Corp. v. United States*, 44 Fed. Cl. 298 (1999) ............................................... 13

*Info. Sys. & Networks Corp. v. United States*, 437 F.3d 1173 (Fed. Cir. 2006) ............................ 6

*Lewis-Nicholson, Inc. v. United States*, 550 F.2d 26, 213 Ct. Cl. 192 (Ct. Cl. 1977) ........... 22, 23

*Malone v. United States*, 849 F.2d 1441 (Fed. Cir. 1988) ............................................. 17, 22, 23

*McDonnell Douglas Corp. v. United States*, 323 F.3d 1006 (Fed. Cir. 2003) ............................ 27

*Morganti National Inc. v. United States*, 49 Fed. Cl. 110 (2001) .................................. 17, 18, 30

*National Eastern Corporation v. United States*, 201 Ct.Cl. 776, 477 F.2d 1347 (Ct.Cl. 1973) .. 17

*Olympus Corp. v. United States*, 98 F.3d 1314 (Fed. Cir. 1996) ................................................ 22

*Orlosky Inc. v. United States*, 68 Fed. Cl. 296 (2005) ............................................................... 23

*Peter Kiewit Sons' Co. v. United States*, 151 F. Supp. 726 138 Ct. Cl. 668 (Ct. Cl. 1957) ......... 22

*Tabb Lakes, Ltd. v. United States*, 10 F.3d 796 (Fed. Cir. 1993) .................................................. 6

*Tecom, Inc. v. United States*, 66 Fed. Cl. 736 (2005) ................................................................ 22

*TGC Contracting Corporation v. United States*, 736 F.2d 1512 (Fed. Cir. 1984) ...................... 17

*Weaver-Bailey Contractors, Inc. v. United States*, 19 Cl. Ct. 474 (1990) .................................. 30

Miscellaneous Authorities

Federal Rules of Civil Procedure ........................................................................................ 35

Restatement (Second) of Contracts (1981) .................................................................... 22

## SUMMARY OF THE ARGUMENT

The Government's argument for reprocurement costs is completely undermined by its position that Modification No. 11 constituted an accord and satisfaction. Because all payments made to ATSIC were made after approval of the work by the Government, an accord and satisfaction eliminated and waived any right the Government may have wanted to assert to review another time the work performed before Modification No. 11.

The severe weather in the form of persistent, often torrential, rain, and the Government's continuing failure to make payments as agreed, were both significant causes of ATSIC's failure to complete the Project timely, and the Government was contractually bound to take such delay days into account and extend the completion date. Besides terminating the Contract prematurely, the termination was procedurally defective, and the Government twice established a completion date months later than the date on which ATSIC was terminated.

Perhaps worst of all, the Contracting Officer and the Project Manager were not acting in good faith. They manifested every intention of undermining ATSIC by failing to abide by the Contract requirements. The Contracting Officer even prepared the "stop work" letter before the completion date expired and ATSIC provided evidence of valid reasons for delay days to be added to the Contract.

Concurrent delay by the Government excuses the Contractor from the delay. Thus, by law,

ATSIC could only be terminated for convenience, and, by Contract, the only penalty was liquidated damages, not reprocurement costs.

Because this is a response to the Government's Motions to Dismiss and for Partial Summary Judgment, ATSIC must only raise a genuine issue of material fact regarding these issues. It raises this, and far more, in the Argument below.

## ARGUMENT

### I. STANDARD OF REVIEW

> A grant of summary judgment is appropriate "where the record shows 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"

*Info. Sys. & Networks Corp. v. United States*, 437 F.3d 1173, 1176 (Fed. Cir. 2006), *citing Argent v. United States*, 124 F.3d 1277, 1280 (Fed. Cir. 1997), *quoting Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 799 (Fed. Cir. 1993). As cited by the Defendant in its Motion, Mot. at 5 (Docket No. 60), a "material fact" is one "that might affect the outcome of the suit under the governing law," and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### II. DEFENDANT'S MOTION TO DISMISS INTERNATIONAL FIDELITY

With regard to Defendant's Motion to Dismiss International Fidelity, Plaintiff Advanced Technology Systems Integrators Corp ("ATSIC")[1] relies upon and hereby incorporates the

---

1

The Defendant may be known as the "United States," the "Government," the "Postal Service," or "USPS." Plaintiff Advanced Technology Systems Integrators Corp. shall be known as "ATSIC." Plaintiff International Fidelity Insurance Company may be known as "International Fidelity."

Memorandum of Law and any appendix or other supporting documents to be filed by Plaintiff International Fidelity Insurance Company.

## III. DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO COUNTS I AND II

### A. The Government's Position That it is Entitled to Summary Judgment for "Any Claims Arising Prior to Modification No. 11" is Irrelevant as to ATSIC's Claims, but Requires the Court to Find That the Government Can Make No Claim Against ATSIC for Excess Reprocurement Costs

#### 1. The Effect of Modification No. 11.

Plaintiff has made no claims for matters arising prior to Modification No. 11. Plaintiff's sole outstanding claim is for payment under Pay Application 17, which was paid in part after Modification No. 11 was approved by the parties, and Pay Application 18, which was submitted after the parties' approval of Modification No. 11 and concerned work performed or otherwise due after the parties approval of Modification No. 11. See Dep. Ex. 20 (Payment Application No. 17),

---

The documents referenced in the parties' cross motions for summary judgment were (i) the jointly-filed text of the depositions taken in this matter, denominated herein by "[name of deponent] dep. [page and line]" filed as Attachment 2-5 of Docket No. 61, (ii) documents identified as exhibits at deposition, denominated "Dep. Ex. ___," which were sequentially numbered throughout the depositions, found at Docket No. 58, and (iii) additional documents attached to the parties' summary judgment motions. The additional documents referenced as exhibits to ATSIC's Motion for Partial Summary Judgment are denominated herein as "Mot. Ex. ___," and are filed at Docket No. 57. All such documents were filed as attachments to ATSIC's Motion for Partial Summary Judgment, except as to the deposition texts, which were jointly filed by Defendant, and all such documents are incorporated herein by this reference. In addition to the foregoing documents, the documents referenced in this Memorandum of Law may include additional deposition exhibits or other documents, all of which shall be attached to this Memorandum and denominated herein as Dep. Ex. ___ or as Mem. Ex. ___.

The Contract incorporates USPS Facilities Department Contract Requirements, reference to which are denoted in this Motion as F.D. §___, which are filed as Docket No. 57. References to the sections of the United States Postal Service Purchasing Manual shall be denoted as "Purch. Man.§____." Each Contract modification may be known as "Mod. ___."

21 (Response to Show Cause letter referencing enclosure of Payment Application No. 18).

The relevant language of Modification No. 11, Dep. Ex. 31A, states the following:

> By signing this mod, both parties agree that all issues through mod 11 and 5/29/02 are mutually agreed to and will not be made a part of any claim arising out of or related to either contract 123125-00-B03153 [the so-called "AMC" contract] or 123125-00-B-3154 [the subject "P&DC" contract].

The Government asserts that ATSIC's agreement not to make a claim for matters arising prior to Modification No. 11 means that nothing that occurred prior to such date is relevant to the Court's inquiry. This is incorrect on its face. The Contract, the prior payment applications and payments, the work previously done, and the orders by the Government for ATSIC not to proceed on some facets of the project until the Government completes work (prepares design plans for other contractors) unrelated to the Contract, all existed. Modification No. 11 did not erase them; it merely asserted that the parties could not make a claim based on them.

