IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ADVANCED TECHNOLOGY SYSTEMS INTEGRATORS CORP. and INTERNATIONAL FIDELITY INSURANCE COMPANY,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

No. 03-1953C
(Senior Judge Margolis)

DEFENDANT'S RESPONSE TO PLAINTIFF'S
PROPOSED FINDINGS OF UNCONTROVERTED FACT

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits this response to the proposed findings of uncontroverted fact filed by plaintiff Advanced Technology Systems Integrators Corp. ("ATSIC").

**Proposed Finding:**

1. The claims of ATSIC arise out of its performance under Contract No. 123125-00-B-3154 - Project H54096 (the "Contract"), which project was also known as the Miami P&DC Security & Access Control (the "Project" or the "P&DC Project"), issued by the United States Postal Service ("USPS") to ATSIC. Mot. Ex. 1. The Project included the acquisition and installation of both interior and exterior security components on a USPS facility.

**Response:**

Not in dispute.

**Proposed Finding:**

2. The surety for ATSIC was International Fidelity Insurance Company. Dep. Ex. 3, 5.

**Response:**

Not in dispute.

**Proposed Finding:**

3. The initial contract amount was $1,308,990.00. The Contract provided a performance time of 230 days. The Contract contains a time is of the essence clause and a liquidated damages clause. Mot. Ex. 1.

**Response:**

Not in dispute.

**Proposed Finding:**

4. On October 3, 2000, the USPS issued its Formal Notice to Proceed for the Project as of January 15, 2001. The Notice specified a Contract duration of 230 days and a completion date of September 2, 2001. Mot. Ex. 2.

**Response:**

Not in dispute.

**Proposed Finding:**

5. During the period that ATSIC performed work under the Contract, USPS required and/or directed changed, extra, or additional work, requiring modification to the initial Contract. Mot. Ex. 4; Dep. Ex. 20, 31A, 37.

**Response:**

Not in dispute.

**Proposed Finding:**

6. ATSIC submitted proposed change orders for processing of the USPS-directed modifications to the Contract in which ATSIC requested both (i) an equitable adjustment of the compensation for the extra work required by USPS to be performed under the Contract and (ii) equitable time extensions to perform that work. Mot. Ex. 4; Dep. Ex. 20, 31A, 37.

**Response:**

Not in dispute.

**Proposed Finding:**

7. USPS failed to process properly some of the proposed change orders and requests for the USPS-directed modifications. USPS failed to act on some change orders for more than ten (10) months. Dep. Ex. 57.

**Response:**

ATSIC's proposed finding No. 7, and similar allegations in ATSICs' proposed finding No. 9(iii), are incorrect. USPS did not fail to properly process any modifications, and furthermore all claims regarding the proposed change orders were waived through modification No. 11.

Contrary to ATSIC's assertion, USPS did not fail to act on some change orders for more than ten months. Rather, USPS and the project engineer, Joseph Stuhl, responded quickly to proposed change orders once all necessary information was provided. Supp. App. 1 (Goddard 2nd Aff. ¶ 2). Any delay in approving contract modifications were the result of ATSIC's failure to provide necessary information to the project engineer and the contracting officer, or disputes related to proposed contract modifications. Id.; see also Supp. App. 44 (e-mail dated November 21, 2001 from USPS to ATSIC regarding requested information as to proposed modifications 1 and 2); Supp. App. 45-47 (letter dated January 2, 2002 from Joseph Stuhl to USPS regarding

deficiencies in support for requested contract modifications); Supp. App. 6 (letter dated January 3, 2002 from USPS to ATSIC, discussing "numerous attempts during the past few months to acquire the information necessary to process modifications on the project."); Supp. App. 8 (letter dated February 21, 2002 from USPS to ATSIC: "Jerry Goddard has been requesting information from ATC for over 4 months regarding these modifications. The Architect and Engineer have been requesting information regarding these modifications and other required information on the project for many months prior to that."); App. 28 (P&DC contract § F.3, describing procedures and necessary information for equitable adjustments to the contract).

In any event, all claims regarding the proposed modifications prior to Modification No. 11 were waived by that modification. Furthermore, ATSIC has not identified any proposed modifications requested after Modification No. 11 that were not addressed promptly by USPS.

**Proposed Finding:**

8. The Project Engineer, Stuhl Engineering Contractors, Inc. ("SEC"), with its principal, Joseph Stuhl, was installed as the Project Manager when the prior Project Manager was dismissed. ATSIC, which had already been working with SEC on both the P&DC and the AMC Projects, protested both orally and in writing SEC's elevation to that position. Vento dep. 32:11-33:7, 159:9-160:5; Dep. Ex. 5.

**Response:**

Mr. Stuhl never acted as project manager. Rather, Mr. Stuhl was the project engineer on the project from approximately November 2001, through completion of the project. App. 9 (Stuhl Affidavit, ¶ 3) ATSIC has not identified any document in which ATSIC protested Stuhl's position as Project Manager; deposition exhibit 5 is a letter from Jerry Goddard to Vincent Vento, dated May 1, 2002 ("Second Show Cause") that does not even mention Mr. Stuhl.

**Proposed Finding:**

9. Joseph Stuhl:

(i) made obstructive, parochial decisions in violation of the Contract specifications, Vento dep. 85:24-90:22;

(ii) repeatedly made decisions that retarded the progress of the Project, Vento dep. 157:8-159:5; Warren dep. 44:25-46:16; Dep. Ex. 54, 59;

(iii) failed to make timely decisions necessary to prosecute the work of the Project, including withholding change order approval for changes required by Stuhl for more than ten months after submittal, Vento dep. 157:8-159:5, 163:20-164:14, 164:21-165:19; Dep. Ex. 54, 58;

(iv) repeatedly and consistently reduced and delayed ATSIC's payment requisitions, often after orally approving them on-site, Vento dep. 135:3-136:22; Warren dep. 32:23-34:15, 39:9-23, 114:16-115:10 (withholding of 75% of pay requisitions), 127:7-21, 131:24-132:16 (re 75% retainage); Zamora dep. 72:12-73:10, 83:11-84:9; Dep Ex. 20, 25, 40 (protesting 75% retainage), 54 (protesting SEC's arbitrary and contradictory reduction of pay requisitions based on how Mr. Stuhl "feels" on any given day, rather than on the approved progress on the Project), 59;

(v) overlooked Postal Service irregularities, Vento dep. 138:5-21;

(vi) submitted false reports, Warren dep. 40:20-41:16, 45:25-47:5, 108:22-110:7; Zamora dep. 60:24-61:9, 77:1-78:22 (SEC dunning ATSIC for a Contract reduction despite previous approval by SEC); Dep. Ex. 36, 37; and

(vii) repeatedly and consistently agreed to one method of Project implementation on-site, only to return to his office in Orlando and issue later reports requiring a different method

of implementation than he had previously approved. Vento dep. 33:12-34:18, 78:11-22, 160:8-20, 164:21-165:19; Warren dep. 128:20-130:7; Dep. Ex. 23, 56, 58, 59.

**Response:**

(i) Contrary to ATSIC's assertion, Joseph Stuhl did not make "obstructive, parochial decisions in violation of the Contract specifications." ATSIC has failed to identify an "obstructive, parochial" decision, nor identified what would have made any such decision obstructive or parochial, nor demonstrated how any such decision violated the Contract specifications.[1]

(ii) Contrary to ATSIC's assertion, Joseph Stuhl did not "make decisions that retarded the progress of the Project." ATSIC fails to identify any decisions by Stuhl that retarded progress of the P&DC project.

(iii) See our response to ATSIC's proposed finding No. 7. Contrary to ATSIC's assertion, Joseph Stuhl did not fail to make timely decisions necessary to prosecute the work of the Project, including withholding change order approval for changes required by Stuhl for more than ten months after submittal.

(iv) See our response to ATSIC's proposed finding Nos. 10 and 46. Contrary to ATSIC's assertion, Joseph Stuhl did not delay ATSIC's payment requisitions. ATSIC has not identified any payment requisition which Joseph Stuhl delayed after approving it on-site. Furthermore, when Mr. Stuhl recommended a reduction in a payment request, his request was justified and ATSIC agreed to the final amount of all payment requests submitted to USPS.

[1] In the portion of Mr. Vento's testimony cited by ATSIC, Mr. Vento discusses a dispute regarding a gate which was damaged by a truck. Mr. Vento fails to point out that this issue was resolved through Modification No. 6, signed by Mr. Goddard on March 12, 2002. Supp. App. 21 (Modification No. 6, agreed to by both parties); Supp. App. 47 (letter from Joseph Stuhl to Jerry Goddard, dated January 2, 2002, describing proposed Modification No. 6).

(v) Contrary to ATSIC's assertion, Joseph Stuhl did not overlook any "Postal Service irregularities." ATSIC has failed to identify any "Postal Service irregularities."

(vi) Contrary to ATSIC's assertion, Joseph Stuhl did not submit false reports. ATSIC has failed to identify the reports by Mr. Stuhl which were allegedly false, or demonstrate that any such report was false.

