**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

ADVANCED TECHNOLOGY SYSTEMS INTEGRATORS CORP.

and

INTERNATIONAL FIDELITY INSURANCE COMPANY

Plaintiffs,

v.

THE UNITED STATES OF AMERICA,

Defendant.

Case No. 03-1953C
(Senior Judge Margolis)

**PLAINTIFF ADVANCED TECHNOLOGY SYSTEMS INTEGRATORS CORP.'S REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFF ATSIC'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................... 3

ARGUMENT .................... 4

I. THE GOVERNMENT'S CONTENTION THAT THE PARTIES WAIVED CLAIMS ARISING PRIOR TO THE EXECUTION OF MODIFICATION NO. 11 IS NOT DISPOSITIVE .................... 4

A. Waiver of the Prior Claims Did Not Eliminate the Existence of Such Circumstances .................... 4

B. The Government's Contention that Modification No. 11 Established a Revised Completion Date of July 15, 2002, is Without Foundation .................... 8

II. THE GOVERNMENT WAIVED ITS RIGHT TO TERMINATE FOR DEFAULT AND FAILED TO REESTABLISH IT .................... 9

A. The Government Waived Its Right to Terminate for Default .................... 9

B. Even if the Government Reinstated Its Right to Terminate for Default, the Termination was Effected Several Months Prior to the Date of Termination ..... 9

III. ATSIC MAY RAISE DURESS ..... 10

IV. ATSIC HAS ESTABLISHED EXCUSABLE DELAY AFTER MODIFICATION NO. 11 ..... 10

V. ATSIC'S CLAIM FOR SUMMARY JUDGMENT BASED ON ITS CLAIM OF THE FAILURE OF THE GOVERNMENT TO PROCEED IN GOOD FAITH AND WITH FAIR DEALING ARE NOT DEFEATED BY THE GOVERNMENT'S ARGUMENTS ..... 13

VI. ATSIC HAS PROVED ITS REMAINING CLAIMS ..... 15

A. The Government's Reliance on ABCON Association as a Basis to Deny a Cure Period is Misplaced ..... 15

B. The Government Failed to Respond Timely to the CDA Claims ..... 16

C. ATSIC Timely Raised the Violation of Section 6.9.3b7(c)(6) of the USPS Purchasing Manual ..... 17

D. USPS Violated Section 6.9.3b7(a) of the USPS Purchasing Manual ..... 17

E. ATSIC is Entitled to Attorneys Fees ..... 18

F. ATSIC is Entitled to the Credit Modification ..... 18

CONCLUSION ..... 19

CERTIFICATE OF SERVICE ..... 20

## TABLE OF AUTHORITIES

Cases

*ABCON Associates, Inc. v. United States*, 49 Fed. Cl. 678 (2001). ............................................ 16

*ABCON Associates, Inc. v. United States*, 44 Fed. Cl. 635 (1999). ...................................... 15, 16

*D.V. Gonzalez Elec. & Gen. Contractors, Inc. v .United States*, 55 Fed. Cl. 447 (2003). .......... 14

*Fru-Con Constr. Corp. v. United States*, 44 Fed. Cl. 298 (1999).. ............................................. 12

*Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320 (Fed. Cir. 2003). ............................................... 10

Statutes

41 U.S.C. § 605(c)(5) ..................................................................................................... 16

Rules

RCFC 8(a) ......................................................................................................................... 14

## ARGUMENT

COMES NOW Plaintiff Advanced Technology Systems Integrators Corp. ("ATSIC"),[1] by and through its undersigned counsel, replies to the Government's Response to ATSIC's Motion for Partial Summary Judgment, and states as follows:

### I. THE GOVERNMENT'S CONTENTION THAT THE PARTIES WAIVED CLAIMS ARISING PRIOR TO THE EXECUTION OF MODIFICATION NO. 11 IS NOT DISPOSITIVE

#### A. Waiver of the Prior Claims Did Not Eliminate the Existence of Such Circumstances.

The Government asserts that ATSIC's agreement not to make a claim for matters arising prior to Modification No. 11 means that nothing that occurred prior to such date is relevant to the Court's inquiry. This is incorrect on its face. The Contract, the prior payment applications and

---

[1]The Defendant may be known as the "United States," the "Government," the "Postal Service," or "USPS." Plaintiff Advanced Technology Systems Integrators Corp. shall be known as "ATSIC." Plaintiff International Fidelity Insurance Company may be known as "International Fidelity."