Furthermore, the Government's own reprocurement assertions against ATSIC undermine the interpretation of Modification No. 11 that the Government here asks the Court to adopt. The Government seeks from ATSIC excess reprocurement costs for work that the Government, by payment of the first seventeen Payment Applications, agreed was finished and approved. F.D. § F.2e (second ¶e; payment is to be made after acceptance), Mem.Ex. 1. Surely, if the Government asserts, on the one hand, that the cited language prohibits ATSIC from asserting non-financial matters (delays, course of dealing) against the Government, then, *a fortiori*, the Government cannot then assert against ATSIC financial matters (reprocurement costs for work previously approved by the Government).

Furthermore, the Government recognizes that the effect of the quoted language was financial,

as it specifies in its brief that "Modification No. 11 represents an accord and satisfaction of (sic) as to any claims that the parties could have brought prior to Modification No. 11." Motion at 9 (Docket #60). As an accord and satisfaction, Modification No. 11 undermines and completely eviscerates the Government's assertion of excess reprocurement costs against ATSIC. Because, by Contract, all work that was paid for was already completed to the Government's satisfaction, then the only work that remained under the Contract was able to be completed within the remainder of the money due under the Contract. Moreover, because the Government withheld retainage from ATSIC [F.D. § F.2c (Mem. Ex. 1); Dep. Ex. 20], the work to be completed was less in value than the amount that the Government retained under the Contract.

In addition to the legal limitation on the Government's argument due to the accord and satisfaction, there is evidence that the work could actually (not just "supposedly" or "presumably" be completed for the amount retained by the Government at termination. The outside contractor, Tri-State Life Safety & Electric System, Inc. ("Tri-State"), that the Government eventually retained to complete the Project, informed ATSIC in late May of 2002 that it could complete (and was interested in completing) the Project for less than the amount remaining under the Contract. Mr. Stuhl, the Government's Project manager, made no secret that he wanted Tri-State to be retained for that purpose. Vento dep. 99:11-101:20, Warren dep. 77:4-22, and Dep. Ex. 18. When Mr. Stuhl became completely intractable, and he and Mr. Goddard refused to approve payment requests and change orders, some of which were more than ten months old (Dep. Ex. 57), ATSIC contacted Tri-State to ask Tri-State to consider completing the P&DC Project for ATSIC. Tri-State was interested in doing so for approximately $215,000.00, which was less than the amount remaining and unpaid

under the Contract. Dep. Ex. 20 (showing $269,672.21 remaining unpaid).

The Government relies on *Appeal of Meyer Labs., Inc.*, ASBCA 18033, 1973 WL 1683 (1973), for the proposition that, by entering into a new contract completion date, the prior delay caused by the Government was no longer relevant to the inquiry of timely completion. Essentially, the Government argues that its numerous mistakes prior to such date are deemed to be cured. However, *Meyer Labs* is wholly dissimilar to the facts presented in the instant case. Some of the dissimilarities are as follows:

1. In the instant case, even after May 29, 2002, the Government refused to pay outstanding amounts, including payment of materials that the Government agreed to pay at 100%. Warren dep. 132:19-135:20; Dep. Ex. 20, 26. This caused ATSIC, which had relied on the Government's representations, not to be able to procure the remaining needed items to complete the Project. *Id.*

2. The Government continued to restrict ATSIC from working in the control room, where a significant portion of the remaining inside work was to be done. As of May 29, 2002, this restriction had lasted for more than four months and had nothing to do with ATSIC. It was due solely to the Government's need (and evident failure) to prepare air conditioner design plans for another contractor. Vento dep. 55:1-57:16, 116:8-117:11, 161:21-162:9, and Dep. Ex. 56. USPS never rescinded or revised these directions, thus making completion of the Project <u>impossible</u>. Vento dep. 129:10-130:3, 130:15-132:6.

3. After what the Government deems to be the new contract (or accord and satisfaction) date of May 29, 2002, there are legitimate causes for delay, such as persistent rainy weather that

made the outside work of trenching or pouring concrete or installing electrical components impossible to do, which the Contracting Officer is contractually bound to take into account and add to the completion date. F.D. § C.3a; Mot. Ex. 1. This he failed to do.

2. ATSIC was unconscionably coerced by the Government into signing Modification No. 11.

The Postal Service failed to negotiate in good faith. After ATSIC waited as much as ten or more months for USPS to approve Modifications, in some cases for work already performed at the Project Manager's insistence and direction, and during which ATSIC was directed not to proceed with some of the work, but continued to incur overhead, the Contracting Officer refused to sign a modification to move forward unless ATSIC (i) relinquished its rights to payment for proposed Modifications 3, 4, 5, and interest due on the Government's delay in payment, and (ii) accepted a reduction from $93,759.10 to $63,009.49 in Pay Application No, 17, the work for which had already been approved by SEC. Dep. Ex. 20; Zamora dep. 72:12-73:10; Dep. Ex. 31A (Modification 11).

B. <u>ATSIC has Established that Events After the Execution of Modification No. 11 Constituted Justifiable Cause for Excusable Delay.</u>

1. The Government's Position that ATSIC Cannot Establish That it Was Delayed Due to Rain, Because Rain was Foreseeable, Ignores the Unopposed Facts in the Record

The following salient facts are undisputed in the record: The Project is located in Miami, Florida. Mot. Ex. 1. It rained in Miami on no fewer than 37 of 48 days before the agreed completion date, and the rain was often torrential. Dep. Ex. 21. Much of the work that remained to be completed on the Project was required to be completed out of doors. Dep. Ex. 17. Much of the non-outdoor work was in the control room, which affected the critical path and on which the

Government had prevented ATSIC from proceeding, through no fault of ATSIC. Dep. Ex. 23 (Item 5). ATSIC made such progress, even in the face of these difficulties, that the number of items to be remedied by ATSIC was reduced from six to one between May 1, 2002, when the second Show Cause letter was issued detailing six alleged failings of ATSIC, and July 15, 2006, when the third and final Show Cause letter was issued, which stated "Failure to complete project per revised completion date" as the only alleged failing. Dep.Ex. 5, 9.

The Government attempts to make the case that, because rain is foreseeable, it was not a basis for an extension. However, this ignores the additional following, undisputed in the record, salient facts that bear directly on the issue of an extension due to rain: ATSIC proposed a schedule that, if all went perfectly, required five weeks to complete the work. Dep. Ex. 17. In the cover letter accompanying that schedule, ATSIC proposed an additional week and preconditioned the resolution on the Government's assent to the remaining conditions. *Id.* ATSIC and the Contracting Officer settled in Modification No. 11 on a period of seven weeks to complete the work (oral agreement by May 29, 2002, for completion by July 15, 2002), Dep. Ex. 31A, which allowed ATSIC two extra weeks for rain. The Contracting Officer failed to sign Modification No. 11 until June 20, 2002, leaving ATSIC only 3½ weeks to complete the work before July 15, 2002. Dep. Ex. 31A. During the entire period of seven weeks, the frequency of the rain was exceptional, and the amount of rain was torrential. Dep. Ex. 21, 33, 42 (Item #6). By its very nature, as a matter of common sense and reason, seven weeks of daily, often torrential rain is not foreseeable and is "severe weather," as set forth in the Regulations (F.D. § C.3a) imported into the Contract.