(vii) Contrary to ATSIC's assertion, Mr. Stuhl did not repeatedly and consistently agree to one method of Project implementation on-site, only to return to his office in Orlando and issue later reports requiring a different method of implementation than he had previously approved. None of the documents or testimony cited by ATSIC demonstrate any improper conduct by Mr. Stuhl, nor has ATSIC demonstrated any delay resulting from any of Mr. Stuhl's actions. Furthermore, ATSIC has not identified any conduct by Mr. Stuhl after Modification No. 11 which delayed the project, and failed to identify any such conduct in its letter dated July 19, 2002, requesting an extension of the project and explaining the basis for the delay. App. 104-05.

**Proposed Finding:**

10. The Contracting Officers, first Ronald Grzymala and later Jerry Goddard, collaborated with Mr. Stuhl in the items described in Paragraph 9 and maliciously and unprofessionally interfered in the prosecution of the work. Warren dep. 101:19-103:18. They wrote formal letters with incorrect or incomplete information that formed the basis for legal consequences. See Dep. Ex. 5, 19, Warren dep. 121:25-124:6 (using SEC letters to rebut Goddard's allegations in the second Show Cause letter). They promised to expedite payments, but, instead, cut them and then did not approve the reduced payment for more than two months, which was untimely by more than one month under the Contract. Warren dep. 119:13-120:23, 134:6-135:5; Zamora dep. 78:23-80:3 (USPS failure to approve Modifications stopped all work

agreed with SEC), 80:7-81:1 (Stuhl duns ATSIC for failure to complete modification work that USPS hasn't approved, and ATSIC responds to Contracting Officer); Dep. Ex. 17, 20, 26, 37, 38.

**Response:**

The contracting officers neither "collaborated" with Mr. Stuhl, nor maliciously and unprofessionally interfered in the prosecution of the work. Contrary to ATSIC's assertion, the contracting officers did not write formal letters with incorrect or incomplete information that formed the basis for legal consequences. ATSIC has not identified which letters contained incorrect or incomplete information, nor demonstrate how any such document contained incorrect or incomplete information.[2] ATSIC has not identified any payment requests which were not paid in a timely fashion, or that payment by the USPS violated any terms of the contract. Furthermore, USPS did not promise to expedite payments, Supp. App. 6 (Goddard 2nd Aff. ¶ 6), and approved payment requests expeditiously upon receipt of a payment request which appeared to accurately reflect the amount of work performed to date and which was accompanied by requisite information. Supp. App. 6 (Goddard 2nd Aff. ¶ 7).

**Proposed Finding:**

11. September 2, 2001, the initial completion date under the Contract, passed without USPS terminating the Contract. Mot. Ex. 3. USPS did not seek an extension agreement with ATSIC.

---

[2] The only USPS document referred to in the cited portion of Mr. Warren's testimony is USPS's second show cause letter, dated May 1, 2002, in which Mr. Warren disagreed with the bases cited by USPS for possible termination.

**Response:**

ATSIC is correct that USPS did not terminate the P&DC project on the initial completion date of September 2, 2001. Furthermore, ATSIC is correct that the parties did not agree upon a revised schedule at that time. However, through several contract modifications, the parties later agreed to extensions of the Project Completion date, ultimately extending the completion date by more than 300 days. Supp. App. 12 (Modification No. 1, signed by both parties, extending the contract completion date by two days, to September 4, 2001); Supp. App. 21 (Modification No. 6, extending the contract completion date by one day, to September 5, 2001); Supp. App. 25 (Modification No. 7, extending the contract completion date by five days, to September 10, 2001); App. 100 (Modification No. 11, extending the contract completion date by more than 300 days, to July 15, 2002).

**Proposed Finding:**

12. ATSIC continued performing under the Contract after September 2, 2001.

**Response:**

Not in dispute.

**Proposed Finding:**

13. On January 4, 2002, one hundred twenty four (124) days after the specified Contract completion date, the USPS gave ATSIC its first Show Cause letter, which warned ATSIC of possible termination of the Contract for failure to timely complete the project. Mot. Ex. 3. USPS did not terminate ATSIC at that time. Dep. Ex. 12.

**Response:**

Not in dispute.

**Proposed Finding:**

14. On March 12, 2002, USPS, by and through its Contracting Officer, executed Contract Modification No. Eight (8), which increased the contract price to $1,351,961.14, but did not grant an extension of time to complete the project. The stated completion date remained September 10, 2001. Mot. Ex. 4. By executing Contract Modification No. Eight (8), the Contracting Officer (i) explicitly acknowledged that ATSIC's work on the Project was approximately six months beyond the required (but abandoned) completion date for the Project, and (ii) confirmed his intention to waive the time of performance clause and liquidated damages clause in the Contract.

**Response:**

No dispute regarding the first and second sentences of proposed finding number 14. The third full sentence of proposed finding number 14 is not a statement of fact; rather, it is a legal conclusion and ATSIC's characterization of Modification No. 8. In any event, there is nothing in Modification No. 8 to suggest that the parties agreed to eliminate the time of performance clause and liquidated damages clause in the contract. Pl. Mot. Ex. 4. Furthermore, Modification No. 8 explicitly states that the revised contract completion date, as of that modification, is September 10, 2001. Id.

**Proposed Finding:**

15. On May 1, 2002, two hundred thirty-three (233) days after the revised Contract completion date, USPS gave ATSIC its second Show Cause letter, which warned ATSIC of possible termination of the Contract for failure to timely complete the Project. This letter explicitly recited a revised contract completion date of September 10, 2002. Dep. Ex. 5. USPS did not terminate ATSIC at that time. Dep. Ex. 12.

**Response:**

We do not dispute that, on May 1, 2002, USPS sent ATSIC its second show cause letter, which warned ATSIC of possible termination of the P&DC contract for failure to timely complete the project, among other reasons. Furthermore, we do not dispute that this letter, due to a typographical error, refers to a revised completion date of September 10, 2002. However the revised completion date as of the second show cause letter, based upon three contract modifications providing a total extension of eight days, was September 10, 2001. Supp. App. 12 (Modification No. 1, signed by both parties, extending the contract completion date by two days, to September 4, 2001); Supp. App. 21 (Modification No. 6, extending the contract completion date by one day, to September 5, 2001); Supp. App. 25 (Modification No. 7, extending the contract completion date by five days, to September 10, 2001). See also Def. Resp. Br. at 4-6 (explaining that the reference to September 10, 2002 cannot reasonably be interpreted as a modification of the contract to extend the completion date to September, 2002).

**Proposed Finding:**

16. During the course of the Project, ATSIC issued and proposed approximately twelve (12) change orders or contract modifications to USPS, seeking equitable adjustments in the time of performance or the cost of the work. Mot. Ex. 4; Dep. Ex. 20, 31A, 37. An ongoing dispute developed between ATSIC, on the one hand, and the USPS and its Project Engineer, on the other hand, regarding these issues. Dep Ex. 31A, 37. ATSIC made payment requests, each of less than $100,000.00, all or a portion of which were in dispute or not acted upon by the Contracting Officer within a reasonable time. Dep. Ex. 31A, 28, 59. USPS’s failure to issue a timely decision violated Section 605(c)(5) of the Contract Disputes Act of 1978.

**Response:**

As to the first sentence, it is unclear how ATSIC contends that there were 12 change orders seeking equitable adjustments in the time of performance or the cost of the work, when the latest document cited by ATSIC is Modification No. 11 (Dep. Ex. 31A). Furthermore, ATSIC requested extensions for some of the modifications, while not for others. For example, Modification No. 8 to the Contract, approved by Jerry Goddard on March 2, 2002, provided for a $ 3,441.79 increase in the amount payable to ATSIC for certain repairs to the perimeter fence, but did not extend the completion date. Pl. Mot. Ex. 4.

We do not dispute the second full sentence of proposed finding number 16. As to the third full sentence of proposed finding number 16, we do not dispute that ATSIC made payment requests and that most of these requests were for less than $100,000.

The Government did not fail to act upon the payment requests within a reasonable time, and ATSIC has not identified any payment requests for which the Government failed to act upon the payment request within a reasonable time. See Supp. App. 2-3 (Goddard Aff. ¶ 6).

Finally, ATSIC's statement that USPS violated Section 605(c)(5) of the Contract Disputes Act of 1978 is an erroneous legal conclusion, rather than a statement of fact. See Def. Resp. Br. at 24-25.

**Proposed Finding:**

17. On June 20, 2002, ATSIC and USPS purported to compromise and settle their prior disputes by execution of Contract Modification No. 11, which stated a new contract completion date of July 15, 2002, further stating that it extended the original contract completion date by 293 calendar days. Vento dep. 104:24-107:15; Dep. Ex. 31A. Contract Modification No. 11 further provided that "[i]f ATC has not completed the project by 7/15/02, Liquidated Damages of $100/day will be reinstated beginning on 7/15/02 and continuing until building acceptance."

**Response:**

ATSIC's description of Modification No. 11 as a "purported" agreement is incorrect and inconsistent with its second amended complaint, which stated, "On June 20, 2002, ATSIC and USPS compromised and settled their dispute by execution of Contract Modification No. 11 . . . ." Compl. ¶ 13. Otherwise, not in dispute.