The Government's Response to ATSIC's Motion for Partial Summary Judgment (Docket No. 68) shall be cited herein as "Response at __."

The documents referenced in the parties' cross motions for summary judgment were (i) the jointly-filed text of the depositions taken in this matter, denominated herein by "[name of deponent] dep. [page and line]" located as Attachments to Docket No. 61, (ii) documents identified as exhibits at deposition, denominated "Dep. Ex. ___," which were sequentially numbered throughout the depositions, located as Attachments to Docket No. 58, and (iii) additional documents attached to the parties' summary judgment motions. The additional documents referenced as exhibits to ATSIC's Motion for Partial Summary Judgment are denominated herein as "ATSIC's Mot. Ex. ___," and are located at Docket No. 57.

The Contract incorporates USPS Facilities Department Contract Requirements, reference to which are denoted in this Motion as F.D. §___, which are located as Attachments to Docket No. 57. References to the sections of the United States Postal Service Purchasing Manual shall be denoted as "Purch. Man.§____." Each Contract modification may be known as "Mod. ___."

payments, the work previously done, and the orders by the Government for ATSIC not to proceed on some facets of the project until the Government completed work unrelated to the Contract (preparing design plans for other contractors), all existed. Modification No. 11 did not erase them; it merely asserted that the parties could not make a claim based on them.

Furthermore, the Government's own reprocurement assertion against ATSIC undermines the interpretation of Modification No. 11 that the Government here asks the Court to adopt. The Government seeks from ATSIC excess reprocurement costs for work that the Government, by payment of the first seventeen Payment Applications, agreed was finished and approved. F.D. § F.2e (second ¶e; payment is to be made after acceptance), Mem.Ex. 1. Surely, if the Government asserts that the cited language prohibits ATSIC from asserting against the Government non-financial matters (delays, course of dealing), then, *a fortiori*, the Government cannot assert against ATSIC financial matters (reprocurement costs for work previously approved by the Government).

Furthermore, the Government recognizes that the effect of the quoted language was financial, as it specifies in its own Brief on its Motion for Partial Summary Judgment that "Modification No. 11 represents an accord and satisfaction of (sic) as to any claims that the parties could have brought prior to Modification No. 11." Motion at 9 (Docket #60). As an accord and satisfaction, Modification No. 11 undermines and completely eviscerates the Government's assertion of excess reprocurement costs against ATSIC. Because, by Contract, all work that was paid for was already completed to the Government's satisfaction, then the only work that remained under the Contract was able to be completed within the remainder of the money due under the Contract. Moreover, because the Government withheld retainage from ATSIC [F.D. § F.2c (Mem. Ex. 1); Dep. Ex. 20],

the work to be completed was less in value than the amount that the Government retained under the Contract.

In addition to the legal limitation on the Government's argument due to the accord and satisfaction, there is evidence that the work could actually (not just "supposedly" or "presumably") be completed for the amount retained by the Government at termination. The outside contractor, Tri-State Life Safety & Electric System, Inc. ("Tri-State"), that the Government eventually retained to complete the Project, informed ATSIC in late May of 2002 that it could complete (and was interested in completing) the Project for less than the amount remaining under the Contract. Mr. Stuhl, the Government's Project manager, made no secret that he wanted Tri-State to be retained for that purpose. Vento dep. 99:11-101:20, Warren dep. 77:4-22, and Dep. Ex. 18. When Mr. Stuhl became completely intractable, and he and Mr. Goddard refused to approve payment requests and change orders, some of which were more than ten months old (Dep. Ex. 57), ATSIC contacted Tri-State to ask Tri-State to consider completing the P&DC Project for ATSIC. Tri-State was interested in doing so for approximately $215,000.00, which was less than the amount remaining and unpaid under the Contract. Dep. Ex. 20 (showing $269,672.21 remaining unpaid).