In addition to the unopposed evidence of the amount of rain during the 45 days prior to

termination, the overwhelming, uncontradicted testimony establishes that the weather had an adverse impact on critical work. Warren dep. 146:16-147:7, 148:25-150:4; Zamora dep. 26:24-27:14, 73:15-74:11, 97:23-98:7; Dep. Ex. 17, 33, 42 (detailing persistent rain in June 2002), 43. Some of the rain was heavy (several inches in a day), Dep. Ex. 21, which could effectively halt trenching work for an additional day. Furthermore, some work had to be completed before other work could be done, so ATSIC was equitably entitled to an extension of 35 days due to the weather delays. Zamora dep. 70:24-7:6; Dep. Ex. 17 (schedule printout). This testimony, supported by the exhibits, is sufficient, under the standard cited by the Government relying on *Fru-Con Constr. Corp. v. United States*, 44 Fed. Cl. 298 (1999), for ATSIC to prevail on the issue of its right to have been granted rain delays, and it is more than sufficient to establish a genuine issue of material fact regarding whether the rain days should have been granted to ATSIC.

Furthermore, rhetoric in cases such as *Fru-Con* is not dispositive. First, a rain delay of a few days in the course of a project of more than two years (as in *Fru-Con*) is a relatively small matter, whereas a rain delay of more than 75% of the days of a project with a significant outdoor component is obviously critical. In the instant case, the parties agreed by May 29, 2002, to extend the contract completion date, ultimately choosing July 15, 2002, for such date. This is a period of 47 days. The Government failed to sign the document, Modification No. 11, Dep. Ex.31A, until June 20, 2002, leaving only 25 days before the completion date. During the period of 48 days from June 1, 2002, through July 18, 2002, it rained 37 days. Dep. Ex. 21. This is more than 75% of the days remaining to complete the Project.

The Government's argument as to foreseeability is undermined by the amount of rain and

the torrential nature of much of the rain, making the event "severe weather." ATSIC characterized the rain as "excessive" and "torrential," and the letters from Messrs. Warren and Zamora seeking extension of the completion date clearly specify that they believe that the amount of rain justified extension of the completion date. Warren dep. 146:16-147:7, 148:25-150:4; Zamora dep. 26:24-27:14, 73:15-74:11, 97:23-98:7; Dep. Ex. 21, 33. The Government has presented no expert testimony, or, indeed, testimony or other evidence of any kind, that the amount of rain was different than as described by ATSIC. This evidence is more than adequate to establish, if not proof of the right to an extension of the completion date, then a genuine issue of material fact regarding the right to an extension for rain days.

The Contract provides for rain day delays. As required by the Excusable Delays provision of the Contract, F.D. §C.3, and consistent with the course of dealing between the parties, the July15, 2002, Show Cause letter offered ATSIC the opportunity to show facts indicating that ATSIC's delay in completing the project arose out of causes beyond ATSIC's control and without fault or negligence by ATSIC. On July 19, 2002, ATSIC provided a letter to USPS showing that its work had been delayed (i) because of nearly continuous rain during June and early July, 2002, and (ii) because of USPS's failure to timely process payment applications. Warren dep. 89:13-90:13, 95:24-96:5 and Dep. Ex. 21 (showing delays of 37 days for rain and 24 days for late payment). The letter included, *inter alia*, National Weather Service records showing rain on 37 of the previous 48 days, Zamora dep. 55:14-23; Dep. Ex. 21, and delays due to the Government's failure to pay outstanding invoices. This uncontroverted information required the Contract Officer (i) to extend the delivery schedule accordingly, and (ii) to recognize that, in the event of termination, "the supplier will not

be in default." F.D. §C.3a.

On August 16, 2002, USPS issued its Termination for Default, effective July 31, 2002. In issuing its Termination for Default, USPS again violated the Contract by failing to properly consider the fact that ATSIC was entitled to an equitable extension of the time of performance because of severe weather consisting of excessive rain, which delayed its work. F.D. §C.3a. Significant and persistent rain, which effectively halted the trenching and the gate and closed circuit television installation and testing of the electronic security components to be installed by ATSIC under the Contract, rendered timely completion impossible. Warren dep. 146:16-147:7, 148:25-150:4; Zamora dep. 26:24-27:14, 73:15-74:11; Dep. Ex. 33, 42 (detailing persistent rain in June 2002), 43. Furthermore, some work had to be completed before other work could be done, so ATSIC was equitably entitled to an extension of 35 days due to the weather delays. Zamora dep. 70:24-7:6; Dep. Ex. 17 (schedule printout).

ATSIC's on-site Project Manager, José Zamora, was asked at deposition:

> Q. Was it your understanding at this time that if Advanced Technology, in cooperation with the government, had had sufficient funds and if the rain had not intervened that the project would have been able to be completed according to this schedule that's set forth here?
>
> A. At that time they should have been able to have been (sic) completed.
>
> Q. According to the schedule?
>
> A. Yeah.

Zamora dep. 97:23-98:7; Dep. Ex. 17.

The Government's implicit assertion is that, even if the outside work could not be completed due to rain, the other work could be done. Motion at 11-13 (Docket #60). To some degree, this may

be correct. However, ATSIC did the available work. Dep. Ex. 42 (letter from Jose Zamora detailing the work that had been done and was being done during the interim period).

The Government's legally unsupported assertion that a rain day is only permitted if, four years after the fact, the claimant is able to remember exactly which aspect of a Project was to have been completed on any particular day, is specious, and it ignores the facts of the instant case. First, there is no law requiring ATSIC to know or provide that information at the summary judgment stage. It is more than sufficient that the uncontroverted evidence, corroborated by multiple witnesses, several documents, and climatological data supplied by the federal Government through the National Oceanographic and Atmospheric Administration, all uniformly support that there was severe weather in the form of persistent, excessive rain that disrupted the contractor's opportunity to complete the work.

Second, it is undisputed that the Government asked ATSIC for such a schedule, Dep. Ex. 5, and that ATSIC had and supplied such a schedule on May 13, 2002. Dep. Ex. 17. The delays that occurred thereafter were due to the rain and the failure of the Government to fulfill its payment and other obligations. The remaining work was completed. Dep. Ex. 42.

2. ATSIC has Established that It was Delayed Due to the Postal Service's Conduct and Contract Modifications.

While attempting to assert that ATSIC cannot prosecute its claim for delay based on the Government's failure to pay ATSIC, due to the Government's argument that ATSIC's financial condition was poor, the Government properly states that "an exception applies when the contractor's financial difficulties are caused by the acts or omissions of the Government," *citing Discount Co., Inc. v. United States*, 213 Ct. Cl. 567, 554 F.2d 435, 442 (1977). Motion at 13 (Docket #60).

> Although it is well settled that the mere financial incapacity of a contractor to perform is not a cause beyond its control and without its fault or negligence, it is equally well established that financial incapacity can be excusable when it was precipitated by causes beyond the control and without the fault or negligence of the contractor. This is *a fortiori* true when the precipitating causes are acts or omissions of the Government, the other contracting party. As a result, and as illustrated by the cited cases, closer issues are presented herein than would at first blush appear. [Footnotes omitted.]

*National Eastern Corporation v. United States*, 201 Ct.Cl. 776, 477 F.2d 1347, 1356 (Ct.Cl. 1973).

> [W]hen the financial incapacity of the contractor to perform is caused by the acts or omissions of the government, the default is excused and the contract is deemed to have been terminated for the convenience of the government.