**Proposed Finding:**

18. Contact Modification No. 11 was executed under duress of non-payment. Vento dep. 107:16-109:14; 113:20-114:6.

**Response:**

ATSIC's erroneous legal conclusion that Modification No. 11 was executed under duress, which ATSIC did not allege in its complaint, is addressed in our response to ATSIC's motion for partial summary judgment. Def. Resp. Br. at 15-17.

**Proposed Finding:**

19. On July 15, 2002, which was 25 days after execution of Contract Modification No. 11, USPS gave ATSIC its third Show Cause letter, which warned ATSIC of possible termination of the Contract for failure to complete the Project by July 15, 2002. Vento dep. 109:22-111:3; Dep. Ex. 9.

**Response:**

Not in dispute.

**Proposed Finding:**

20. ATSIC responded in two letters explaining the extent of required extensions due to weather delays and due to the USPS failure to meet contract payment requirements. Vento dep. 111:4-13; Warren dep. 148:25-150:4; Dep. Ex. 21, 33.

**Response:**

Not in dispute, except to the extent that ATSIC suggests that the critical path of the project was in fact excusably delayed due to weather and actions by USPS.

**Proposed Finding:**

21. Simultaneously with the issuance of its third Show Cause letter, on July 15, 2002, USPS issued a letter directing ATSIC "to immediately cease all work at the job-site until further notice." Vento dep. 111:14-112:9, 127:1-128-7; Dep. Ex. 32.

**Response:**

ATSIC is correct that USPS issued a cease work order, dated July 15, 2002, directing ATSIC "to immediately cease all work at the job-site until further notice." However, the date of the letter is not indicative of the date on which USPS issued the cease work order. The cease work order was issued on July 31, 2002. Def. Prop. Findings ¶ 22; Def. Resp. Br. at 18-19.

**Proposed Finding:**

22. The USPS Contracting Officer, Jerry Goddard, issued his Termination for Default on August 16, 2002. Dep. Ex. 12. The termination was based on (i) failure to complete the Contract by July 15, 2002 (ii) unsatisfactory progress, and (iii) failure to man the project adequately. The termination letter stated that the "explanation offered by ATC, Inc. was not an acceptable cause for delay."

**Response:**

Not in dispute.

**Proposed Finding:**

23. The termination letter cited two reasons for termination that were not included in the third Show Cause letter.

**Response:**

We do not dispute that the Third Show Cause Letter did not separately identify unsatisfactory progress and failure to man the project adequately as potential bases for termination for default.

**Proposed Finding:**

24. On June 20, 2002, the USPS Contracting Officer issued Modification No. M02 on Contract No. 123125-00-B-3153 (the AMC Project) in which, in consideration for ATSIC's agreement to be terminated from the AMC Project contract and pay USPS $52,137.10 from ATSIC's P&DC Project receipts, the Postal Service agreed in writing to a revised completion date on the P&DC Contract of December 19, 2002. Dep. Ex. 53; Vento dep. 155:17-21.

**Response:**

We do not dispute that ATSIC and USPS executed a modification to contract 123125-00-B-3153 (the AMC project), dated May 29, 2002, in which the parties agreed that $52,137.10 which ATSIC owed USPS on the AMC project would be withheld from the P&DC project. Furthermore, we do not dispute that this modification was signed by Jerry Goddard on behalf of USPS on June 20, 2002. However, ATSIC's proposed finding No. 24 incorrectly states that this modification to the AMC project revised the completion date for the P&DC project. See Def. Resp. Br. at 6.

**Proposed Finding:**

25. On February 8, 2002, USPS had issued directions to ATSIC not to continue on specified portions of the Project work due to matters, such as air conditioning issues and design plans that were the responsibility of the Postal Service, that needed to be resolved before ATSIC's work in those areas could be concluded. These were not the responsibility of ATSIC. Vento dep. 56:1-57:16, 116:8-117:11, 161:21-162:9; Dep. Ex. 56. USPS never rescinded or

revised these directions, thus making completion of the Project impossible. Vento dep. 129:10-130:3, 130:15-132:6. A significant portion of the work remaining unfinished between February 8, 2002, and the date when ATSIC was terminated was directly related to the control room work that ATSIC was required by USPS not to complete. Vento dep. 116:18-117:11; Zamora dep. 32:6-22; Dep. Ex. 34 ("Microsoft Project" printout).

**<u>Response:</u>**

ATSIC's proposed finding number 25, and ATSIC's related proposed finding number 38, are incorrect in several respects. First, as to the control room, ATSIC fails to identify any action or inaction by the Government which prevented ATSIC from proceeding with the work. ATSIC cites deposition exhibit 56 to support its allegation regarding the control room, but this document does not support ATSIC's allegations. Deposition exhibit 56 is a letter dated February 8, 2002 from Joseph Stuhl to Jerry Goddard. Page 2, item 3 states, "We have not received the requested elevation or floor plan for the console to be installed. By copy of this report, we request that ATC stop work on the console until we have received all of the required drawings and information for this room." Item 3 of this letter in turn refers to item 3 of an earlier field investigation report by Mr. Stuhl, in which Mr. Stuhl explains that ATSIC has installed five of the console sections in the control room, but <u>ATSIC</u> needs to provide plans for the location of the remaining 2 sections. Supp. App. 49 (letter dated January 28, 2002, from Stuhl to Goddard, item 3). Therefore, there is nothing in deposition exhibit 56 to support ATSIC's contention that the Government hindered ATSIC's progress with respect to the control room. Rather, Joseph Stuhl requested that ATSIC stop work as to on the remaining sections of the console until <u>ATSIC</u> provides the required drawings. Furthermore, even if there were any delay with respect to the two console sections attributable to the Government, ATSIC has failed to demonstrate that

such delay occurred after the parties agreed to the waiver of claims and established the revised schedule through Modification No. 11.

ATSIC has failed to demonstrate any other issue with the control room. Vincent Vento testified that there was an issue with the control room window, but his testimony fails to demonstrate that any action or inaction by the Government caused a delay in the project based upon the control room window. See App. 72 (letter dated May 24, 2002 from Joseph Stuhl to USPS, item number 9). Furthermore, ATSIC failed to demonstrate that whatever alleged Government action or inaction with respect to the control room window caused an overall delay to the project or that any such issue survived Modification No. 11.

Mr. Vento also testified that USPS caused delay with respect to air conditioning in the control room, and that the Government never approved a requested modification for air conditioning. However, contrary to this assertion, the parties entered into a bilateral modification of the contract (signed by Mr. Vento) with respect to the air conditioning on March 12, 2002, which gave ATSIC a five-day extension in the contract. Supp. App. 25 (Modification No. 7).

Finally, ATSIC's contention that it was delayed following Modification No. 11 is undermined by the fact that ATSIC, in its July 19, 2002 letter attempting to justify its delay and requesting an extension of the Contract, never identified the problems it now alleges with respect to the control room and air conditioning. App. 104-05. ATSIC's likewise failed to identify the alleged delays due to the control room and air conditioning in its response the Government's first set of interrogatories. App. 133-34 (ATSIC's response to Interrogatory No. 1, only identifying USPS's conduct with respect to payment requests as a basis for Government-caused delay).

**Proposed Finding:**

26. By June 20, 2002, USPS had paid ATSIC approximately $1,078,719.20 under the Contract, excluding retainage as provided for by the Contract. Thus, by no later than June 20, 2002, more than 82 percent of the Contract value had been earned and paid to ATSIC under the Contract. Dep. Ex. 40. Moreover, additional work in the amount of approximately $116,392.81 had been completed by May 20, 2002, and requisitioned by ATSIC, but not yet paid. Dep. Ex. 21. Thus, the total of the work completed by that date, all of which had been approved by the Project Manager, SEC, was $1,195,112.01, which constituted over 91% of the original Contract amount. See Vento dep. 132:17-133:3.

**Response:**

The first sentence of proposed finding number 26 is not in dispute. As to the second sentence, ATSIC is correct that, no later than June 20, 2002, more than 82 percent of the Contract value had been paid to ATSIC under the Contract. However, at that point, significantly less than 80 percent of the work had been performed under the contract. Throughout the performance of the contract, USPS and the project engineer, Joseph Stuhl, had significant concerns about the amount of work performed by ATSIC relative to what ATSIC claimed had been performed. <u>See</u>, <u>e.g.</u>, Supp. App. 52 (letter dated January 17, 2002, from USPS to ATSIC, rejecting payment request because amount requested was in excess of work performed and stored materials); App. 72 (letter dated May 24, 2002, from Joseph Stuhl to USPS, indicating that amount of work performed is far less than indicated in ATSIC's payment request). After ATSIC's termination from the contract, these concerns turned out to be well-founded. The Government learned that a significant amount of items for which ATSIC had requested payment from USPS were never provided by ATSIC during the performance of the contract. <u>See</u>, <u>e.g.</u>, Supp. App. 59 (letter dated August 26, 2002, from Joseph Stuhl to Jerry Goddard, estimating that

only 60 percent of contract had been performed by ATSIC); Supp. App. 61-69 (letter dated September 23, 2002, from Joseph Stuhl to Jerry Goddard, listing items not provided by ATSIC, and stating that the total amount over-paid by USPS for equipment and materials never provided by ATSIC was $ 125,903.60); Supp. App. 2 (Goddard 2nd Aff. ¶ 4, describing the difficulties in assessing ATSIC's progress prior to termination given the nature of the project).