While ATSIC waived in Modification No. 11 the right to make a financial claim based on the events occurring prior to May 29, 2002, ATSIC did not agree to ignore the effects on its financial well-being of the Government's continual extreme tardiness. Furthermore, ATSIC made purchasing arrangements in reliance of the payment agreement of the Contracting Officer, and the Contracting Officer then refused to make payments as agreed. Warren dep. 119:13-120:23, 134:6-135:5, Dep. Ex. 26. This is no mere passive observance by the Government of the financial decline of a

contractor; the decline was due specifically and clearly to (i) the failure of the Government to make timely payments on submitted Pay Applications as contractually required, and (2) the explicit promise of the Contracting Officer to pay, followed by his failure to do so.

Furthermore, the Government cannot claim that it was unaware of the effect its failure to pay was having on ATSIC's financial condition, as ATSIC repeatedly informed the Government of the difficulties engendered by the Government's failure to pay. Vento dep. 139:5-21, 157:8-159:5, 163:20-164:14, 164:21-165:19, 135:3-136:22; Warren dep. 32:23-34:15 39:9-23 , 101:19-103:18, 114:16-115:10, 119:13-120:23, 121:25-124:6, 127:7-21, 131:24-132:16, 134:6-135:5; Zamora dep. 72:12-73:10, 78:23-80:3, 80:7-81:1, 83:11-84:9; Dep Ex. 17, 21, 25 26, 57, 59.

The Government's Answer assumes that "the defects and deficiencies in the plans and specifications," "over inspection and active interference in the Project by USPS's Project Engineer," "poor and untimely communication," "changes and constructive changes in the work on the Project," and "the manner in which the Government processed proposed Contract modifications," each of which was asserted by Plaintiffs in Paragraph 16 of the Second Amended Complaint, do not, by themselves, create a basis for the Court to find that the Contracting Officer was required to find a delay. Of particular importance to the Government is that some of these activities by the Government occurred prior to the May 29, 2002, date set forth in Modification No. 11 before which claims were waived. However, in taking this perspective, the Government ignores the larger issue.

These actions of the Government did not occur in a vacuum. They occurred in a climate in which the Contracting Officer and Project Engineer, acting as the Government, continuously and systematically failed to perform their jobs properly, resulting in a tremendously prolonged period

of overhead expense, further resulting in the poor economic condition of ATSIC. Thus, even if these objectionable activities do not by themselves, in part because of their pre-Modification No. 11 timing, create a basis for extension, they contribute to the circumstances (ATSIC's poor economic health at the end of the Project exacerbated by the Government's failure to pay for completed work and for materials for which it promised to pay) that do create a basis for the extension. Consequently, the termination must be for convenience, rather than for default.

B. The Government's Contention that Modification No. 11 Established a Revised Completion Date of July 15, 2002, is Without Foundation

The Government states that ATSIC's assertion of the completion dates established by the Postal Service in two separate documents promulgated by the Postal Service, both of which dates are later than the July 15, 2002, date asserted by the Government in its third Show Cause letter and at subsequent termination "lack any merit." Response at 4. However, the Government gives no credible explanation for the revised completion date in AMC Project Modification No. 2, explicitly extending the completion date to the P&DC Project. Response at 6. The Government's only explanation is that the revised completion date of September 10, 2002, set forth in the Second Show Cause letter was a typographical error. Response at 4.

The Government's assertion that the completion date in the Second Show Cause letter should have been September 2, 2001, is belied by the fact that the second Show Cause letter was not issued until May 1, 2002. A completion date of approximately eight months earlier is not reasonable.

The Government also misses the point. The Government promulgated three official documents, one on May 1, 2006 (second Show Cause letter), and two on or about June 20, 2006

(AMC Project Modification No. 2 and P&DC Project Modification No. 11), each and all of which purported to establish new completion dates for the P&DC Project. It then unilaterally held ATSIC to the earliest of the three dates (by more than two months). It is unconscionable that ATSIC should be terminated for default due, at least in part, to multiple mistakes in the expression and notification of the completion date actually admitted by the Government.

## II. THE GOVERNMENT WAIVED ITS RIGHT TO TERMINATE FOR DEFAULT AND FAILED TO REESTABLISH IT

### A. The Government Waived Its Right to Terminate for Default

ATSIC asserts more than adequate circumstances confirming the Government's waiver of the right to terminate. As for the Government's contention that the Government "repeatedly informed ATSIC that it was subject to termination for default for failure to complete the Project by the completion date," (Response at 10), the Government points to only a few such assertions over many months, and, as explained thoroughly in ATSIC's Motion, the Government was in its own breach and engaging in dilatory practices during the entire time that such assertions were made.