*TGC Contracting Corporation v. United States*, 736 F.2d 1512, 1515 (Fed. Cir. 1984). The Court in *TGC* cites numerous cases in which the government's failure timely to accept work and pay the contractor as required under the contract, causing financial stress to the contractor, or failing to pay the actual value of the services received, forms a basis for an excusable default by the contractor. *TGC* at 1515.

> A contractor's failure to perform may be excused and a termination for default converted to a termination for the convenience of the Government if the contractor can establish that the Government materially breached the Contract. *Alliant Techsystems, Inc., v. United States*, 178 F.3d 1260, 1276 (Fed. Cir. 1999); *Malone v. United States*, 849 F.3d 1441, 1445 (Fed. Cir. 1988).

*Morganti National Inc. v. United States*, 49 Fed. Cl. 110, 140 (2001). For all the reasons described throughout the Second Amended Complaint (Docket No. 42) and this Memorandum, the Postal Service's conduct in administering the Contract amounted to a material breach, and the failure of the Postal Service to pay (including the unreasonable and unconscionable withholding of 75% retainage) created the financial incapacity of ATSIC. Accordingly, any failure to perform on the part of ATSIC should be excused, and the termination for default should be converted to one for the

convenience of the Government. *See Morganti, supra*. Just as in the *Morganti* case, the contract was materially breached by the Government entity by: (1) making late progress payments; (2) making baseless retainages and excessive withholdings; and (3) failing to negotiate and make payments of change orders and modifications directed by the Postal Service or its project manager. *See Morganti, supra*, at 140.

The Government's assertion that ATSIC has no basis to assert its claim for delay based on the Government's failure ignores the only relevant evidence regarding the issue. In his deposition, Vincent Vento, the President of ATSIC, stated clearly and categorically that ATSIC had resources and had several large projects underway when the P&DC project began. Vento dep. 45:11-49:24; Dep. Ex. 51, 52. The financial undoing of ATSIC with regard to this Project was due to (i) the inordinate period of time required to complete the Project due to the continual delays interjected by the Government's Project Manager, and (ii) the Government's failure to comply with the direct promises of the Contracting Officer, such as paying for materials and equipment on an expedited basis. (Warren dep. 119:13-120:23, 134:6-135:5, Dep. Ex. 26).

ATSIC repeatedly informed the Government of the difficulties engendered by the Government's failure to pay. Vento dep. 139:5-21, 157:8-159:5, 163:20-164:14, 164:21-165:19, 135:3-136:22; Warren dep. 32:23-34:15 39:9-23 , 101:19-103:18, 114:16-115:10, 119:13-120:23, 121:25-124:6, 127:7-21, 131:24-132:16, 134:6-135:5; Zamora dep. 72:12-73:10, 78:23-80:3, 80:7-81:1, 83:11-84:9; Dep Ex. 17, 21, 25 26, 57, 59. While ATSIC waived in Modification No. 11 the right to make a financial claim based on the events occurring prior to May 29, 2002, it did not agree to ignore the effects on its financial well-being of the Government's continual extreme tardiness. Furthermore, ATSIC made purchasing arrangements in reliance of the payment agreement of the

Contracting officer, and the Contracting Officer then refused to make payments as agreed. Warren dep. 119:13-120:23, 134:6-135:5, Dep. Ex. 26. This is no mere passive observance by the Government of the financial decline of a contractor; the decline was due specifically and clearly to (i) the failure of the Government to make timely payments on submitted Pay Applications as contractually required, and (2) the explicit promise of the Contracting Officer to pay, followed by his failure to do so.

It is not necessary for ATSIC to establish that it will prevail on the issue of whether the Government's failure to pay timely was cause for delay days; on summary judgment it is sufficient that ATSIC has presented evidence which, if the Court determines at trial has merit, would allow ATSIC to prevail on this issue. ATSIC has presented such evidence, and the Government has presented none.

3. The Postal Service terminated the Contract before the termination for completion deadline under Contract Modification No. 11

3(i). *The Contract required adherence to the completion date.*

Simultaneously with the issuance of its third Show Cause letter, on July 15, 2002, USPS issued a second letter directing ATSIC "to immediately cease all work at the job-site until further notice." Dep. Ex. 32. Even if the USPS did have the right to terminate ATSIC for failure to complete the work by July 15, 2002, ATSIC could not be in default until July 16, 2005, Vento dep. 149:16-150:24 and Dep. Ex. 31A, supplemented by authorized, required delay days. The letter from the USPS requiring ATSIC to cease in ATSIC's attempt to complete the work was issued prior to the expiration of the contracted completion deadline. ATSIC cannot be at fault for failing to complete the work by the deadline, when the USPS ordered ATSIC to stop work prior to the

deadline.

Suspension of the work by the Contracting Officer requires an extension of the Contract. F.D.§C.2a. Unless the termination is construed as a termination for convenience, USPS's order for ATSIC to stop work prior to the deadline, (i) made it impossible for ATSIC to have the full, contracted time to complete the job before that deadline, (ii) violated the requirement of a 10-day cure period after notice of a specified failure, and (iii) constituted a clear and direct breach by USPS of the Contract Modification No. 11 deadline executed less than a month earlier. Modification No. 11, Dep. Ex. 31A. Furthermore, because the suspension of work occurred prior to the deadline, and was never lifted, ATSIC still, to this day, has never received the required Contract extension. Therefore, any termination of ATSIC for failing to meet the completion date cannot be for cause.

3(ii). *The Contracting Officer failed the fundamental requirement of acting in Good Faith.*

There is a more fundamental issue presented here. The Contracting Officer, who, through the Project Manager, had already been informed of the daily rain (Dep. Ex. 42), and who knew that he had failed to comply with his own promise to Greg Warren of ATSIC that he would expedite payment of the cost for materials (Warren dep. 119:13-120:23, 134:6-135:5, Dep. Ex. 26), prepared the stop work order (1) before the end of the completion date, (2) before determining how many days of rain delay he was contractually required to authorize, (3) before determining how many days of payment delay he was contractually required to authorize, and (4) before allowing the contractually required cure period. The fact that he was one day premature in the issuance of the show cause letter is not the principal issue; it is the fact that it is irrefutable proof that he intended, even before the contract completion date, not to comply with the contract by observing in good faith

the four requirements set forth in the prior sentence. This is clear and convincing evidence of his lack of good faith. He had already made up his mind before reviewing the evidence.

4. There is Overwhelming Evidence of Other Governmentally-Based Causes of Delay.

The Government's Motion takes great pains to establish that "the defects and deficiencies in the plans and specifications," "over inspection and active interference in the Project by USPS's Project Engineer," "poor and untimely communication," "changes and constructive changes in the work on the Project," and "the manner in which the Government processed proposed Contract modifications," each of which was asserted by Plaintiffs in Paragraph 16 of the Second Amended Complaint, do not, by themselves, create a basis for the Court to find that the Contracting Officer was required to find a delay. Of particular importance to this argument is that some of these activities by the Government occurred prior to the May 29, 2002, date set forth in Modification No. 11 before which claims were waived. However, in taking this perspective, the Government ignores the larger issue in two ways.