ATSIC's statement "Moreover, additional work in the amount of approximately $116,392.81 had been completed by May 20, 2002, and requisitioned by ATSIC, but not yet paid" is unclear. Assuming that ATSIC meant June 20, 2002, rather than May 20, 2002, ATSIC cites to no evidence that it performed "additional work" totaling $116,332.81; deposition exhibit 21 (letter dated July 19, 2002 from Greg Warren to Jerry Goddard, responding to USPS's Third Show Cause), which plaintiff cites in support of its "additional work" allegation, does not refer to additional work totaling $116,332.81. Furthermore, ATSIC has not cited any payment request to USPS in that amount.

**Proposed Finding:**

27. At the time the Contracting Officer issued the final decision to terminate the Contract, Contract funds in the amount of $269,671.61 remained unpaid. Dep. Ex. 20.

**Response:**

ATSIC's proposed finding number 27 is incorrect. At the time USPS issued it final decision terminating the contract, contract funds in the amount of $ 217,534.61 remained unpaid. The amount paid by USPS as of the last payment authorization approved by USPS (payment application No. 17), on June 11, 2002, was $ 1,087,289.43. App. 79 (Payment request authorization No. 17, dated June 11, 2002). The original contract amount was $ 1,308,990. Furthermore, the parties agreed upon six modifications increasing the contract price, and one modification decreasing the contract price, resulting in a final contract price of $ 1,304,824.04.

Supp. App. 12 (Modification No. 1, increasing the contract price by $ 9,850.75); Supp. App. 17 (Modification No. 2, increasing the contract price by $ 17,500.00)[3]; Supp. App. 21 (Modification No. 6, increasing the contract price by $ 5,40.60); Supp. App. 25 (Modification No. 7, increasing the contract price by $ 11,638.00); Pl. Mot. Ex. 4 (Modification No. 8, increasing the contract price by $ 3,441.79); Supp. App. 35 (Modification No. 9, increasing the contract price by $ 5,000.00)[4]; App. 96 (Modification No. 10, decreasing the contract price by $ 52,137.10.). Subtracting the final contract price at the time of termination ($ 1,304,824.04) from the amount paid to ATSIC (1,087,289.43) results in a balance remaining on the contract of $ 217,534.61.

**Proposed Finding:**

28. Joseph Stuhl of SEC consistently manifested his intention to terminate the Contract prematurely and divert Project funds to friends and favored parties. Vento dep. 85:24-86:14, 96:4-97:3, 147:4-148:1. Mr. Stuhl made no secret that he wanted Tri-State Life Safety & Electric System, Inc. ("Tri-State"), the company that was ultimately retained to complete the Project, to be retained for that purpose. Vento dep. 99:11-101:20; Warren dep. 77:4-22; Dep. Ex. 18. In May of 2002, ATSIC contacted Tri-State to ask Tri-State to consider completing the P&DC Project for ATSIC. Warren dep. 77:4-22, Dep. Ex. 18. Tri-State indicated interest in doing so for approximately $215,000.00, which was less than the amount remaining and unpaid under the Contract. Dep. Ex. 20 (showing $269,672.21 remaining unpaid). After a site visit by Tri-State followed by finalizing discussions, Tri-State suddenly stopped communicating with ATSIC, and, within days, Stuhl and the Contracting Officer entered into an agreement with

---

[3] Modification No. 2 replaced an order directing work on a price-to-be-determined later basis ("PDL"), dated April 24, 2001. Supp. App. 5, 17.

[4] Modification No. 9 replaced an order directing work on a price-to-be-determined later basis ("PDL"), dated March 12, 2002. Supp. App. 29, 35.

ATSIC, intending thereby to resolve the outstanding issues in return for a short extension of the completion date. Dep. Ex. 31A (Modification No. 11). However, the Contracting Officer delayed signing Modification No. 11 until June 20, 2002, leaving less than 3-1/2 weeks for ATSIC to complete the Project. Less than one month later, without Stuhl lifting the restrictions against completing some portions of the work, ATSIC was removed from the Project and, shortly thereafter, terminated. Dep. Ex. 12, 32. Tri-State was then retained by the Government at a substantially higher contract price to complete the Project. Vento dep. 101:21-104:23, 149:2-14; Warren dep. 78:15-24; Dep. Ex. 18.

**Response:**

Joseph Stuhl did not manifest a desire or "intention" that USPS terminate the contract prematurely. Rather, like the contracting officer, Mr. Stuhl indicated to ATSIC the importance of completing the project in a timely fashion, and indicated that USPS could terminate for default for ATSIC's failure to complete the project in a timely fashion. See, e.g. Supp. App. 31 (letter dated March 13, 2002, from Joseph Stuhl to ATSIC regarding lack of progress); App. 113-16 (letter dated July 25, 2002 from Joseph Stuhl to Jerry Goddard, copied to ATSIC, regarding lack of progress).

Furthermore, while ATSIC contends that Mr. Stuhl had a bias in favor of Tri-State, the only basis cited for the alleged bias by Mr. Vento is that Mr. Stuhl had worked with Tri-State in the past. Vento Tr. at 99-100. In addition, ATSIC's claim is misplaced given that it was ATSIC who contacted Tri-State to see if Tri-State could complete the project for ATSIC. Zamora Tr. 45-46; Dep. Ex. 18 (Memo dated May 16, 2002 from Jose Zamora to Vincent Vento regarding ATSIC's discussions with Tri-State).

As for ATSIC's contention, "After a site visit by Tri-State followed by finalizing discussions, Tri-State suddenly stopped communicating with ATSIC, and, within days, Stuhl and

the Contracting Officer entered into an agreement with ATSIC, intending thereby to resolve the outstanding issues in return for a short extension of the completion date," ATSIC fails to cite any document or testimony that would support this statement.

As to Mr. Stuhl allegedly not "lifting the restrictions against completing some portions of the work," see our response to proposed finding No. 25.

**Proposed Finding:**

29. After terminating ATSIC, but expecting to charge it excess reprocurement costs, Mr. Stuhl actively and candidly diverted funds, meanwhile expending unnecessary funds, by diverting work to a person who he describes in his communications as his "good buddy," Joseph Erickson. Three emails between Messrs. Stuhl and Erickson clearly illustrate the diversion. Mot. Ex. 5, 6, 7. In Exhibit 5, Mr. Stuhl writes, "I think there is some extra money left in the contract," and, then, tongue in cheek, "Thanks for making this easy on me, we both know that you had a chance to take advantage of the dumb engineer." In Exhibit 7, Mr. Erickson, writing to Mr. Stuhl about the "gate situation," which was still not resolved more than 21 months after ATSIC was ordered to cease working, and speaking of the Postal Service management, says candidly (because he was only addressing his "good buddy") that "they deserve what they get and (sic) unless and until sane management comes to the District."

**Response:**

Proposed Finding No. 29 relates to excess reprocurement costs after termination of the Contract. Neither party has moved for summary judgment as to excess reprocurement costs, therefore, the only possible purpose for ATSIC's inclusion of this proposed finding is an attempt to color the Court's judgment regarding the project engineer, Joseph Stuhl. In any event, ATSIC is mistaken in its interpretation of these documents as indicating that Mr. Stuhl engaged in any inappropriate conduct after ATSIC's termination.

**Proposed Finding:**

30. The relevant portion of Section H.6, Termination for Default, of the USPS Facilities Department Contract Requirements, which the USPS Contracting Officer referenced in his first Show Cause letter (see Exhibit 3 to this Motion), provides as follows:

H.6 Termination for Default
(Clause B-13) (January 1997)

a.

(1) The Postal Service may, subject to Paragraphs c and d below, by written notice of default to the supplier, terminate this contract in whole or in part if the supplier fails to:

(a) Complete the requirements of this contract within the time specified in the contract or any extension;
(b) Make progress, so as to endanger performance of this contract (but see paragraph d below); or
(c) Perform any of the other provisions of this contract(but see subparagraph a.2 following).

(2) The postal Service's right to terminate this contract under a.1(b) and (c) above may be exercised if the supplier does not cure the failure within ten days (or more is authorized in writing by the contracting officer) after receipt of the notice from the contracting officer specifying the failure.

. . .

c. . . . the supplier is not liable for any excess costs if the failure to perform the contract arises from causes beyond the control and without the fault or negligence of the supplier.

. . .

g. If, after termination, it is determined that the supplier was not in default, or that the delay was excusable, the rights and obligations of the parties will be the same as if the termination had been issued for convenience.

**Response:**

No dispute that the termination for default clause contains the excerpts cited by ATSIC.

**Proposed Finding:**

31. USPS waived termination for cause as a remedy by course of dealing. ATSIC continually relied on the Postal Service forbearance to forge ahead with the portion of the Project that it was permitted to prosecute; thereby incurring increased, exaggerated overhead during the excessively long Postal Service delays.

**Response:**

Proposed finding number 31 is an erroneous legal conclusion based upon factual allegations for which ATSIC cites no documents or testimony in support. As we demonstrate in our response brief, the Government did not waive its right to terminate. Def. Resp. Br. at 6-12. Furthermore, ATSIC fails to cite any evidence to support its claim that it incurred "increased, exaggerated overhead" during any portion of ATSIC's performance under the contract.