### B. Even if the Government Reinstated Its Right to Terminate for Default, the Termination was Effected Several Months Prior to the Date of Termination

Curiously, the Government asserts that, if the Government waived its right to terminate for default, the waiver was reinstated by the second Show Cause letter of May 1, 2002. Response at 12. The second Show Cause letter explicitly sets a completion date of September 10, 2002. Dep. Ex. 5. Despite this, the Government issued its "stop work" letter as of July 15, 2002, and its termination letter as of July 31, 2002. Dep. Ex. 12, 32. Accordingly, both the stop work letter and the termination letter were, at a minimum, six weeks premature. This is a fatal mistake by the

Government in a project that, according to the schedule, would only required five more weeks in order to complete the work. Dep. Ex. 17. Thus, because the termination was premature, it must be for convenience, rather than cause.

III. ATSIC MAY RAISE DURESS

The Government's contention that ATSIC may not now raise duress is not supported by the excerpts it cites. Each of the excerpts deals with the inability of a litigant to raise a new claim upon summary judgment. However, ATSIC's assertion of duress is not an assertion of a claim. It is not even a defense to a claim. It relates only to the execution of a single document.

Similarly, the Government's assertion that "financial stress alone will not establish duress," Response at 16, is *in apropos*, as ATSIC's assertion is not simply that it had financial stress, but that (i) the Government caused its financial stress, and (ii) the Government extorted the signature by agreeing to pay (a portion of) what was due on Pay Application 17 only if ATSIC would sign Modification No. 11. This meets the requirements of *Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320 (Fed. Cir. 2003), that duress be "(1) an illegal act, (2) a breach of the contract by the Government without a good faith belief by the Government that its actions are justified, or (3) a violation of the covenant of good faith and fair dealing." Response at 16, citing *Rumsfeld* at 1330.

IV. ATSIC HAS ESTABLISHED EXCUSABLE DELAY AFTER MODIFICATION NO. 11

The Government tries mightily to establish reasons to conclude that the stop work order was not issued until 16 days after the date that the Government placed on the letter. Response at 18-19. None of the arguments is dispositive or even persuasive. The letter says what it says. If, in fact, the Government issued the letter and then waited weeks to deliver it, as the Government contends, it is

one more of many indications of the Government's failure to act in this matter in good faith and with fair dealing.

The Government spends several pages attempting to undermine ATSIC's right to delay days to be added to the completion date due to rain. Response at 19-22. This effort is misplaced and unavailing. The following salient facts are undisputed in the record: The Project is located in Miami, Florida. Mot. Ex. 1. It rained in Miami on no fewer than 37 of 48 days before the agreed completion date, and the rain was often torrential. Dep. Ex. 21. Much of the work that remained to be completed on the Project was required to be completed out of doors. Dep. Ex. 17. Much of the non-outdoor work was in the control room, which affected the critical path and on which the Government had prevented ATSIC from proceeding, through no fault of ATSIC. Dep. Ex. 23 (Item 5). ATSIC made such progress, even in the face of these difficulties, that the number of items to be remedied by ATSIC was reduced from six to one between May 1, 2002, when the second Show Cause letter was issued detailing six alleged failings of ATSIC, and July 15, 2006, when the third and final Show Cause letter was issued, which stated "Failure to complete project per revised completion date" as the only alleged failing. Dep.Ex. 5, 9.

The Government attempts to make the case that, because rain is foreseeable, it was not a basis for an extension. However, this ignores the following salient facts, undisputed in the record, that bear directly on the issue of an extension due to rain: ATSIC proposed a schedule that, if all went perfectly, required five weeks to complete the work. Dep. Ex. 17. In the cover letter accompanying that schedule, ATSIC proposed an additional week and preconditioned the resolution on the Government's assent to the remaining conditions in the letter. *Id.* ATSIC and the

Contracting Officer settled in Modification No. 11 on a period of seven weeks to complete the work (oral agreement by May 29, 2002, for completion by July 15, 2002), Dep. Ex. 31A, which allowed ATSIC two extra weeks for rain. The Contracting Officer failed to sign Modification No. 11 until June 20, 2002, leaving ATSIC only 3½ weeks to complete the work before July 15, 2002. Dep. Ex. 31A. During the entire period of seven weeks, the frequency of the rain was exceptional, and the amount of rain was torrential. Dep. Ex. 21, 33, 42 (Item #6). By its very nature, as a matter of common sense and reason, seven weeks of daily, often torrential, rain is not foreseeable and is "severe weather," as set forth in the Regulations (F.D. § C.3a) imported into the Contract.