First, these actions of the Government did not occur in a vacuum. They occurred in a climate in which the Contracting Officer and Project Engineer, acting as the Government, continuously and systematically failed to perform their jobs properly, resulting in a tremendously prolonged period of overhead expense, resulting in the poor economic condition of ATSIC. Thus, even if these objectionable activities do not by themselves, in part because of their timing, create a basis for extension, they contribute to the circumstances (ATSIC's poor economic health at the end of the Project exacerbated by the Government's failure to pay for completed work and for materials for which it promised to pay) that do create a basis for the extension.

Second, the larger issue is not whether ATSIC was entitled to delay days, for the evidence is overwhelming that it was. At issue here is the Government's pervading gross negligence, disregard of contractual requirements, and, in some cases, intentional interference with ATSIC's ability to complete the work. The question is whether the Government is required to act in good faith. The Postal Service seems to think not. The cases say otherwise.

> Every contract includes the implied covenant of good faith and fair dealing. *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005); see also Restatement (Second) of Contracts 205 (1981). Two closely related aspects of the covenant of good faith and fair dealing are "the duties to cooperate and not hinder the contractor's performance." *C. Sanchez & Son, Inc. v. United States,* 6 F.3d 1539, 1542 (Fed. Cir. 1993); *Centex Corp.*, 395 F.3d at 1304 (stating that the covenant of good faith and fair dealing "imposes obligations . . . that include the duty not to interfere with the other party's performance"); *see Olympus Corp. v. United States*, 98 F.3d 1314, 1318 (Fed. Cir. 1996) ("Interference by the government with a contractor's access to the work site may constitute a breach of the government's duty to cooperate . . . ."). A breach of these duties is actually a breach of the covenant of good faith and fair dealing. *See Malone v. United States*, 849 F.2d 1441, 1445 (Fed. Cir. 1988).
>
> The duty not to hinder performance requires a party "not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex Corp.*, 395 F.3d at 1304. The contracting party is prohibited from "doing anything to prevent performance . . . by the [contractor] or that will hinder or delay him in its performance." *Lewis-Nicholson, Inc. v. United States*, 550 F.2d 26, 32, 213 Ct. Cl. 192 (Ct. Cl. 1977). "Not only must the Government refrain from hindering the contractor's performance, it must do whatever is necessary to enable the contractor to perform." *Id.* . . .
>
> The Government breaches these duties when it acts unreasonably under the circumstances-specifically, if it unreasonably delays the contractor or unreasonably fails to cooperate. *See C. Sanchez & Son*, 6 F.3d at 1542 ("The government must avoid actions that unreasonably cause delay . . . ."); *Commerce Int'l Co. v. United States*, 338 F.2d 81, 86, 167 Ct. Cl. 529 (Ct. Cl. 1964) (holding that what actions cause "breach of [the] obligation of reasonable cooperation" depend upon "particular contract, its context, and its surrounding circumstances"). Bad faith on the part of the Government is not required for a breach of these duties, *Abcon Assocs. v. United States*, 49 Fed. Cl. 678, 688 (2001), only "willful[] or negligent[] interference with the contractor in the performance of his contract[.]" *Peter Kiewit Sons' Co. v. United States*, 151 F. Supp. 726, 731, 138 Ct. Cl. 668 (Ct. Cl. 1957). *See generally Tecom, Inc. v. United States*, 66 Fed. Cl. 736 (2005).

> The case law is instructive. In *Malone v. United States*, 849 F.2d 1441, 1442 (Fed. Cir. 1988), a contractor built a model home for the military "as a means of establishing workmanship standards before [the contractor] commenced work on other houses." The Government's contracting officer viewed the model home unfavorably, but was evasive in his answers to the contractor, causing the contractor to complete extensive work not up to the Government's standards. Upon these facts the United States Court of Appeals for the Federal Circuit found a breach of the duty to cooperate on the part of the Government. In *Lewis-Nicholson*, 550 F.2d 26, 213 Ct. Cl. 192, the United States Court of Claims found that the Government breached its duty not to hinder the contractor's performance when it was unreasonably slow in doing necessary survey and staking work on a piece of land. The Government's failure to do this work in a timely manner hindered the contractor's performance and rendered the Government liable for any damages caused by the delays that the contractor suffered.

*Orlosky Inc. v. United States*, 68 Fed. Cl. 296, 311-12 (2005).

The Postal Service's (i) failure to approve change orders and modifications for more than ten months, (ii) failure to rectify over many months its orders to ATSIC not to proceed with certain portions of the work due to failure of the Postal Service to provide design plans, which was completely within its hands (SEC was an engineering firm), (iii) disingenuousness by Stuhl telling ATSIC on-site that work was acceptable and then writing reports to Goddard that the same work was not, and (iv) failure to pay approved requisitions timely and to approve requisitions for work actually completed, all of which unfairly and unreasonably lengthened the period required for completion of the Project, is exactly the kind of interference, unreasonable slowness, and evasiveness decried in the *Malone* and *Lewis-Nicholson* cases. Thus, the facts of this case demand a determination of a breach of the covenant of good faith and fair dealing.

Prior to execution of Contract Modification No. 11, on various occasions during the course of ATSIC's work on the Project, delay in performance was caused by the USPS, by and through its authorized representatives, including, by way of example but not of limitation, the Project Architect and SEC, the Project Engineer. On January 18, 2002, six months prior to the Government's "stop

work" order, ATSIC met with the Project Engineer, and then wrote the Project Engineer, with a copy to the Contracting Officer, explaining critical path decisions that the Government had to make before ATSIC could complete the last portion of the Project. Dep. Ex. 23 (re cable, air conditioning, and bulletproof glass decisions). The Government's delay in making critical path decisions was a principal reason for months of delay. Dep. Ex. 57, 59. At all relevant times, ATSIC attempted to work with the representatives of the USPS to make sure the Contract was properly and fully completed. Warren dep. 139:10-141:17; Dep. Ex. 28 (offering joint payment alternative rejected by USPS). However, the plans prepared by the Project Architect or Project Engineer contained numerous defects and deficiencies. *See*, *e.g.*, Dep. Ex. 56. Moreover, the Project Engineer, who provided professional services during the construction phase, routinely failed to perform his duties properly. See Paragraph 5.1 of ATSIC's Motion for Partial Summary Judgment (Docket No. 56), quoted in Section IV, below.

Because the delays in completing the work under the Contract were caused, in whole or part, by the USPS, during the relevant time, any resulting delays were not chargeable to ATSIC and were excused. Not only did ATSIC offer alternatives, but International Fidelity, the surety, also asked Jerry Goddard, the Contracting Officer, to contact it if "there was a request for the Surety to get financially involved in the P&DC project." Dep. Ex. 3, Sexton dep. 24:17-25:22. The Contracting Officer made no such request.

ATSIC's performance of the work on the Project was substantially delayed by:

a. the failure of USPS or its agent, the Project Engineer, to provide adequate, complete, and non-deficient plans and specifications,

b. over-inspection and active interference in the Project by USPS's Project Engineer,

c. poor and untimely communication and contract administration by the Project Engineer and the Contracting Officer,

d. changes and constructive changes in the work of the Project directed by USPS or its Agent,

e. the failure of the Project Engineer to respond or to timely respond to ATSIC's requests for information,

f. the failure of USPS or its agent, the Project Engineer, to respond or timely respond to ATSIC's submittals, including technical data and shop drawings,

g. the failure of USPS or its agent, the Project Engineer, to respond or timely respond to ATSIC's request for change orders or contract modifications,

h. the failure of USPS or its agent, the Project Engineer, to respond to and process ATSIC's payment applications,

i. the failure of USPS to make payment or to make payment timely to ATSIC in violation of USPS Facilities Department Contract Requirement Section F.4a3. See further discussion in ATSIC's Motion for Partial Summary Judgment. Docket No. 56.