**Proposed Finding:**

32. The Postal Service failed to comply with the requirements of Part 49 of the Federal Acquisition Regulations ("FAR"), in that USPS had taken action that "might be construed as a waiver of the Contract delivery or performance date." FAR §49.402-3(c).

**Response:**

This proposed finding is an erroneous legal conclusion, rather than a proposed finding of uncontroverted fact. In any event, as we demonstrate in our response brief, the FAR does not apply to USPS contracts, and in any event USPS had not taken actions resulting in a waiver. Def. Resp. Br. at 6-12; see also Def. Mot. at 21 (regarding the inapplicability of the FAR to USPS contracts).

**Proposed Finding:**

33. In order to set a new date for the Contractor to complete performance, USPS was required to send a notice to the Contractor, which notice must have reserved "the Government's rights under the Default clause." FAR §49.402-3(c).

**Response:**

Proposed finding number 33 is not a proposed finding of uncontroverted fact, but rather an erroneous statement of law, based upon the FAR which does not apply to USPS contracts. See Def. Mot. at 21.

**Proposed Finding:**

34. The Postal Service failed to give ATSIC notice of a new completion date that reserved the Postal Service's rights under the Default clause. Contract Modification No. 11 reinstated a liquidated damages provision of the Contract that had been previously waived, but did not reinstate the right to terminate the Contractor for default for failure of timely completion. Dep. Ex. 31A.

**Response:**

This proposed finding of fact is incorrect in several respects. First, ATSIC incorrectly assumes that USPS was obligated to specifically reserve its right to terminate pursuant to the contract. See Def. Resp. Br. at 6-12. Furthermore, ATSIC is incorrect about liquidated damages. Contrary to ATSIC's assertion, Modification No. 11 did not reinstate previously waived liquidated damages. Instead, prior to Modification No. 11, USPS indicated that liquidated damages were accruing against ATSIC. For example, by facsimile dated May 9, 2002, from Jerry Goddard to Greg Warren, regarding the negotiations which eventually led to Modification No. 11, Mr. Goddard indicates USPS's position that ATSIC owes $23,000 in liquidated damages on the P&DC Project (referred to as the GMF project). Supp. App. 70-71; see also Supp. App. 73 (fax dated May 2, 2002 from Greg Warren to Jerry Goddard, item 10, in which Mr. Warren acknowledge's USPS's position that ATSIC owes liquidated damages for the P&DC project of $23,000, starting from September 10, 2001); App. 63 (second show cause letter, dated May 1, 2002, stating "At this time the project is in liquidated damages of

$100/day."); Supp. App. 7 (e-mail dated January 28, 2002 from Jerry Goddard to ATSIC: "Your contract remains in liquidated damages of $100/day."); Supp. App. 6 (letter from Jerry Goddard to ATSIC: "The current completion date is 9-02-01. Liquidated damages are accruing at $100/day, since that date); Vento Dep. at 150; Dep. Ex. 17 (letter dated May 13, 2002, from ATSIC to USPS requesting that, as part of any "total settlement," that there would be "no further liquidated damages if P&DC is substantially complete by 6/21/02 per the attached schedule."). Rather, liquidated damages that had accrued, and would accrue, up to July 15, 2002 were part of the consideration that USPS gave as part of Modification No. 11.

Finally, ATSIC's proposed finding incorrectly assumes that USPS had waived the termination for default provision, and that this provision therefore needed to be reinstated. No such waiver occurred and there was never a need to reinstate the default provision. See Def. Resp. Br. at 6-12.

**Proposed Finding:**

35. Because of its failure to follow the FAR §49.402-3(c) procedures after action that might have been construed as a waiver, the USPS was barred from terminating ATSIC for default.

**Response:**

This proposed finding is an incorrect legal conclusion, rather than a statement of fact. As we demonstrate in our response brief and elsewhere in this response to ATSIC's proposed findings of fact, there was never a waiver of the completion date and, in any event, the FAR does not apply to USPS contracts. See, e.g. Def. Resp. Br. at 6-12.

**Proposed Finding:**

36. By entering into Contract Modification No. 11, Dep. Ex. 31A, the parties agreed, *inter alia*, to a new failure of completion remedy. By virtue of the negotiated solution

culminating in Contract Modification No. 11, USPS reinstated its right to liquidated damages beginning on July 15, 2002, as its exclusive remedy for failure of completion. Vento dep. 150:25-151:24; Dep. Ex. 31A. Contract Modification No. 11 did not reinstate the waived contract provision permitting the USPS to enforce the time of performance clause by terminating ATSIC for default. The choice of termination for default due to failure of timely completion was both passively waived by USPS inactivity (Facts 32-34) and then affirmatively superseded by USPS's execution of Contract Modification No. 11. Dep. Ex. 31A.

**Response:**

This proposed finding of fact is incorrect for reasons which we have addressed elsewhere. See, e.g. Def. Resp. Br. at 6-12 (addressing incorrect assumption that USPS had waived the termination for default clause). In addition, there is nothing in Modification No. 11 indicating that liquidated damages are to be the exclusive remedy for failure to complete by the revised completion date, and this Modification cannot be interpreted as waiving termination for default as a remedy in the event that USPS does not complete construction by the revised completion date. See Def. Resp. to Pl. Prop. Finding No. 34; Def. Resp. Br. at 14.

**Proposed Finding:**

37. ATSIC would have been able to complete the Project timely within the final Project schedule if ATSIC had received the funds that were required to be paid to it under outstanding pay requisitions and if the rain had not intervened. Zamora dep. 97:23-98:7; Dep. Ex. 17.

**Response:**

This proposed finding is incorrect in that USPS paid all funds that were required of it under the contract, and in any event, ATSIC has not shown that it would have been able to complete the project by the revised completion date if it had received additional funds from USPS which USPS was not obligated to pay. Deposition Exhibit 17 does not support ATSIC's

proposed finding of fact. This document is a letter dated May 13, 2002, from Greg Warren to Jerry Goddard, in which Mr. Warren continues the discussion regarding a settlement of outstanding issues with USPS and in which Mr. Warren provides a schedule for completion of the project. This document cannot establish that ATSIC would have completed the project by the revised completion date had there not been any rain after May 13, 2002.

Furthermore, Mr. Zamora's deposition does not support the proposition stated by ATSIC in its proposed finding of fact. Mr. Zamora testified that he couldn't say one way or another whether ATSIC would have been able to complete the project given the hypothetical posed by counsel for ATSIC. Zamora Dep. 95-96. Furthermore, ATSIC's proposed finding depends upon a faulty assumption that any financial problems were caused by USPS. For example, Mr. Zamora testified as to his belief that ATSIC had cash flow problems towards the end of the project, he couldn't say what the cause of those cash flow problems were. Zamora Dep. at 73.

**Proposed Finding:**

38. USPS's explicit written instructions not to complete the control room, issued approximately six months prior to ATSIC's termination, with the result that many other items and components could not be completed or installed, were never rescinded, even after Modification No. 11 was executed. Vento dep. 129:10-130:31, 130:15-132:6; Zamora dep. 32:6-22; Dep. Ex. 34, 56 (Item #3).

**Response:**

See our response to ATSIC's related proposed finding number 25.

**Proposed Finding:**

39. Suspension of the work by the Contracting Officer requires an extension of the Contract. F.D.§C.2a.

**Response:**

Proposed finding number 39 is a legal conclusion, not a proposed finding of uncontroverted fact. In any event, a suspension of work by the contracting officer does not automatically result in an extension of the completion date. For example, there is no reason for an extension of the completion date for a suspension of work that does not affect the work prior to the required completion date. See App. 22-23 (clause C.2).

**Proposed Finding:**

40. Because the completion date of July 15, 2002, set forth in Modification No. 11 was subject to weather delays and payment delays, and because, most importantly, the Postal Service never rescinded its orders for ATSIC not to proceed on certain items due under the Contract, the written plans for which were completely under the control of the Postal Service, the Postal Service was never in a position to be able to determine whether the contractor would be able to complete the project by a proper completion date.

**Response:**

We have addressed the erroneous allegations contained in ATSIC's proposed finding number 40 elsewhere in this response and in our response brief. See Def. Resp. Br. 19-22 (weather delays); Def. Resp. to Prop. Findings Nos. 25, 28 (allegation of rescinding certain items). Furthermore, ATSIC cites no support for these allegations. In addition, at all relevant times USPS had ample information, from its own observations, communications with ATSIC, and from inspections by the project engineer, Joseph Stuhl, with which to evaluate ATSIC's progress, or lack thereof.

**Proposed Finding:**

41. ATSIC had consistently, for many months, indicated that the Project could be completed in two months. Dep. Ex 17. By promulgation of the Microsoft Project report, Dep.

Ex. 17, ATSIC confirmed that the project could actually be completed in less than six weeks with the Government's cooperation.

**Response:**

We do not dispute that ATSIC repeatedly represented over the course of the contract that it could complete the project in two months or less. For example, by letter dated March 18, 2002, from ATSIC to Joseph Stuhl, ATSIC estimated that only two more months were required to complete the project. Dep. Ex. 34. In addition, by letter dated May 13, 2002, ATSIC provided a schedule showing that less than two months was required to complete the project. App. 65-68.