In addition to the unopposed evidence of the amount of rain during the 45 days prior to termination, the overwhelming, uncontradicted testimony establishes that the weather had an adverse impact on critical work. Warren dep. 146:16-147:7, 148:25-150:4; Zamora dep. 26:24-27:14, 73:15-74:11, 97:23-98:7; Dep. Ex. 17, 33, 42 (detailing persistent rain in June 2002), 43. Some of the rain was heavy (several inches in a day), Dep. Ex. 21, which could effectively halt trenching work for an additional day. Furthermore, some work had to be completed before other work could be done, so ATSIC was equitably entitled to an extension of 35 days due to the weather delays. Zamora dep. 70:24-7:6; Dep. Ex. 17 (schedule printout). This testimony, supported by the exhibits, is sufficient, under the standard cited by the Government relying on *Fru-Con Constr. Corp. v. United States*, 44 Fed. Cl. 298 (1999), for ATSIC to prevail on the issue of its right to have been granted a rain delay extension.

Furthermore, rhetoric in cases such as *Fru-Con* is not dispositive. First, a rain delay of a few days in the course of a project of more than two years (as in *Fru-Con*) is a relatively small matter,

whereas a rain delay of more than 75% of the days of a project with a significant outdoor component is obviously critical. In the instant case, the parties agreed by May 29, 2002, to extend the contract completion date, ultimately choosing July 15, 2002, for such date. This is a period of 47 days. The Government failed to sign the document, Modification No. 11, Dep. Ex.31A, until June 20, 2002, leaving only 25 days before the completion date. During the period of 48 days from June 1, 2002, through July 18, 2002, it rained 37 days. Dep. Ex. 21. This is more than 75% of the days remaining to complete the Project.

## V. ATSIC'S CLAIM FOR SUMMARY JUDGMENT BASED ON ITS CLAIM OF THE FAILURE OF THE GOVERNMENT TO PROCEED IN GOOD FAITH AND WITH FAIR DEALING ARE NOT DEFEATED BY THE GOVERNMENT'S ARGUMENTS

The principal basis for the Government's objection to Count III (violation of good faith), as articulated in the Government's Motion to Dismiss and for Partial Summary Judgment (Docket No. 60), is that the Second Amended Complaint fails to state sufficient allegations of bad faith. This is essentially the argument made (with less specificity) in the Government's Response. Response at 22-23. This argument ignores the numerous specific statements underlying Plaintiffs' contention set forth in the Second Amended Complaint at Paragraphs 9, 13, and 15-17 (relating to the pre-termination issues), and 19-22.3 (relating to the improper termination of the Contract without even a good faith attempt to take the causes for delay into account). The specific pre-termination allegations were explained in detail in Paragraphs 5.1 and 5.2 of ATSIC's Motion for Partial Summary Judgment (Docket no. 56), and the post-termination allegations were explained in detail in Paragraph 21.2.

Furthermore, the Postal Service issued its second Show Cause letter on May 1, 2002, with

a September 10, 2002, completion date, followed by its Modification No. 02 on the AMC Contract on June 20, 2002, specifying a PD&C Contract completion date of December 19, 2002. Then, also on June 20, 2002, it asserted a July 15, 2002, completion date, which it knew from the construction schedule was inadequate to complete the five weeks of work remaining. Dep. Ex. 17 This short period to a new completion date, after the binding, written statements of later completion dates on two separate occasions, evidences neither good faith nor fair dealing. Thus, ATSIC's allegations meet the standard advanced by the Government of "clear and strong evidence" (Government's Motion for Partial Summary Judgment at 22, Docket #60), as well as explicitly alleging malice on the part of the Government employees (Messrs. Stuhl and Goddard). Any presumption that government officials acted conscientiously, *id.*, cannot stand in the face of the overwhelming evidence in this instance that they did not.