All acts of the Contracting Officer in administering the Contract that suspended, delayed, or interrupted ATSIC's work under the Contract required the Contracting Officer to extend the delivery or performance dates accordingly. F.D. §C.2a. Even after the execution of Modification No. 11, which arguably extended the completion date, the Contracting Officer failed to extend the performance date despite (i) suspending work on the Contract, (ii) failing to resolve continuing design deficiencies that completely suspended work on the computer operations room, delaying specific work on the Contract, and (iii) delaying completion by failing to pay ATSIC needed funds

in conformity with the Contract terms for work previously completed.

C. <u>The Termination for Default was Procedurally Defective.</u>

1. Issuance of the Third Show Cause Letter was a Ruse.

The Government pins its basis for upholding its termination for cause on the fact that "the Government provided notice to ATSIC that it was considering terminating the contract, and the grounds for termination, more than ten days prior to termination." Motion at 19 (Docket #60) (the "Third Show Cause letter"). As explained in Section III B3(ii), above, the notice was a ruse, as both the notice and the "stop work" letter, which was prepared the same date, were prepared before the completion date. The Contracting Officer was not "considering" terminating the Contract, he had already determined to do so. He was merely making a show of meeting the necessary formalities.

2. The Government Failed to Comply with the Requirement to Calculate Delay Days.

In order to find termination for default based on failure of timely completion, the Government must show "that it was reasonable for the [Postal Service] to conclude that [ATSIC] would be unable to complete the project by the proper completion date." *See Danzig v. AEC Corporation*, 224 F.3d 1333, 1336 (Fed. Cir. 2000). Because the completion date of July 15, 2002, set forth in Modification No. 11 was subject to weather delays and payment delays, and because, most importantly, the Postal Service never rescinded its orders for ATSIC not to proceed on certain items due under the Contract, <u>the written plans of which were completely under the control of the Postal Service</u>, the Postal Service was never in a position to be able to determine whether the contractor would be able to complete the project by a particular completion date. In fact, until the forgoing issues were resolved, it was impossible for the Postal Service to determine a proper, final

completion date. ATSIC had consistently, for many months, indicated that the Project could be completed in two months. By promulgation of the Microsoft Project report, Dep. Ex. 17, ATSIC indicated that the project could actually be completed in less than six weeks with the Government's cooperation on the forgoing issues. That cooperation was never forthcoming, so it was never possible for the Government to specify a "proper completion date."

> ("[A] court's review of default justification does not turn on the contracting officer's subjective beliefs, but rather requires an objective inquiry.") It requires the court to consider whether the contracting officer's decision to terminate for failure to make progress was reasonable given the events that occurred before the termination decision was made. *Id*. at 1017.

*Empire Energy Management Systems, Inc. v. Roche*, 362 F.3d 1343, 1357-58 (Fed. Cir. 2004), *citing McDonnell Douglas Corp. v. United States,* 323 F.3d 1006, 1017 (Fed. Cir. 2003).

A reasonable analysis requires the Postal Service to compare the number of days required to complete the Project with the number of days of excusable delay. *Empire Energy*, *supra*, 362 F.3d at 1358. Even without regard to the Postal Service's failure to rescind its order not to proceed on certain items, the Postal Service dismissed ATSIC's explanation for excusable delay and failed to present any analysis of the permitted excusable delay versus the time necessary to complete the Project.

Even if the Contracting Officer is permitted to determine whether it is reasonable to expect the supplier to complete the project in the time remaining, when making that determination he is required to extend the completion date to take into account delays caused by weather, the Postal Services's own delays and failures, and, in this odd case, the fact that the Postal Service still had not authorized that work be done (or provided the plans for the air conditioning so that the supplier's work could be done) in the control room. Based on the undisputed facts that (i) the extension was

negotiated in May of 2002 and gave ATSIC through July 15, 2002, and (ii) ATSIC's own Project Close-Out Schedule (prepared at the USPS Contracting Officer's request, Warren dep. 63:17-64:24) showed that the remaining work would take approximately five weeks once ATSIC was freed to do the work, Dep. Ex. 17 and Warren dep. 68:21-70:6, it is impossible for the Contracting Officer to have reasonably concluded that the work could not be done timely. Thus, he had no legal or contractual basis to terminate the contract prematurely, even if only by one day, and the improper termination must be deemed for convenience.

D. <u>The Government Established Two Other Dates for Completion, Neither of Which was Reached Prior to Termination.</u>

1. USPS Terminated ATSIC Prematurely Under the September 10, 2002, Date Specified in the Second Show Cause Letter.

On May 1, 2002, the USPS Contacting Officer issued the second Show Cause letter to ATSIC explicitly revising the Contract completion date to September 10, 2002. Dep. Ex. 5; Warren dep. 121:7-24 (ATSIC relied on revised date). Accordingly, the Postal Service's "stop work" letter on July 15, 2002, and subsequent termination letter were several months premature. Thus, the termination cannot be for default for failure to meet the completion deadline and must be deemed for convenience.

2. USPS Terminated ATSIC Prematurely Under the December 19, 2002, Date Specified in Modification No. M02 of Contract No. 123125-00-B-3153 of the AMC Project.

On June 20, 2002, the USPS Contracting Officer issued Modification No. M02 on Contract No. 123125-00-B-3153 (the AMC Project) in which, in consideration for ATSIC's agreement to be terminated for convenience from the AMC Project contract and pay USPS $52,137.10 from ATSIC's P&DC Project receipts, the Postal Service agreed in writing to a revised completion date

of December 19, 2002, on the P&DC Contract. Dep. Ex. 53; Vento dep. 155:17-21. Although, the Modification was to the AMC Project, the revised completion date is part of the sentence applying the $52,137.10 to the P&DC Contract (known in that Modification as the GMF Project). The revised completion date cannot apply to the AMC Contract, because that Contract was terminated per the description in Block 7 reading "Settlement of Termination Issues." In light of the December 19, 2002, completion date, the Postal Service's "stop work" letter on July 15, 2002, and subsequent termination letter were several months premature.

3. The Postal Service Failed to Comply with Termination Notice Requirements.

Among other things, Section 6.9.3b7(c)(6) of the Purchasing Manual requires that, in a termination for default, the Postal Service "[i]nform the supplier that the termination is subject to Clause B-9, *Claims and Disputes*." The Postal Service Notice of Termination neither contained the specified language not contains a copy of Clause B-9 (F.D § H.3 of the Contact). Dep. Ex. 12. Accordingly, the Notice of Termination was substantially and fatally defective and cannot serve as the basis for a termination for default.

4. The Postal Service Notice of Termination violated USPS Purchasing Manual Notice Requirements.

Section 6.9.3b7(a) of the Purchasing Manual requires that, if a contracting officer is going to issue a notice of termination for default, he do so "immediately" upon determining that termination is proper. Once again, the Postal Service, through the Contracting Officer, failed to act timely. The Show Cause letter was issued July 15, 2002, before the completion date had elapsed. Dep. Ex. 9. Nonetheless, ATSIC responded with its reasonable basis for the delay (including weather issues and the USPS financing issues) by July 19, 2002. Dep. Ex. 21. Goddard obviously

determined that a termination for default was in order in July, because he issued the termination "effective July 31, 2002." However, he did not bother to issue the Notice of Termination until August 16, 2002. Dep. Ex. 12. This delay cannot be construed as "immediately,"as required by the Postal Service Purchasing Manual. Accordingly, the Notice of Termination cannot serve as the basis for a termination for default.