**Proposed Finding:**

42. Even without regard to the Postal Service's failure to rescind its order not to proceed on certain items, the Postal Service dismissed ATSIC's explanation for excusable delay and failed to present any analysis of the permitted excusable delay versus the time necessary to complete the Project. Dep. Ex. 12.

**Response:**

ATSIC's proposed finding of fact has the parties' obligations reversed; contrary to ATSIC's suggestion, it was ATSIC's responsibility to demonstrate to the contracting officer that there was an excusable delay and the number of days of delay caused by the excusable delay. ATSIC neither established the existence of excusable delay, nor the number of days of delay that would be attributable to the alleged excusable delay. See Def. Mot. 9-10; Def. Resp. Br. at 20-22. Furthermore, ATSIC failed to identify in its response to USPS's third show cause letter any issue with respect to alleged orders not to proceed. App. 104-05.

**Proposed Finding:**

43. Based on the undisputed facts that (i) the extension was negotiated in May of 2002 and gave ATSIC through July 15, 2002, and (ii) ATSIC's own Project Close-Out Schedule (prepared at the USPS Contracting Officer's request, Warren dep. 63:17-64:24) showed that the remaining work would take approximately five weeks once ATSIC was freed to do the work, Dep. Ex. 17 and Warren dep. 68:21-70:6, it is impossible for the Contracting Officer to have reasonably concluded that the work could not be done timely.

**Response:**

We agree with ATSIC that based upon the information available to USPS at the time it entered into Modification No. 11, USPS believed that the project could be completed by the revised completion date of July 15, 2002. We do not dispute that negotiations began in May of 2002, however USPS did not receive signed documents from ATSIC until June 17, 2002, at the earliest. Supp. App. 34. Furthermore, ATSIC is incorrect in its characterization of the schedule provided by ATSIC on May 13, 2002. This schedule shows a projected completion within five weeks from May 10, 2002. App. 68.

**Proposed Finding:**

44. USPS issued the third and final Show Cause letter without extending the completion date based on USPS's failure to pay the proper claims and requisitions of ATSIC. ATSIC had outstanding its May 20, 2002, requisition for $116,392.81, which had not been paid after 56 days, despite the contractual requirement to pay requisitions in 30 days. Vento dep. 132:17-133:3; F.D. § F.4a1(a)(2).

**Response:**

ATSIC's proposed finding is incorrect. ATSIC has not identified any documents identifying or referring to a payment request for $ 116,392.81. Furthermore, the portion of Mr.

Vento's deposition cited by ATSIC does not refer to any payment request for $116,392. In any event, payment request number 17 covered all work through at least May 20, 2002. App. 80.

**Proposed Finding:**

45. USPS agreed to pay materials at 100% of schedule of values, per Modification No. M10, Dep. Ex. 30, but failed to do so. See Dep. Ex. 20, 26.

**Response:**

The parties agreed through Modification No. 10 that "[t]he remaining materials will be paid as invoiced, at 100 percent of the schedule of values under the normal payment request process." Dep. Ex. 20. This modification, executed by USPS on the same day as Modification No. 11, June 20, 2002, could not have applied to prior payment requests. Furthermore, it could not have applied to payment request number 17, for which the parties had agreed upon the amount to be paid and which was signed by the parties prior to Modification No. 10. ATSIC has failed to identify any properly submitted payment request after payment request number 17 for which USPS failed to pay 100 percent of the schedule of values of materials. The only thing that ATSIC cites for its claim that USPS failed to abide by Modification No. 10 is deposition exhibit 26, which is a letter dated April 9, 2002, from ATSIC to a supplier, Tomsed Corporation, regarding turnstiles to be provided to ATSIC for the project. Although the letter from ATSIC indicates that ATSIC would pay approximately half of the amount owed to Tomsed for the turnstiles, ATSIC indicated as part of payment application number 17 that ATSIC had paid the full amount of the cost of the turnstiles. App. 80. In fact, ATSIC never paid Tomsed the remaining balance for the turnstiles. Supp. App. 75-80 (December 31, 2002 letter from Tomsed to International Fidelity).

**Proposed Finding:**

46. The Contracting Officer failed to properly consider the fact that ATSIC was delayed by the USPS's delays in making payment in violation of the payment provisions under the Contract. F.D. §C.4a; FAR §49.402-3(f)(1). During the extension period, the USPS continued to delay processing of the payment requisitions and modifications for additional work, leaving the Project without adequate funds to purchase equipment and making timely completion of the Project impossible. Dep. Ex. 21.

**Response:**

ATSIC fails to identify any payment which violated the payment provisions of the contract, or the FAR, which in any event does not apply to USPS contracts. Deposition Exhibit 21, which is ATSIC's response dated July 19, 2002 to USPS's third show cause letter, does not identify any untimely payments nor establish in any way a violation of the contract with respect to the timing of payments.

ATSIC's statement that "[d]uring the extension period, the USPS continued to delay processing of the payment requisitions and modifications for additional work" is also incorrect. Contrary to this statement, after Modification No. 11, no certified payment applications were ever submitted to the contracting officer by ATSIC. Deposition exhibit 21 refers to payment request number 18 in the amount of $38,250, however, we have been unable to locate any certified request for payment in that amount, and plaintiff has failed to produce a certified request for payment in that amount. Without such a certified request for payment, USPS is not obligated to make any payment to ATSIC. Furthermore, even if ATSIC had submitted a certified request for payment in the amount of $38,250 on July 19, 2002, this could not excuse ATSIC's failure to complete the project by the revised completion date of July 15, 2002, since

payment would not be required under the contract until after the revised completion date had already passed.

**Proposed Finding:**

47. Given that the time to completion provided to USPS by ATSIC was 35 calendar days once the Postal Service paid the outstanding pay requisitions and rescinded the order preventing ATSIC from performing work in the control room, Dep. Ex. 17, the Contracting Officer failed to properly consider the cost and the period of time required to obtain completion of the Contract by other means as compared to completion of the work by ATSIC. FAR §49.402-3(f)(4).

**Response:**

The revised completion date, pursuant to Modification No. 11, was July 15, 2002, App. 100 (Dep. Ex. 31A), not 35 days from the occurrence of certain events as ATSIC suggests. ATSIC's statement about the revised completion date being 35 days from certain events is not supported by Modification No. 11, nor any other evidence. The only document that ATSIC cites in support of this contention, deposition exhibit 17, a letter dated May 13, 2002 from Greg Warren to Jerry Goddard, does not even refer to the events ATSIC contends were to be the starting point for any contract extension. ATSIC's contention regarding the FAR is misplaced because the FAR does not apply to USPS procurements, and in any event USPS considered the relevant factors in determining that termination for default was appropriate.

**Proposed Finding:**

48. The plans prepared by the Project Architect or Project Engineer contained numerous defects and deficiencies. Dep. Ex. 56.

**Response:**

ATSIC fails to specifically identify any defect or deficiency in the plans. Furthermore, deposition exhibit 56, which is a letter dated February 8, 2002 from Joseph Stuhl to Jerry

Goddard, identifies only one purported defect or deficiency in the plan. Dep. Ex. 56. This purported defect, identified in item number one of the letter (relating to conduit), was addressed by USPS in a letter to ATSIC dated March 12, 2002. Supp. App. 29. This letter instructed ATSIC to proceed immediately with the suggested changes to the conduit on a price-to-be-determined basis ("PDL"), not to exceed $5,000. Id. This PDL was later converted to a modification, as Modification No. 9. Supp. App. 35. Moreover, ATSIC waived any claims regarding this purported defect as part of Modification No. 11.

**Proposed Finding:**

49. On January 18, 2002, six months prior to the Government's "stop work" order, ATSIC met with the Project Engineer, and then wrote the Project Engineer, with a copy to the Contract Officer, explaining critical path decisions that the Government had to make before ATSIC could complete the last portion of the Project. Dep. Ex. 23 (re cable, air conditioning, and bulletproof glass decisions). The Government's delay in making such decisions was a principal reason for months of delay.

**Response:**

ATSIC fails to establish any delay by USPS in making decisions with respect to these items relevant to the critical path. The only document cited by ATSIC in support of its contention does not demonstrate any delay on the part of the Government. Furthermore, ATSIC has not demonstrated, or even claimed, that any Government-caused delay continued after Modification No. 11. E.g., Supp. App. 25 (bilateral Modification No. 7, approved March 12, 2002, regarding work related to the air conditioning for the control room).

**Proposed Finding:**

50. At all relevant times, ATSIC attempted to work with the representatives of the USPS to make sure the Contract was properly and fully completed. Warren dep. 139:10-141:17; Dep. Ex. 28 (offering joint payment alternative rejected by USPS).

**Response:**

Whether ATSIC attempted to complete the project properly and in a timely fashion is irrelevant, the relevant facts are that they failed to complete the project by the original completion date, then following a second show cause and the establishment of a revised completion date, ATSIC still failed to meet the revised completion date.