Finally, with regard to this issue, the Government in its Motion invoked two cases dealing with motions to dismiss in order to imply that the Plaintiffs' failure to include magic language about malice in the Second Amended Complaint was fatal to this Count. Government Motion at 23-24 (Docket #60). The Government's argument is essentially that, if a claimant alleges all the elements of bad faith, but doesn't say the word "malice" in its complaint, then it cannot proceed on the bad faith claim. First, this is incorrect as a matter of law, because the allegation of a specific intent to injure is sufficient for a count based on the Government's lack of good faith and fair dealing. *D.V. Gonzalez Elec. & Gen. Contractors, Inc. v .United States*, 55 Fed. Cl. 447, 457-58 (2003), as cited by the Government in its Motion at 24 (Docket #60). Second, this is incorrect as a matter of rule [RCFC 8(a)], because this Court proceeds on notice pleading, and because the Government cannot

have failed to understand that the Count entitled "Breach of Covenant of Good Faith and Fair Dealing" was an allegation of the Government's breach of good faith and fair dealing, which Count incorporated specific instances of the Government's failure to proceed in good faith and with fair dealing. The Government was certainly on notice as to the allegations made against it.

## VI. ATSIC HAS PROVED ITS REMAINING CLAIMS

### A. <u>The Government's Reliance on ABCON Association as a Basis to Deny a Cure Period is Misplaced</u>

The Government relies on *ABCON Associates, Inc. v. United States*, 44 Fed. Cl. 635 (1999), which is the first of several appeals of this case, for the proposition that ATSIC was not entitled to a cure period. Response at 24. This reliance is misplaced for three reasons.

First, on that particular appeal of *ABCON*, the Court said that the cure period is not necessary only if the termination is for failure to meet the deadline. The Government terminated ATSIC on July 15, 2002, despite the fact that (i) the deadline established in the second Show Cause letter had not passed, (ii) the deadline established in the agreement resolving the companion AMC contract had not passed, (iii) the deadline established in Modification No. 11 had not yet elapsed, and (iv) the Government had not yet taken into account the contractually-required delay days.

Second, the termination letter did not state that the termination was for the sole issue of failure to meet the deadline, as the third show cause letter had alluded, but for three reasons: (1) the Contract is delinquent; Contract completion date is July 15, 2002, (2) the progress on the job is not satisfactory, and (3) the project is not adequately manned. Dep. Ex. 12. Thus, even under the Government's reading of this particular *ABCON* decision, the Government was required to provide

a cure period.

Third, on a subsequent appeal of *ABCON* reported at *ABCON Associates, Inc. v. United States*, 49 Fed. Cl. 678 (2001), the Court held that, even if the cure period were not necessary, upon a showing that (i) improper Government actions were the primary or controlling cause of the default and rendered the contractor financially incapable of performing, or (ii) the Government failed to make payment or to cooperate, or the Government acted with a lack of diligence, then the default is excused. *Id.* at 687-90. ATSIC has established each and all of these Government failings.

B. <u>The Government Failed to Respond Timely to the CDA Claims</u>

The Government's arguments for its proposition that the Government should not be deemed to have violated Section 605(c)(5) of the Contract Disputes Act ("CDA") seems to be that, (i) because the only effect of a violation is that the claim is deemed to be denied, the Court should overlook the pattern of violations, and (ii) all payment requests were resolved by Modification No. 11. Once again, the Government tries to deflect attention from the fact that the Postal Service repeatedly failed to pay timely under the Contract, which contributed significantly to ATSIC's poor financial condition at the time that it was terminated.

The Government's next argument, that the unpaid payment requests were not claims under the CDA because they were routine requests for payment, Response at 25, misstates ATSIC's position. The payment requests timely paid were not "claims" under the CDA; however, those that were not were claims according to the CDA definition, because they were "in dispute." F.D. § H.3c (Docket No. 57). The unpaid or otherwise disputed payment requests were, by definition, "claims."

C. ATSIC Timely Raised the Violation of Section 6.9.3b7(c)(6) of the USPS Purchasing Manual

Plaintiffs alleged in the Second Amended Complaint the manifold failures of USPS to comply with the Contract. Docket No. 42. The Government failed to comply specifically with Section 6.9.3b7(c)(6) of the USPS Purchasing Manual regarding terminations. This provision is not an obscure term buried in a contract, but a standard provision regularly incorporated into Postal Service contracts. The Government does not contest this failure, because the failure, in fact, occurred. The Government cites no authority for its proposition that Plaintiffs' filing of this suit cured the Government's facially defective termination notice issued a year earlier.