E. Concurrent Delay by the Government Excuses the Contractor. When seeking extensions of a contract completion date due to contract changes and excusable delay, the contractor must establish by a preponderance of the evidence the existence of an excusable cause of delay and the extent to which the completion of the contract work as a whole is delayed. *Morganti National Inc. v. United States*, 49 Fed Cl. 110, 132 (2001). However, if the court determines that the Government contributed to the delay, "the fact that the contractor may also have caused concurrent delay is not fatal to the contractor's claim for additional time due to excusable delay." *Id.* "If a period of delay can be attributed simultaneously to the Government and the Contractor, there are said to be concurrent delays, and the result is an excusable but not a compensable delay." *Id., citing Weaver-Bailey Contractors, Inc. v. United States*, 19 Cl. Ct. 474, 476 (1990).

Even if the Court were to determine that ATSIC bore any fault for the failure of timely completion, the numerous material, substantial mistakes and failures of the Postal Service and its agents, as detailed throughout the Second Amended Complaint (Docket No. 42) and this Memorandum, require the Court to determine that the delays were concurrent. Such a determination requires the Court to conclude that the Postal Service was required to provide ATSIC additional time to complete the Project, and its failure to do so requires that the termination be deemed for convenience, rather than for default.

F. The Government's Exclusive Remedy for Termination was Liquidated Damages.

In contravention of the rules of construction, the Government argues that the general statement in Modification No. 11 that "except as provided herein, all terms and conditions [of the Contract], as heretofore changed, remain unchanged and in full force and effect,"takes precedence over the specific statement regarding damages that "[i]f ATC has not completed the project by 7/15/02, Liquidated Damages of $100/day will be reinstated beginning 7/16/02 and continuing until building acceptance." Motion at 21 (Docket #60). *See First Nationwide Bank v. United States*, 431 F.3d 1342, 1348 (Fed. Cir. 2005).

The Government then states that "ATSIC cannot reasonably contend that the Postal Service would modify the contract so as to eliminate the termination for default provision of the contract, thereby permitting ATSIC as much time as it pleased to complete the construction of the Project." Motion at 21 (Docket #60).

ATSIC is not "contending" anything. The Contracting Officer agreed to and signed Modification No. 11. There is nothing to contend. Furthermore, the Government's statement implies that the Government could not terminate the Contract, if it chose to do so. This is, of course, absolutely incorrect, as the Government had the right to terminate the Contract for convenience at any time. F,D, §H.5a.

IV. THE GOVERNMENT'S OBJECTION TO COUNT III IGNORES THE FACTS IN THE SECOND AMENDED COMPLAINT

The principal basis for the Government's objection to Count III (violation of good faith) is that the Second Amended Complaint fails to state sufficient allegations of bad faith. This argument ignores the numerous specific statements underlying Plaintiffs' contention set forth in the Second

Amended Complaint at Paragraphs 9, 13, and 15-17 (relating to the pre-termination issues), and 19-22.3 (relating to the improper termination of the Contract without even a good faith attempt to take the causes for delay into account). During discovery, the specific pre-termination allegations were explained in detail, as stated in the following way in Paragraphs 5.1 and 5.2 of ATSIC's Motion for Partial Summary Judgment:

> 5.1. ATSIC, which had already been working with SEC as the Project Engineer on both the P&DC and the AMC Projects, protested both orally and in writing SEC's elevation to a position for which it was not suited or prepared. Vento dep. 32:11-33:7, 159:9-160:5, and Dep. Ex. 5. Subsequent events proved that ATSIC's concerns were well-founded, as Joseph Stuhl:
>
> (i) made obstructive, parochial decisions in violation of the Contract specifications, Vento dep. 86:24-90:22 (Stuhl refused to allow the use of an approved equipment vendor specified in the accepted bid, attempted to require use of the only vendor with which he was familiar, and finally agreed on a third vendor and required reduction of the contract price) ;
>
> (ii) repeatedly made decisions that retarded the progress of the Project, Vento dep. 157:8-159:5 (Stuhl's fickle decision-making and errors and miscalculations regarding conduit); Warren dep. 44:25-46:16 (Stuhl would write reports that were different than the statements he made on-site); Dep. Ex. 54, 59;
>
> (iii) failed to make timely decisions necessary to prosecute the work on the Project, including withholding change order approval for changes required by Stuhl for more than ten months after submittal, Vento dep. 157:8-159:5 (Stuhl withheld decisions necessary to the critical path of the Project), 163:20-164:14 (ATSIC had waited for approval for some change orders for over ten months), 164:21-165:19 (four change orders were never approved, so the changes required by Stuhl could never be completed); Dep. Ex. 54, 58;
>
> (iv) repeatedly and consistently reduced and delayed approval of ATSIC's payment requisitions, often after orally approving them on-site, Vento dep. 135:3-136:22 (the Post Office did not put requisitions on their list to be paid until four to six weeks after receipt) ; Warren dep. 32:23-34:15 (reduced pay requisitions by 75% from the amounts approved by Stuhl), 39:9-23 (withholding of 75%), 114:16-115:10 (withholding of 75% of pay requisitions), 127:7-21(Stuhl approved portions of the work and then later said that it was not done, in order to cur pay requisitions), 131:24-132:16 (re 75% retainage); Zamora dep. 72:12-73:10 (USPS cut the last pay requisition from $93,759 to $63,000 without specifying what was being cut), 83:11-84:9 (payments cut 75%); Dep Ex. 20, 25, 40

(protesting 75% retainage), 54 (protesting SEC's arbitrary and contradictory reduction of pay requisitions based on how Mr. Stuhl "feels" on any given day, rather than on the approved progress on the Project), 59;

(v) overlooked Postal Service irregularities, Vento dep. 139:5-21 (USPS refused to pay for the repair for a gate that was installed by ATSIC and then later hit by a USPS truck);

(vi) submitted false reports, Warren dep. 40:20-41:16 (Stuhl says something at a meeting and writes a report saying something completely different), 45:25-47:5 (discrepancies between on-site discussions and Stuhl's written letters and reports that were "not accurate in many cases"), 108:22-110:7 (items documented "partially incorrectly"); Zamora dep. 60:24-61:9 (discrepancies between what Stuhl said was complete and what was actually complete) , 77:1-78:22 (SEC dunning ATSIC for a Contract reduction despite previous approval by SEC); Dep. Ex. 36, 37, and

(vii) repeatedly and consistently agreed to one method of Project implementation on-site, only to return to his office in Orlando and issue later reports requiring a different method of implementation than he had previously approved. Vento dep. 34:12-35:18 (Stuhl would approve work on-site, refuse to sign off on-site, and send a letter saying the work was not done), 79:11-22 (Stuhl refused to give a change order for work already done requiring digging underneath concrete), 160:8-161:20 (change orders prosecuted as required by Stuhl, but not paid), 164:21-165:19 (four change orders were never approved); Warren dep. 128:20-130:7 ["the pay ap (sic: app)would be changed or the report would be different than the walk-through said"]; Ex. 23, 56, 58, 59.