**Proposed Finding:**

51. On July 19, 2002, ATSIC provided a letter, in response to the July 15, 2002, Show Cause letter, to USPS showing (i) that its critical path work had been delayed because of nearly continuous rain during June and early July, 2002, and (ii) because of USPS's failure to timely process payment applications. Warren dep. 89:13-90:13, 95:24-96:5; Dep. Ex. 21 (showing delays of 37 days for rain and 24 days for late payment). The letter included, *inter alia*, National Weather Service records showing rain on 37 of the previous 48 days, Zamora dep. 55:14-23; Dep. Ex. 21, and delays due to the Government's failure to pay outstanding invoices. This uncontroverted information requires the Contract Officer (i) to extend the delivery schedule accordingly, and (ii) to recognize that, in the event of termination, "the supplier will not be in default." F.D. §C3a.

**Response:**

We do not dispute that ATSIC provided to USPS the letter dated July 19, 2002, and that ATSIC alleged in this letter that it was unable to complete the project by the revised completion because of rain and the timeliness of payments by the Government. Furthermore, we do not

dispute that the document attached to ATSIC's letter purported to show that there were 37 days of rain of 0.01 inches or more between June 1, 2002 and July 18, 2002 at the Miami, Florida climatological station. App. 106-10. As we demonstrated in our motion for partial summary judgment, even if there were 37 days of 0.01 inches of rain or more during this time period, ATSIC failed to establish any entitlement to excusable delay. Def. Mot. at 11-13; see also Def. Resp. Br. at 20-22.

**Proposed Finding:**

52. The Contracting Officer failed to properly consider the fact that ATSIC was entitled to an equitable extension of the time of performance because of excessive rain, which delayed its work. F.D. §C3a; FAR §49.402-3(f)(1). Significant and persistent rain, which effectively halted the trenching and the gate and closed circuit television installation and testing of the electronic security components to be installed by ATSIC under the Contract, rendered timely completion impossible. Warren dep. 146:16-147:7, 148:25-150:4; Zamora dep. 26:24-27:14, 73:15-74:11; Ex. 33, 42 (detailing persistent rain in June 2002), 43. Some of the rain was heavy (several inches in a day), Dep. Ex. 21, which could effectively halt trenching work for an additional day. Furthermore, some work had to be completed before other work could be done, so ATSIC equitably required 35 days. Zamora dep. 70:24-7:6; Dep. Ex. 17 (schedule printout).

**Response:**

ATSIC's erroneous allegations of excusable delay based upon rain, including the lack of a factual predicate necessary to establish excusable delay, are addressed in our motion for partial summary judgment and in our response to ATSIC's motion for partial summary judgment. Def. Mot. at 11-13; Def. Resp. Br. at 20-22.

**Proposed Finding:**

53. On August 16, 2002, USPS issued its Termination for Default, effective July 31, 2002. From July 15, 2002, to July 31, 2002, it was impossible for ATSIC to complete the work, even if the rainy weather cleared, because ATSIC remained under the USPS order to "cease all work."

**Response:**

We do not dispute the first sentence regarding the termination for default. However, the second sentence is incorrect. As demonstrated in defendant's proposed finding number 22, the stop work order was not issued until July 31, 2002, and ATSIC was not operating under any directions to "cease all work" until July 31, 2002. Def. Prop. Findings ¶ 22; see also Def. Resp. Br. at 18-19.

**Proposed Finding:**

54. F.D. §H.6a expressly predicates the Postal Service's right to terminate a supplier for default on the prior requirement that the supplier not cure a failure within ten days . . ."after receipt of the notice from the Contracting Officer specifying the failure." The Contracting Officer expressly acknowledged the requirement of a cure period in the first Show Cause letter. Mot. Ex. 3.

**Response:**

As we demonstrated in our motion for partial summary judgment, the 10-day cure period does not apply to failures to complete by the completion date. Def. Mot. at 19-21; Def. Resp. Br. at 24. Furthermore, as to motion exhibit number 3, the only document cited by ATSIC in support of its contention, this document fails to demonstrate any "acknowledgment" regarding the alleged requirement of a cure period. Mot. Ex. 3.

**Proposed Finding:**

55. The Postal Service notice letter (third Show Cause letter) never provided a cure notice that specified the items to be cured, Dep. Ex. 9, as required by F.D. §H.6a. ATSIC repeatedly stated that, if the Postal Service would fulfill its responsibilities of providing payments due to ATSIC and rescind its prior instructions not to complete the control room, then, with proper consideration for weather delays, the Project could and would be completed timely. Zamora dep. 97:23-98:7, Dep. Ex. 17.

**Response:**

The first sentence of this proposed finding is addressed in our motion for partial summary judgment. Def. Br. at 19-21. Furthermore, as to the second sentence, none of the allegations are supported by cited portion of Jose Zamora's deposition or the document cited. Zamora dep. 97-98, Dep. Ex. 17.

**Proposed Finding:**

56. Because the Postal Service Contracting Officer issued a "stop work" letter the same date as the third Show Cause letter, Dep. Ex. 32, the "stop work" letter would have made the cure period a nullity. Because of the Postal Service's failure to provide time to cure, which is a condition precedent to the right to terminate for default, the termination must be deemed to be for convenience pursuant to F.D. §H.6g.

**Response:**

The errors in this proposed finding have been explained in our motion for partial summary judgment and our proposed findings of fact. Def. Mot. at 19-21 (regarding a cure period); Def. Prop. Findings ¶ 22 (regarding the date of issuance of the stop work order).

**Proposed Finding:**

57. On May 1, 2002, the USPS Contacting Officer issued a letter to ATSIC explicitly revising the Contract completion date to September 10, 2002. Dep. Ex. 5; Warren dep. 121:7-24 (ATSIC relied on revised date).

**Response:**

This proposed finding restates an allegation contained in ATSIC's proposed finding number 15, which has been addressed above, and in our response to ATSIC's motion for partial summary judgment. See Def. Resp. at 4-6. In this proposed finding, ATSIC cites as additional authority the deposition of Greg Warren. However, in the portion of his deposition cited by ATSIC, Mr. Warren merely refers to the date indicated in the letter, which as we have demonstrated above and in our response brief, cannot be interpreted as anything other than a typographical error regarding the year. Mr. Warren, in the same deposition, identifies the revised completion date as July 15, 2002, based upon Modification No. 11. Warren Dep. at 145. Furthermore, any claim that the contract completion date was modified to be September 10, 2002 would be inconsistent with Mr. Warren's own request to USPS, by letter dated May 23, 2002, that the new modification extend the revised completion date to June 30, 2002, "to allow [ATSIC] some cushion for the unexpected." Supp. App. 33.

**Proposed Finding:**

58. On June 20, 2002, the USPS Contracting Officer issued Modification No. M02 on Contract No. 123125-00-B-3153 (the AMC Project) in which, in consideration for ATSIC's agreement to be terminated for convenience from the AMC Project contract and pay USPS $52,137.10 from ATSIC's P&DC Project receipts, the Postal Service agreed in writing to a revised completion date on the P&DC Contract of December 19, 2002. Dep. Ex. 53; Vento dep. 155:17-21.

**Response:**

This proposed finding repeats allegations contained in proposed finding number 24, which we have addressed above and in our response brief. Def. Resp. Br. at 6. As we demonstrate in response to proposed finding number 24 and in our response brief, deposition exhibit 53, which is a modification to the AMC project, not the P&DC project, could not have modified the completion date for the P&DC project. Dep. Ex. 53. Nor does this modification to the AMC project purport to modify the completion date for the P&DC project. Id.; see also Def. Resp. Br. at 28 (regarding ATSIC's suggestion about deduction from project receipts).

**Proposed Finding:**

59. The Postal Service's (i) failure to approve change orders and modifications for more than ten months, (ii) failure to rectify over many months its orders to ATSIC not to proceed with certain portions of the work due to failure of the Postal Service to provide design plans, which was completely within its hands (SEC was an engineering firm), (iii) disingenuousness by Stuhl telling ATSIC on-site that work was acceptable and then writing reports to Goddard that it was not, and (iv) failure to pay approved requisitions timely and to approve requisitions for work actually completed, all of which unfairly and unreasonably lengthened the period required for completion of the Project, constitute a breach of the covenant of good faith and fair dealing. Mot. Ex. 1.

Furthermore, USPS first issued its second Show Cause letter with a September 10, 2002, completion date, followed by its Modification No. 02 on the AMC Contract specifying a PD&C Contract completion date of December 19, 2002. Then it asserted a July 15, 2002, completion date on June 20, 2002, which it knew from the construction schedule was inadequate to complete the five weeks of work remaining. Dep. Ex. 17. This short period to a new completion date, after two assertions of a later completion date, evidences neither good faith nor fair dealing.

For all the foregoing reasons, USPS acted with conscious indifference to the rights, obligations, and interests of the Plaintiffs; with improper motive; and in a manner of unfair dealing. Such actions of USPS constitute a breach of the covenant of good faith and fair dealing with regard to the Contract and the bonds issued by International Fidelity for the Contract. Accordingly, the termination for default of ATSIC under the Contract was improper, not in the best interest of USPS, and should be converted to a termination for convenience.