D. USPS Violated Section 6.9.3b7(a) of the USPS Purchasing Manual

The Government's argument regarding this allegation of ATSIC is alarming. The Government makes the argument that it can date the termination one date and then withhold issuance of it until another date, and the Government implies that any duration may close between the date of termination set forth in the termination letter and the actual date of issuance of the letter. Response at 26-27. Under this theory, the required Government official can approve the termination on one date and the Government can then backdate the termination letter in order to make it look as though the Government timely complied with the timeliness requirements under the Regulation. If anyone other than the Government backdated documents to come within regulatory guidelines, it would be considered a fraud. The Government should not be permitted to perpetrate frauds.

The termination letter should be dated the actual date of issuance. The Court should not permit an improper, and fraudulent, termination letter to serve as a basis for a termination for

default. To do so will only encourage the Government to continue its fraudulent actions.

E. ATSIC is Entitled to Attorneys Fees

The Government contends that ATSIC's request for attorneys fees is premature. Response at 27. If, as ATSIC has requested by its Motion, the Court finds that the termination should have been for convenience, not for cause, then ATSIC will have prevailed. Accordingly, a request for attorneys fees is not premature. Even if the Government were to prevail on this Motion, the Court should only deny the request for attorneys fees without prejudice to resubmit the request later.

F. ATSIC is Entitled to the Credit Modification

The Government's contention that the issue of the credit modification is premature is incorrect. Response at 27-28. ATSIC is entitled to seek summary judgment on any matter on which there is no genuine issue of material fact. ATSIC made such a case in its Motion. The Government's Response provides no basis to assert that there is an issue of material fact. Therefore, summary judgment is appropriate.

The Government's contention is that the plain statement in the Settlement Agreement that the credit is to "be withheld from [the P&DC Project]," Dep. Ex. 29 at Par. C, which was corroborated in AMC Project Modification No. 2, Dep. Ex. 53, means something other than what it says. ATSIC contends that it means what it says and is binding. There is no basis for the Court to go beyond the four corners of either instrument. If ATSIC is paid nothing from the contract funds, then there is nothing from which to withhold the funds. ATSIC (and its surety, International Fidelity) is not personally liable for them.

**CONCLUSION**

For the foregoing reasons, ATSIC submits that the Court should (i) grant judgment in favor of Plaintiffs on their appeal of the termination for fault, order that the determination to terminate ATSIC for fault was improper, declare that USPS wrongfully terminated the Contract for fault, declare USPS liable to ATSIC for the costs of completed, but unaccepted, work at the time of termination, declare that neither ATSIC nor International Fidelity is liable for excess costs of reprocurement or completion of the Contract, declare that neither ATSIC nor International Fidelity is liable for liquidated damages, if any; (ii) determine that the $52,137.10 due the Government because of the Settlement Agreement on the AMC Project may only be paid, if at all, as a setoff from funds to be paid by the Government to ATSIC under the P&DC Contract; (iii) award Plaintiffs attorneys fees and costs associated with this action as provided by law, and (iv) award such other and further relief as is just and proper

Respectfully submitted on this 31st day of July, 2006.

E. SCOTT GOLDEN & ASSOCIATES
Attorneys for Plaintiff Advanced
Technology Systems Integrators Corp.
644 S.E. Fourth Avenue
Fort Lauderdale, FL 33301
Tel.: (954) 764-6766 ext. 2
Fax: (954) 764-6789
Email: esglaw@bellsouth.net

s/E. Scott Golden
E. Scott Golden

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by electronic transmission to the following persons as of this 31st day of July, 2006.

Michael J. Dierberg, Esquire
U.S. Department of Justice, Civil Division
Commercial Litigation Branch
1100 L. Street NW, Room 12116
Washington, D.C. 20530

Helen H. Albee, Esquire
HENRICHSEN SIEGEL, P.L.L.C.
1648 Osceola St.
Jacksonville, FL 32204

s/E. Scott Golden
E. Scott Golden

HP2C:\Mydocs\3082-1\Reply.P's.msj.wpd(rev.July 31, 2006)