5.2. In addition to elevating SEC and Mr. Stuhl to a position for which they were unsuitable, the Contracting Officer, first Ronald Grzymala and later Jerry Goddard, collaborated with Mr. Stuhl in the items described in Paragraphs 5.1 and maliciously and unprofessionally interfered in the prosecution of the work. Warren dep. 101:19-103:18 [Jerry Goddard was unprofessional and malicious. "He just wasn't proceeding in a matter (sic: manner) of a business fair relationship. It was more setting the stage for the kill or for the claim."]. They wrote formal letters with incorrect or incomplete information that formed the basis for legal consequences. See Dep. Ex. 5, 19, Warren dep. 121:25-124:6 (using SEC letters to rebut Goddard's allegations in the second Show Cause letter). They promised to expedite payments, but, instead, cut them and then did not approve the reduced payment for more than two months, which was untimely by more than one month under the Contract. Warren dep. 119:13-120:23, 134:6-135:5 (Goddard failed to pay 100% of material costs, as agreed); Zamora dep. 78:23-80:3 (USPS failure to approve Modifications stopped all work to which SEC and ATSIC had previously agreed), 80:7-81:1 (Stuhl duns ATSIC for failure to complete modification work that USPS has not approved, and ATSIC responds to Contracting Officer); Dep. Ex. 17, 20, 26, 37, 38.

Plaintiff's Motion for Partial Summary Judgment ¶¶5.1, 5.2.

Additional facts have come to light during discovery that also show bad faith:

> After terminating ATSIC, but expecting to charge it excess reprocurement costs, [Project Manager Joseph] Stuhl actively and candidly diverted funds, meanwhile expending unnecessary funds, by diverting work to his "good buddy," Joseph Erickson. Three emails between Messrs. Stuhl and Erickson clearly illustrate the diversion. Mot. Ex. 5, 6, and 7. In Exhibit 5, Mr. Stuhl writes, "I think there is some extra money left in the contract," and, then, tongue in cheek, "Thanks for making this easy on me, we both know that you had a chance to take advantage of the dumb engineer." In Exhibit 7, Mr. Erickson, writing to Mr. Stuhl about the "gate situation," which was still not resolved more than 21 months after ATSIC ceased working, and speaking of the Postal Service management, says candidly (because he was only addressing his "good buddy") that "they deserve what they get and (sic) unless and until sane management comes to the District."

Plaintiff's Motion for Partial Summary Judgment ¶21.2.

Furthermore, as further described in Section IIID, above, USPS first issued its second Show Cause letter on May 1, 2002, with a September 10, 2002, completion date, followed by its Modification No. 02 on the AMC Contract on June 20, 2002, specifying a PD&C Contract completion date of December 19, 2002. Then, also on June 20, 2002, it asserted a July 15, 2002, completion date, which it knew from the construction schedule was inadequate to complete the five weeks of work remaining. Dep. Ex. 17 This short period to a new completion date, after the binding, written statements of later completion dates on two separate occasions, evidences neither good faith nor fair dealing.

Not only do these allegations meet the standard advanced by the Government of "clear and strong evidence" (Motion at 22, Docket #60), as well as explicitly alleging malice on the part of the Government employees (Messrs. Stuhl and Goddard), the allegations, if proved at trial, will result in the Court finding for Plaintiffs on the issue of the Government's lack of good faith and fair dealing. Any presumption that government officials acted conscientiously, *id.*, cannot stand in the

face of the overwhelming evidence in this instance that they did not. In any event, ATSIC's allegations are certainly sufficient, and are sufficiently supported, to show a genuine issue of material fact regarding whether the Government acted in good faith and with fair dealing.

Finally, with regard to this issue, the Government points to two cases dealing with motions to dismiss in order to imply that the Plaintiffs' failure to include magic language about malice in the Second Amended Complaint was fatal to this Count. Motion at 23-24 (Docket #60). The Government's argument is essentially that, if you allege all the elements of bad faith, but don't say the word "malice" in your complaint, then you can't proceed on the bad faith claim. First, this is incorrect as a matter of law, because the allegation of a specific intent to injure is sufficient for a count based on the Government's lack of good faith and fair dealing. *D.V. Gonzalez Elec. & Gen. Contractors, Inc. v .United States*, 55 Fed. Cl. 447, 457-58 (2003), as cited by the Government in its Motion at 24 (Docket #60). Second, this is incorrect as a matter of rule (Fed. R. Civ. P. 8), because the federal courts proceed on notice pleading, and because the Government cannot have failed to understand that the Count entitled "Breach of Covenant of Good Faith and Fair Dealing" was an allegation of the Government's breach of good faith and fair dealing, which Count incorporated specific instances of the Government's failure to proceed in good faith and with fair dealing. The Government was certainly on notice as to the allegations made against it.

Furthermore, the parties are not before the Court on a motion to dismiss. They are before the Court on a motion for summary judgment, in which the Court takes into account the depositions and documents in the record. The Government has not sought leave, nor have Plaintiffs tacitly agreed, to allow the Government to bring a motion to dismiss against ATSIC at this late date. The

Court specified a date for summary judgment motions only.[2] Therefore, ATSIC asks that the Court treat the Government's Motion to Dismiss Count III as a motion for summary judgment.

If the Court finds ATSIC's arguments on this point unpersuasive, accepts as properly before it the Government's motion to dismiss Count III, and grants the Government's request for the dismissal of Count III, then ATSIC prays that the Court allow Plaintiffs to amend the Complaint to include the word "malice" that, despite describing in specificity, it failed to include in the Second Amended Complaint. Plaintiffs have certainly shown that they can make a claim under Count III that would withstand dismissal. See ATSIC's Motion for Partial Summary Judgment (Docket No. 56) at 39-42.

If the Court rejects the Government's request to treat its Motion as a motion to dismiss, but, instead, proceeds with the Government's alternate request to treat the Motion as a motion for summary judgment, Motion at 24 (Docket #60), then the Motion must be denied. As set forth at length in the paragraphs above, the deposition testimony, the deposition exhibits, and the agreed exhibits categorically evidence the Government's malice, lack of good faith, and lack of fair dealing. This evidence overwhelmingly raises, at a minimum, a genuine issue of material fact regarding whether the Government acted with good faith and fair dealing.

---

[2]To be fair, the Government's counsel, in private communications with Plaintiffs' counsel, previously informed Plaintiffs that it would simultaneously bring a Motion to Dismiss against the surety, International Fidelity, and, therefore, if the Court chooses to countenance such a Motion, ATSIC raises no objection.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss and for Partial Summary Judgment must be denied.

Respectfully submitted on this 14 day of July, 2006.

E. SCOTT GOLDEN & ASSOCIATES
Attorneys for Plaintiff Advanced
Technology Systems Integrators Corp.
644 S.E. Fourth Avenue
Fort Lauderdale, FL 33301
Tel.: (954) 764-6766 ext. 2
Fax: (954) 764-6789
Email: esglaw@bellsouth.net

s/E. Scott Golden
E. Scott Golden

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by electronic transmission to the following persons as of this 14 day of July, 2006.

Michael J. Dierberg, Esquire
U.S. Department of Justice, Civil Division
Commercial Litigation Branch
1100 L. Street NW, Room 12116
Washington, D.C. 20530

Helen H. Albee, Esquire
HENRICHSEN SIEGEL, P.L.L.C.
1648 Osceola St.
Jacksonville, FL 32204

s/E. Scott Golden
E. Scott Golden