**Response:**

Most of the allegations contained in the first and second paragraphs merely repeat allegations contained in prior proposed findings, which we have addressed above. Def. Resp. to Pl. Prop. Finding No. 7 (contract modifications); Def. Resp. to Pl. Prop. Finding Nos. 9, 10 and 46 (payment requests); Def. Resp. to Pl. Prop. Finding No. 25 (designs); Def. Resp. to Pl. Prop. Finding No. 9 (Stuhl's actions); Def. Resp. to Pl. Prop. Finding No. 15 (September, 2002 date). The only allegation in the first two paragraphs not raised in other proposed findings is ATSIC's claim that ATSIC "asserted a July 15, 2002, completion date on June 20, 2002, which it knew from the construction schedule was inadequate to complete the five weeks of work remaining." Contrary to this assertion, ATSIC requested that the completion date be extended to June 30, 2002, then as negotiations continued, to July 15, 2002. At the time Mr. Goddard signed Modification No. 11, and based upon the information available to him at that time, he believed that it was possible for ATSIC to complete the project by the revised completion date of July 15, 2002. Supp. App. 3-4 (Goddard 2nd Aff. ¶ 3). Furthermore, ATSIC's allegation is directly contrary to ATSIC's proposed finding number 43, which states "Based on the undisputed facts that (i) the extension was negotiated in May of 2002 and gave ATSIC through July 15, 2002, and (ii) ATSIC's own Project Close-Out Schedule (prepared at the USPS Contracting Officer's request, Warren dep. 63:17-64:24) showed that the remaining work would take approximately

five weeks once ATSIC was freed to do the work, Dep. Ex. 17 and Warren dep. 68:21-70:6, it is impossible for the Contracting Officer to have reasonably concluded that the work could not be done timely."

The third paragraph of proposed finding number 59 is not a proposed finding of fact, but rather an erroneous legal conclusion flowing from erroneous factual allegations.

**Proposed Finding:**

60. The "supplier is not liable for any excess costs if the failure to perform the contract arises from causes beyond the control without the fault or negligence of the supplier." F.D. §H.6c. USPS's unrescinded orders not to proceed on portions of the Project, the severe inclement weather, USPS's failure to make timely payments, and USPS's premature notice requiring ATSIC to cease the work, each of which was a sufficient cause of ATSIC's failure to have completed the Project by the date ATSIC was terminated, were all beyond the control and without the fault or negligence of ATSIC.

**Response:**

Proposed finding No. 60 repeats erroneous legal conclusions and erroneous factual allegations contained in previous proposed findings, which we have addressed above.

**Proposed Finding:**

61. The Project was adequately manned when there was work to do. Warren dep. 115:11-116:7 (staffed according to conditions), 116:8-118:18 (can't do much of the work in the rain); Zamora 38:22-39:1 ("there was (sic) always personnel to find the work that needed to be done"). Even SEC acknowledged on June 10, 2002, that "my inspection revealed that some progress has been made by ATC and it appears they are increasing their effort at this facility." Dep. Ex. 19.

**Response:**

Contrary to ATSIC's assertion, ATSIC's failure to adequately man the project was a continual problem during the course of the project. See, e.g. Supp. App. 2 (Goddard 2nd Aff. ¶ 5); Supp. App. 81-84 (letter dated February 19, 2002, from Joseph Stuhl to Jerry Goddard, discussing lack of manpower on the project); App. 63 (second show cause, dated May 1, 2002, citing failure to adequately man the project as possible basis for termination); Supp. App. 85-86 (letter dated July 25, 2002 from Joseph Stuhl).

**Proposed Finding:**

62. Among other things, Section 6.9.3b7(6) of the Purchasing Manual requires that, in a termination for default, the Postal Service "[i]nform the supplier that the termination is subject to Clause B-9, *Claims and Disputes*." The Postal Service Notice of Termination neither contained the specified language nor contains a copy of Clause B-9 (F.D § H.3 of the Contact). Dep. Ex. 12. Accordingly, the Notice of Termination was substantially and fatally defective and cannot serve as the basis for a termination for default.

**Response:**

As we demonstrate in our response brief, ATSIC failed to assert a violation of section 6.9.3b7(c)(6) in its complaint, and ATSIC is therefore barred from raising this claim at this time. Def. Resp. Br. at 26. In any event, as we further demonstrate in our response brief, section 6.9.3b7(c)(6) of the Purchasing Manual does not require that specific language be used so as to inform the contractor of its right to appeal the termination for default pursuant to the claims and disputes clause and the Contract Disputes Act. Id. In addition, USPS stated in its termination notice that ATSIC could challenge the termination before the Postal Service Board of Contract Appeals or the United States Court of Federal Claims, and the procedures that apply with respect to submitting appeals to those tribunals. Dep. Ex. 12; see also Def. Resp. Br. at 26.

**Proposed Finding:**

63. Section 6.9.3b7(a) of the Purchasing Manual requires that, if a contracting officer is going to issue a notice of termination for default, he must do so "immediately" upon determining that termination is proper. The Show Cause letter was issued July 15, 2002, before the completion date had elapsed. Dep. Ex. 9. Nonetheless, ATSIC responded with its reasonable basis for the delay (including weather issues and USPS financing issues) by July 19, 2002. Dep. Ex. 21. The Contracting Officer obviously made his decision in July to terminate ATSIC for default, because he issued the termination "effective July 31, 2002." However, he delayed issuing the Notice of Termination until August 16, 2002. Dep. Ex. 12. This delay cannot be construed as "immediately,"as required by the Postal Service. Accordingly, the Notice of Termination cannot serve as the basis for a termination for default.

**Response:**

As we demonstrate in our response brief, ATSIC failed to assert a violation of section 6.9.3b7(a) in its complaint, and ATSIC is therefore barred from raising this claim at this time. Def. Resp. Br. at 26-27. In any event, as we further demonstrate in our response brief, USPS did not violate section 6.9.3b7(a). A stop work order was issued on July 31, 2002. Def. Prop. Finding No. 22. By letter of the same date, July 31, 2002, from the contracting officer to Keith Strange, Vice President Purchasing and Materials, the contracting officer requested concurrence to terminate ATSIC for default. Supp. App. 36. The requested concurrence was given on August 8, 2002 by Robert Fraga, Manager, Major Facility Purchasing, and August 12, 2002 by Keith Strange. Id. The termination for default was issued just a few days later, on August 16, 2002. App. 121. Therefore, USPS complied with section 6.9.3b7(a).

**Proposed Finding:**

64. The USPS did not award attorneys fees to ATSIC, and ATSIC is seeking review. Second Amended Complaint, ¶¶ 29, 43, 48, 54, and 65.

**Response:**

ATSIC's premature and misguided request for attorneys fees is addressed in our response brief. Def. Resp. Br. at 27.

**Proposed Finding:**

65. ATSIC is entitled to attorneys fees pursuant to the Equal Access to Justice Act, 5 USCA §504, and 28 USCA §2412.

**Response:**

This erroneous legal conclusion is addressed in our response brief. Def. Resp. Br. at 27.

**Proposed Finding:**

66. The parties executed as of June 19, 2002, an Agreement of Settlement Between the Parties ("Settlement Agreement") settling a dispute regarding another contract between the parties designated Contract #123125-00-3153 (on the "AMC Project"). Dep. Ex. 29. Under the terms of the Settlement Agreement, Postal Service was to receive the sum of $52,137.10 solely on the condition that it "be withheld from Contract No.123125-00-B-3154 [the P&DC Project]." Dep. Ex. 29 at Par. C. This requirement is corroborated by Mod. 2 of the AMC Project, which provides that $52,137.10 was to be withheld from . . . contract no. 123125-00-B-3154." Dep. Ex. 29, 53; Vento dep. 153:20-154:8, 155:2-9; Warren dep. 141:20-143:7.

**Response:**

The first sentence is correct, and ATSIC is correct that Modification No. 2 to the AMC project provides that $52,137.10 is to be withheld from the P&DC project. The remainder is

incorrect. See Def. Resp. Br. at 28; see also Def. Resp. to Pl. Prop. Finding No. 27 (explaining the impact of Modification No. 10 upon the contract amount and the balance remaining under the contract at the time of termination).

**Proposed Finding:**

67. The Settlement Agreement explicitly provides and binds the USPS that it is "intended to constitute full and final . . . disposition of all matters arising under the Contract No. 123125-00-B-3153, [and] shall constitute a full release and complete accord and satisfaction as to any and all claims, demands or causes of action, actual or constructive, legal, equitable, or contractual, either party has against the other which arise under [Contract No. 123125-00-B-3153]" and "shall constitute a full release." Dep. Ex. 29 at Par. D.

**Response:**

Not in dispute.

Respectfully Submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

/s/ Donald E. Kinner
DONALD E. KINNER
Assistant Director

/s/ Michael J. Dierberg
MICHAEL J. DIERBERG
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Class. Unit 8th Floor
1100 L St., N.W.
Washington, D.C. 20530
Phone: (202) 353-0536
Attorneys for Defendant

OF COUNSEL:

STEPHEN D. LOBAUGH
Attorney
Law Department – Civil Practice
Commercial & Appellate Litigation
United States Postal Service
475 L'Enfant Plaza SW
Washington, DC 20260

July 14, 2006